## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>    P.O. Box 710<br>    Tucson, AZ 85702; and<br><br>APPALACHIAN VOICES,<br>    589 West King Street<br>    Boone, NC 28607,<br><br>        *Plaintiffs*,<br><br><br>        *v.*<br><br><br>U.S. OFFICE OF SURFACE MINING<br>RECLAMATION AND ENFORCEMENT,<br>    1849 C Street, N.W.<br>    Washington, DC 20240;<br><br>GLENDA OWENS, in her official capacity as<br>Acting Director of the Office of Surface Mining<br>Reclamation and Enforcement,<br>    1849 C Street, N.W.<br>    Mail Stop 4526<br>    Washington, DC 20240;<br><br>UNITED STATES FISH AND WILDLIFE<br>SERVICE,<br>    1849 C Street, N.W.<br>    Washington, DC 20240;<br><br>DEB HAALAND, in her official capacity as<br>Secretary of the U.S. Department of the Interior,<br>    1849 C Street, N.W.<br>    Washington, DC 20240; and<br><br>MARTHA WILLIAMS, in her official capacity as<br>Director of the U.S. Fish and Wildlife Service,<br>    1849 C Street, N.W.<br>    Washington, DC 20240,<br><br>        *Defendants*. | Case No.: 23-cv-03343<br><br><br><br><br><br><br><br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## I.    INTRODUCTION

1.      In this civil action for declaratory and injunctive relief, Plaintiffs Center for

Biological Diversity and Appalachian Voices ("Plaintiffs") challenge the failure of Defendants to

comply with their duties under the Endangered Species Act, 16 U.S.C. §§ 1531–1544 ("ESA"),

regarding the impacts to imperiled species from coal mining activities regulated pursuant to the

Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 ("SMCRA"), regulatory

program.

2.      For decades, coal mining has been destroying watersheds, decimating wildlife

populations, and upending ecosystems without effective mitigation from regulatory agencies. In

2020, to comply with section 7 of the ESA—which requires that federal agencies such as the

Office of Surface Mining Reclamation and Enforcement ("OSMRE") consult with the U.S. Fish

and Wildlife Service ("FWS") to ensure that agency actions do not jeopardize the continued

existence of ESA-listed species or impair their critical habitats, 16 U.S.C. § 1536(a)(2)—FWS

issued a programmatic "biological opinion" for the SMCRA Title V program ("2020 BiOp").

3.      The 2020 BiOp replaced an earlier programmatic biological opinion from 1996

("1996 BiOp") with a new scheme for the SMCRA program's compliance with the ESA. FWS

specifically found that the 1996 BiOp needed to be replaced because it was failing to protect a

multitude of species and their habitat from the devastating impacts of coal mining. To illustrate

this point, the agency cited the ESA-listing of numerous species since the implementation of the

1996 BiOp—including the 2016 listings of the Guyandotte River crayfish and Big Sandy

crayfish—as evidence that the previous regulatory regime had failed to protect species and their

habitat from coal mining-induced extinction pressures.

4.      The 2020 BiOp requires that states with delegated authority over implementation of Title V of SMCRA "coordinate" with FWS to prevent jeopardy to species listed under the ESA, and to prevent destruction and adverse modification of critical habitats. This coordination process requires that any permit that "may affect" listed species or critical habitat implement permit-specific Protection and Enhancement Plans ("PEPs"), which must include species-specific protective measures. However, Defendants have failed to implement this new scheme for ESA compliance, and hundreds of mining facilities that threaten listed species continue to operate without the vital protections required by the 2020 BiOp.

5.      One of the core safeguards relied upon by FWS in the 2020 BiOp was oversight by OSMRE of the state-delegated SMCRA programs, and OSMRE's enforcement of SMCRA regulations that require protections for listed species, including the development of PEPs. However, Plaintiffs have identified hundreds of SMCRA-permitted mining facilities in various states that are in close proximity to—and upstream from—critical habitat for listed species that do not have these protections in place more than three years after the 2020 BiOp was issued. These states have failed to coordinate with FWS on hundreds of SMCRA permits that threaten listed species and their designated critical habitat, in clear violation of the terms and conditions of the 2020 BiOp.

6.      On April 6, 2023, Plaintiffs provided notice to OSMRE that they had identified hundreds of SMCRA permits across three states that lack proper coordination, and thus were operating without the requisite PEPs and species-specific protective measures for the Guyandotte River crayfish and Big Sandy crayfish. However, Plaintiffs made clear that this was merely the tip of the iceberg. Plaintiffs only reviewed permits in very close proximity to designated critical habitat for these two species, such as those within 3 miles upstream from critical habitat.

However, FWS has acknowledged in an internal agency guidance document that coal mining activities threaten aquatic species with significant sedimentation impacts up to *12 miles* downstream from the permitted activity. Thus, many more permits that "may affect" listed or proposed species and critical habitats likely lack the requisite coordination and PEPs with species-specific protective measures that the 2020 BiOp requires. Yet, OSMRE has made no effort to examine the compliance status of *all* permits that may affect listed species or their critical habitat in any state with primacy, and has established no plan or mechanism to do so.

7.     While OSMRE has the duty to oversee and enforce the implementation of the 2020 BiOp, OSMRE took no action in response to the states' noncompliance until Plaintiffs notified the agency of these violations. Further, even when it investigated these violations, OSMRE arbitrarily and capriciously accepted the states' unsupported assertions regarding the lack of a need for PEPs, looking no further into whether there was a factual basis for these determinations.

8.     OSMRE has therefore failed to properly implement the oversight of state-delegated SMCRA programs as set forth in the 2020 BiOp, thereby putting protected species at risk of jeopardy in violation of the ESA, 16 U.S.C. § 1536(a)(2), and requiring reinitiation of Section 7 consultation on the SMCRA program.

9.     FWS, for its part, is likewise failing to properly fulfill its role in implementing the 2020 BiOp, which requires that it review and approve PEPs in a timely manner to ensure that sufficient species-specific protective measures are in place to ensure against jeopardy and adverse modification of critical habitat. In the rare instances where the states have pursued coordination with FWS on the development of PEPs, FWS has repeatedly failed to provide its required feedback to the states in a timely manner, delaying the implementation of PEPs for

4

unlawful and unreasonable amounts of time. The result is that mining facilities that certainly "may affect" listed or proposed species and critical habitat continue to operate without the protections that the 2020 BiOp requires to prevent jeopardy.

10.     Even when states have coordinated with FWS, the agency has failed to ensure that PEPs are implemented for all permits that "may affect" listed species as the 2020 BiOp requires. For example, after receiving Plaintiffs' notice letter identifying 157 noncompliant permits in Kentucky within 3 miles upstream from Big Sandy crayfish critical habitat, the state sought FWS' opinion regarding the need for PEPs for 94 of these permits. FWS accepted the state's erroneous position that 79 of the permits required no PEPs, despite their close proximity to critical habitat. Thus, in contravention of FWS' own internal guidance acknowledging significant coal mining sedimentation impacts to aquatic species up to 12 miles downstream from mining facilities, FWS ignored the best available science, and as a result dozens of permitted mining facilities continue to operate without the necessary protections to ensure against jeopardy and adverse modification for the Big Sandy crayfish. FWS' failure to properly implement the 2020 BiOp requires reinitiation of consultation to address the potential for harm to listed species from this non-compliance, and to put in place safeguards that will ensure that such species will not continue to be jeopardized by SMCRA-regulated coal mining.

11.     Furthermore, the 2020 BiOp is facially invalid because it cannot insure against jeopardy, as the ESA requires. The 2020 BiOp's "coordination" process unlawfully allows the states to reject protective measures that FWS indicates are needed to avoid jeopardy to listed species, thereby allowing states to eschew the implementation of measures necessary to comply with the requirements of Section 7, rendering the 2020 BiOp invalid.

12.     Therefore, Plaintiffs bring suit seeking injunctive and declaratory relief to compel reinitiation of programmatic consultation on the SMCRA Title V program. The Court should likewise find OSMRE in violation of Section 7(a)(2) of the ESA for failing to provide the oversight that the 2020 BiOp relied on to find that SMCRA Title V permits will not jeopardize listed species or impair their critical habitat. Plaintiffs further seek declaratory relief that the 2020 BiOp is facially invalid, and to vacate and enjoin any further reliance on the BiOp.

## II.     JURISDICTION AND VENUE

13.     This court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c) (actions under the ESA); 16 U.S.C. § 1540(g) (ESA citizen suit provision); 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); and 28 U.S.C. § 2201-02 (power to issue declaratory judgments in cases of actual controversy).

14.     By written notice sent by electronic mail and certified mail on April 6, 2023, Plaintiffs informed Defendants of their violations more than sixty days prior to the filing of this Complaint, as required by the Endangered Species Act. 16 U.S.C. § 1540(g).

15.     Plaintiffs' notice letter provided detailed information indicating that OSMRE and FWS have failed to implement the 2020 BiOp's terms and conditions—including by failing to ensure that state regulatory authorities are implementing required protective measures for listed species—and therefore had failed to ensure against jeopardy as the ESA requires, and that such violations require reinitiation of Section 7 consultation. OSMRE and FWS have failed to remedy the alleged violations, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. § 2201(a).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e), as Defendants reside in this District, and as a substantial part of the events or omissions giving rise to the claims occurred in this District.

