## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, *et al.*,

       *Plaintiffs*,

   v.

U.S. OFFICE OF SURFACE MINING
RECLAMATION AND ENFORCEMENT,
*et al.*,

       *Defendants*.

Civil Action No. 23‑3343 (SLS)

Judge Sparkle L. Sooknanan

## MEMORANDUM OPINION

This case is about the effects of Appalachian coal mining on protected species. The Plaintiffs, two environmental groups, have sued the U.S. Office of Surface Reclamation and Enforcement, the U.S. Fish and Wildlife Service, and various federal officers, alleging violations of the Endangered Species Act, its implementing regulations, and the Administrative Procedure Act. Before briefing the merits of their claims, the Plaintiffs seek to add ten sets of documents to an administrative record that is already over 69,500 pages long. They argue that the agency considered some of these documents but left them out of the administrative record. And they argue that all of them should be added to the administrative record as necessary background for the Court to determine whether the agency considered all of the relevant factors. The Court disagrees and denies the Plaintiffs' motion. Judicial review of agency action is generally limited to the administrative record before the agency when it made the challenged decision. And the Plaintiffs have not justified departing from that general rule, particularly with an administrative record as vast as this one.

## BACKGROUND

**A.    Statutory and Regulatory Background**

**1.    The Endangered Species Act (ESA)**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The legislation "seeks to protect species of animals against threats of their continuing existence caused by man." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 558 (1992). It "instructs the Secretary of the Interior and the Secretary of Commerce to make a list of all species that are either 'endangered' or 'threatened[.]'" *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1078 (D.C. Cir. 2021) (quoting 16 U.S.C. § 1533). Then the Fish and Wildlife Service (FWS) administers the statute with respect to species under the jurisdiction of the Secretary of the Interior, and the National Marine Fisheries Service (NMFS) does the same with respect to species under the jurisdiction of the Secretary of Commerce. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 651 (2007). Once a species has been listed, it gains "significant protections" under the ESA. *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 749 F. Supp. 3d 26, 36 (D.D.C. 2024). Congress created these protections "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

The first major protection flows from Section 9 of the ESA, which makes it unlawful for "any person," including private parties, States, and federal agencies, to "take" an endangered species. 16 U.S.C. § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). And "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions."

*Babbitt v. Sweet Home Chapter of Cmtys. for Great Or.*, 515 U.S. 687, 704 (1995). Violators of this prohibition may face civil or criminal penalties. *See* 16 U.S.C. § 1540.

The second relevant set of protections flows from Section 7 of the ESA, which "prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." *Nat'l Ass'n of Home Builders*, 551 U.S. at 652. Section 7(a)(2) provides that "[e]ach Federal agency shall, in consultation with and with the assistance of [the FWS or the NMFS], insure that any action authorized, funded, or carried out by such an agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). The agency proposing the action is known as the "action agency," and the agency providing consultation—either the FWS or the NMFS—serves as the "consulting agency." *Oceana, Inc.*, 75 F. Supp. 3d at 474 n.3 (citation omitted). "An action 'jeopardize[s] the continued existence of' a species if it 'reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.'" *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 16 (D.D.C. 2024) (quoting 50 C.F.R. § 402.02).

The action agency must first determine whether formal consultation is required. To do this, "[e]ach federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). "If the action agency determines—and the consulting agency concurs—that 'the proposed action is not likely to adversely affect any listed species or critical habitat,' then no formal consultation is required." *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 16 (quoting 50 C.F.R. § 402.14(b)(1)). But if the action agency "concludes after an initial review that its action 'may affect listed species or critical

habitat,' that agency must engage in 'consultation' with [the FWS or the NMFS]." *Id.* (quoting 50 C.F.R. § 402.14(a)); *see also* 50 C.F.R. § 402.02 (defining "Service" as either the FWS or the NMFS, "as appropriate").

The formal consultation process requires the consulting agency to "determine whether the project will violate [Section 7's] prohibition on jeopardizing the continued existence of endangered and threatened species." *Ctr. for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 339 (D.D.C. 2020). The process culminates in the consulting agency issuing a biological opinion (BiOp) "setting forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 16 (quoting 16 U.S.C. § 1536(b)(3)(A)) (citing 50 C.F.R. § 402.14(h)). When crafting a BiOp, the consulting agency "(a) must use the best scientific data available, (b) must determine the environmental baseline of the listed species or critical habitat, (c) must evaluate the effects of the action and cumulative effects on the listed species or critical habitat, and (d) must add that baseline to the effects of the action and cumulative effects on the listed species or critical habitat (in light of the status of the species and critical habitat)[.]" *Id.* at 18 (citing 50 C.F.R. § 402.14(g)). If the consulting agency concludes that the agency action is "[l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," it issues what is called "a 'jeopardy' biological opinion." 50 C.F.R. § 402.14(h)(1)(iv). And if it concludes the opposite, it issues "a 'no jeopardy' biological opinion." *Id.*

"In the event of a 'jeopardy biological opinion,' the consulting agency 'shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency].'" *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 18

(quoting 16 U.S.C. § 1536(b)(3)(A)) (citing 50 C.F.R. § 402.14(h)(3), (g)(5)). "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." *Nat'l Ass'n of Home Builders*, 551 U.S. at 652.

In the event of a "no jeopardy biological opinion," the consulting agency may sometimes need to provide what is called "an incidental take statement." *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 18 (cleaned up). This is because the proposed action "may still cause some harm to the [listed] species" "[e]ven if . . . [it] will not 'jeopardize the continued existence' of [the] listed species." *Shafer & Freeman Lakes Env't Conservation Corp.*, 992 F.3d at 1080. "That type of harm is referred to as 'incidental take.'" *Id.* (quoting 50 C.F.R. § 402.14(i)). And when it "is reasonably certain to occur, the wildlife agency must include an 'Incidental Take Statement' as part of its [b]iological [o]pinion." *Id.* (citing 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7), (i)). The Incidental Take Statement (ITS) "(i) specifies the extent of the anticipated take, (ii) identifies any 'reasonable and prudent measures' that the wildlife agency considers 'necessary or appropriate to minimize such impact,' and (iii) sets forth detailed 'terms and conditions' that the action agency or licensed private party must undertake to implement those reasonable and prudent measures." *Id.* (quoting 16 U.S.C. § 1536(b)(4)) (citing 50 C.F.R. § 402.14(i)). And it "provides liability protection because any incidental take that 'is in compliance with the terms and conditions specified' by an ITS 'shall not be considered to be a prohibited taking of the species concerned.'" *WildEarth Guardians*, 749 F. Supp. 3d at 37 (quoting 16 U.S.C. § 1563(o)(2)).

The issuance of a biological opinion does not always mark the end of the story. Assuming "discretionary Federal involvement or control over the [agency] action has been retained or is authorized by law," the action agency and the consulting agency must reinitiate

formal consultation: "(1) [i]f the amount or extent of taking specified in the incidental take statement is exceeded; (2) [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) [i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(a). Such reinitiation "shall be requested" by the action agency. *Id.*

### 2.    The Surface Mining Control and Reclamation Act (SMCRA)

Congress enacted the Surface Mining Control and Reclamation Act "to establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." *Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 105 F.3d 691, 693 (D.C. Cir. 1997) (quoting 30 U.S.C. § 1202(a)). "Environmental impacts from surface coal mining (and the surface impacts of underground coal mining operations) are regulated through two basic mechanisms: a permit system . . . and a series of performance standards[.]" *Nat'l Wildlife Federation v. Hodel*, 839 F.2d 694, 701 (D.C. Cir. 1988). "The [SMCRA's] permit provisions require that before engaging in a surface coal mining operation, a mine operator must submit detailed information concerning the environmental consequences of the proposed mining operations and include a plan for recla[i]ming affected lands as required by the Act." *Id.* Each applicant must submit a "[p]rotection and enhancement plan" (PEP) describing "how . . . the operator will minimize disturbances and adverse impacts on fish and wildlife and related environmental values, including compliance with the [ESA], during the surface coal mining and reclamation operations[.]" 30 C.F.R. § 780.16(b). "Once the mining operation has begun, the mine operator must adhere to

the statutory environmental performance standards, many of which relate to the obligation to restore and reclaim affected lands." *Nat'l Wildlife Federation*, 839 F.2d at 701 (citations omitted).