### III.     PARTIES

<u>PLAINTIFFS</u>

17.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) corporation with offices in California, Washington, Oregon, Arizona, Nevada, New Mexico, Colorado, Illinois, Minnesota, New York, Virginia, North Carolina, Florida, and Washington, D.C. Through science, policy, and law, the Center works to secure a future for all species, great or small, hovering on the brink of extinction. The Center has 84,324 members, including those who have viewed, photographed, and otherwise appreciated threatened and endangered species that may be affected by surface coal mining; who live near these species, habitats, and ecosystems; and who intend to visit and enjoy these species, habitats, and ecosystems in the future.

18.     Plaintiff APPALACHIAN VOICES is a non-profit 501(c)(3) North Carolina corporation committed to protecting the land, air, and water of the central and southern Appalachian region. The organization has a focus on reducing coal mining's impact on the region, including to species listed under the ESA. Appalachian Voices has more than 1,000 members, the majority of whom live in the Appalachian states. It maintains two permanent offices in Virginia. The group's concerns include addressing the water quality impacts of surface coal mining in Virginia, Kentucky, and West Virginia.

19.     Plaintiffs' members derive scientific, academic, recreational, spiritual, and aesthetic benefits from imperiled species' existence in the wild. Their interest in maintaining the

species inhabiting rivers, streams, and wetlands that may be affected by SMCRA-regulated coal mining is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations. Any activities that "may affect" or destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace populations of listed species interfere with Plaintiffs' members' use and enjoyment of the areas and species.

20.     Plaintiffs' members have researched, studied, observed, and sought protection for ESA-listed species that are adversely affected—and whose survival and recovery are threatened—by SMCRA-regulated coal mining activities. Furthermore, Plaintiffs' members have visited and observed, or sought out, threatened and endangered species that are imperiled by SMCRA-regulated coal mining. Plaintiffs' members enjoy hiking, fishing, and observing wildlife in wetlands and along rivers and streams that are impacted by SMCRA-regulated coal mining activities and intend to continue to visit and observe—or attempt to visit and observe—these species in the near future.

21.     SMCRA-regulated coal mining threatens the use, enjoyment, and economic value of property owned and/or visited by Plaintiffs' members, as well as the waters that members use and enjoy both as a resource and for the habitat they provide for plants and animals. For example, sedimentation and contamination of waterways interfere with use and enjoyment of those waters, threaten water supplies, and decrease property values. Similarly, the negative ecological effects of such activities interfere with members' use and enjoyment of those waterways and the wildlife they support. Any activities that destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace populations of listed species interfere with Plaintiffs' members' use and enjoyment of the areas and species.

22.     Plaintiffs have members whose interests are adversely affected by the direct, indirect, and cumulative harm from SMCRA-regulated activities to aquatic, riparian, and upland habitat areas that such members use and enjoy, including as habitat for ESA-listed wildlife. For example, Appalachian Voices' member Willie Dodson has worked for years to protect listed crayfish and fish, and has conducted stream water monitoring in Guyandotte River crayfish, Big Sandy crayfish, and candy darter designated critical habitat to monitor for pollutants that may be harmful to these and other species, and to observe the species themselves. Mr. Dodson plans to periodically return to these watersheds for more water quality testing and species observations in the future.

23.     Specifically, Mr. Dodson has worked to protect Big Sandy crayfish from the S-1 Hunts Branch Mine (Permit # 8981016), which drains into Knox Creek in Pike County, Kentucky. The mine is within 2 miles upstream from Big Sandy crayfish designated critical habitat, and Mr. Dodson and has complained to Kentucky regarding the lack of a Big Sandy crayfish PEP for this mine. Mr. Dodson has conducted water quality monitoring at Knox Creek and plans to return there to continue water quality monitoring and to look for Big Sandy crayfish. His interests in protecting and viewing Big Sandy crayfish and in conserving the species' habitat are harmed by coal mine pollution from the S-1 Hunts Branch Mine.

24.     Mr. Dodson has also conducted water quality monitoring in the South Fork Cherry River of West Virginia, in designated critical habitat for the candy darter, and plans to return to the area in the coming months to continue this water quality monitoring, and to look for candy darters. The Rocky Run Surface Mine (Permit # S300212) drains directly into the South Fork Cherry River, and Mr. Dodson's interests in protecting and viewing candy darters and their

habitat is threatened by coal mine pollution from the Rocky Run Surface Mine, which does not have a candy darter PEP that covers impacts from its SMCRA permit for Amendment 1.

25.     Mr. Dodson has also spent time looking for Big Sandy crayfish in the area around the Ailey Branch Surface Mine (Permit #1502344) on Dismal Creek in Virginia several times per year since 2019. He has also conducted water quality monitoring on this section of Dismal Creek and plans to return to continue these activities. Dismal Creek is designated critical habitat for the Big Sandy crayfish, and yet the Ailey Branch Surface Mine does not have a PEP for the species. Mr. Dodson has complained to Virginia about the impacts of this mine on Dismal Creek, and has written several articles on the topic. Additionally, he has worked on numerous occasions to address the needs of local residents who suffer from flooding caused by the mine. His interests in seeing Big Sandy crayfish and in conserving the habitat for this species in Dismal Creek are therefore harmed by Defendants' violations of the ESA as set forth herein.

26.     Appalachian Voices' member Erin Savage has also spent considerable time in the habitat for the Big Sandy crayfish, recreating and attempting to observe the crayfish, and plans to continue to do so in the near future. For example, every year for the past several years, Ms. Savage and her husband have kayaked the Russell Fork in Virginia, looking for Big Sandy crayfish, and they plan to continue to take such trips annually. Among the mines noticed by Plaintiffs, Hawks Nest Surface Mine (Permit #1102188) and Butcherknife Mine (Permit # 1102233) both drain into designated critical habitat for the Big Sandy crayfish in Russell Prater Creek and the Russell Fork, but do not have PEPs for the species. Contamination and sedimentation from these coal mining activities harms Ms. Savages' interests in protecting and observing Big Sandy crayfish.

27.     Plaintiffs' members also include scientists who study various threatened and endangered species impacted by SMCRA-regulated coal mining, and whose interests in studying and enjoying these species and their habitats are entirely dependent on the continued existence of the species. This includes Center for Biological Diversity member Roger Thoma, the scientist who discovered the Guyandotte River crayfish in 2014, and who continues to study the species. Mr. Thoma has written reports on the evolution, life history and conservation status of the Guyandotte River and Big Sandy crayfishes, and plans to return to the last remaining habitat for these species in West Virginia, Kentucky, and Virginia to continue studying these species and publishing articles on them. Any action that interferes with and harms these species also harms the interests of members such as Mr. Thoma. Any loss of crayfish or crayfish habitat—such as through bioaccumulation of contaminants, direct mortality, reduced reproductive success, deformities, and developmental delays caused by the hundreds of mines that are not in compliance with the 2020 BiOp—would hamper these members' ability to undertake such research in the future, thereby harming their academic, scientific, and aesthetic interests in those species.

28.     Past and ongoing SMCRA-regulated coal mining demonstrates that such activities result in harm to rivers, streams, wetlands, and the wildlife and communities that rely on those waterways, thereby harming the interests of Plaintiffs' members who live near, study, and/or enjoy areas affected by such mining. Activities authorized and/or overseen by Defendants directly and irreparably injure Plaintiffs' interests. OSMRE's and FWS' failure to comply with the requirements of the ESA and SMCRA delays, avoids, and undermines protections that are necessary to secure Plaintiffs' interests in the existence of listed species and their critical habitat.

29.     Plaintiffs have also suffered informational and procedural injuries from Defendants' failure to properly oversee the implementation of the ESA in the permitting of coal mining activities, which oversight must include full and adequate analysis of the impacts to listed species. These injuries are connected to Plaintiffs' substantive conservation, recreational, scientific, and aesthetic interests. Plaintiffs' members and staff rely on Defendants to comply with the requirements of the ESA and prepare adequate environmental analyses as required by the statute. Plaintiffs rely on these analyses to achieve their organizational purposes, including monitoring the impacts of coal mining on listed species; monitoring legal compliance concerning the management of species; educating members, directors, staff, and the public concerning species management and the state of the environment; and advocating for policies that protect habitat and wildlife.

30.     Plaintiffs are also injured through impairment of their fundamental missions to protect the environment and imperiled species, and diversion of resources from other critical tasks that would not have been necessary absent Defendants' actions. Because Defendants' decisions regarding the need for or adequacy of PEPs for SMCRA-regulated operations are made without any public notice or opportunity for public engagement, Defendants' failure to comply with the ESA has caused, and will continue to cause, Plaintiffs to divert and expend resources and staff—which would have instead been expended on other organizational conservation priorities—to learn about the effects of SMCRA-regulated coal mining on the environment and listed species. These diversions of resources include repeatedly making Freedom of Information Act requests and reviewing documents obtained from such requests; monitoring the application of SMCRA and the 2020 BiOp to specific projects in other ways, such as by contacting individual OSMRE and/or state offices; and examining SMCRA-regulated coal mining projects

12

in an effort to ascertain the effects of such projects on specific waterways, habitats, and species in which Plaintiffs and their members have vital interests.