"As part of its comprehensive regulatory scheme, the SMCRA provides for federal coordination with the states." *Coal River Mountain Watch v. U.S. Dep't of Interior*, 146 F. Supp. 3d 17, 20 (D.D.C. 2015). "After an interim period of direct federal regulation, states are authorized by the [SMCRA] to assume a major regulatory role." *Nat'l Wildlife Federation*, 839 F.2d at 701. "[A] State wishing to take permanent regulatory authority over the surface coal mining operations of non-Federal lands within its borders must submit a proposed permanent program to the Secretary of the Interior for his approval[.]" *Coal River Mountain Watch*, 146 F. Supp. 3d at 20 (cleaned up). "The proposed program must demonstrate that the state legislature has enacted laws implementing the environmental protection standards established by the Act and accompanying regulations, and that the State has the administrative and technical ability to enforce these standards." *Hodel*, 452 U.S. at 271 (citing 30 U.S.C. § 1253). "With the Secretary's approval, the state then assumes primary responsibility for SMCRA enforcement and rulemaking." *Nat'l Wildlife Federation*, 839 F.2d at 701. "The federal government, however, retains an active oversight responsibility." James Rasband et al., Natural Resources Law and Policy 1299 (3d ed. 2016).

"To fulfill Congress's vision for the federal government's oversight role, the SMCRA established within the Department [of the Interior] the OSMRE." *Indiana v. Haaland*, No. 24-cv-1665, 2024 WL 5213401, at *2 (D.D.C. Dec. 24, 2024) (citing 30 U.S.C. § 1211(a)). The Secretary of the Interior, acting through the OSMRE, "is to take the necessary steps to insure compliance with [the] SMCRA." *Nat'l Coal Ass'n v. Uram*, No. 87-cv-2076, 1994 WL 736422,

at *2 (D.D.C. Sept. 16, 1994) (citing 30 U.S.C. § 1211(a), (c)(1)). To this end, the OSMRE "shall evaluate the administration of each state program at least annually." 30 C.F.R. § 733.13(a)(1).

30 U.S.C. § 1271 "sets forth the Secretary's authority when conducting oversight of approved state programs." *Nat'l Coal Ass'n*, 1994 WL 736422, at *3. "Whenever, on the basis of information available to him, including receipt of information from any person, the Secretary has reason to believe that any person is in violation of any requirement of [the SMCRA], the Secretary shall notify the State regulatory authority, if one exists, in the State in which such violation exists." 30 U.S.C. § 1271(a)(1). The state regulatory authority "must respond to the OSMRE within ten days notifying the Secretary that it has 'take[n] appropriate action to cause said violation to be corrected' or 'show[] good cause for such failure[.]'" *Indiana*, 2024 WL 5213401, at *2 (quoting 30 U.S.C. § 1271(a)(1)). Should the state regulatory authority fail to show it has taken "appropriate action" or show good cause within ten days, the Secretary must "order [a f]ederal inspection of the surface coal mining operation at which the alleged violation is occurring[.]" *Id.* (quoting 30 U.S.C. § 1271(a)(1)). Based on the findings, the Secretary may be required to order "the cessation of mining at that site." *Id.* (citing 30 U.S.C. § 1271(a)(2)). And "if the Secretary believes that violations exist from the state's failure to enforce its program effectively, he can initiate proceedings to intervene directly by substituting federal enforcement of any part of the program." *Nat'l Coal Ass'n*, 1994 WL 736422, at *3 (citing 30 U.S.C. § 1271(b)); *see also Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 177 F.3d 1, 10 n.13 (D.C. Cir. 1999). "In some circumstances, the Secretary may eventually decide to withdraw the state's program approval[] and implement a federal program where the state 'fails to implement, enforce, or maintain its approved program.'" *Nat'l Coal Ass'n*, 1994 WL 736422, at *4 (quoting 30 U.S.C. § 1254(a)(3)).

### B.    Factual Background

#### 1.    The Effects of Coal Mining

The Plaintiffs are both non-profit 501(c)(3) corporations committed to overlapping environmental goals. *See* Am. Compl. ¶¶ 17–18. The Center for Biological Diversity "works to secure a future for all species, great or small, hovering on the brink of extinction." *Id.* ¶ 17. And Appalachian Voices is "committed to protecting the land, air, and water of the central and southern Appalachian region," with "a focus on reducing coal mining's impact on the region, including to species listed under the ESA." *Id.* ¶ 18. In this case, the Plaintiffs are particularly concerned about the ways that coal mining has negatively impacted threatened and endangered species in West Virginia, Kentucky, and Virginia. *See id.* ¶ 67.

The Plaintiffs allege that "coal mining activities have led to severe habitat degradation and dramatic population declines across the ranges of the Guyandotte River crayfish, Big Sandy crayfish, and candy darter." *Id.* ¶ 70. According to them, coal mining has had a particularly negative impact on the Guyandotte River crayfish, which now survives in only two streams in West Virginia. *Id.* They point to hundreds of SMRCA-related actions as evidence that "the coal industry has a track record of chronic non-compliance with the requirements of [the] SMRCA across the ranges of both the Guyandotte River crayfish and Big Sandy crayfish." *Id.* ¶ 73. All of these species are listed as endangered or threatened under the ESA. *See id.* ¶ 69.

#### 2.    The 1996 Biological Opinion

The Plaintiffs claim that coal operators used to rely on a 1996 FWS BiOp for take coverage, though they provide no support for that assertion. *See id.* ¶ 78. They say that this BiOp concluded that coal mines regulated by "properly implemented" SMCRA programs were "not likely to jeopardize the continued existence of listed or proposed species" or "result in the destruction or

adverse modification of designated or proposed critical habitats." *Id.* It apparently authorized the take of "all present and future Federally listed and proposed species" affected by mining operations regulated by the SMCRA. *Id.*

According to the Plaintiffs, this scheme began to change in 2015, when the OSMRE "undertook efforts to revise a set of regulations known as the Stream Protection Rule in order to better protect streams, fish, and wildlife from the adverse impacts of surface coal mining operations." *See id.* ¶ 79. In proposing changes to the SMCRA regulations, the OSMRE conceded that "it could no longer rely on the 1996 BiOp to meet its ESA Section 7 duties, and it therefore reinitiated formal programmatic consultation with the [FWS] in order to devise a new mechanism for avoiding jeopardy to listed species." *Id.*

The consultation process resulted in a 2016 BiOp that "was emphatic and unequivocal as to the failure of the 1996 BiOp to protect listed species in accordance with the ESA's mandates, the failure of state and federal agencies to consistently implement the technical assistance process set forth in that BiOp, and the consequent need to reinitiate programmatic consultation." *Id.* ¶ 80. The FWS pointed to the recent listing of the Guyandotte River crayfish and the Big Sandy crayfish—among other negative developments—to "illustrate the inadequacy of the [then-existing] SMCRA regulatory environment[.]" *Id.* ¶ 82.

But this change was short-lived. According to the Complaint, on February 2, 2017, Congress rescinded the 2016 revisions to the Stream Protection Rule. *See id.* ¶ 83. The FWS maintained that "this action also nullified the 2016 BiOp," *id.* ¶ 83, and it went on to reinstate the 1996 BiOp, *id.* ¶ 84. The Plaintiffs allege that by making this move, the FWS was "once again relying on this discredited regulatory scheme to satisfy [the] OSMRE's obligations under Section 7 of the ESA." *Id.*

### 3. The 2020 Biological Opinion

The Center for Biological Diversity sued the FWS and the OSMRE in 2019. *Id.* ¶ 85. This triggered the reinitiation of consultation for the SMCRA program, and on October 16, 2020, the FWS issued the 2020 BiOp, finally superseding the 1996 BiOp. *Id.* ¶ 85. The 2020 BiOp concludes that the OSMRE's implementation of the SMCRA is not likely to jeopardize the continued existence of proposed or listed species or destroy or adversely modify designated or proposed critical habitat. *Id.* ¶ 90. It also "sets forth a scheme for the SMCRA program's compliance with the ESA." *Id.* ¶ 87. One part of that scheme provides "take coverage to state regulatory authorities and mine permittees through a technical assistance 'coordination' process, wherein the state regulatory authority must submit a PEP to the [FWS] for approval." *Id.* State regulatory authorities also must "initiate a new coordination process with [the] FWS upon the listing of new species or designation of new critical habitat that may be affected by existing mining activities." *Id.* ¶ 90.