31.     Plaintiffs are non-profit conservation organizations with limited resources to dedicate to their core missions to protect the environment, imperiled species, and the habitats they rely upon. Defendants' actions impede Plaintiffs' ability to carry out their fundamental missions, and directly undercut decades of successful work by Plaintiffs to enforce environmental laws that protect waterways and listed species.

32.     Defendants' failures have also stifled the flow of data on impacts to the environment from SMCRA-regulated coal mining that are vital to Plaintiffs' efforts to conserve and protect the environment. Absent coordination between FWS and the states, Plaintiffs are without recourse to obtain information on the impacts of mining facilities on listed species and the environment that would otherwise be documented during coordination and available via Freedom of Information Act requests. The Defendants' failure to comply with the 2020 BiOp is therefore harming—and will continue to harm—Plaintiffs by interfering with Plaintiffs' core organizational missions and by requiring them to divert their limited resources and personnel away from other activities in an attempt to fill the informational gap left by Defendants. Defendants have compounded this problem by unlawfully allowing many mining activities that pose a significant risk to listed species to continue without the required protective measures to ensure against jeopardy and adverse modification.

33.     Plaintiffs have had to take it upon themselves to investigate the impacts of SMCRA-regulated coal mining projects on listed species and critical habitats of vital interest to Plaintiffs and their members. Indeed, the fact that Plaintiffs had to take it upon themselves to identify hundreds of mines that were operating out of compliance with the 2020 BiOp, and that

Defendant OSMRE did not take any action to address those violations until Plaintiffs made them aware of such failures through an ESA 60-day notice letter, shows that Plaintiffs have had to dedicate significant resources to protect their interests due to the agency's ongoing failure to comply with the law.

34.     Defendants' failure to comply with the 2020 BiOp seriously impairs the Plaintiff organizations' core conservation missions because it allows activities to take place without the protections that are required to prevent jeopardy to listed species. Since Defendants are not complying with the terms of the 2020 BiOp, it remains unknown where harm to highly imperiled species may be taking place. Plaintiffs must instead attempt to learn through other means precisely when and where such activities are taking place and what measures are being applied to protect listed species, with no assurance of ever being able to uncover such information in a timely and effective manner. This constitutes a serious organizational and informational injury, with concomitant diversion of resources, that flows directly from the Defendants' failure to comply with the ESA.

35.     The actions of Defendants not only harm the procedural interests of Plaintiffs and their members, but also have harmed and threaten future harm to the concrete interests that Plaintiffs and their members have in the fish, wildlife, and ecosystems of the United States that are being destroyed by coal mining activities. Defendants' failure to ensure that SMCRA-regulated coal mining activities will not jeopardize protected species directly and irreparably injures Plaintiffs' interests in such species. The failure to comply with the requirements of the ESA and SMCRA delays, avoids, and undermines protections that are necessary to secure Plaintiffs' interests in the existence of listed species and their critical habitat.

36.     The interests and organizational purposes of Plaintiffs and their members are directly and irreparably injured by Defendants' violations of law as described in this Complaint. Unless this Court grants the requested relief and orders Defendants to comply with the ESA and SMCRA, harm to protected species will continue to accrue, and the aesthetic, recreational, academic, scientific, spiritual, and conservation interests of Plaintiffs and their members will continue to be adversely affected.

37.     These are actual, concrete injuries to Plaintiffs, caused by OSMRE's and FWS' failure to comply with the APA, the ESA, SMCRA, and their implementing regulations. The relief requested will directly redress those injuries. Plaintiffs bring this action on their own behalf and on behalf of their members. The relief Plaintiffs seek in this lawsuit will redress their injuries by requiring the Defendants to comply with the ESA. This relief will prevent Plaintiffs from being harmed by SMCRA-regulated activities by ensuring that listed species will not be jeopardized by such activities, as the ESA requires.

<u>DEFENDANTS</u>

38.     Defendant OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT is the United States federal agency that has the primary oversight and enforcement responsibility to ensure that the requirements of the ESA and other applicable laws are followed with respect to the implementation of SMCRA and state-delegated SMCRA programs.

39.     Defendant GLENDA OWENS is sued in her official capacity as Acting Director of the Office of Surface Mining Reclamation and Enforcement.

40.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the United States federal agency that jointly shares responsibility with the National Marine Fisheries Service

for ensuring that the requirements of the ESA are followed and enforced. This includes ensuring that coal mining activities undertaken pursuant to state-delegated SMCRA programs will not jeopardize the continued existence of listed species or adversely modify critical habitat.

41.     Defendant DEB HAALAND is sued in her official capacity as Secretary of the U.S. Department of the Interior.

42.     Defendant MARTHA WILLIAMS is sued in her official capacity as Director of the U.S. Fish and Wildlife Service.

## IV.     STATUTORY BACKGROUND

### A.  Endangered Species Act

43.     In enacting the ESA, Congress intended endangered species to be afforded the highest of priorities. The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

44.     Under the ESA, conservation means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id*. § 1532(3).

45.     The ESA assigns responsibility to implement the statute to the Secretaries of Commerce and Interior, which in turn have delegated responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively. 50 C.F.R. § 402.01(b).

46.     To fulfill the substantive purposes of the ESA, federal agencies are required to engage in Section 7 consultation with FWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

47.     Section 7 consultation is required for "any action [that] may affect listed species or critical habitat." 50 C.F.R. § 402.14. Agency "action" is defined broadly in the ESA's implementing regulations to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," such as the promulgation of regulations, the granting of permits, or actions directly or indirectly causing modifications to the land, water, or air. *Id*. § 402.02.

48.     The duties in ESA Section 7 are only fulfilled by an agency's satisfaction of the consultation requirements that are set forth in the implementing regulations for Section 7 of the ESA, 50 C.F.R. §§ 402.10-402.16, and only after the agency lawfully complies with these requirements may an action that "may affect" a protected species go forward.

49.     Each federal agency must review its actions at "the earliest possible time" to determine whether any action "may affect" listed species or their critical habitat in the "action area." *Id.* § 402.14(a). The "action area" encompasses all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* § 402.02. The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered. *Interagency Cooperation – Endangered Species Act of 1973, As Amended*, 51 Fed. Reg. 19,926 (June 3, 1986).

50.     If an action agency concludes that the action is "likely to adversely affect" listed species or critical habitat, the agency must engage in "formal consultation" with FWS to meet the ESA's substantive "no jeopardy" mandate. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

51.     Formal ESA consultation commences with the action agency's written request for consultation and concludes with FWS' issuance of a "biological opinion." 50 C.F.R. § 402.14(g)(4). During formal consultation, FWS and the action agency must evaluate the "effects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing environmental conditions— that is, the "environmental baseline." *Id.* § 402.02. The environmental baseline includes the "past and present impacts of all Federal, state, or private actions and other human activities in the action area . . ." *Id.* The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

52.     The biological opinion sets forth FWS' determination as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* § 402.02. The determination of whether an activity is likely to jeopardize the continued existence of a species must be based solely on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and FWS must use the best available science in formulating its biological opinion and approving incidental take. 50 C.F.R. § 402.14(g)(8).

53.     It is illegal to engage in any activity that "takes" an endangered species absent valid take coverage under ESA Sections 7 or, in the case of actions with no federal agency

involvement, section 10. 16 U.S.C. §§ 1538(a)(1)(B), 1536(b)(4), 1539. The term "take" is defined in the "broadest possible manner to include every conceivable way" in which a person could harm or kill wildlife. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995). Persons subject to the prohibition on take include individuals and corporations, as well as "any officer, employee, agent, department, or instrumentality of the Federal Government... [or] any State." 16 U.S.C. § 1532(13).

54.     If FWS determines that a federal agency action is not likely to jeopardize a species but will nonetheless result in any take, it must issue an incidental take statement ("ITS"), which provides the federal agency with take authorization. An ITS must specify the allowed amount or extent of take that is incidental to the action (but which would otherwise be prohibited under Section 9 of the ESA), "reasonable and prudent measures" ("RPMs") necessary or appropriate to minimize such take, and the "terms and conditions" that must be complied with by the action agency to implement any RPMs. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). When all of the terms and conditions of the ITS and biological opinion are adhered to, the ITS provides "safe harbor" for the action agency, authorizing limited take of listed species that would otherwise violate Section 9's prohibition.

55.     In the case of programmatic consultations, such as the 2020 BiOp, which are intended to dictate the overall implementation of Federal programs by establishing standards, guidelines, or governing criteria to avoid, minimize, or offset the effects of the program on listed species and critical habitat, FWS has determined that such documents should not provide incidental take authorization at the programmatic level. Rather, "any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate." 50 C.F.R. § 402.14(i)(6).

56.    For non-federal entities, such as states and private parties, section 10 of the ESA has a parallel mechanism for take coverage. Pursuant to Section 10, the Service may issue an incidental take permit ("ITP") allowing take otherwise prohibited by Section 9 if the taking is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Several conditions must be met prior to the grant of an ITP. The applicant for the permit must submit a habitat conservation plan describing: (i) the impact which will likely result from such taking; (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan. 16 U.S.C § 1539(a)(2)(A).