According to the Plaintiffs, the 2020 BiOp explains that PEPs must describe "how, to the extent possible using the best technology currently available, the operator will minimize disturbances and adverse impacts on fish and wildlife and related environmental values, including compliance with the [ESA]." *Id.* ¶ 91 (quoting 30 C.F.R. §§ 780.16(b), 784.21(b)). But it also provides more detail. *Id.* For example, it apparently refers to "[s]pecies-specific protection measures (SSPMs)," which "are activities deemed necessary to avoid, minimize, and monitor the effects of the proposed mining action on ESA-listed and -proposed species." *Id.* This term was referenced in the ITS of the 1996 BiOp, and the FWS uses the term in the 2020 BiOp "to describe measures that minimize the impacts of incidental take and *must be implemented* as a mandatory

condition in the permit if the regulatory authority and/or applicants choose to avail themselves of incidental take coverage under [the 2020 BiOp's] incidental take statement." *Id.* (emphasis added).

### 4. The Plaintiffs' Notice

The Plaintiffs recently "took it upon themselves to investigate whether mining facilities in Kentucky, West Virginia, and Virginia were impacting habitat for the Guyandotte River crayfish and Big Sandy crayfish without the PEPs and species-specific protective measures required by the 2020 BiOp." *Id.* ¶ 102. It found that 98% of the 114 mining facilities identified within three miles upstream from Guyandotte River crayfish critical habitat and 80% of the 346 mining facilities just upstream from Big Sandy crayfish critical habitat lacked PEPs for those species. *Id.* ¶ 104. They sent a formal notice letter to the Defendants "setting forth extensive violations of the scheme embodied in the 2020 BiOp that was relied on by FWS to find that the SMCRA permitting program would not jeopardize listed species or impair their critical habitats." *Id.* ¶ 102. The OSMRE responded by launching an investigation into the permits identified by the Plaintiffs, which resulted in the OSMRE's 2023 compliance investigation report. *See id.* ¶¶ 110, 115, 124, 128, 130. The Amended Complaint breaks down the alleged lack of compliance by state. *See id.* ¶¶ 107–32.

### a. Kentucky

The Plaintiffs allege that the Kentucky Energy and Environment Cabinet reported in a 2022 email to Appalachian Voices that "it believes over [two hundred] SMRCA permits within the state may require PEPs for Big Sandy crayfish due to their potential impacts to designated critical habitat." *Id.* ¶ 107. The Plaintiffs also allege that no mining facilities within three miles upstream of Big Sandy crayfish critical habitat in the state have PEPs for the species, "resulting in a noncompliance rate of 100%." *Id.* ¶ 108. According to the Plaintiffs, "Kentucky has provided [the] FWS with no draft PEPs for review for permits that may affect the Big Sandy crayfish." *Id.* ¶ 109.

The OSMRE's 2023 compliance investigation report states that Kentucky responded to the Plaintiffs' notice by informally discussing ninety-four of the permits with the FWS "to explore the need for PEPs." *Id.* ¶ 111. Kentucky believed that only fifteen permits required PEPs and species-specific protective measures. *Id.* The FWS provided "verbal approval," allowing seventy-nine permits to avoid implementing PEPs for the Big Sandy crayfish. *Id.* According to the Plaintiffs, the FWS provided no formal document memorializing this determination "or otherwise set[ting] forth a basis for the decision regarding the need for PEPs for these [seventy-nine] permits." *Id.* On a related note, the Plaintiffs allege that the OSMRE has taken no action to ensure that other mining facilities in Kentucky beyond those identified by the Plaintiffs have the requisite PEPs. *Id.* ¶ 112. The Plaintiffs further allege that, since the 2020 BiOp, the Defendants have failed to engage in consultation to address the impacts to listed species from Kentucky mining activities that have lacked the proper PEPs or species-specific protective measures. *Id.* ¶ 113.

### b. West Virginia

The Plaintiffs calculate that only six of the more than two hundred mining facilities within three miles upstream from critical habitat for the Guyandotte River crayfish and Big Sandy crayfish in West Virginia have PEPs for the species, "resulting in a noncompliance rate of 97%." *Id.* ¶ 114. The Plaintiffs also allege that the West Virginia Department of Environmental Protection reported in a 2022 email to Appalachian Voices that it had "sent 'several' proposed PEPs to [the] FWS for review and approval, but that FWS [was] 'backlogged' and therefore the state [had] not received a response on those PEPs." *Id.* ¶ 116.

The OSMRE's 2023 compliance investigation report states that FWS received ten "draft PEPs for review from West Virginia for permits that may affect these crayfish species" and that "3+" of the West Virginia SMCRA permits under review will need PEPs for the crayfish. *Id.* ¶ 115.

The Plaintiffs allege that mining activities have continued to adversely affect listed species' habitat in West Virginia. *Id.* ¶ 117. For example, according to the Plaintiffs, the West Virgina Department of Environmental Protection issued a permit amendment for "the Rocky Run surface mine and haul road" in 2022—a project involving the construction of a new haul road and surface mining "adjacent to designated habitat subunit 5f for the federally endangered candy darter in the South Fork Cherry River"—without a candy darter PEP. *Id.* Yet the OSMRE has allegedly not taken any action to ensure that West Virginia mining facilities other than those identified by the Plaintiffs have the required PEPs. *Id.* ¶ 118. And the Plaintiffs allege that the Defendants have failed to engage in consultation to address the impacts to listed species from West Virginia mining activities lacking the proper PEPs and species-specific protective measures since the 2020 BiOp. *Id.* ¶ 119.

### c. Virginia

The Plaintiffs believe that only sixty-six of the eighty-eight identified mining facilities near Big Sandy crayfish critical habitat in Virginia have PEPs for the species, "resulting in a noncompliance rate of 25%." *Id.* ¶ 121. The Plaintiffs also allege that in internal agency correspondence, the "OSMRE reported that as of May 10, 2023, [the] FWS was unable to determine how many draft PEPs it had received for review from Virginia for permits that may affect the Big Sandy crayfish." *Id.* ¶ 122. The OSMRE allegedly reported that the "FWS claimed that a staffing shortage had created a backlog in reviewing Virginia's SMCRA permits that may require PEPs." *Id.* And in a 2023 videoconference with the Center for Biological Diversity, the Virginia Department of Energy apparently cited two reasons for the lack of PEPs for many mining facilities in close proximity and upstream from Big Sandy crayfish critical habitat: the departure of a staff person and the 2020 BiOp's dispute resolution process for the Ball Ridge Mine. *Id.* ¶ 123.

The OSMRE's 2023 compliance investigation report states that Virginia told the agency it would not initiate coordination with the FWS for eight of the purportedly noncompliant permits until new permitting actions take place. *Id.* ¶ 124. It also states that the Virginia field office of the FWS reported a backlog of PEP reviews due to insufficient staff resources. *Id.* ¶ 127. According to the Plaintiffs, the OSMRE has not taken any action to ensure that mining facilities other than those identified by the Plaintiffs have the required PEPs. *Id.* ¶ 125. The Plaintiffs further allege that the Defendants have failed to engage in consultation to address the impacts to listed species from Virginia mining activities lacking the proper PEPs and species-specific protective measures since the 2020 BiOp. *Id.*

### 5.    The Defendants' Response

The Plaintiffs allege that the FWS responded to their notice letter by stating its position that "no compliance problems exist" with respect to the fulfillment of its role under the 2020 BiOp. *Id.* ¶ 127. And the OSMRE apparently responded by initiating an investigation "strictly focused on the permits that [the] Plaintiffs provided as examples of a program-wide problem" without ever indicating "an intention to investigate whether there are additional permits" without a required PEP. *Id.* ¶ 130. According to the Plaintiffs, the OSMRE does not appear to have any plan to provide the oversight envisioned in the 2020 BiOp to make sure that all mining facilities that "'may affect' listed or proposed species or critical habitat complete and implement a PEP with the necessary species-specific protective measures to ensure against jeopardy." *Id.* ¶ 131. And the Plaintiffs allege that neither the OSMRE nor the FWS has indicated any intention to reinitiate consultation on the SMCRA program. *Id.* ¶ 132.