57.    After the issuance of a biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency and FWS must reinitiate formal consultation: "(1) [i]f the amount or extent of taking specified in the incidental take statement is exceeded; (2) [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (4) [i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16.

58.    Section 7(d) of the ESA provides that once a federal agency initiates or reinitiates consultation under the ESA, the agency, as well as any applicant for a federal permit, "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action

which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation. Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to listed species or adverse modification of critical habitat.

### B. Surface Mining Control and Reclamation Act

59.    The environmental impacts of surface coal mining are regulated pursuant to Title V of SMCRA. 30 U.S.C. §§ 1251a - 1279.

60.    OSMRE is the primary regulator of coal mining under SMCRA unless and until a state demonstrates that it has developed a regulatory program that meets all of the requirements of SMCRA and the implementing regulations issued by OSMRE under 30 C.F.R. Chapter VII. 30 U.S.C. § 1253. A state becomes the primary regulator within its jurisdiction when it submits and receives approval of its proposed regulatory program from OSMRE, assuming responsibility over permitting, inspection, and enforcement activities. *Id.*

61.    Even after a SMCRA program has been delegated to a state, OSMRE retains oversight of that program through supervision of the state's implementation of the regulatory program. *Id.* § 1271. OSMRE further maintains federal oversight over state SMCRA programs by funding them on an ongoing basis.

62.    OSMRE's oversight role was reaffirmed in a Memorandum of Understanding between the U.S. Army Corps of Engineers, Department of the Interior, and the Environmental Protection Agency regarding Appalachian coal mining, wherein OSMRE agreed to "determine

how it will more effectively conduct oversight of state permitting, state enforcement, and regulatory activities under SMCRA," and to "remove impediments to its ability to require correction of permit defects in SMCRA primacy states." *Memorandum of Understanding Among the U.S. Department of the Army, U.S. Department of the Interior and U.S. Environmental Protection Agency Implementing the Interagency Action Plan on Appalachian Surface Coal Mining* (June 11, 2009).

63.     SMCRA specifically requires that OSMRE evaluate and oversee the administration of approved state Title V programs and requires that OSMRE enforce the terms of the statute and substitute its enforcement power for that of the state—or take back implementation authority from the state—should it find that the state has failed to adequately enforce its state-delegated SMCRA program. 30 U.S.C. § 1271(b). OSMRE therefore retains discretion and control over the SMCRA program at a programmatic and permit-specific level, even where the program has been delegated to a state authority.

64.     OSMRE retains oversight and enforcement duties for the SMCRA provisions regarding protected species for approved state Title V programs. The regulations specifically require the development of PEPs, 30 C.F.R. § 780.16(a)(1), and prohibit any mining from being allowed to proceed that could jeopardize a listed species or harm designated critical habitat, 30 C.F.R. § 816.97(b). For states with delegated SMCRA programs, OSMRE must ensure that the regulations pertaining to protected species are complied with, and that no mining facilities that "may affect" listed species operate without the required PEPs. OSMRE is obligated to perform a compliance review of each state's SMCRA Title V program at least annually. 30 C.F.R. § 733.13. The product of this review is an Annual Evaluation Report produced by OSMRE for each state.

65.     Upon receipt of any information from any source that any "person" has violated any requirement of SMCRA or a SMCRA permit condition, OSMRE is required to initiate corrective law enforcement procedures with—and potentially against—the states. 30 U.S.C. § 1271(a)(1). Once OSMRE has initiated such enforcement action via written notification of the violation to the state, that state then has ten days to take "appropriate" corrective action to resolve the violation, or to show good cause for why it has not taken such action. *Id.*

## V.     FACTUAL and REGULATORY BACKGROUND

### A. <u>Impacts to Listed Species from SMCRA-Regulated Activities</u>

66.     Coal mining activities have destroyed vital habitat for—and caused significant harm to—imperiled species across many regions of the United States. In particular, the coal-bearing regions of West Virginia, Kentucky, and Virginia are home to many threatened and endangered species that are adversely affected by coal mining activities undertaken pursuant to SMCRA.

67.     Surface coal mining is accomplished by logging and/or clearing the mine site, then removing overburden from the coal seam and blasting and removing the coal. This includes strip mining and open pit mining practices, as well as mountaintop removal mining, wherein excess mining waste is dumped into fills in nearby hollows or valleys, smothering streams and habitat. Surface coal mining requires large areas of land disturbance, destroying mountains and forest habitat, and results in the deposition of sediment and heavy metals into waterbodies, which adversely impacts streams and local biodiversity.

68.     These impacts harm species, including an increasing number of species that are listed as endangered or threatened under the ESA. Numerous species in Kentucky, West Virginia, and Virginia have been listed under the ESA due in large part to SMCRA-regulated

coal mining impacts, including the Guyandotte River crayfish, Big Sandy crayfish, candy darter, diamond darter, and purple bean mussel.

69. In particular, coal mining activities have led to severe habitat degradation and dramatic population declines across the ranges of the Guyandotte River crayfish, Big Sandy crayfish, and candy darter. Among these species, the Guyandotte River crayfish has been the most heavily impacted by coal mining, and as a result, it only survives in two streams in West Virginia today.

70. FWS has created a guidance document for agency staff acknowledging and explaining the extent of harm that coal mining activities inflict on downstream aquatic species, complete with references to numerous studies showing significant habitat degradation and population impacts via sedimentation and other effects up to 12 miles downstream from coal mining operations. Thus, according to FWS the best available science indicates that mines within 12 miles upstream of critical habitat or populations of aquatic species such as the Guyandotte River crayfish, Big Sandy crayfish, and candy darter certainly "may affect" the species and their critical habitat, and therefore require a PEP to address and minimize such impacts.

71. Documented examples show how coal mining pollution is escalating the risk of jeopardy for listed species. For example, the two remaining occupied critical habitat segments for the Guyandotte River crayfish have been impacted by major coal pollution spills in recent years. FWS has documented at least 4 unpermitted sediment spills from the Eagle Surface Mine on Knob Fork of Clear Fork between February and May of 2017, which impacted critical habitat subunit 1b for the Guyandotte River crayfish with siltation and sedimentation impacts 14 miles downstream. Likewise, in its 2023 Guyandotte River crayfish 5-Year Review, FWS documented a 2018 coal slurry spill by an unidentified SMCRA permittee on Pinnacle Creek, in Guyandotte

River crayfish designated critical habitat subunit 1a. This spill resulted in siltation and sedimentation impacts to the critical habitat, and is suspected of directly killing *all* Guyandotte River crayfish in one area of the stream.

72.     Mining activities continue to pose a significant risk to these endangered species and the coal industry has a track record of chronic non-compliance with the requirements of SMCRA across the ranges of both the Guyandotte River crayfish and Big Sandy crayfish. Since April 17, 2015, West Virginia has logged over 490 SMCRA cessation orders, permit violations, and violation extensions that threaten impacts to crayfish critical habitat at coal mining facilities within the state. During the same period of time, Kentucky logged over 520 SMCRA cessation orders, permit violations, and violation extensions from coal mining facilities that threaten impacts to designated critical habitat for the Big Sandy crayfish.

73.     These and other impacts from SMCRA-regulated coal mining activities have devastated the crayfish populations in Appalachia. The Guyandotte River crayfish has been wiped out from 93% of its known historical range. It only survives in Pinnacle Creek and Clear Fork in West Virginia's Wyoming and Logan Counties, both of which watersheds are heavily impacted by coal mining activities. The U.S. Environmental Protection Agency has documented that neither Pinnacle Creek nor Clear Fork meet water quality standards for aquatic life. On information and belief, out of 114 SMCRA-permitted mining facilities identified by Plaintiffs within 3 miles upstream from Guyandotte River crayfish critical habitat, 112 lack a PEP for the species.

74.     The Big Sandy crayfish survives in portions of the upper Big Sandy River basin across southern West Virginia, eastern Kentucky, and southwest Virginia in watersheds that are heavily impacted by coal mining. Sedimentation and siltation of habitat from surface disturbance

are the primary factors driving the extinction threat for this species. The Big Sandy crayfish has also been extirpated from most of its range, and survives in only 34% of sites surveyed for the crustacean. On information and belief, out of 346 SMCRA-permitted mining facilities identified by Plaintiffs in close proximity[1] upstream from Big Sandy crayfish critical habitat, 276 lack a PEP for the species.

75.     The candy darter's critical habitat in West Virginia and Virginia is also heavily impacted by SMCRA-regulated coal mining activities. Candy darters are thought to have lost most of their range due to logging and coal mining-induced land use changes during the industrial revolution, and their critical habitat continues to be adversely affected by coal mining activities.

76.     The manifest harm that the Guyandotte River crayfish, Big Sandy crayfish, candy darter, and countless other aquatic species have suffered due to coal industry pollution underscores the need for OSMRE and FWS to fashion and effectively implement an appropriate mechanism for compliance with the ESA, including by implementing PEPs and species-specific protective measures for permits that threaten these species and their designated critical habitat. Yet at this time, more than 3 years after the issuance of the 2020 BiOp, no PEPs or species-specific protective measures are in place for the vast majority of coal mining facilities that threaten these species and their designated critical habitats.