## C.    Procedural Background

The Plaintiffs filed their Amended Complaint on March 4, 2024, raising three claims. *See id.* ¶¶ 133–59. First, they allege that the OSMRE and the FWS violated the ESA and its implementing regulations by failing to reinitiate consultation, *id.* ¶ 142 (citing 50 C.F.R. § 402.16), which constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA, *id.* (citing 5 U.S.C. § 706(1)). Second, they allege that the OSMRE violated Section 7(a)(2) of the ESA by not providing sufficient oversight for state-implementation of the SMCRA programs as required by the 2020 BiOp, thereby failing to "insure that SMCRA-regulated mining operations will not jeopardize the continued existence of listed species or adversely modify their critical habitat." *Id.* ¶ 150 (citing 16 U.S.C. § 1536(a)(2)). And third, they allege that the 2020 BiOp opinion is facially invalid. *Id.* ¶¶ 151–59 (citing 16 U.S.C. § 1536; 5 U.S.C. § 706(2)(A)).

The Defendants filed certified administrative record indices on July 10, 2024. *See* Admin. R., ECF No. 20. And the Plaintiffs filed a Motion to Complete and Supplement the Administrative Record on October 31, 2024, seeking to include ten sets of files in the administrative record.[1] *See* Pls.' Mot. Suppl. Admin. R., ECF. No. 25. This motion is fully briefed and ripe for review. *See* Pls.' Mem. Supp. Mot. Suppl. Admin. R. (Pls.' Mot. Supp.), ECF No. 25-1; Defs.' Opp'n, ECF No. 27; Pls.' Reply, ECF No. 28.

---

[1] The title of the motion includes a "Request for Judicial Notice." Pls.' Mot. Suppl. Admin. R. at 1. But as the Defendants argued, "the motion does not, in fact, include such request." Defs.' Opp'n at 3 n.2. And the Plaintiffs never responded to this point. *See* Pls.' Reply. So the Court will consider any such request abandoned. *Pauling v. District of Columbia*, No. 13-cv-943, 2015 WL 13891312, at *1 (D.D.C. June 15, 2015) (Jackson, J.) ("Courts have properly and consistently construed this type of silence as abandonment of the argument in question." (collecting cases)).

## LEGAL STANDARD

"It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981). "This principle flows from the APA itself, which directs courts to review agency actions based on 'the whole record or those parts of it cited by a party,'" *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 306 (D.D.C. 2021) (quoting 5 U.S.C. § 706), "meaning 'those documents that were before the administrative decisionmaker,'" *id.* (quoting *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 114 (D.D.C. 2009)).

"It is the agency's responsibility to compile for the court all information it considered either directly or indirectly." *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010). And "[t]he agency is entitled to a strong presumption of regularity in having done so." *Id.* (citations omitted); *see also Sara Lee Corp. v. Am. Bakers Ass'n*, 252 F.R.D. 31, 34 (D.D.C. 2008) (saying that the agency's "submission and certification of [the] administrative record as filed is entitled to a strong presumption of regularity"). "The Court's review is limited to the administrative record as compiled by the agency, save for 'certain narrow exceptions.'" *Open Society Institute*, 573 F. Supp. 3d at 307 (quoting *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 11 (D.D.C. 2001)). "Those 'narrow exceptions' . . . encompass two circumstances[.]" *Id.* (quoting *Amfac Resorts, L.L.C.*, 143 F. Supp. 2d at 11).

"First, a party may 'request to "add to the administrative record documents the agency considered" when it made its decision, that is, to complete the administrative record.'" *Id.* (quoting *Ctr. for Biological Diversity v. U.S. Army Corps of Engineers*, No. 20-cv-103, 2020 WL 5642287, at *8 (D.D.C. Sept. 22, 2020) (alterations omitted) (quoting *Pac. Shores Subdivision v. Army Corps. of Engineers*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006))). "The question in those circumstances

is whether 'the materials in question actually were before the agency at the time of its decision.'"
*Id.* (quoting *Bazzi v. Gacki*, No. 19-cv-484, 2020 WL 5653599, at *3 (D.D.C. Sept. 23, 2020)).
"In order for a Court to order [completion], the plaintiff must overcome [the] strong presumption
of regularity by putting forth concrete evidence that the documents it seeks to 'add' to the record
were actually before the decisionmakers." *The Cape Hatteras*, 667 F. Supp. 2d. at 114 (citation
omitted). "A court that orders an administrative agency to [complete] the record of its decision is
a rare bird." *Id.* at 112.

"Second, a party may ask the Court to consider or 'review . . . extra-record evidence'—
that is, 'evidence outside of or in addition to the administrative record that was not necessarily
considered by the agency.'" *Open Society Institute*, 573 F. Supp. 3d at 307 (quoting *Pac. Shores
Subdivision*, 448 F. Supp. 2d at 5). "Where a party requests that the Court consider extra-record
evidence, 'a more stringent standard applies,'" *id.* (quoting *Univ. of Colo. Health at Mem'l Hosp.
v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015)), "which requires the party to 'demonstrate
unusual circumstances justifying departure from the general rule,'" *id.* (quoting *Oceana, Inc. v.
Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018) (alterations omitted) (quoting *City of Dania Beach v.
FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010))). "The D.C. Circuit has identified 'at least three
instances,'" *id.* (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)),
"in which consideration of extra-record evidence is appropriate: (1) the agency deliberately or
negligently excluded documents that may have been adverse to its decision; (2) the district court
need[s] to supplement the record with background information in order to determine whether the
agency considered all of the relevant factors; or (3) the agency failed to explain administrative
action so as to frustrate effective judicial review," *id.* (cleaned up).

## DISCUSSION

The Plaintiffs seek to add ten sets of files to the administrative record. The Motion to Complete and Supplement the Administrative Record identifies nine sets of files. *See* Pls.' Mot. Suppl. Admin. R. at 1–2. And the Plaintiffs' Memorandum in Support argues for the inclusion of a tenth set of files—the OSMRE's 2023 annual evaluation reports for Kentucky, West Virginia, and Virginia's SMCRA programs. *See* Pls.' Mem. Supp. at 20–22.[2] They argue that some of these files were considered by the agencies and are therefore necessary to complete the administrative record. *See* Pls.' Mem. Supp. at 9–16. Separately, and in the alternative, they argue that all of the files should be included as extra-record evidence because they "provide background information that demonstrates that [the] OSMRE did not consider all of the relevant factors." Pls.' Reply at 1. The Plaintiffs also initially argued that some of these files should be included as extra-record evidence "because they are adverse to [the] OSMRE's position and were deliberately excluded." Pls.' Mem. Supp. at 1. But they have since abandoned this argument by failing to respond to the

---

[2] The Plaintiffs' Memorandum in Support also mentions two additional sets of files that the Court will not consider. First, the Memorandum's Table of Exhibits references Exhibit 1, which it calls the FWS's "Final Programmatic Biological Opinion and Conference Opinion on the United States Department of the Interior Office of Surface Mining Reclamation and Enforcement's Surface Mining Control and Reclamation Act Title V Regulatory Program." Pls.' Mem. Supp. at iii. But the Plaintiffs never argue that this Exhibit should be included in the administrative record. *See generally id.* The Defendants argue that Exhibit 1 is duplicative of a document already included in the OSMRE's record, *see* Defs.' Opp'n at 8, and the Plaintiffs never respond to this argument, *see* Pls.' Reply, so the Court considers the matter abandoned to the extent it was ever raised at all, *Pauling*, 2015 WL 13891312, at *1 ("Courts have properly and consistently construed this type of silence as abandonment of the argument in question." (collecting cases)).

Second, the Memorandum makes a conditional argument to supplement the administrative record with the OSMRE's 2024 evaluation reports for Kentucky, West Virginia, and Virgina "to the extent that the 2024 reports for any of the three states are in fact finalized as of [the] OSMRE's production of the final version of the record." Pls.' Mem. Supp. at 21 n.9. But the Plaintiffs have provided no updates on the existence of these reports. The Court therefore does not rule on this argument.

Defendants' arguments to the contrary. *See* Defs.' Opp'n at 8 ("Plaintiffs have failed to show that their exhibits fit within any exception for either completion or supplementation of OSMRE's administrative record."); Pls.' Reply at 1–3 (mentioning only the relevant-factors exception); *Pauling*, 2015 WL 13891312, at *1 ("Courts have properly and consistently construed this type of silence as abandonment of the argument in question." (collecting cases)).

### A.    Completing the Administrative Record

The Plaintiffs first move to complete the administrative record. They argue that Exhibits 2, 3, and 4 should be included in the administrative record because they "were in the possession of the agency and were considered either directly or indirectly during its review of the ongoing violations of the ESA set forth in [the] Plaintiffs' complaint." Pls.' Mem. Supp. at 9. The Court disagrees.