---

[1] In Kentucky and West Virginia, all permits noticed by Plaintiffs are within 3 miles upstream from designated critical habitat for these crayfish. In Virginia, due to differences in permit data provided by the states, all noticed permits are upstream from and within the same HUC-12 watershed as designated critical habitat for these species.

B. **Consultation History and Development of the 2020 Biological Opinion**

77.     Prior to the 2020 BiOp, SMCRA Title V programs relied on the 1996 BiOp for

ESA compliance, which concluded that surface coal mines regulated by "properly implemented"

SMCRA programs "are not likely to jeopardize the continued existence of listed or proposed

species" or "result in the destruction or adverse modification of designated or proposed critical

habitats." The 1996 BiOp purported to provide incidental take coverage for all coal operations

nationwide, and provided authorization for the take of "all present and future Federally listed and

proposed species" affected by SMCRA-regulated mining operations at any mine site. It assigned

"an unquantifiable level of take" to surface coal mining operations and authorized "the

unavoidable taking of some individuals" of any listed species affected by surface coal mining.

78.     In 2015, pursuant to Title V of SMCRA, OSMRE undertook efforts to revise a set

of regulations known as the Stream Protection Rule in order to better protect streams, fish, and

wildlife from the adverse impacts of surface coal mining operations. As a result of the changes

that were proposed to the SMCRA regulations as part of the revised Stream Protection Rule,

OSMRE conceded that it could no longer rely on the 1996 BiOp to meet its ESA Section 7

duties, and it therefore reinitiated formal programmatic consultation with the Service in order to

devise a new mechanism for avoiding jeopardy to listed species.

79.     In 2016, the Service issued a new biological opinion for the SMCRA Title V

program (the "2016 BiOp"). In issuing the 2016 BiOp, the Service was emphatic and

unequivocal as to the failure of the 1996 BiOp to protect listed species in accordance with the

ESA's mandates, the failure of state and federal agencies to consistently implement the technical

assistance process set forth in that BiOp, and the consequent need to reinitiate programmatic

consultation. The 2016 BiOp stated that:

Even if the Stream Protection Rule did not constitute a significant change to the regulatory environment, the 1996 Biological Opinion would require reinitiation of consultation because there have been effects to ESA resources (listed and proposed species and designated and proposed critical habitat) not considered in the 1996 analysis and because the technical assistance process analyzed in the 1996 Biological Opinion has not been consistently implemented nationwide, as analyzed in that consultation. As a result of new effects and inconsistent implementation of the technical assistance process, many fish and wildlife species continue to decline. Several species in coal mining regions have been listed since conclusion of the 1996 consultation, suggesting the protections afforded to fish and wildlife resources from the existing SMCRA regulations and implementation of the 1996 Biological Opinion may not be as protective as previously considered. Given the contribution of surface coal mining to the decline of some species and the new listing of species that previously did not require protection under the ESA, and evidence that the technical assistance process outlined in the 1996 Biological Opinion is not being followed, *it is no longer possible to rely on the 1996 Biological Opinion to conclude that the existing regulatory environment (prior to 2016 MOU and Stream Protection Rule implementation) would not result in jeopardy or adverse modification of ESA-listed resources.*

80.     The Service concluded that "despite the environmental protections granted by SMCRA and the permit review process set forth in the 1996 BiOp, surface coal mining operations continue to negatively impact threatened and endangered species and the habitats upon which they depend." The Service further found that the implementation of the 1996 BiOp failed to insure that physical, chemical, or biotic stressors were reliably estimated; that adverse effects to ESA-listed species and critical habitat were not being evaluated, monitored and minimized; and that permit compliance was not being enforced.

81.     The Service also noted in the 2016 BiOp that the recent listing of the Guyandotte River crayfish and the Big Sandy crayfish "illustrate the inadequacy of the current SMCRA regulatory environment in protecting fish and wildlife and the habitats upon which they depend."

82.     On February 2, 2017, Congress used the Congressional Review Act to rescind the 2016 revisions to the Stream Protection Rule. FWS maintained that this action also nullified the 2016 BiOp. However, the agency never disclaimed the findings it made in the 2016 BiOp

establishing that the 1996 BiOp and ITS failed to meet the ESA's mandates and thus could not lawfully be relied on for ESA compliance.

83.     FWS subsequently reinstated the 1996 BiOp, once again relying on this discredited regulatory scheme to satisfy OSMRE's obligations under Section 7 of the ESA.

84.     In 2019, the Center for Biological Diversity sued FWS and OSMRE, which resulted in reinitiation of consultation on the SMCRA Title V program. On October 16, 2020, FWS issued the 2020 BiOp, permanently superseding the 1996 BiOp.

**C. The 2020 Biological Opinion**

85.     As with the 1996 BiOp, the 2020 BiOp ostensibly provides ESA Section 7 coverage for all listed species and designated or proposed critical habitat potentially affected by surface coal mining, surface effects of underground coal mining, and coal mine reclamation, nationwide. Specifically, it provides Section 7 coverage for OSMRE's implementation of Title V of SMCRA, including providing take coverage to state regulatory authorities and mine operators in states that have primacy under the statute.

86.     In the 2020 BiOp, FWS concluded that OSMRE's implementation of Title V of SMCRA is not likely to jeopardize the continued existence of proposed or listed species and or destroy or adversely modify designated or proposed critical habitat. To reach this conclusion, FWS explicitly relied upon: 1) OSMRE's oversight of state programs and enforcement of SMCRA in states with primacy, including the proper implementation of PEPs and their species-specific protective measures; and 2) a coordination process that requires FWS to cooperatively develop PEPs and species-specific protective measures with the states, and ultimately approve the final versions of these provisions. The 2020 BiOp also requires state regulatory authorities to

initiate a new coordination process with FWS upon the listing of new species or designation of

new critical habitat that may be affected by existing mining activities.

87.    The 2020 BiOp explains that PEPs must describe "how, to the extent possible

using the best technology currently available, the operator will minimize disturbances and

adverse impacts on fish and wildlife and related environmental values, including compliance

with the Endangered Species Act." 30 C.F.R. §§ 780.16(b), 784.21(b). The document explains in

further detail:

> More specifically, the PEP must include protective measures that will be used
> during the active mining phase of operation (e.g., the establishment of buffer zones,
> selective location and design of haul roads and powerlines, and monitoring of
> surface water quality and quantity) and enhancement measures that will be used
> during the reclamation and postmining phase of operation to develop aquatic and
> terrestrial habitat ( *Id.* at §§ 780.16(b)(3)(i)-(ii) and 784.21(b)(3)(i)-(ii)). "Such
> measures may include restoration of streams and other wetlands, retention of ponds
> and impoundments, establishment of vegetation for wildlife food and cover,
> replacement of perches, and nest boxes. Where the plan does not include
> enhancement measures, the operator must provide a statement explaining why
> enhancement is not practicable" (*Id.* at §§ 780.16(b)(3)(ii) and 784.21(b)(3)(i)-(ii)).
>
> ***
>
> Species-specific protection measures (SSPMs) are activities deemed necessary to
> avoid, minimize, and monitor the effects of the proposed mining action on ESA-
> listed and -proposed species. SSPMs was a term referenced in the terms and
> conditions contained in the ITS of the 1996 Opinion. The Service uses the term in
> this Opinion to describe measures that minimize the impacts of incidental take and
> must be implemented as a mandatory condition in the permit if the regulatory
> authority and/or applicants choose to avail themselves of incidental take coverage
> under this Opinion's incidental take statement.

88.    It is only through compliance with the terms and conditions of the 2020 BiOp that

OSMRE, and through it the state regulatory authorities and mine operators, receive take

coverage via ESA Section 7.

### 1. The 2020 BiOp's Reliance on OSMRE's Oversight of State-Delegated SMCRA Programs

89.     FWS made its "no-jeopardy" finding for the SMCRA program in the 2020 BiOp based, in large part, on OSMRE's oversight role under SMCRA, which requires the agency to ensure that mining facilities are operating consistent with the provisions of SMCRA that require protection of listed species, such as the development of PEPs with species-specific protective measures. Among the "reasonable and prudent measures" the 2020 BiOp/ITS identifies as "necessary and appropriate to minimize impacts of incidental take to ESA-listed species" is the requirement that "OSMRE will use its authorities to minimize impacts to listed species through oversight of State and Tribal programs." The 2020 BiOp therefore relies on OSMRE's oversight of state-delegated SMCRA programs on a permit-by-permit basis to ensure that measures are being implemented to ensure against jeopardy and adverse modification at mining facilities that "may affect" listed or proposed species or critical habitat.

90.     In support of this reliance, FWS cites OSMRE's duty to intervene and develop a corrective action plan when it becomes aware of a state failing to properly implement the 2020 BiOp and associated SMCRA regulations. The corrective action plan must provide a schedule and a strategy for the state to come back into compliance. If the state does not comply with the corrective action plan—causing OSMRE to believe that the state is not effectively implementing or enforcing any part of its state program—OSMRE must initiate proceedings to determine whether to substitute its federal enforcement power for that of the state's, or whether to withdraw SMCRA delegation to the state altogether. It was this process of oversight and enforcement that FWS cited as the reason for its confidence that OSMRE has a sufficient mechanism in place to monitor and enforce the state's compliance with SMCRA for the protection of listed species and critical habitat.