### 1.    Exhibit 2

The Plaintiffs argue that Exhibit 2 should be included in the administrative record. *See* Pls.' Mem. Supp. at 9–11. Exhibit 2 consists of the OSMRE's enforcement records related to water quality violations at the Rocky Run mine in West Virginia. *See id.* at 9. This mine lies in the endangered candy darter's designated critical habitat on the South Fork Cherry River. *Id.* But the Plaintiffs fail to identify any "reasonable, *non-speculative grounds* for [their] belief that the documents were *considered* by the agency and not included in the record." *Marcum*, 751 F. Supp. 2d at 78 (quoting *Pac. Shores*, 448 F. Supp. 2d at 6).

*First*, the Plaintiffs show incredulity toward the idea that the "OSMRE somehow failed to consider these highly relevant documents that were in its possession." Pls.' Mem. Supp. at 9; *see also id.* at 9–11 (saying the OSMRE excluded relevant information when it excluded Exhibit 2). But "[a] plaintiff cannot merely assert . . . that materials were relevant and were before

an agency when it made its decision" to show that those materials are part of the administrative record. *Marcum*, 751 F. Supp. 2d at 78 (cleaned up). "[I]interpreting the word 'before' so broadly as to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless." *Pac. Shores*, 448 F. Supp. 2d at 5 (cleaned up).

*Second*, the Plaintiffs argue that the documents must have been before the agency because "portions of this same set of documents *were* included in the record, showing that these files were relevant and were considered by OSMRE." Pls. Reply at 4; *see also* Pls.' Mem. Supp. at 11. According to the Plaintiffs, the enforcement documents included in Exhibit 2 come from a "document file" or an "enforcement file" created by the OSMRE while overseeing the West Virginia SMCRA program. Pls.' Mem. Supp. at 9. They say that the OSMRE then omitted from the administrative record any mine site evaluations "contained in the file that did not explicitly state that the violations at issue concerned listed species, critical habitat, and [PEPs] developed pursuant to the 2020 BiOp." Pls.' Reply at 4.

The Plaintiffs seem to be arguing that because the enforcement file itself was considered by the OSMRE—as evidenced by the inclusion of some documents included within it—the documents in Exhibit 2 necessarily must have been considered since they apparently come from that same file. *See id.* ("[T]he entire file was before the agency and was considered[.]"). But they offer no theory for why this would not entail including the hundreds of additional mine site evaluations also omitted from the administrative record. *See* Defs.' Opp'n at 10 ("OSMRE's record properly does not include *any* of these hundreds of MSEs that—like Exhibit 2—do not relate to violations of PEPs or impacts to ESA-listed species or designated critical habitats."); *cf. Taylor Energy Comp. LLC v. United States*, No. 20-cv-1086, 2021 WL 538052, at *8 (D.D.C. Feb.

15, 2021) ("That a few IGCEs or PRs were attached . . . to one email in the administrative record does not suffice to prove that NPFC considered *all* IGCEs and PRs."). The Plaintiffs hint that the Exhibit 2 documents might be unique because they are also relevant. *See* Pls.' Reply at 4 (saying they "are relevant and were considered by [the] OSMRE"). But the gap between relevance and consideration is not obvious to the Court. *See General Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 18 (D.D.C. 2009) ("But irrelevant documents *should* be excluded from the record—the record should only include documents that the agency directly or indirectly considered." (cleaned up)). The Plaintiffs have therefore failed to overcome the "strong presumption of regularity" afforded to the Defendants. *Marcum*, 751 F. Supp. 2d at 78.

### 2.    Exhibit 3

The Plaintiffs next argue that Exhibit 3 should be included in the administrative record. *See* Pls.' Mem. Supp. at 11–12. Exhibit 3 consists of "three pages of OSMRE emails regarding Kentucky's, West Virginia's, and Virginia's compliance with the 2020 BiOp." *Id.* at 11. These emails followed the Plaintiffs' notice letter, "wherein [the] OSMRE began communicating with [the] FWS about the degree of implementation of the 2020 BiOp coordination procedures in the three states at issue in this litigation." *Id.* at 11–12. According to the emails, in the nearly three years between the 2020 BiOp and May 2023, Kentucky had submitted zero PEPs to the FWS for coordination and review; West Virginia had submitted only ten; and the FWS was unable to determine how many Virginia had submitted. *See id.* at 12.

But these emails fall within the scope of the deliberative-process privilege. And "[c]ourts in this District have long held that materials that fall within the scope of the deliberative-process privilege are not part of the administrative record." *Citizens for Resp. & Ethics in Wash. v. FEC*, No. 22-cv-35, 2024 WL 2110141, at *5 (D.D.C. May 10, 2024); *accord Campuzano v. United*

*States*, No. 24-cv-1652, 2024 WL 5331992, at *2 (D.D.C. Dec. 30, 2024). "Deliberative documents are excluded from the record because, when a party challenges agency action as arbitrary and capricious, the reasonableness of the agency's action 'is judged in accordance with its stated reasons.'" *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*, 631 F. Supp. 2d 23, 27 (D.D.C. 2009) (quoting *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 156 F.3d 1279, 1279 (D.C. Cir. 1998)). "[T]he actual subjective motivation or agency decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior." *In re Subpoena Duces Tecum*, 156 F.3d at 1279–80.

"The deliberative process privilege shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 266 (2021). "The privilege therefore distinguishes between predecisional, deliberative documents, which are exempt from disclosure, and documents reflecting a final agency decision and the reasons supporting it, which are not." *Id.* at 268 (citation omitted). "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Id.* (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–152 (1975); *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184–86 (1975)). "There is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional." *Id.*

"[I]nternal and deliberative emails and drafts of agency decisions are the sort of materials often protected by the deliberative process privilege." *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 85 (D.D.C. 2018). And that fits Exhibit 3 to a tee. The email reporting the number of PEPs submitted to the FWS repeatedly says that the numbers were only initial. *See* Pls.' Mot. Suppl. Admin. R.,

23

Ex. 4 at 1, ECF No. 25-4 ("We did receive some initial information from the FWS field offices[.]");
*id.* at 2 ("[I]ncluded is a summary of initial NOI responses from the relevant Service ES field
offices."). So Exhibit 3 falls within the scope of the deliberative-process privilege.

The Plaintiffs argue that they "only seek to have the factual information contained in the
emails included in the record." Reply at 8. "But the so-called 'fact/opinion' dichotomy is not [so]
clearly delineated[.]" *Oceana, Inc.*, 290 F. Supp. 3d at 84. "As the D.C. Circuit has explained in
the FOIA context, 'the legitimacy of withholding [under the deliberative-process privilege] does
not turn on whether the material is purely factual in nature or whether it is already in the public
domain, but rather on whether the selection or organization of facts is part of an agency's
deliberative process.'" *Id.* (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d
504, 513 (D.C. Cir. 2011)). Here, the agency officials' selection and organization of the PEP
numbers and permit numbers appear to have been part of the OSMRE's deliberative process for
responding to the Plaintiffs' notice of intent to sue. *See* Pls.' Mot. Suppl. Admin. R., Ex. 4 at 1–3,
ECF No. 25-4 ("RE: Center for Biological Diversity NOI Response"); *id.* at 2 ("[W]e sent the
following two questions to KYESFO . . . , WVESFO, and VAESFO to guide their review and
assist HQ ES with considering our response to CBD's SMCRA NOI."); *see also* 50 C.F.R.
§ 402.16 (requiring reinitiation of consultation if new information reveals previously unconsidered
effects on listed species or critical habitat). So the factual nature of the emails does not remove
them from the scope of the deliberative-process privilege.

### 3.    Exhibit 4

Finally, the Plaintiffs argue that Exhibit 4 should be included in the administrative record.
*See* Pls. Mem. Supp. at 13–16. "Exhibit 4 compiles over 170 water quality-related violations
documented by WVDEP at dozens of mines in close proximity upstream from designated critical

habitat[s] for listed aquatic species in West Virginia throughout parts of 2021 and 2022." *Id.* at 13. The OSMRE staff used this data "to make a summary table that indicates the percent of SMCRA sites with no offsite impacts." Defs.' Opp'n at 15. This summary table was then included in the 2022 annual report for West Virginia. *Id.* And according to the Defendants, this "final report is what agency decision makers consider directly or indirectly as part of their review and decision-making process." *Id.*

The Plaintiffs fail to provide any "concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers." *The Cape Hatteras*, 667 F. Supp. 2d at 114 (citation omitted). They argue that "[s]ince [the] OSMRE acknowledges that it did consider the information set forth in its evaluation report that was based on the list set forth in Exhibit 4, the information in Exhibit 4 was before the agency and provides the basis for any reasonable review of the impacts of specific mines that may be impacting listed species." Pls.' Reply at 10. But agencies "can determine which datasets to consult and utilize in its analysis without consulting or utilizing the underlying data in that set." *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 82 (D.D.C. 2018). And here, the OSMRE claims that it chose to consider Table 5 without utilizing the underlying data in Exhibit 4. *See* Opp'n at 15. The Plaintiffs have therefore not provided a "concrete, non-speculative basis upon which to conclude" that the agency considered Exhibit 4. *Oceana Inc.*, 290 F. Supp. 3d at 82.