91.     However, OSMRE has no mechanism in place to ensure that the states will make OSMRE aware of permits that may affect listed species, and thus no way to actually provide the oversight that the 2020 BiOp relied upon. Rather, the 2020 BiOp provides that state regulatory authorities are to provide information on mining facilities that may affect listed species directly to FWS and not OSMRE, and such information is only provided at the discretion of the state regulatory authority. Thus, if the state erroneously determines that a mine does not meet the ESA's low Section 7 "may affect" threshold, neither OSMRE nor FWS would be made aware of the potential for harm to protected wildlife, and no PEP would be developed for those permits, although one would be necessary to insure against jeopardy and adverse modification pursuant to the 2020 BiOp. And OSMRE has no means to discover this problem and initiate corrective action, as evidenced by the hundreds of violations identified by Plaintiffs. Therefore, even though the 2020 BiOp relies on oversight by OSMRE of state-delegated SMCRA programs, there is no mechanism in place for OSMRE to provide such oversight and ensure state compliance with the terms and conditions of the biological opinion.

92.     OSMRE is only under an obligation to review the compliance status of each state's Title V program on an annual basis. 30 C.F.R. § 733.13. OSMRE must produce an Annual Evaluation Report for each state Title V program that reflects the findings of the annual compliance review. This requirement, however, is insufficient to provide the oversight contemplated in the 2020 BiOp, as evidenced by the fact that no enforcement actions were forthcoming from OSMRE as a result of its ostensible annual compliance reviews, and indeed OSMRE took no action to enforce the requirements of the 2020 BiOp against the states prior to Plaintiffs' April 6, 2023, notice of intent to sue.

**2.   The 2020 BiOp's Coordination Process Between States and FWS for Development of PEPs**

93.     Although the 2020 BiOp contemplates that OSMRE will provide oversight to ensure that all mining facilities that "may affect" listed species or critical habitat address such impacts by developing a PEP with species-specific protective measures, the BiOp further requires that those PEPs be provided to FWS for review and approval. This "coordination" process with FWS is supposed to ensure that adequate PEPs and species-specific protective measures are in place to avoid harm to listed species and their critical habitat.

94.     Therefore, under the 2020 BiOp the state is supposed to submit a proposed PEP to FWS for any permit where the proposed action "may affect" listed or proposed species or its designated or proposed critical habitat. FWS is then supposed to work with the state through a "technical assistance process," whereby FWS determines whether the PEP's proposed species-specific protective measures are adequately protective to avoid jeopardy and adverse modification, and if not, the Service provides additional measures to protect the species.

95.     However, the 2020 BiOp does not require that the measures FWS deems necessary to ensure against jeopardy are in fact incorporated into the PEP. Rather, the 2020 BiOp includes a dispute resolution process to resolve any disagreement between the state regulatory authority and FWS, set forth in Appendix B to the 2020 BiOp. Pursuant to that process, if, after reviewing the draft PEP, FWS proposes measures to minimize disturbances and adverse impacts to species and the state regulatory authority disagrees with those measures, the state may elevate the disagreement to the Field Office, the Regional Office, and ultimately to the FWS headquarters and the Secretary of the Interior. However, Appendix B makes clear that at each stage, the state regulatory authority is free to reject the proposed resolution and approve the permit, thereby disregarding the protective measures that FWS has provided.

96.     State regulatory authorities have in fact rejected measures deemed necessary by FWS to protect listed species. For example, in the case of the Ball Ridge mine, Paramont Contura had SMCRA permit # 1010685 pending before the Virginia Department of Mines, Minerals, and Energy for 2,700+ acres of underground and surface mining upstream from designated critical habitat for the Big Sandy crayfish and less than half a mile upstream from a documented population of the species on McClure Creek in Dickenson County, Virginia. FWS wrote to Virgina on September 30, 2020, indicating that the measures outlined in Virginia's proposed PEP were not sufficient to protect Big Sandy crayfish from impacts to water quality. FWS proposed additional water quality-based species-specific protective measures to minimize take, but the state objected to these measures. On February 4, 2021, FWS warned the state that if Virginia chose not to implement the protective measures, it would not receive incidental take coverage under the 2020 BiOp. On March 2, 2021, Virginia initiated the dispute resolution process with OSMRE. On information and belief, this dispute resolution process is still ongoing, and, in the meantime, the state has refused to implement the measures that FWS specified were necessary for the protection of the crayfish.

### D. Defendants' Ongoing Failure to Comply with the 2020 BiOp

97.     Out of concern for the enormous harm that coal mining continues to have on habitat for the highly imperiled Guyandotte River crayfish and Big Sandy crayfish, Plaintiffs took it upon themselves to investigate whether mining facilities in Kentucky, West Virginia, and Virginia were impacting habitat for the Guyandotte River crayfish and Big Sandy crayfish without the PEPs and species-specific protective measures required by the 2020 BiOp. This resulted in Plaintiffs' formal notice letter to Defendants setting forth extensive violations of the

scheme embodied in the 2020 BiOp that was relied on by FWS to find that the SMCRA permitting program would not jeopardize listed species or impair their critical habitats.

98.    On information and belief, the majority of the permits identified by Plaintiffs in their notice letter that are within close proximity to listed crayfish critical habitat in Kentucky, West Virginia, and Virginia lack PEPs for those species.

99.    Specifically, 98% of the 114 mining facilities identified by Plaintiffs within 3 miles upstream from occupied Guyandotte River crayfish critical habitat and 80% of the 346 mining facilities in close proximity upstream from occupied Big Sandy crayfish critical habitat lack PEPs for those species.

100.    The permits identified by Plaintiffs are only a sample of the mines that are out of compliance with the 2020 BiOp. Plaintiffs only noticed permits impacting 2 listed species in 3 of the states where surface mining occurs. It is highly likely that, with further investigation, many more permits affecting these and other species—in these and other states—would be found to be out of compliance.

101.    The 2020 BiOp has therefore not been implemented in Kentucky, West Virginia, and Virginia, in the manner that FWS found was necessary to avoid jeopardy to listed species and/or destruction or adverse modification of critical habitat. The following details the pertinent information that is publicly available:

### 1. Kentucky

102.    The Kentucky Energy and Environment Cabinet reported in a September 28, 2022, email to Plaintiff Appalachian Voices that it believes that over 200 SMCRA permits within the state may require PEPs for Big Sandy crayfish due to their potential impacts to designated critical habitat.

103.   On information and belief, no mining facilities within 3 miles upstream from Big Sandy crayfish critical habitat in Kentucky have PEPs for the species, resulting in a noncompliance rate of 100%.

104.   Kentucky has provided FWS with no draft PEPs for review for permits that may affect the Big Sandy crayfish.

105.   In response to Plaintiffs' notice letter, OSMRE launched an investigation of the compliance status of the permits noticed by Plaintiffs. The result of this investigation was OSMRE's 2023 compliance investigation report.

106.   According to OSMRE's 2023 compliance investigation report, following the submission of Plaintiffs' notice of intent to sue, and in response to that notice, Kentucky informally discussed with FWS 94 of the non-compliant permits identified by Plaintiffs, in order to explore the need for PEPs. All of these permits are for coal mining facilities within 3 miles upstream from designated critical habitat for Big Sandy crayfish but lack PEPs and species-specific protective measures for the species. Kentucky stated that in its opinion, only 15 of the 94 permits required PEPs and species-specific protective measures. OSMRE's compliance investigation report states that FWS provided "verbal approval," allowing 79 permits to avoid implementing PEPs for the Big Sandy crayfish, even though the mines were within 3-miles upstream from critical habitat for the crayfish and FWS had previously found that mines within 12-miles could cause significant damage to their habitat. On information and belief, FWS did not provide a formal document regarding this determination or otherwise set forth a basis for the decision regarding the need for PEPs for these 79 permits.

107.  On information and belief, OSMRE has not taken any action to ensure that mining facilities in Kentucky other than those identified in Plaintiffs' notice letter have the requisite

PEPs, nor has OSMRE considered the need for PEPs outside of the 3-mile area used by Plaintiffs to identify relevant mining facilities. Thus, neither OSMRE nor Kentucky have identified all such facilities that are non-compliant with the 2020 BiOp.

108.     Defendants have also failed to undertake ESA Section 7 consultation to address the impacts to listed species from the past three years of mining activities that have occurred at mines in Kentucky where a PEP and species-specific protective measures were required pursuant to the 2020 BiOp, but where none were in place, including those identified by Plaintiffs and all other such mines that "may affect" listed species. Such consultation is required to identify measures to address and mitigate any resulting harm.

### 2.  West Virginia

109.     On information and belief, of the more than 200 mining facilities within 3-miles upstream from critical habitat for the Guyandotte River crayfish and Big Sandy crayfish in West Virginia, only 6 have PEPs for the species, resulting in a noncompliance rate of 97%.