**B.    Including Extra-Record Evidence**

The Plaintiffs also argue that all of the proffered files "provide background information that demonstrates that OSMRE did not consider all of the relevant factors." Pls.' Reply at 1.[3] "The 'relevant factors' ground for supplementation comes into play where a party seeks to demonstrate that an agency decision was arbitrary because the agency did not consider some important aspect of the regulatory problem before it." *Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62, 69 (D.D.C. 2020) (quoting 44 Wright & Miller, Fed. Prac. & Proc. § 8391 (2d ed. 1987)). "A reviewing court may therefore 'consider evidence not included in the administrative record to ascertain *whether* the agency considered all factors relevant to its decision.'" *Id.* (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 2d 1, 7 (D.D.C. 2001) (emphasis added)); *see also CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("[R]esort to extra-record evidence may, for example, help the court to determine whether the administrative record is deficient in the first place."). "However, the court may never 'substitut[e] . . . [its] determination for the agency's, based on the non-record information.'" *Oceana, Inc.*, 454 F. Supp. 3d at 69 (quoting *Sw. Ctr. for Biological Diversity*, 131 F. Supp. 2d at 8); *see also Envtl. Def. Fund., Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) ("Consideration of [extra-record] evidence to determine the correctness or wisdom of the agency's decision is not permitted, even when the court has also examined the administrative record." (cleaned up)).

---

[3] The Plaintiffs originally also argued that some number of these files should be included as extra-record evidence because "they are adverse to [the] OSMRE's position and were deliberately excluded." Pls.' Mem. Supp. at 1. But as the Court has explained, they have since abandoned this argument by failing to respond to the Defendants' counterarguments. *See supra*, at 19–20; *see also Pauling*, 2015 WL 13891312, at *1 ("Courts have properly and consistently construed this type of silence as abandonment of the argument in question." (collecting cases)).

"To satisfy the 'relevant factors' exception, the document in question must do more than raise nuanced points about a particular issue; it must point out an *entirely new* general subject matter that the defendant agency failed to consider." *Oceana, Inc.*, 454 F. Supp. 3d at 70 (cleaned up); *see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (saying an agency action is arbitrary "if the agency . . . entirely failed to consider an important aspect of the problem"). "The question then becomes at what 'level of generality' courts should 'define[] the relevant factor which the agency must consider.'" *Oceana, Inc.*, 454 F. Supp. 3d at 70 (quoting *Sw. Ctr. for Biological Diversity*, 131 F. Supp. 2d at 8).

### 1.    Exhibit 2

The Plaintiffs first argue that Exhibit 2 must be included as background information. *See* Pls.' Mem. Supp. at 10. Exhibit 2 consists of OSMRE's enforcement records related to water quality violations at the Rocky Run mine in West Virginia. *See id.* at 9. This mine lies in the endangered candy darter's designated critical habitat on the South Fork Cherry River. *Id.* The documents include West Virginia records of violations obtained by the OSMRE in its oversight role and OSMRE's analysis of West Virginia's related enforcement actions. *See id.*

Some of the recorded violations could plausibly suggest that the candy darter is not being sufficiently protected. These records "pertain to water pollution and sediment control violations from mines that are in close proximity to—and upstream from—[the] designated critical habitat for the endangered candy darter." *Id.* at 9–10. For example, one operator contaminated the watershed with toxic coal pollution and spent eighteen months declining to comply with permit requirements to revegetate denuded soils. *See id.* at 10 (citing Ex. 2 at 1–7). That same operator also engaged in other violations at a different mining facility in the same watershed. *See id.*

(citing Ex. 2 at 38–47). The Plaintiffs therefore argue that these records "show potential harm to [a] listed species where the agencies *ignored* the potential for such harm and the need for a PEP, thereby sowing that they failed to consider all relevant factors." *Id.*

The Defendants counter that none of these records are relevant. *See* Defs.' Opp'n at 10 (citing *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 18 (D.D.C. 2009)). They explain that for each mine site evaluation, the inspector checked "N" when asked if there were "Any Off-Site Impacts (Y/N)." *Id.* at 9–10. Therefore, they argue, "the records in question do not indicate any impacts to ESA-listed species or designated critical habitats or note any violations of [PEPs]." *Id.* at 10. They view these records as a few of the "hundreds" of mine site evaluations that "do not relate to violations of PEPs or impacts to ESA-listed species or designated critical habitats." *Id.*

But the Defendants "put[] the cart before the horse" and "confuse[] the summary judgment question . . . with the admissibility question[.]" *Oceana, Inc.*, 454 F. Supp. 3d at 72 (cleaned up). The Court is not currently tasked with deciding whether the factors captured by these records are relevant and therefore should have been considered. *See id.* It need only decide whether the records are "needed to discern *whether* the agency considered" such factors. *Id.* (citation omitted).

The Plaintiffs argue that the documents in Exhibit 2 "show potential harm to listed species"—a factor they argue should have been considered. Pls.' Mem. Supp. at 10; *see also The Cape Hatteras*, 667 F. Supp. 2d at 116 (suggesting movants must identify the "particular factors [the agency] failed to consider"). But they acknowledge that the administrative record already includes mine site evaluations "performed by inspectors between 2020 and 2023 that explicitly identified violations of [PEPs] or impacts to species listed under the [ESA] or designated critical habitats[.]" Joint Status Report at 2, ECF No. 32. Indeed, two of those evaluations expressly note off-site impacts. *See* OSMRE_0031951; OSMRE_0031967.

And another one explains how a permit "may affect" two different listed species, with the caveat that those effects are unlikely. *See* OSMRE_0031926. So this factor cannot form the basis for adding this extra-record evidence. *See Oceana, Inc.*, 454 F. Supp. 3d at 70 ("Oceana has not shown . . . that [the] 'administrative record is *silent* about' the agency's consideration of the first three factors." (quoting *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 5 (D.D.C. 2017)); *Am. Wildlands v. Norton*, No. 05-cv-1043, 2006 WL 2780702, at *1 (D.D.C. Sept. 21, 2006) ("The letters discuss issues . . . that were considered by the agency."); *see also Carlton v. Babbitt*, 26 F. Supp. 2d 102, 107 (D.D.C. 1998) (declining to supplement the record where the agency already considered the issue of "lag time").

The Plaintiffs also offer a more specific factor for consideration: "that real-world offsite impacts to the candy darter's designated critical habitat were occurring as a result of reported violations." Pls.' Reply at 7. But this is not an "'entirely new' general subject matter that the defendant agency failed to consider." *Oceana, Inc.*, 454 F. Supp. 3d at 70 (quoting *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) (emphasis omitted). At bottom, the Plaintiffs seem to think that the "OSMRE . . . erroneously described [the Exhibit 2] incidents as having 'no offsite impacts.'" Pls.' Reply at 7. But the Court may not use this extra-record evidence to second-guess the OSMRE's determinations. *See Oceana, Inc.*, 454 F. Supp. 3d at 71; *Sw. Ctr. for Biological Diversity*, 131 F. Supp. 2d at 8; *see also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) ("[R]eviewing courts may not look to [extra-record] evidence as a basis for questioning the agency's scientific analyses or conclusions."); *Native Ecosystems Council v. Weldon*, 232 F. Supp. 3d 1142, 1149 (D. Mont. 2017) (choosing not to consider extra-record declarations because "[t]hey do not support the proposition that the agency failed to consider relevant factors, but rather that its consideration of

those factors was scientifically unsound"). The OSMRE's record and the FWS's record combine to run more than 69,500 pages in length. *See* Defs.' Opp'n at 1. This is not a "threadbare" administrative record that might undercut deference. 1 Pub. Nat. Resources L. § 8:50, Westlaw (database updated Feb. 2025) (citing *Helena Hunter & Anglers Ass'n v. Marten*, 470 F. Supp. 3d 1151, 1166 (D. Mont. 2020) ("[A] Court cannot defer to a void." (cleaned up))). The Court therefore declines to add Exhibit 2 to the administrative record.