110.     OSMRE's 2023 compliance investigation report states that FWS has received 10 draft PEPs for review from West Virginia for permits that may affect these crayfish species. The report further states that FWS had "3+" West Virginia SMCRA permits under review that will need PEPs for the crayfish.

111.     The West Virginia Department of Environmental Protection reported in a September 29, 2022, email to Plaintiff Appalachian Voices that it has sent "several" proposed PEPs to FWS for review and approval, but that FWS is "backlogged" and therefore the state has not received a response on those PEPs. West Virginia also reported in this email that it is developing "multiple" other proposed PEPs to submit to FWS, and that it is waiting on guidance from FWS for how to proceed on "several" other SMCRA permits.

112.    Mining activities continue to take place that are adversely affecting listed species' habitat in West Virginia, and these impacts have not been addressed in the manner set forth in the 2020 BiOp. For example, Amendment No. 1 to the Rocky Run surface mine and haul road permit was issued by the state in 2022, and allows construction of a new haul road and additional surface mining adjacent to designated habitat subunit 5f for the federally endangered candy darter in the South Fork Cherry River. West Virginia Department of Environmental Protection issued this permit without developing a candy darter PEP for this permit amendment.

113.    On information and belief, OSMRE has not taken any action to ensure that mining facilities in West Virginia other than those identified in Plaintiffs' notice letter have the requisite PEPs, nor has OSMRE considered the need for PEPs outside of the limited 3-mile area used by Plaintiffs to identify non-compliant mining facilities. Thus, neither OSMRE nor West Virginia have identified all such facilities that are non-compliant with the 2020 BiOp.

114.    Defendants have also failed to undertake ESA Section 7 consultation to address the impacts to listed species from the past three years of mining activities that have occurred at mines in West Virginia where a PEP and species-specific protective measures were required pursuant to the 2020 BiOp, but where none were in place, including those identified by Plaintiffs and all other such mines that "may affect" listed species. Such consultation is required to identify measures to address and mitigate any resulting harm.

**3.  Virginia**

115.    On information and belief, many of the mining facilities in close proximity and upstream from Big Sandy crayfish critical habitat in Virginia have no PEPs for the species.

116.    Specifically, out of the 88 mining facilities identified by Plaintiffs near Big Sandy crayfish critical habitat in Virginia, only 66 have PEPs for the species, resulting in a noncompliance rate of 25%.

117.    In internal agency email correspondence dated May 15, 2023, OSMRE reported that as of May 10, 2023, FWS was unable to determine how many draft PEPs it had received for review from Virginia for permits that may affect the Big Sandy crayfish. Further, in the same internal agency correspondence, OSMRE reported that FWS claimed that a staffing shortage had created a backlog in reviewing Virginia SMCRA permits that may require PEPs.

118.    In a February 27, 2023, videoconference with Plaintiff Center for Biological Diversity, the Virginia Department of Energy provided two explanations for why it has not completed PEPs for many of the mining facilities in close proximity and upstream from Big Sandy crayfish critical habitat. First, the state cited the departure of a staff person in the southwest Virginia FWS field office, which it described as grinding FWS' work on Virginia's PEPs to a halt. Second, it stated that the use of the 2020 BiOp's dispute resolution process for the Ball Ridge Mine is holding up progress on PEPs across Virginia.

119.    OSMRE's 2023 compliance investigation report states that Virginia told the agency that the state will not initiate coordination with FWS on 8 of the noncompliant permits identified by Plaintiffs until new permitting actions take place on those permits.

120.    On information and belief, OSMRE has not taken any action to ensure that mining facilities in Virginia other than those identified in Plaintiffs' notice letter have the requisite PEPs, nor has OSMRE considered the need for PEPs for any mines other than those noticed by Plaintiffs. Thus, neither OSMRE nor Virginia have identified all such facilities that are non-compliant with the 2020 BiOp. Defendants have also failed to consult on the impacts to listed

crayfish from the past three years of mining activities that have occurred at mining facilities in Virginia where a PEP and species-specific protective measures were required pursuant to the 2020 BiOp, but where none were in place.

### E.   OSMRE's and FWS' Response to Plaintiffs' Notice Letter

121.   On April 6, 2023, Plaintiffs provided notice to Defendants detailing OSMRE's failure to ensure that all permits that "may affect" listed species have a PEP in place, as well as FWS' failure to ensure that PEPs are properly crafted and approved where required and in a timely fashion. Plaintiffs also provided notice of the resulting problem that species hovering on the precipice of extinction have been left unprotected for years—and continue to be unprotected—from the same coal mining impacts that caused them to become endangered in the first place. Plaintiffs explained that Defendants' failure to properly implement the 2020 BiOp has allowed—and continues to allow—mining operations to take place absent measures necessary to protect species, in violation of the terms and conditions of the 2020 BiOp, the plain language of SMCRA, and the requirements of ESA Section 7.

122.   FWS responded to Plaintiffs' notice of intent to sue by stating the agency's position that no compliance problems exist with regards to FWS' fulfillment of its role under the 2020 BiOp. This is despite Virginia and West Virginia reporting that FWS has failed to review PEPs in a timely manner and that the dispute resolution process has hindered the state's ability to comply with the 2020 BiOp. Moreover, OSMRE's 2023 compliance investigation report states that FWS' Virginia field office reported to OSMRE that it has a backlog of PEP reviews in that state due to insufficient staff resources.

123.   OSMRE responded to Plaintiffs' notice of intent to sue by initiating an investigation regarding the status of the permits that Plaintiffs identified in their notice letter.

124.    OSMRE did not begin work on corrective action plans to address those permits that lack PEPs and species-specific protective measures until August of 2023, nearly 3 years after the issuance of the 2020 BiOp.

125.    On information and belief, OSMRE's investigation in response to Plaintiff's notice letter is strictly focused on the permits that Plaintiffs provided as examples of a program-wide problem, but at no point has the agency indicated an intention to investigate whether there are additional permits which require a PEP but do not have one in place.

126.    OSMRE's failure to ensure that PEPs and species-specific protective measures are being generated for all permits that required them has resulted in 3-years of non-compliance with the requirements of the 2020 BiOp. However, OSMRE's proposed corrective actions in response to Plaintiffs' notice letter do not include any steps to remedy harm to listed species or designated critical habitat that has occurred due to the lack of appropriate species-specific protective measures being implemented at SMCRA-permitted facilities. Nor does OSMRE appear to have any plan in place to provide the oversight envisioned in the 2020 BiOp to ensure that all mining facilities in all states that "may affect" listed or proposed species or critical habitat complete and implement a PEP with the necessary species-specific protective measures to ensure against jeopardy.

127.    In response to Plaintiffs' notice of intent to sue, both OSMRE and FWS have indicated that they do not intend to reinitiate consultation on the SMCRA Title V program.

## VI.   CLAIMS FOR RELIEF

## CLAIM 1

**Violation of 50 C.F.R. § 402.16, Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*., and the Administrative Procedure Act, 5 U.S.C. § 706(1) (Failure to reinitiate consultation on the SMCRA Title V program)**

128.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

129.    OSMRE and FWS are required to reinitiate ESA Section 7 consultation for the 2020 BiOp because new information reveals effects of the SMCRA program that "may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16. As set forth above, OSMRE and FWS have failed to comply with the BiOp's terms and conditions; mining facilities that may affect listed species continue to operate without the necessary protective measures to ensure against jeopardy; and there is no mechanism in place for OSMRE to ensure that state regulatory authorities are complying with the 2020 BiOp.

130.    The failure to implement the 2020 BiOp in a manner that FWS deemed necessary to avoid jeopardy and/or adverse modification of critical habitat—including the failures of the states, OSMRE, and FWS as described in this complaint—undermine the basis for FWS' determination in the 2020 BiOp that SMCRA-regulated coal mining will not continue to jeopardize listed species and adversely modify critical habitat, requiring reinitiation of consultation on the SMCRA program.

131.    OSMRE has failed entirely to provide the oversight on which the 2020 BiOp relies to ensure that state-delegated SMCRA programs comply with the ESA. OSMRE has failed to ensure that Kentucky, West Virginia, and Virginia initiate coordination with FWS on hundreds of mining facilities that have the potential to adversely affect critical habitat for listed species. This breakdown of OSMRE's oversight role, which FWS specifically relied on for the

no-jeopardy determination in the 2020 BiOp, is new information that reveals effects of the SMCRA Title V program that may affect listed or proposed species or critical habitat in a manner or to an extent not previously considered in the 2020 BiOp, requiring reinitiation of ESA consultation.

132.     To the extent that OSMRE responded to Plaintiffs' notice of intent to sue by initiating an investigation regarding the status of the permits that Plaintiffs identified in their notice letter, that investigation has not cured the need for reinitiation of consultation on the SMCRA program. Not only does this action confirm that OSMRE was not undertaking the appropriate oversight following issuance of the 2020 BiOp, but OSMRE has only addressed the specific permits that Plaintiffs identified as examples of a program-wide breakdown. At no point has the agency indicated an intention to exercise the oversight required by the 2020 BiOp with regard to all SMCRA permits which may require a PEP, and in fact it has continued to fail to ensure that all mining operations that "may affect" listed species have a PEP in place. Nor does OSMRE have any mechanism in place to ensure that it identifies all permits that require a PEP.