### 2.    Exhibit 3

The Plaintiffs next argue that Exhibit 3 "provides important background information that will allow the Court 'to determine whether the agency considered all the relevant factors' regarding the potential for jeopardy to listed species." Pls.' Reply at 9 (quoting *Dania Beach*, 628 F.3d at 590). But the Plaintiffs waived this argument by raising it for the first time in a reply brief. *See Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 538 n.3 (D.D.C. 2021) (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007)); *see also* Pls.' Mem. Supp. at 11–12 (mentioning nothing about relevant factors). And Exhibit 3 falls within the scope of the deliberative-process privilege regardless. *See supra*, at 22–24. So the Court will not add it to the administrative record. *See, e.g.*, *Oceana, Inc. v. Guitterez*, No. 08-cv-318, 2009 WL 8725110, at *2–5 (D.D.C. May 28, 2009) (listing the extra-record evidence exceptions then denying the plaintiff's motion to add documents to the administrative record because they fell within the scope of the deliberative-process privilege).

### 3.    Exhibit 4

The Plaintiffs argue that Exhibit 4 "provides the Court with essential background information to help determine whether the agency considered all the relevant factors." Pls.' Mem. Supp. at 16. "Exhibit 4 compiles over 170 water quality-related violations documented by WVDEP

at dozens of mines in close proximity upstream from designated critical habitat[s] for listed aquatic species in West Virginia throughout parts of 2021 and 2022." *Id.* at 13. The Plaintiffs therefore argue that "this document indicates that WVDEP's enforcement actions are not effectively protecting listed species from coal mining pollution-induced jeopardy," and that the Court needs Exhibit 4 to determine whether the OSMRE considered all relevant factors. *Id.* at 16.

The Court is not persuaded. As the Defendants point out, this data is summarized into a table for each year's annual evaluation report, and the administrative record already includes the 2022 West Virginia Annual Evaluation Report, including the summary table (Table 5). *See* Defs.' Opp'n at 15; *see also* OSMRE_0029573–76. So no new factor would be introduced by Exhibit 4. *See Oceana, Inc.*, 454 F. Supp. 3d at 70 ("Oceana has not shown . . . that [the] administrative record is *silent* about the agency's consideration of the first three factors." (cleaned up)); *Am. Wildlands*, 2006 WL 2780702, at *1 ("The letters discuss issues . . . that were considered by the agency."); *see also Carlton*, 26 F. Supp. 2d at 107 (declining to supplement the record where the agency already considered the issue of "lag time").

The Plaintiffs argue that Table 5 is insufficient because it "merely indicates the percent of SMCRA sites with off-site impacts in the State." Pls.' Reply at 10. According to the Plaintiffs, Exhibit 4 would provide new information that speaks to "the types of violations, where the violations are occurring, and whether listed species are being harmed." *Id.* But "the document in question must do more than raise nuanced points about a particular issue; it must point out an entirely new general subject matter that the defendant failed to consider." *Oceana, Inc.*, 454 F. Supp. 3d at 70 (cleaned up); *see, e.g.*, *id.* at 72 (including year-by-year data of a decline in dusky shark interactions and mortalities because they were necessary to determine whether the agency failed to consider alternative causes of trends in the data). The granularity of these

alternative factors therefore makes them insufficient, and the Court will not add Exhibit 4 to the administrative record.

### 4. Exhibit 5

The Plaintiffs argue that Exhibit 5 "will provide the Court with essential background information to help determine whether the agency considered all the relevant factors." Pls.' Mem. Supp. at 20. Exhibit 5 is a "report created by [the] OSMRE following a study undertaken by the agency regarding harm to endangered crayfish from water quality impacts at coal mines in West Virginia." *Id.* at 16–17. The study set out to determine the origins of certain sediment and "if existing erosion and sedimentation controls used by the mining operations and approved by the WVDEP are effective in protecting these species[.]" *Id.* at 17. Such sediment matters to the crayfish because "[e]xcessive sedimentation leading to substrate embeddedness creates unsuitable conditions for [the] species." 85 Fed. Reg. 5072, 5076 (Jan. 28, 2020). And it appears that the study documented "significantly elevated levels of sediment pollution in Pinnacle Creek and Clear Fork, the Guyandotte River crayfish's last remaining streams." Pls.' Mem. Supp. at 18.

But the problem is that Exhibit 5 is a draft report that falls within the scope of the deliberative-process privilege—a point the Plaintiffs appear to address only in a footnote, *see* Pls.' Reply at 11 n.8. As explained above, this privilege "shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 266 (2021). While it is not always obvious whether a document amounts to an agency's final decision, "one thing is clear: A document is not final solely because nothing else follows it." *Id.* at 268; *see also id.* ("Sometimes a proposal dies on the vine."). "What matters, then, is not whether a document is last in line, but whether it communicates a policy on which the agency has settled." *Id.* To answer this question, "courts must

consider whether the agency treats the document as its final view on the matter." *Id.* "[A] document that leaves agency decisionmakers 'free to change their minds' does not reflect the agency's final decision." *Id.* at 269 (citing *Grumman*, 421 U.S. at 189–90 & n.26).

"A draft is, by definition, a preliminary version of a piece of writing subject to feedback and change." *Id.* "That is not to say that the label 'draft' is determinative." *Id.* Courts must evaluate documents in the context of the administrative process to confirm that they were "opinions subject to change." *Id.* Here, the draft report was "prepared at the staff level and has not been finalized." Defs.' Opp'n at 17. And "[a]s a staff-level draft, the report's methodology, findings, and conclusions have not been peer reviewed or otherwise vetted, much less formally accepted or adopted by the agency." *Id.* It does not matter that the report "has sat idle for years without being finalized." Reply at 11 n.8. The Court is "wary of interfering" with this draft just because it has "not ripen[ed] into [an] agency decision[.]" *Sears*, 421 U.S. at 151 n.18. The Court will therefore not add Exhibit 5 to the administrative record. *See Citizens for Resp. & Ethics in Wash.*, 2024 WL 2110141, at *5 ("Courts in this District have long held that materials that fall within the scope of the deliberative-process privilege are not part of the administrative record.").

### 5.    Exhibit 6

The Plaintiffs argue that Exhibit 6 "demonstrates that [the] OSMRE did not consider all of the relevant factors." Pls.' Mem. Supp. at 25. Exhibit 6 includes records of various water quality-related violations from 2021 by the Pretty Ridge Surface Mine within the watershed that has been designated as a critical habitat for the endangered candy darter on the South Fork Cherry River in West Virginia. *See id.* at 23; *id.*, Ex. 6, ECF No. 25-7; Defs.' Opp'n at 19. It shows that the same operator in charge of the Rocky Run mine began mining the Pretty Ridge Surface Mine "without even finishing construction of [the] required sediment control structures." Pls.' Mem.

Supp. at 23 (citing Ex. 6 at 1). It also continued mining after the existing sediment control structures failed, diverted runoff to avoid sediment control systems, unlawfully dumped mining spoil in the stream management zone, and mined outside of its permitted area, among other violations. *See id.* (citing Ex. 6 at 8, 10).

The Plaintiffs are not clear about the factors contributed by Exhibit 6. *See* Pls.' Mem. Supp. at 22 ("These reports will show any state [SMCRA] program problems uncovered by [the] OSMRE's oversight, and thus reveal ongoing harm to habitat for listed species at mines that are directly at issue in this litigation."); Pls.' Reply at 14 ("[T]hese are state enforcement records that reflect significant impacts to candy darter critical habitat from SMCRA permit violations[.]"); *id.* at 15 (saying these documents "speak directly to the jeopardy and adverse modification issues highlighted in [the] Plaintiffs' Claim II"). But regardless of their framing, the OSMRE's record already includes its 2021 annual report for West Virginia, which "includes a discussion of the number of violations issued by the state and by [the] OSMRE, and the types of violations, and compares those violations to historic totals." Defs.' Opp'n at 20; *see also* Joint Status Report (citing OSMRE_0029232–33; OSMRE_0029294–96; OSMRE_0029311–12; OSMRE_0029316–17). So Exhibit 6 does not "point out an *entirely new* general subject matter that the defendant agency failed to consider." *Oceana, Inc.*, 454 F. Supp. 3d at 70 (cleaned up).