133.     Likewise, FWS' failure to comply with its role as outlined in the 2020 BiOp also requires reinitiation of consultation. FWS' ongoing failure to provide timely technical assistance to the states to ensure that adequate PEPs and species-specific protective measures are in place for numerous permits is new information that reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered in the 2020 BiOp.

134.     FWS has also failed to ensure that all SMCRA permits that "may affect" listed species are being required to implement PEPs. As described herein, FWS allowed Kentucky to avoid implementing PEPs for 79 permits within 3-miles upstream from Big Sandy crayfish critical habitat, contrary to the best available science, which shows that mines as far as 12-miles

upstream from crayfish critical habitat may cause significant adverse sedimentation and other effects to the species. FWS' determination was therefore arbitrary and capricious, resulting in mining facilities that categorically "may affect" listed crayfish operating without the species-specific protective measures required to ensure against jeopardy as set forth in the 2020 BiOp. This failure to properly implement the BiOp and to ensure that protective measures are in place for all permits that may affect listed species is new information that reveals effects of the action that may affect listed or proposed species or critical habitat in a manner or to an extent not previously considered in the 2020 BiOp, requiring reinitiation of consultation.

135.    Reinitiation of consultation is also required because developments since issuance of the 2020 BiOp confirm that the dispute resolution process relied on by FWS—set forth at Appendix B to the BiOp—has proven to be inadequate to prevent jeopardy to listed species. In at least one instance, a state regulatory authority has relied on the dispute resolution process to reject measures that FWS stated were necessary to ensure that a listed species was adequately protected. Since the 2020 BiOp allows the states to ultimately decide not to implement protective measures that FWS says are necessary, and because that process is being used to the detriment of listed species, this reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered in the 2020 BiOp, requiring reinitiation of consultation.

136.    Reinitiation of consultation is also required to address the potential harm to listed species from the Defendants' systematic failure to implement the 2020 BiOp and ITS for the past 3 years. It is well established that coal mining activities may not only harm but can jeopardize listed species such as the Guyandotte and Big Sandy crayfish; however, since the BiOp was issued in October of 2020, hundreds—if not thousands—of permitted mining facilities have been

operating without the required PEPs and species-specific protective measures that the 2020 BiOp relied upon to guard against jeopardy and adverse modification. During that time, harm has accrued to listed species and their critical habitats, which have remained unprotected from coal mining pollution impacts as required by the 2020 BiOp and ITS. This non-compliance reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered in the 2020 BiOp, requiring reinitiation of consultation.

137.    In sum, Defendants' ongoing failure to properly implement the 2020 BiOp, and their blatant violations of the protective measures set forth in that document, constitute a continuing failure to ensure against jeopardy, in violation of Section 7 of the ESA. Reinitiation of consultation is therefore required to create a suitable plan for ESA compliance that Defendants are in fact able to implement, as well as to address any harm that has occurred as a result of the agencies' failure to properly implement the 2020 BiOp for the past 3 years, and to implement measures to address and mitigate any harm from such failures. 50 C.F.R. § 402.16. Defendants' failure to reinitiate consultation violates the ESA and its implementing regulations, and constitutes agency action unlawfully withheld and unreasonably delayed in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1).

## CLAIM 2

**Violation of the Endangered Species Act Section 7(a)(2), 16 U.S.C. § 1536(a)(2) (Failure to insure that surface coal mining activities are not likely to jeopardize listed species or adversely modify critical habitat)**

138.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

139.    OSMRE has an ongoing duty pursuant to ESA Section 7(a)(2) and the 2020 BiOp to insure that SMCRA-regulated mining activities are not likely to jeopardize the continued

existence of endangered and threatened species or result in the destruction or adverse modification of such species' critical habitat. 16 U.S.C. § 1536(a)(2).

140.    As discussed above, coal mining pollution escalates the risk of jeopardy for listed species, including through sedimentation and contamination of waterways as well as major coal pollution spills. Thus, there is no doubt that coal mining threatens to degrade listed species' habitat and jeopardize their continued existence. Indeed, FWS has acknowledged that coal mining under the 1996 BiOp *was* jeopardizing listed species such as the Guyandotte River crayfish and Big Sandy crayfish, and determined that only through the implementation of the new framework of the 2020 BiOp could jeopardy be avoided.

141.    Defendant OSMRE, however, has failed to implement the 2020 BiOp by providing the oversight that FWS relied on in reaching its no-jeopardy conclusion. As a result, hundreds of mines that "may affect" highly imperiled species are operating without the 2020 BiOp's species-specific protective measures necessary to ensure against jeopardy. This constitutes a failure to ensure against jeopardy, in violation of Section 7 of the ESA. 16 U.S.C. § 1536(a)(2).

142.    Specifically, in the absence of effective oversight from OSMRE, Kentucky, West Virginia, and Virginia are systematically failing to initiate coordination with FWS for hundreds of SMCRA permits that, by FWS' definition, categorically "may affect" listed species and their designated critical habitat. Yet, until Plaintiff provided notice of these violations, OSMRE had failed entirely to provide the oversight that the 2020 BiOp requires to ensure compliance with the ESA. This failure occurred despite OSMRE's duty to perform an annual performance evaluation for each state Title V program pursuant to 30 C.F.R. § 733.13.

143. Although coordination has been initiated on *some* SMCRA permits that Plaintiffs highlighted in their notice of intent to sue, OSMRE has failed to take steps to address the fact that hundreds—if not thousands—of mining facilities that threaten listed species with adverse impacts continue to operate without the requisite PEPs and species-specific protective measures that the 2020 BiOp requires.

144. While OSMRE initiated a compliance review of the permits noticed by Plaintiffs, an unknown number of permits that "may affect" listed or proposed species and their designated or proposed critical habitat have never been examined by OSMRE for compliance with the 2020 BiOp. OSMRE has therefore continued to fail to ensure compliance for all permits that may affect these species and their critical habitat.

145. Due to this failure to provide oversight for state-implementation of SMCRA programs as required by the 2020 BiOp, OSMRE has failed to insure that SMCRA-regulated mining operations will not jeopardize the continued existence of listed species or adversely modify their critical habitat, as the ESA requires. 16 U.S.C. § 1536(a)(2).

## CLAIM 3

**Violation of the Endangered Species Act Section 7, 16 U.S.C. § 1536, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (The 2020 BiOp is facially invalid)**

146. Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

147. In contravention of Section 7 of the ESA, the 2020 BiOp does not "insure" that SMCRA-permitted mining activities in states with primacy are not likely to jeopardize listed species or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2).

148. Pursuant to the dispute resolution process established in Appendix B to the 2020 BiOp, the state regulatory authority may reject measures provided by FWS through the PEP

coordination process that are necessary to prevent jeopardy or adverse modification, and to approve the permit without such measures in place. Thus, the state regulatory authority has been delegated the final say on what protective measures are implemented (or not implemented), rather than the expert wildlife agency, as mandated by Congress. This is contrary to the requirements of Section 7 and allows permitted mining facilities to operate without the RPMs that would be enforceable by FWS through the normal Section 7 process.

149.    The coordination and dispute resolution process set forth in the 2020 BiOp therefore constitutes an unlawful delegation of authority conferred on FWS, and is therefore inadequate to ensure that measures necessary to prevent jeopardy to listed species and adverse modification of critical habitat will be implemented for SMCRA permits, in violation of the clear requirements of Section 7. The 2020 BiOp is therefore arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A). In turn, OSMRE's reliance on the 2020 BiOp to comply with its duties under section 7 violates the ESA and APA.

## VII.    PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs respectfully request that the Court grant the following relief:

1.    Declare that Defendants have failed to comply with the 2020 BiOp, remand the 2020 BiOp to FWS, and require Defendants to reinitiate and complete consultation by a date certain;

2.    Declare that OSMRE has violated ESA Section 7(a)(2) and its implementing regulations by failing to comply with the provisions of the 2020 BiOp and for continuing to rely on the unlawful 2020 BiOp, and enjoin any further reliance on the 2020 BiOp;

3.      Declare that the 2020 BiOp violates the ESA and APA, and vacate the 2020

BiOp;

4.      Award Plaintiffs costs and attorneys' fees under the ESA, 16 U.S.C. § 1540(g);

and

5.      Grant Plaintiffs such other and further relief as the Court deems just and

equitable.

DATED: November 8, 2023                    Respectfully Submitted,

/s/ Hannah Connor
Hannah Connor (DC Bar #1014143)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 681-1676
Email: hconnor@biologicaldiversity.org

/s/ Perrin W. de Jong
Perrin W. de Jong (*pro hac vice pending*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 6414
Asheville, NC 28816
Phone: (828) 252-4646
Email: perrin@biologicaldiversity.org

/s/ Jared M. Margolis
Jared M. Margolis (*pro hac vice pending*)
CENTER FOR BIOLOGICAL DIVERSITY
2852 Willamette St. # 171
Eugene, OR 97405
Phone: (802) 310-4054
Email: jmargolis@biologicaldiversity.org

*Attorneys for the Plaintiffs*