### 6.    Exhibits 7, 8, 9, 10, and the 2023 Reports

Finally, the Plaintiffs argue that Exhibits 7, 8, 9, and 10 provide "background information that demonstrates that [the] OSMRE did not consider all of the relevant factors in its overview of State SMCRA program compliance with the 2020 BiOp and the ESA." Pls.' Mem. Supp. at 27–28 (Exhibits 7 and 8); *see also id.* at 29–30 (Exhibits 9 and 10). And they say the same about the

OSMRE's 2023 annual evaluation reports for Kentucky, West Virginia, and Virginia.[4] *See id.* at 22. Exhibits 7 and 8 are two citizen complaints filed with the OSMRE regarding permitting actions at the Point Lick Surface Mine and the Poca No. 11 Mine. Pls.' Mem. Supp. at 25. Exhibit 7 was filed on November 17, 2023, and Exhibit 8 was filed on December 16, 2023. *Id.* at 26. Exhibit 9 is a complaint filed with the OSMRE by the Plaintiffs regarding water quality violations in the candy darter's critical habitat on the South Fork Cherry River. *Id.* at 28. And the attachments to that complaint are found in Exhibit 10. *Id.* This complaint was filed on December 8, 2023. *Id.* Finally, the 2023 annual evaluation reports are "the final product of [the] OSMRE's mandatory annual review of the efficacy of the States' [SMCRA] programs, wherein [the] OSMRE analyzes and describes the sufficiency of state regulatory compliance with the requirements of Title V of SMCRA." *Id.* at 20.

The Defendants argue against adding these documents because they post-date August 18, 2023, which is when the "OSMRE made its determination" not to "reinitiate ESA consultation." Defs.' Opp'n at 21; *see also id.* (citing *Overton Park*, 401 U.S. at 420 (teaching that courts should base their evaluation on "the full administrative record that was before the Secretary *at the time he made his decision*" (emphasis added)); *Costle*, 657 F.2d at 284 (saying that the administrative record includes materials that were "before the agency *at the time the decision was made*" (emphasis added))). The Defendants have called this a final agency action, *id.* at 21–22; *see also*

---

[4] The Plaintiffs never originally argued that these reports should be added to the administrative record because they were deliberately or negligently excluded from the administrative record as documents that were adverse to an agency decision. *See* Pls.' Mem. Supp. at 20–22. The Defendants nevertheless argued that they were not "deliberately or negligently excluded." Defs.' Opp'n at 23. And the Plaintiffs were silent on this issue in response. *See* Pls.' Reply at 17–18. So to the extent the Plaintiffs believe they ever raised this argument, they have since abandoned it. *See Pauling*, 2015 WL 13891312, at *1.

*id.* at 13 (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)), and the Plaintiffs have not contested this characterization, *see* Pls.' Reply at 15–18.

But this case is not so simple. As the Plaintiffs point out, they have challenged not only the agencies' decision not to reinitiate consultation in violation of the ESA and the APA, but also the OSMRE's continued failure to protect endangered species in violation of the ESA. *See* Pls.' Reply at 15–16; Am. Compl. ¶¶ 133–50. And "because there is no clear end-point to decision-making when an agency has failed to act, some courts have allowed an agency to supplement the record with relevant documents generated after the agency produced the administrative record." *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 540 (D.D.C. 2021). The Court nonetheless declines to add this evidence for two reasons.

*First*, the case law in this District counsels against considering extra-record evidence for agency inaction claims when they are brought alongside agency action claims. *Dallas Safari Club* faced this very question when a plaintiff brought a Section 706(2) claim for agency action and a Section 706(1) claim for agency inaction and argued that the latter meant that "the court [was] not limited to the agency's tendered record." 518 F. Supp. 3d at 538. But the court explained that it would "make[] little sense" to "apply different standards of review to different claims, even though they are premised on the same theory of violation." *Id.* at 538–39. It rejected the idea that "the court is confined to the administrative record in determining whether FWS's failure to act was 'per se arbitrary and capricious' . . . but is permitted to engage in *de novo*, extra-record review to assess whether the processing of their applications was 'unreasonably delayed[.]'" *Id.* at 539. The Court is persuaded by this reasoning.

*Dallas Safari Club* acknowledged an exception to the general rule. It said that "there are some failure-to-act cases where, as a practical matter, judicial review is difficult, if not impossible,

absent extra-record evidence." *Id.* at 540. "For example, where an agency has failed to act, there simply may not be a record to review because the agency quite literally has done nothing." *Id.* *Democracy Forward Foundation v. Pompeo* presented such a case. 474 F. Supp. 3d 138 (D.D.C. 2020). There, the court contemplated admitting evidence to support the plaintiff's Section 706(1) claim but not its Section 706(2) claim, because the lack of final agency action meant that there were "no written documents reflecting [the agency's] consideration or decision[.]" *Id.* at 149, 153 (ultimately declining to admit the evidence due to hearsay concerns); *see also Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 20-cv-3706, 2023 WL 1860960, at *4 (D.D.C. Feb. 9, 2023) (declining to consider extra-record evidence for an agency inaction claim because there was a "lengthy administrative record"). But this exception does not apply here where the administrative record is already voluminous. *See* Defs.' Opp'n at 1 ("[The] OSMRE's record consisted of 1,167 documents and 31,975 pages, and [the] FWS's record consisted of 1,636 documents and 37,527 pages.").

*Second*, even where courts do consider extra-record evidence for agency inaction claims, they tend not to add that evidence to the administrative record. *See, e.g.*, *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (considering supplemental material that had been submitted); *Nio v. U.S. Dep't of Homeland Sec.*, 314 F. Supp. 3d 238, 242 (D.D.C. 2018) (considering "an exhibit to Plaintiffs' motion for summary judgment"); *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (allowing review of extra-record materials "where no administrative record was ever filed").

The Plaintiffs cite only one unreported case where a court added a document to the administrative record because the plaintiff challenged agency inaction. *See* Pls.' Mem. Supp. at 22

(citing *Chem. Weapons Working Grp. v. U.S. Dep't of Def.*, No. 03-cv-645, 2007 WL 7713916, at *3 (D.D.C. Mar. 8, 2007)). But the Court is not persuaded to do the same for three reasons.

1. That case did not present the difficulties identified in *Dallas Safari Club* because all of the plaintiffs' claims challenged failures to act. *See* Am. Compl. ¶¶ 59–148, *Chem. Weapons Working Grp. v. U.S. Dep't of Def.*, No. 03-cv-645, 2007 WL 7713916 (D.D.C. Mar. 8, 2007), ECF No. 2. So it was not a mixed case that might lead to confusion.

2. That case cited no decisions adding documents to the administrative record because the plaintiff challenged agency inaction. *See Friends of the Clearwater*, 222 F. 3d at 560 (considering supplemental material that had been submitted); *S.F. BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) (affirming district court's reliance on a document that was already included in the agency's offered administrative record); *S.F. BayKeeper, Inc. v. Browner*, 147 F. Supp. 2d 991, 997 (N.D. Cal. 2001) ("But the report is a part of the administrative record of the EPA[.]"); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (reporting that commentators have recognized an exception to the administrative-record rule "in cases where agencies are sued for a failure to take action"); *Fund for Animals v. Williams*, 391 F. Supp. 2d 191 (D.D.C. 2005) (using the adverse-evidence and NEPA exceptions).

3. That case also relied on the fact that the plaintiffs brought claims under the National Environmental Policy Act of 1969 (NEPA), where "many courts have found the need to supplement the record[.]" *Chem. Weapons Working Grp.*, 2007 WL 7713916, at *2.

The Court therefore declines to add these proffered exhibits to the administrative record.

## C.     Scope of Review

The Parties spill much ink debating whether the Plaintiffs' ESA citizen suit claims should be limited to the administrative record. *See* Pls.' Mem. Supp. at 1–4; Defs.' Opp'n at 24–30;

Pls.' Reply at 18–24. But that has nothing to do with the question of whether certain documents should be included in or added to the administrative record. And that is the only question presented by the Plaintiffs' motion. *See* Pls.' Mot. Suppl. Admin. R.

## CONCLUSION

For the foregoing reasons, the Court denies the Plaintiffs' Motion to Complete and Supplement the Administrative Record, ECF No. 25.

A separate order will issue.

 

 

 

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 27, 2025