**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, *et al.*,<br><br>*Defendants.* | Civil Case No.: 1:23-cv-03343-SLS |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGEMENT**

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

LEGAL BACKGROUND ........ 1

A. The Surface Mining Control and Reclamation Act. ........ 1

B. The Endangered Species Act. ........ 2

STATEMENT OF FACTS ........ 5

A. Impacts of Coal Mining on Federally Protected Species. ........ 5

B. Compliance With the ESA. ........ 7

STANDARD OF REVIEW ........ 13

STANDING ........ 14

ARGUMENT ........ 14

I. The 2020 BiOp Cannot Provide Section 7 Incidental Take Coverage for State-Delegated SMCRA Programs and is Facially Invalid. ........ 14

A. The 2020 BiOp Impermissibly Allows Non-Federal Entities to Receive Section 7 Incidental Take Coverage for State-Delegated SMCRA Programs and to Unlawfully Avoid the Requirements of ESA Section 10. ........ 15

B. The 2020 BiOp and ITS Do Not Provide the Required Species-Specific Analysis or Limits on Take that the ESA requires. ........ 21

C. The 2020 BiOp Unlawfully Delegates Authority to the States to Reject Measures Necessary to Protect Listed Species. ........ 26

II. Because Defendants Have Failed to Implement the 2020 BiOp, Defendants are in Violation of Section 7(a)(2) and Reinitiation of Consultation is Required. ........ 30

A. OSMRE is Failing to Provide the Oversight the 2020 BiOp Requires to Ensure Against Jeopardy and Adverse Modification. ........ 30

1. OSMRE Has Allowed Dozens of Mines That "May Affect" Guyandotte River Crayfish to Operate in West Virginia Without PEPs. ........ 30

2. OSMRE Has Allowed Dozens of Mines That "May Affect" Big Sandy Crayfish to Operate in Kentucky in Violation of the 2020 BiOp. ........ 36

3. OSMRE Has Routinely Failed to Engage in Essential Oversight Activities and Has Not Remedied the Violations Noticed by Plaintiffs. ........ 38

III. The Presumptive Remedy for Defendants' ESA Violations is Vacatur. ........ 43

CONCLUSION ........ 45

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ........ 44

*Am. Bird Conservancy, Inc. v. FCC*,
516 F.3d 1027 (D.C. Cir. 2008) ........ 44

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) ........ 44

*Am. Rivers & Ala. Rivers All. v. FERC*,
895 F.3d 32 (D.C. Cir. 2018) ........ 23

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., BLM*,
273 F.3d 1229 (9th Cir. 2001) ........ 23

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995) ........ 2

*Bluewater Network v. EPA*,
370 F.3d 1 (D.C. Cir. 2004) ........ 13

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) ........ 44

*City of Tacoma v. Nat'l Marine Fisheries Serv.*,
383 F. Supp. 2d 89 (D.D.C. 2005) ........ 25

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ........ 37

*Cooling Water Intake Structure Coal. v. EPA,*
905 F.3d 49 (2d Cir. 2018) ........ 18, 19

**Ctr. for Biological Diversity v. Regan*,
734 F. Supp. 3d 1 (D.D.C. 2024) ........ 16, 17, 18, 19, 20, 22, 23, 24, 26, 28, 43

*Ctr. for Biological Diversity v. Regan*,
No. 24-5101 (D.C. Cir. 2025) ........ 18

*Ctr. for Biological Diversity v. Ross,*
349 F. Supp. 3d 38 (D.D.C. 2018) ........ 31

*Ctr. for Biological Diversity v. Ross*,
480 F. Supp. 3d 236 (D.D.C. 2020) ........ 44

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) ........ 19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ 14

**Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) ........ 13, 20, 27

*Ill. Commerce Comm'n v. ICC*,
848 F.2d 1246 (D.C. Cir. 1988) ... 27

*Ill. Pub. Telecomms. Ass'n v. FCC*,
123 F.3d 693 (D.C. Cir. 1997) ... 44

**Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ... 13, 16, 23

*Marin Audubon Soc'y v. FAA*,
121 F.4th 902 (D.C. Cir. 2024) ... 44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*.,
463 U.S. 29 (1983) ... 13

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
551 U.S. 644 (2007) ... 15

*Oceana, Inc. v. Pritzker*,
75 F. Supp. 3d 469 (D.D.C. 2014) ... 23

*Pub. Emps. for Envtl. Responsibility v. Beaudreau*,
25 F. Supp. 3d 67 (D.D.C. 2014) ("*PEER*") ... 27, 28

*Sierra Club v. U.S. Army Corps of Eng'rs*,
701 F.2d 1011 (2d Cir. 1983) ... 41

*Sierra Club v. U.S. Army Corps of Eng'rs*,
803 F.3d 31 (D.C. Cir. 2015) ... 16

*TVA v. Hill*,
437 U.S. 153 (1978) ... 2, 28

*U.S. Sugar Corp. v. EPA*,
844 F.3d 269 (D.C. Cir. 2016) ... 44

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ... 44

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ... 31

*WildEarth Guardians v. Salazar*,
880 F. Supp. 2d 77 (D.D.C. 2012) ... 40

**Statutes**

5 U.S.C. § 706(2)(A) ... 13, 26

16 U.S.C. § 1531(b) ... 2

16 U.S.C. § 1532(13) ... 2

16 U.S.C. § 1532(19) ... 2

16 U.S.C. § 1536 ... 15

16 U.S.C. § 1536(a)(2) ........ 3, 11, 15, 17, 30, 36, 37, 38, 43, 45
16 U.S.C. § 1536(b) ........ 16
16 U.S.C. § 1536(b)(3)(A) ........ 26
16 U.S.C. § 1536(b)(4) ........ 3, 14, 23, 28
16 U.S.C. § 1536(b)(4)(C)(ii) ........ 26, 27
16 U.S.C. § 1536(b)(4)(C)(iv) ........ 26, 27
16 U.S.C. § 1538(a)(1)(B) ........ 2
16 U.S.C. § 1539 ........ 4, 14, 15, 20
16 U.S.C. § 1539(a)(1)(B) ........ 5, 17
16 U.S.C. § 1539(a)(2)(A) ........ 5, 20
16 U.S.C. § 1539(a)(2)(B) ........ 5, 20, 27
16 U.S.C. § 1539(c) ........ 20
30 U.S.C. §§ 1251a-1279 ........ 1
30 U.S.C. § 1253 ........ 1, 2

**Regulations**

30 C.F.R. § 733.13(a)(1) ........ 42
30 C.F.R. § 773.15(j) ........ 37
30 C.F.R. § 773.19(c) ........ 32
30 C.F.R. § 774.13(c) ........ 37
30 C.F.R. § 780.16 ........ 19
30 C.F.R. § 784.21 ........ 19
50 C.F.R. § 402.02 ........ 3, 4, 15, 25
50 C.F.R. § 402.03 ........ 15
50 C.F.R. § 402.14 ........ 3, 16, 26, 38
50 C.F.R. § 402.14(c)(4) ........ 25
50 C.F.R. § 402.14(g) ........ 22, 24
50 C.F.R. § 402.14(g)(4) ........ 3
50 C.F.R. § 402.14(g)(8) ........ 37
50 C.F.R. § 402.14(h) ........ 3, 21, 22, 23, 24, 26
50 C.F.R. § 402.14(i) ........ 3, 23, 27, 28
50 C.F.R. § 402.14(i)(1) ........ 24

50 C.F.R. § 402.14(i)(1)(i) .......... 23
50 C.F.R. § 402.14(i)(4) .......... 23
50 C.F.R. § 402.14(i)(7) .......... 4, 16, 25
50 C.F.R. § 402.16 .......... 4, 23, 36, 43, 45
50 C.F.R. Part 13 .......... 20

**Federal Register**

68 Fed. Reg. 33234 (June 3, 2003) .......... 11
77 Fed. Reg. 43906 (July 26, 2012) .......... 11
80 Fed. Reg. 18710 (Apr. 7, 2015) .......... 5, 6
83 Fed. Reg. 58747 (Nov. 21, 2018) .......... 11

**Other Authorities**

Fed. R. Evid. 201 .......... 31, 33

# INTRODUCTION

The Endangered Species Act ("ESA") requires that all Federal agencies "insure" that their actions do not jeopardize the continued existence of endangered and threatened species or result in the degradation of their critical habitats. This case concerns Defendants' failure to comply with that obligation with regard to the oversight of coal mining programs that have been delegated to various States under the Surface Mining Control and Reclamation Act ("SMCRA"). SMCRA-regulated coal mining activities cause devastation to surrounding river and stream habitats and the wildlife that rely on them, including Federally protected species. However, as set forth below, rather than fulfill their ESA duties, Defendants are relying on an unlawful Biological Opinion issued in 2020 ("2020 BiOp") that does not comply with the ESA and implementing regulations. But even if the 2020 BiOp was valid when issued, Defendants have failed to fully implement it, which is jeopardizing protected species and impairing designated critical habitats in violation of the ESA.

The Court should vacate the 2020 BiOp and/or declare that Defendants have not properly implemented the 2020 BiOp and therefore have violated their duty to ensure against jeopardy, requiring reinitiation of ESA consultation.

# LEGAL BACKGROUND

## A. The Surface Mining Control and Reclamation Act.

The environmental impacts of surface coal mining are regulated pursuant to Title V of SMCRA. 30 U.S.C. §§ 1251a-1279. The Office of Surface Mining Reclamation and Enforcement ("OSMRE") is the primary regulator of coal mining under SMCRA unless and until a State demonstrates that it has developed a regulatory program that meets all of the requirements of SMCRA and the implementing regulations in 30 C.F.R. Chapter VII. 30 U.S.C. § 1253. A State becomes the primary regulator within its jurisdiction when it submits and

receives approval of its proposed regulatory program from OSMRE, assuming responsibility over permitting, inspection, and enforcement activities. *Id.* This is known as "state-delegation" of the program.

**B. The Endangered Species Act.**

"The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost," and therefore Congress intended endangered species to be afforded the "highest of priorities." *TVA v. Hill*, 437 U.S. 153, 174 (1978). The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

Pursuant to ESA Section 9, it is illegal to engage in any activity that "takes" (i.e., kills or harms) an endangered species. 16 U.S.C. § 1538(a)(1)(B).[1] Persons subject to the prohibition on take include corporations, and any department or instrumentality of the Federal Government or any State. *Id.* § 1532(13). The ESA, however, provides only two avenues for lawfully allowing the "incidental take" of listed species: the Section 7 consultation process applicable to Federal agency actions, or the Section 10 process for State and private actors. Both have detailed requirements that must be followed to ensure the approved activity will not jeopardize the continued existence of any listed species.

Pursuant to ESA Section 7, Federal agencies must engage in a statutory consultation process with the U.S. Fish and Wildlife Service ("FWS") for any agency action that "may affect"

---

[1] The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," 16 U.S.C. § 1532(19), and is to be interpreted in the "broadest possible manner to include every conceivable way" in which a person could harm or kill wildlife. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995).

listed species or their critical habitat to "insure" that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.[2] If an action is "likely to adversely affect" listed species or critical habitat, the agency must engage in "formal consultation" with FWS. 50 C.F.R. § 402.14. Formal ESA consultation commences with the action agency's written request for consultation and concludes with FWS's issuance of a "biological opinion." *Id.* § 402.14(g)(4).

The biological opinion "shall include" a "detailed discussion of the effects of the action on listed species or critical habitat," *id.* § 402.14(h), and ultimately provide FWS's determination as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," *id.* § 402.14(g)(4). To provide incidental take coverage, and thereby avoid Section 9 liability, a biological opinion must ordinarily include an incidental take statement ("ITS") setting forth limits on the allowed amount of "take" (i.e., a numerical quantification of take or lawful surrogate, such as habitat loss) along with the "reasonable and prudent measures" necessary or appropriate to minimize "take" of listed species, and the "terms and conditions" that must be complied with by the action agency to implement any reasonable and prudent measures. 16 U.S.C. § 1536(b)(4), 50 C.F.R. § 402.14(i). Compliance with the biological opinion is necessary to meet the ESA's substantive "no jeopardy" mandate. 16 U.S.C. § 1536(a)(2).

[2] To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

After the issuance of a biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," 50 C.F.R. § 402.16, consultation must be reinitiated (i.e., a new biological opinion developed) where, *inter alia*, new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered. *Id.*

FWS has adopted additional regulations for programmatic level Section 7 consultations that entail review of a Federal program, such as the SMCRA regulatory program, where subsequent actions such as the issuance of project-specific permits will occur at a later time and be subject to further Section 7 consultation. Such programmatic review must consider the aggregate impacts of the program and confirm that standard procedures are in place to help ensure the program will not result in jeopardy to listed species. *See* 50 C.F.R. §§ 402.02 (defining "programmatic consultation" as "consultation addressing an agency's multiple actions on a program, region, or other basis" that "allow the Services to consult on the effects of programmatic actions"); 402.14(i)(7) (setting forth the requirements for framework programmatic consultations). However, under these regulations an ITS ordinarily is not provided as part of the biological opinion that results from the programmatic consultation. Rather, incidental take should be "addressed in subsequent section 7 consultation, as appropriate" (i.e., project-specific consultation), *id.* § 402.14(i)(7), or through a Section 10 incidental take permit ("ITP") if future actions will be conducted by States or private parties.

ESA Section 10 provides for the issuance of permits to non-Federal parties whose actions "incidentally" kill or otherwise take listed species. 16 U.S.C. § 1539. An ITP can be granted only if several conditions are met, including the submission of a habitat conservation plan describing: (i) the impact that will likely result from such taking; (ii) what steps the applicant will take to

minimize and mitigate such impacts, and the funding that will be available to implement such steps; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan. 16 U.S.C. § 1539(a)(1)(B), (a)(2)(A). Before issuing an ITP, FWS must provide for public comment and make certain specified findings. These include, *inter alia*, that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking." *Id.* § 1539(a)(2)(B).

## STATEMENT OF FACTS

### A. Impacts of Coal Mining on Federally Protected Species.

SMCRA-regulated coal mining activities, which include strip mining and mountaintop removal practices, often result in harm to listed species through deforestation, pollution of waterways, and the filling of valleys and streams with sediment and mining waste. These activities can severely degrade habitats that Federally listed wildlife rely upon and even result in the animals themselves being buried. Coal mining activities have caused, and continue to cause, devastation to surrounding river and stream habitats and the wildlife that rely on them through deforestation, chemical and sediment pollution of waterways, and the filling of valleys and streams with sediment and mining waste. *See, e.g.,* 80 Fed. Reg. 18710, 18726-28 (Apr. 7, 2015) (documenting the widespread harm that coal mining can cause to listed species); FWS_36658-62 (2020 BiOp discussing the impacts of coal mining); FWS_20315-318 (2016 SMCRA BiOp describing the devastating impacts of coal mining, which is "continuing to result in physical and chemical effects on surface waters," including through "direct impacts to streams," and concluding that mining activities "continue to negatively impact threatened and endangered species and the habitats upon which they depend").

Coal mining poses a particularly significant risk to the Federally endangered Guyandotte River crayfish and the threatened Big Sandy crayfish. The Guyandotte River crayfish now only survives in two streams in West Virginia—Pinnacle Creek and Clear Fork in West Virginia's Wyoming and Logan Counties, both of which are heavily impacted by coal mining activities. 80 Fed. Reg. at 18716; FWS_37462. FWS itself has stated that this species is "already pretty close to spiraling down the extinction vortex so it may be that no additional impacts can satisfy the jeopardy standard." *See* Curry Decl. ¶¶ 25-26, Ex. A.

The Big Sandy crayfish likewise has been extirpated from most of its range and survives in only a few watersheds that are heavily impacted by coal mining. 80 Fed. Reg. at 18722-25. Sedimentation and siltation of their habitat from coal mining are the primary factors driving the extinction threat for these species. *Id.* at 18710, 18722-23.

Documented pollution control failures illustrate the risk of extinction for these species. For example, the two remaining occupied critical habitat segments for the Guyandotte River crayfish in Pinnacle Creek and Clear Fork have been impacted by major coal pollution spills in recent years.[3] The Environmental Protection Agency ("EPA") has found that these areas no longer meet water quality standards for aquatic life.[4] Mining activities continue to pose a

[3] FWS has documented at least four unpermitted sediment spills from the Eagle Surface Mine on Knob Fork of Clear Fork between February and May of 2017, which impacted critical habitat subunit 1b for the Guyandotte River crayfish with siltation and sedimentation impacts 14 miles downstream. FWS_37042. Likewise, FWS documented a 2018 coal slurry spill by an unidentified SMCRA permittee on Pinnacle Creek in Guyandotte River crayfish designated critical habitat subunit 1a. FWS_37467. This spill resulted in siltation and sedimentation impacts to the critical habitat and appears to have killed *all* Guyandotte River crayfish in one stretch of the stream. *See id.*

[4] *See* EPA, *How's My Waterway – WATERSHED: Pinnacle Creek,* https://mywaterway.epa.gov/community/050701010302/overview; EPA, *How's My Waterway – WATERSHED: Outlet Clear Fork,* https://mywaterway.epa.gov/community/Clear%20Fork,%20WV,%20USA/overview.

significant risk, due in large part to the coal industry's track record of chronic non-compliance with the water quality protection requirements of SMCRA across the ranges of both the Guyandotte River crayfish and Big Sandy crayfish. Since the species were listed in 2015, there have been hundreds of documented permit violations in West Virginia and Kentucky that threaten impacts to these crayfishes' critical habitat from coal mining activities. *See* FWS_36541.

**B. Compliance With the ESA.**

For many years, SMCRA-regulated coal mining activities were provided blanket ESA take coverage through a 1996 Biological Opinion ("1996 BiOp"). *See* FWS_20186-200. The 1996 BiOp relied on "enhancement and protection" plans with species-specific protective measures developed through a technical assistance process to ensure against jeopardy from coal mining activities, and for OSMRE to provide ongoing oversight to ensure compliance with the BiOp. FWS_20195-98. However, as FWS itself found when it first attempted to replace the 1996 BiOp in 2016,[5] because the technical assistance process was not being followed, and given the ongoing harm to wildlife from coal mining, "it is no longer possible to rely on the 1996 Biological Opinion to conclude that the existing regulatory environment … would not result in jeopardy or adverse modification of ESA-listed resources." FWS_20243-44.

Ultimately, FWS concluded that adverse effects to listed species and critical habitats were not being properly evaluated, monitored, and minimized, and that permit compliance was not being enforced. FWS_20333. FWS based this conclusion in part on its findings that "despite the environmental protections granted by SMCRA and the permit review process set forth in the

[5] A new biological opinion was developed in 2016 to replace the 1996 BiOp as part of a new Stream Protection Rule ("SPR") but was subsequently abandoned when Congress invalidated the 2016 SPR under the Congressional Review Act. *See* FWS_36608.

1996 BiOp, surface coal mining operations continue to negatively impact threatened and endangered species and the habitats upon which they depend." FWS_20318. FWS highlighted the listing of the Guyandotte River and Big Sandy crayfish, finding that their plight "illustrate[s] the inadequacy of the current SMCRA regulatory environment in protecting fish and wildlife and the habitats upon which they depend." FWS_20333. Accordingly, FWS and OSMRE reinitiated consultation on the 1996 BiOp and eventually developed the 2020 BiOp at issue in this case.

**The 2020 BiOp**

The 2020 BiOp states that it is intended to provide a programmatic analysis of the SMCRA program, designed to "examine whether and to what degree OSMRE has structured its regulatory program to ensure its implementation is not likely to jeopardize the continued existence of proposed or listed species or result in the destruction or adverse modification of proposed or designated critical habitat." FWS_36608. Yet despite being a programmatic level review, the 2020 BiOp includes an ITS that provides ESA Section 7 incidental take coverage for all listed species and critical habitat affected by coal mining nationwide. This includes not only OSMRE's implementation of Title V of SMCRA, but extends that incidental take coverage to State regulatory authorities and mine operators in State-delegated SMCRA programs, such as in Virginia, West Virginia, and Kentucky. FWS_36608-09; FWS_36684.

Despite FWS's recognition of the inadequacy of the 1996 BiOp's technical assistance process for protecting listed species, the 2020 BiOp relies on an analogous framework for ESA compliance. That process is outlined in Section 8.2 and Appendix A of the 2020 BiOp. *See* FWS_36708-10; FWS_36662-64. For States with delegated SMCRA programs, the 2020 BiOp requires the State regulatory authority ("SRA") to engage with FWS through a "coordination" process, which is not defined or sanctioned anywhere in the ESA or implementing regulations.

Pursuant to Appendix A of the 2020 BiOp, the State provides notice of SMCRA permit applications to FWS where the proposed action "may affect" listed species or critical habitat and must then submit fish and wildlife resource information and a proposed Protection and Enhancement Plan ("PEP"), but only if FWS requests such information. FWS_36708. The SRA then works with FWS through a technical assistance process, during which FWS considers whether the PEP's proposed species-specific protective measures are adequately protective to avoid jeopardy and adverse modification. If they are not, FWS provides additional measures to protect the affected species. FWS_36709-713.

However, the 2020 BiOp does not require that measures FWS deems necessary to ensure against jeopardy are in fact incorporated into the SMCRA permit. Rather, the 2020 BiOp includes a dispute resolution process to resolve any disagreement between the SRA and FWS, set forth in Appendix B to the 2020 BiOp. FWS_36711-13. Pursuant to that process, if the State disagrees with any additional measures proposed by FWS to minimize adverse impacts to species, the State may elevate the disagreement to the Field Office, the Regional Office, and ultimately to the FWS headquarters and the Secretary of the Interior. However, Appendix B makes clear that at each stage, the SRA is free to reject the proposed resolution and approve the permit, thereby disregarding the protective measures that FWS has indicated are required to avoid jeopardy and adverse modification. *Id.*

The 2020 BiOp does not include a species-specific review of the impacts of SMCRA-regulated coal mining or of the effects of specific coal mining activities on listed species or critical habitats. Instead, it only purports to evaluate the general effects of the SMCRA program on "guilds" of ESA-listed species (i.e., generalized groupings based on taxa and/or habitat associations). FWS_36629. Similarly, the 2020 BiOp's ITS does not provide any specific limits

on the amount or extent of anticipated take or a trigger to reinitiate ESA consultation if excessive take occurs. *See* FWS_36684. ("[T]he paucity of information regarding future mining projects that is available at the time of this programmatic consultation does not allow the Service to identify the specific locations in which future mining projects will occur, the specific activities associated with a particular mining permit, and the number of individuals that might be affected by such activities in order for the Service to conduct species and site-specific analyses.").

The technical assistance "coordination" process and the PEPs that have been developed for *some* of the mines near crayfish habitat show that the PEPs developed by States likewise do not provide specific take limits or a clear standard for determining when the level of anticipated take has been exceeded. *See* FWS_36708-10; FWS_23812 (Big Sandy crayfish PEP for the Gig Tree Auger Mine with no take limits); FWS_22620 (PEP for the Long Branch Auger Mine stating that take of Big Sandy Crayfish "cannot be determined with numerical precision" and failing to provide any take limit); FWS_32769 (PEP for the Bailey Surface Mine in West Virginia for the Guyandotte River crayfish that sets no limits on take or any trigger for reinitiating with FWS); FWS_0033031-74 (Big Sandy crayfish PEP for Zack's Branch Surface Mine that sets no limits on take or any trigger for reinitiating with FWS); FWS_33555 (Guyandotte River crayfish PEP for West Virginia Permit No. S-5006-19 that sets no take limits or any trigger for reinitiating with FWS).

The 2020 BiOp relies on OSMRE's oversight of State-delegated SMCRA programs to ensure that mining facilities operate consistent with the provisions of SMCRA that require protection of listed species, such as the development of PEPs. Indeed, this oversight is the primary "reasonable and prudent measure" in the 2020 BiOp as it relates to programs where the State is the regulatory authority, such as in Virginia, West Virginia, and Kentucky. *See*

FWS_36685 ("OSMRE will use its authorities to minimize impacts to listed species through oversight of State and Tribal programs."). Pursuant to the 2020 BiOp, OSMRE is tasked with ensuring that States follow the "coordination" procedures with FWS to implement PEPs. FWS_36708 (2020 BiOp, Appx. A, setting forth the "SMCRA/ESA Coordination Process … Based on OSMRE's Oversight Process"). The 2020 BiOp therefore relies on OSMRE's oversight of State-delegated SMCRA programs on a permit-by-permit basis to ensure that measures are being implemented so to ensure against jeopardizing imperiled species. *Id.*; FWS_36674.

**Defendants' Failure to Comply With the 2020 BiOp**

Out of a longstanding interest in and concern for the wildlife impacted by SMCRA-regulated coal mining activities,[6] prior to filing this lawsuit Plaintiffs investigated whether OSMRE was in fact ensuring that PEPs were being implemented for all mines that may adversely affect listed species, as the 2020 BiOp requires. *See* Dodson Decl. at ¶¶ 27-35; ECF No. 13 at 3-4, 36-41. That investigation showed that many mines that certainly "may affect" Guyandotte River and Big Sandy crayfish and their critical habitats were operating without PEPs, and that OSMRE and FWS appear incapable of fulfilling their roles under the 2020 BiOp such that the existence of these species continues to be jeopardized and their critical habitat destroyed and adversely modified in violation of the ESA, 16 U.S.C. § 1536(a)(2).

Plaintiffs identified dozens of mines with outflows to streams or tributaries that are in close proximity to designated critical habitat for Guyandotte River and Big Sandy crayfish and were renewed following the implementation of the 2020 BiOp but were operating without PEPs,

[6] Numerous listed and proposed species have been pushed to the brink of extinction by SMCRA-permitted mining activities in Appalachia, including not only the Guyandotte River crayfish and the Big Sandy crayfish, but also the candy darter, 83 Fed. Reg. 58747, 58751-53 (Nov. 21, 2018), the diamond darter, 77 Fed. Reg. 43906, 43912-13 (July 26, 2012), and the purple bean mussel, 68 Fed. Reg. 33234, 33238 (June 3, 2003), among others.

in violation of the BiOp. *See* FWS_37016-33; OSMRE_31519-35 (OSMRE's response to Plaintiffs' notice letter noting 32 permits in West Virginia within 3 miles of critical habitat that lack PEPs and over 90 permits in Kentucky within 3 miles of critical habitat that lack PEPs). The record shows that the States unilaterally determined that PEPs were not required for these mines because there were no pending significant revisions at time of renewal following implementation of the 2020 BiOp, OSMRE_31519-35, notwithstanding the 2020 BiOp's specific requirement that "coordination" occur at the time of permit renewal. *See* FWS_36621-22 (requiring SRAs to initiate the technical assistance process at the time of "permit issuance, permit renewals, and significant permit revisions").

Importantly, the list of mines provided to the agencies by Plaintiffs encompasses only a small subset of permits that require a PEP under the 2020 BiOp, because it only includes mines that are within an extremely conservative 3 miles of designated critical habitat for these species. In fact, the best available science indicates mine waste and sediment can affect wildlife habitat 12-miles or more downstream. *See* FWS_36839 (FWS' statement indicating that coal mining pollution can cause "decimation" of freshwater habitat and wipe out entire aquatic endangered species populations as far as 12 miles downstream from coal mining operations). Therefore, there are likely many other mines—perhaps dozens and even hundreds more—within 12 miles of protected crayfish habitat and other listed species' habitat that likewise do not have PEPs in place, thereby jeopardizing the continued existence of such species in violation of the ESA. *See* FWS_37028 (Plaintiffs' notice letter stating that the list provided "by no means captures all SMCRA-permitted operations that may affect" listed species because it was limited to mines within three miles upstream from crayfish critical habitat).

OSMRE did eventually generate "corrective action plans" for Virginia, West Virginia, and Kentucky in response to Plaintiffs' notice letter. *See* OSMRE_31670, 31681, 31702. However, the belated plans fail to acknowledge that the best available science shows that impacts from mines can occur 12 miles downstream and continue to allow the SRAs to unilaterally determine whether to engage in "coordination" with FWS.

## STANDARD OF REVIEW

As the ESA does not specify a standard of review, judicial review of ESA claims uses the same standard as the Administrative Procedure Act ("APA"). *Gerber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002). The APA instructs the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court is "principally concerned with ensuring that [the Agency] has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,' that the Agency's 'decision was based on a consideration of the relevant factors,' and that the Agency has made no 'clear error of judgment.'" *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). Where, as here, the Court is called upon to interpret a statute, the Court must apply its own "best" reading without affording any deference to the agency. *See Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 402, 408-9 (2024) ("The statute still has a best meaning, necessarily discernible by a court deploying its full interpretive toolkit.").

## STANDING

Plaintiffs are non-profit conservation groups and bring this lawsuit on behalf of their members who are harmed by SMCRA-regulated coal mining activities. *See* First Am. Compl. ¶¶ 17-37; Dodson Decl.; Curry Decl.; Thoma Decl.; Young Decl.; Sneed Decl. Specifically, Plaintiffs and their members have educational, recreational, scientific, aesthetic, and preservation interests in the species and habitats adversely affected by the coal mining at issue, and those interests have been, and will continue to be, adversely affected by SMCRA-regulated coal mining under the 2020 BiOp. *See, e.g.,* Dodson Decl. ¶¶ 14-26, 42-50; Curry Decl. ¶¶ 12-42; Thoma Decl. ¶¶ 13-26; Young Decl. ¶¶ 5-20; Sneed Decl. ¶¶ 7-19. These are concrete and particularized harms that are the direct result of Defendants' actions. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). A Court order declaring that Defendants have violated the ESA, vacating the 2020 BiOp, and/or requiring reinitiation of consultation would redress Plaintiffs' injuries.

## ARGUMENT

### I. The 2020 BiOp Cannot Provide Section 7 Incidental Take Coverage for State-Delegated SMCRA Programs and is Facially Invalid.

As explained, SMCRA-regulated coal mining activities, which include strip mining and mountaintop removal practices, often result in harm to listed species through deforestation, pollution of waterways, and the filling of valleys and streams with sediment and mining waste. These activities can severely degrade habitats that Federally listed wildlife rely upon and even result in the animals themselves being buried. Such outcomes constitute "take" under the ESA, and without valid "take coverage" pursuant to ESA Section 7 or Section 10, the offending coal mine operators—and the State agencies that permit coal mining activities in SMCRA-delegated States—are in violation of the ESA's prohibition on take. 16 U.S.C. §§ 1536(b)(4), 1539.

Here, however, FWS and OSMRE have administratively concocted a "coordination" process that is outside of the framework mandated by the ESA in order to provide pass-through Section 7 "take coverage" to States and private mine operators, thereby unlawfully side-stepping the obligations of Section 10. That "coordination" process is not the same as Section 7 consultation and does not ensure implementation of measures necessary to protect listed species and critical habitats. In addition, Defendants do so through an inadequate programmatic biological opinion and ITS that do not comply with the ESA and implementing regulations. Defendants are consequently allowing devastating coal mining activities to be permitted that avoid the required analysis and obligations of the ESA. The 2020 BiOp is, thus, facially invalid.

### A. The 2020 BiOp Impermissibly Allows Non-Federal Entities to Receive Section 7 Incidental Take Coverage for State-Delegated SMCRA Programs and to Unlawfully Avoid the Requirements of ESA Section 10.

The ESA explicitly provides two distinct processes for obtaining incidental take coverage for activities, such as coal mining, that result in "take" of ESA-listed species: the Section 7 consultation process—which applies to actions undertaken by Federal agencies[7]—and the Section 10 process—which is intended for non-Federal entities (i.e., States and private parties) to obtain incidental take coverage for otherwise lawful activities that are reasonably certain to result in take of listed species. *See* 16 U.S.C. §§ 1536, 1539. By creating separate avenues for incidental take coverage with regard to actions undertaken by Federal agencies versus other actors, Congress unambiguously provided that private entities and State regulators may *not* rely

[7] *See* 16 U.S.C. § 1536(a)(2) (applying Section 7 to "each *Federal agency*") (emphasis added); 50 C.F.R. §§ 402.02, 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control" where "Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by *Federal agencies*") (emphasis added); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 652 (2007) ("Section 7 of the ESA prescribes the steps that *federal agencies* must take to ensure that their actions do not jeopardize endangered wildlife and flora.") (emphasis added).

on Section 7 where a Federal agency is not the permitting authority, but must rather seek incidental take coverage through ESA Section 10, which has distinct procedural and substantive requirements applicable to such non-Federal entities. *See Loper Bright,* 603 U.S. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").[8]

Therefore, pursuant to a plain reading of the ESA, for a Federal program that is delegated to a State—such as the SMCRA programs in Virginia, West Virginia, and Kentucky—while OSMRE must still undertake programmatic Section 7 consultation on the overall SMCRA program and the impacts of delegating that program to the State, 50 C.F.R. § 402.14(i)(7), once the program has been delegated and the Federal agency is no longer issuing permits and is not undertaking project/permit-specific Section 7 consultation, the only way for the liable non-Federal entities (i.e., States and coal mine operators) to obtain incidental take coverage for mining activities is through ESA Section 10.[9] *See Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 13 (D.D.C. 2024) ("*Regan*") ("[W]here a state administers the [] program, permittees" who cannot "avoid entirely adverse impacts to listed species" must "seek an incidental take permit under ESA Section 10"). The 2020 BiOp's attempt to circumvent this plain

[8] While the ESA allows non-Federal entities to obtain take coverage and otherwise rely on Section 7 consultation where a Federal agency is *itself* the permitting authority, that is not what is occurring here. Rather, in States where the SMCRA program has been delegated, the State is the permitting authority and OSMRE is not consulting on individual SMCRA permits to ensure against jeopardy. *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 41 (D.C. Cir. 2015) ("The Service allows private parties to participate in a Section 7 consultation when the contemplated action involves the action agency's approval of private-party conduct.") (citing 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14)).

[9] To be clear, it is consistent with the ESA for OSMRE to continue to receive take coverage pursuant to Section 7 when the agency itself issues a permit in a State where OSMRE retains primacy, and it goes through a subsequent permit-specific Section 7 consultation. However, in States where the program has been delegated and OSMRE is no longer the permitting authority, the only way for the non-Federal entities to obtain take coverage is through Section 10.

reading of the ESA by providing Section 7 incidental take coverage for States and permittees in State-delegated SMCRA programs is therefore blatantly unlawful.

This issue was recently addressed by Judge Moss in *Regan,* which concerned a nearly identical scheme for ESA compliance as the 2020 BiOp. That case pertained to a biological opinion for the State of Florida's assumption of the Clean Water Act ("CWA") Section 404 program (the "404 BiOp") but the underlying statute is irrelevant to the question of whether ESA Section 7 or 10 applies in the context of a delegated permit program. The 404 BiOp likewise attempted to provide take coverage to a State permitting authority and private permittees through a one-time Section 7 programmatic consultation that provided non-Federal permittees with liability protection for all future State-issued permits through a subsequent technical assistance "coordination" process between the State and FWS without requiring future permit-specific Section 7 consultations. *See Regan*, 734 F. Supp. 3d at 12, 27 (discussing the "coordination between the []FWS and FDEP related to the proposed action's effects on species [that] will occur through the technical assistance process"). Thus, the 404 BiOp presents a nearly identical scheme for ESA compliance for State-issued CWA Section 404 permits in Florida as the 2020 BiOp does for State-issued SMCRA permits, and the two BiOps were clearly based on the same template. *See* FWS_36708-10 (2020 BiOp Appx. A, describing a nearly identical "coordination" process for State-issued SMCRA permits).

As Judge Moss held in vacating the 404 BiOp, "[t]he long and short of it is that the ESA creates two paths for extending take liability coverage: Section 7 (consultation for federal actions) and Section 10 (incidental take permits for non-federal actions). 16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B). Neither authorizes [a] scheme" through which Section 7 coverage is applied via a programmatic biological opinion to permits subsequently issued by State authorities

without further permit-specific Section 7 consultation by a Federal agency or compliance with Section 10 by the responsible non-Federal entities. *Regan*, 734 F. Supp. 3d at 56.

Again, the court's decision as to the applicability of ESA Sections 7 or 10 in the context of a State-delegated program was not premised on anything specific to the underlying statute or the timing of the delegation to Florida. Rather, the issue was simply whether a State permitting authority and private permittees could receive Section 7 take coverage for permits issued through a delegated program using a technical assistance "coordination" process or, rather, had to rely on the Section 10 ITP process—i.e., *the exact question before the Court now*. Judge Moss held that, pursuant to the plain language of the ESA, "incidental take liability protection flows from the rigorous analysis required by Section 10 (for private actions) or Section 7 (for Federal agency actions). Congress did not codify a third option, whereby incidental take liability might flow from an alternative set of arguably similar procedures." *Id.* at 45. A programmatic BiOp followed by a project-level non-statutory "coordination" process is *not* a "lawful substitute for the procedures and remedies that Congress enacted in the ESA and that the Services established in the implementing regulations." *Id.* at 14. The same reasoning applies here.[10]

Furthermore, the scheme for ESA compliance here is distinguishable from another case in which a court upheld the use of a Section 7 programmatic biological opinion/ITS to provide ESA take coverage to non-Federal entities. *See Cooling Water Intake Structure Coal. v. EPA,* 905 F.3d 49 (2d Cir. 2018). That case involved EPA's promulgation of a standard pursuant to Section 316(b) of the CWA to reduce harm to aquatic species from cooling water intake structures. *Id.* at

[10] The decision in *Regan* has been appealed to the D.C. Circuit. *Ctr. for Biological Diversity v. Regan*, No. 24-5101. Oral argument was held on May 5, 2025. Whether state and private entities can receive ESA Section 7 take coverage through a technical assistance "coordination" process set forth in a programmatic biological opinion is one of the primary legal questions before the court.

65-70. The technical assistance process at issue there served as an extra check on a rule that, by design, would *reduce* incidental take of listed species and be implemented through permits for a discrete universe of existing facilities. This is in stark contrast to the technical assistance "coordination" process being relied on here to permit mining activities that continue to devastate listed species and their habitats.

In addition, the court in *Cooling Water* relied heavily on the fact that the technical assistance process was promulgated as part of the rulemaking action on which FWS consulted, thereby creating legally binding responsibilities for all parties. *Id*. at 62–63, 72 (citing *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1046 (9th Cir. 2015)). The technical assistance process here, however, is contained in a biological opinion that was not part of any OSMRE rulemaking concerning the delegation of the SMCRA program to States. Indeed, the 2020 BiOp does not actually *require* FWS to ensure that States are implementing protective measures to prevent jeopardy, but only provides for voluntary review of permit applications if the *State* opts to initiate the "coordination" process. *See* FWS_36708 (2020 BiOp Appx. A, relying on 30 C.F.R. §§ 780.16 and 784.21, which only require the State to provide a PEP if FWS requests one, but establishing no mandate for FWS to review all SMCRA permits to ensure that sufficient measures are in place to avoid jeopardy); FWS_36709-713 (2020 BiOp Appx. B, which allows State regulatory authorities to disregard protective measures FWS proposes to ensure against jeopardy and issue a permit without such measures in place). In short, the safeguards on which the court relied in *Cooling Water* are not present in this case. Accordingly, as Judge Moss held in *Regan*, applying *Cooling Water* to the scheme in the 2020 BiOp would be "at odds with the [ESA], regulations, and caselaw." *Regan*, 734 F. Supp. 3d at 66-71.

Defendants' attempt to unlawfully avoid Section 10 and apply Section 7 to delegated SMCRA programs has important practical and legal consequences. The Section 10 incidental take coverage process that applies to States and private entities has specific requirements that are not found in the 2020 BiOp's "coordination" process or in the Section 7 process that applies to Federal agencies. This includes the development of a habitat conservation plan specifying what steps will be taken to protect listed species, and the funding that will be available to implement such steps.[11] *See* 16 U.S.C. § 1539; 50 C.F.R. Part 13; *Gerber*, 294 F.3d at 175-76; *Regan*, 734 F. Supp. 3d at 20-21, 35 (explaining how plaintiffs and listed species "would receive far greater protection under the Section 10 process than under the technical assistance process" set forth in the biological opinion that provides Section 7 take coverage to a delegated State authority).

FWS must also publish the habitat conservation plan in the Federal Register, 16 U.S.C. § 1539(c), which is not the case for Section 7 agency consultation. And FWS must make underlying documents immediately available and provide an opportunity for public comment on such documents and the habitat conservation plan, *id*. § 1539(a)(2)(B), which also is not the case for Section 7 consultation or through the 2020 BiOp's "coordination" process. *See also Gerber*, 294 F.3d at 179-81 (holding that FWS violated section 10 by failing to make the map of a mitigation site available for public scrutiny and comment). Finally, before issuing an ITP, FWS must make certain specified findings, including that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking," *id*. at 176, whereas Section 7 does not contain the same "maximum extent practicable" mandate for Federal action agencies.

---

[11] An HCP must describe: "(i) the impact which will likely result from such taking; (ii) what steps the applicant will take to minimize and mitigate such impacts … ; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan. 16 U.S.C. § 1539(a)(2)(A).

Thus, by allowing State regulatory authorities and coal mine operators to avoid compliance with Section 10 for State-delegated SMCRA programs, the 2020 BiOp undermines important protective measures for listed species that Congress specifically instituted for non-Federal entities to obtain incidental take coverage under the ESA.

In sum, just as in *Regan*, the 2020 BiOp unlawfully allows State regulatory authorities and coal mine operators to avoid compliance with the protections that Congress implemented through the applicable Section 10 process by attempting to confer pass-through Section 7 incidental take coverage where the SMCRA program has been delegated to a State and thus no Federal agency is issuing a permit or conducting permit-specific Section 7 consultation. The Court should hold that for State-delegated SMCRA programs, State regulatory authorities and permittees must seek incidental take coverage, where appropriate, through ESA Section 10, and cannot rely on Section 7 or the 2020 BiOp for incidental take coverage.

### B. The 2020 BiOp and ITS Do Not Provide the Required Species-Specific Analysis or Limits on Take that the ESA requires.

Even if State regulatory authorities and private mine operators *could* obtain incidental take coverage for delegated SMCRA programs through ESA Section 7 rather than having to comply with the applicable Section 10 requirements (which they cannot), here the 2020 BiOp and ITS do not comply with express requirements of the ESA and implementing regulations that require species-specific analyses in a Section 7 biological opinion and specific take limits in the ITS to authorize incidental take, and are therefore facially unlawful.

First, the 2020 BiOp does not provide the project- and species-specific analysis (i.e., a "detailed discussion of the effects of the action on listed species or critical habitat") that the ESA requires in a biological opinion to support a jeopardy determination and issuance of take coverage via Section 7. *See* 50 C.F.R. § 402.14(h). Indeed, it does quite the opposite, asserting

that "the paucity of information regarding future mining projects that is available at the time of this programmatic consultation does not allow the Service to identify the specific locations in which future mining projects will occur, the specific activities associated with a particular mining permit, and the number of individuals that might be affected by such activities in order for the Service to conduct species and site-specific analyses." FWS_36684. Rather than analyze impacts to specific listed species from actual mining projects, the 2020 BiOp only evaluates the general effects of the SMCRA program on "guilds" of ESA-listed species (i.e., generalized groupings based on habitat associations). FWS_36629. As Judge Moss explained in *Regan*, "an analysis at the guild-level fails the statutory and regulatory demand to assess the environmental baseline, effects, and cumulative effects at the species-level." *Regan*, 734 F. Supp. 3d at 42. "Without those essential components, the BiOp fails to meet the minimum statutory and regulatory requirements." *Id.*

Additionally, relegating the required species-specific analysis to the subsequent technical assistance "coordination" process does not comply with the ESA regulations. *See* 50 C.F.R. § 402.14(g), (h). As Judge Moss found, "the ESA does not permit an agency to bypass the Section 7 consultative process altogether by postponing the required, 'detailed discussion of the effects of the action on listed species,' 50 C.F.R. § 402.14(g), to a later phase," where, as here, "the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7." *Regan*, 734 F. Supp. 3d at 48. Therefore, relying on the subsequent technical assistance "coordination" process and resulting PEPs cannot cure the deficiencies of the 2020 BiOp and does not provide valid take coverage under Section 7. Since the ESA itself provides no basis for relying on a "coordination" process to provide non-Federal entities with incidental take coverage, Defendants' actions here should be afforded no deference by the Court. *Loper Bright*,

603 U.S. at 370-71 (Striking down *Chevron* deference and holding that Courts must decide all relevant questions of law).

Second, the 2020 BiOp's ITS does not comply with the express regulatory requirement that FWS must set forth in an ITS the "amount or extent of anticipated take" or a "clear standard for determining when the level of anticipated take has been exceeded" to ensure against jeopardy. 50 C.F.R. §§ 402.14(h), 402.14(i)(1)(i). The 2020 BiOp's ITS provides no specific limits on incidental take whatsoever, *see* FWS_36684, and therefore fails to include one of the most important protections required by the ESA to ensure against jeopardy. *See Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 496 (D.D.C. 2014) (the take limit operates as "a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation") (quoting *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., BLM*, 273 F.3d 1229, 1249 (9th Cir. 2001)).

As Judge Moss noted in *Regan*, the "ITS is crucial in a no-jeopardy BiOp," since it provides FWS's expert determination as to the extent of incidental take that is acceptable to ensure that take will not jeopardize any species. *Regan*, 734 F. Supp. 3d at 51 (citing 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)). The take limit is intended to provide a backstop, whereby the Federal action agency would need to "reinitiate consultation immediately" if the anticipated take is exceeded in order to implement measures to address the excessive take. 50 C.F.R. § 402.14(i)(4); 50 C.F.R. § 402.16 (requiring reinitiation of Section 7 consultation if the amount or extent of anticipated incidental take is exceeded). The failure to include specific take limits in the 2020 BiOp/ITS renders it facially invalid and incapable of providing valid take coverage. *See Am. Rivers & Ala. Rivers All. v. FERC,* 895 F.3d 32, 49 (D.C. Cir. 2018) ("The lack of a clear trigger point to reinitiate consultation renders the Opinion unlawful.").

Again, there is no basis for Defendants' reliance on the subsequent technical assistance "coordination" process to remedy this blatant inadequacy given the regulatory requirement that Section 7 take coverage may *only* be provided through a project-specific biological opinion and ITS produced by FWS that specifies the amount or extent of take to ensure against jeopardy. 50 C.F.R. §§ 402.14(i)(1); 402.14(g), (h) (requiring incidental take be approved through a project-specific biological opinion and ITS produced by FWS). The regulations do *not* provide that take limits may be set forth through a contrived "coordination" process in PEPs that do not provide the extensive analysis required in a biological opinion and ITS. Regardless, the small number of PEPs that *have* been produced through the "coordination" process do not even attempt to rectify this defect, as they also do not contain any specific take limits. *See supra* at 10. The 2020 BiOp's "coordination" process therefore fails to provide an essential protection for listed species that the ESA requires through specifying an amount or extent of anticipated take in an ITS.

Fundamentally, "Defendants cannot plausibly argue both (1) that it was necessary to issue an ITS (resulting in take protection for future permittees) and (2) that the technical assistance process replicates the Section 7 consultation process (thereby obviating the need for any species-specific analyses or take limits)." *Regan*, 734 F. Supp. 3d at 50. Looking to the technical assistance process to "fill the scientific and regulatory gap" where a programmatic opinion does not set a numeric limit on take or otherwise provide a clear standard for determining when acceptable take has been exceeded cannot "withstand scrutiny." *Id.* at 52. "[T]hat argument improperly seeks to replace the statutory and regulatory ESA regime with a process defined in a BiOp [] that differs in important respects from the governing law." *Id*. at 53.

Pursuant to the ESA implementing regulations, incidental take coverage should not even be provided at the programmatic level but, rather, should be "addressed in subsequent section 7

consultation, as appropriate"—i.e., when actions are taken pursuant to the program (here, the issuance of project-specific SMCRA permits). 50 C.F.R. § 402.14(i)(7). This is for good reason: programmatic consultation is supposed to provide the framework for subsequent project-specific actions that will undergo Section 7 consultation wherein it is appropriate to authorize take based on project- and species-specific analysis, as the ESA requires. Thus, for Federal programs, such as the SMCRA program, the Services' regulations provide for a two-step process for consultation that requires, first, an analysis of the overall program, and second, project/permit-specific Section 7 consultation through which incidental take coverage may be provided through a project- and species-specific biological opinion and ITS. *See* 50 C.F.R. § 402.02 (defining "[f]ramework programmatic action," to mean "a framework for the development of future action(s) that are … carried out at a later time," where "any take of a listed species [will] not occur unless and until those future action(s) are … carried out and *subject to further section 7 consultation*") (emphasis added); *see also* 50 C.F.R. §§ 402.14(c)(4), 402.14(i)(7).

The 2020 BiOp does not reflect this structure because *there is no subsequent Section 7 consultation* for specific mining permits issued in delegated States. Instead, the 2020 BiOp relies on a subsequent non-statutory, technical assistance "coordination" process that results in the development of a PEP. Again, the ESA does not allow incidental take to be authorized through an administratively fabricated "coordination" process that is found nowhere in the statute or regulations, and which does not include the same rigorous approach to analyzing and addressing the impacts to listed species in a biological opinion as Section 7 (or Section 10) requires. *See City of Tacoma v. Nat'l Marine Fisheries Serv.*, 383 F. Supp. 2d 89, 91 (D.D.C. 2005) ("A Biological Opinion is the final product of the rigorous and lengthy 'formal consultation' process, and is conducted exclusively by experts with either the NMFS or the Fish and Wildlife

Service." (citing 50 C.F.R. § 402.14)). Take coverage simply cannot be provided through a programmatic consultation "followed by state-licensing decisions that may occur years later" and that "do not constitute federal action subject to Section 7 consultation." *Regan*, 734 F. Supp. 3d at 49.

In sum, the ESA does not authorize the 2020 BiOp's scheme whereby non-Federal entities may receive Section 7 take coverage through a programmatic biological opinion and ITS that do not contain the required species-specific analysis and numerical take limits. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). Furthermore, Defendants may not lawfully rely on the 2020 BiOp's technical assistance "coordination" process to remedy these inadequacies through PEPs. The 2020 BiOp cannot ensure against jeopardy in the manner the ESA requires, is unlawful on its face, and should be vacated. 5 U.S.C. § 706(2)(A).

### C. The 2020 BiOp Unlawfully Delegates Authority to the States to Reject Measures Necessary to Protect Listed Species.

There is still another reason why the 2020 BiOp cannot ensure against jeopardy as the ESA requires. Pursuant to the dispute resolution process set forth in Appendix B to the 2020 BiOp, the State may *reject* protective measures that FWS determines are necessary to prevent jeopardy and still issue the permit. *See* FWS_36711-13. That is contrary to the requirements of the ESA, and unlawfully delegates the final say as to what protective measures will be implemented to ensure against jeopardy to the State, rather than FWS as the expert wildlife agency having the final say, as mandated by Congress. *See* 16 U.S.C. § 1536(b)(4)(C)(ii), (iv).

Pursuant to the ESA and implementing regulations, the duty to ensure against jeopardy is only met through compliance with the "reasonable and prudent measures" provided by FWS through the consultation process that are necessary or appropriate to minimize take, and such "terms and conditions" that *must* be complied with to implement those measures. 16 U.S.C. §

1536(b)(4)(C)(ii), (iv); 50 C.F.R. § 402.14(i). Nowhere does the ESA allow reasonable and prudent measures and/or terms and conditions of an ITS to be disregarded. The conflict resolution process set forth in Appendix B of the 2020 BiOp, however, unlawfully delegates ultimate authority to the SRAs to determine what protective measures will be included in a SMCRA permit and to thereby disregard measures that FWS finds necessary to protect listed species, and which would be enforceable through the normal Section 7 process.

It is well-settled in this Circuit that FWS cannot delegate away its duty to ensure against jeopardy. In *Gerber*, the Court of Appeals held that FWS could not delegate the agency's statutory responsibility under the ESA to determine whether impacts on a listed species had been mitigated "'to the maximum extent practicable.'" *Gerber*, 294 F.3d at 184 (quoting 16 U.S.C. § 1539(a)(2)(B)). The court explained that "[w]hen a statute requires an agency to make a finding as a prerequisite to action, it must do so." *Id*. at 185. The same applies here. The 2020 BiOp unlawfully allows the State regulatory authority to veto measures that FWS believes are necessary to protect highly imperiled species. This is an egregiously improper delegation of the Federal agency's responsibility to ensure against jeopardy. *See Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C. Cir. 1988) (holding that the agency may not delegate its responsibility to independently investigate and assess the environmental impact of the proposal before it).

Other courts in this district have underscored that FWS may not delegate its ESA responsibilities in this manner. *See Pub. Emps. for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014) ("*PEER*"). Relying on *Gerber*, in *PEER*, Judge Walton held that FWS had improperly delegated its statutory responsibility under Section 7 to set forth measures for mitigating impacts on listed species in a biological opinion. The agency had rejected measures based solely on the position of the private applicant and another Federal agency, which

the court held "is not acceptable" because the ESA requires FWS itself to make an independent determination. *Id*. at 108-09. The same is true here. The 2020 BiOp unlawfully delegates the decision as to what specific measures will be applied to ensure against jeopardy to the State—a determination that FWS, as the expert agency, *must* make in order to comply with the plain language of the ESA's mandate to conserve listed species. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); *see also TVA v. Hill*, 437 U.S. at 194 (stating that Congress granted "endangered species the highest of priorities, thereby adopting a policy which it described as 'institutional caution'").

This aspect of the 2020 BiOp makes it even *less* capable of providing the protections mandated by the ESA than the 404 BiOp struck down by Judge Moss. There, at least, the BiOp required permits to "include all species protection measures that the [] FWS may recommend as permit conditions or [to] deny the request for a permit," and the EPA claimed that this made it "at least as protective" as Section 7 consultation. *Regan*, 734 F. Supp. 3d at 26. Judge Moss held that this was insufficient. *Id* at 45. But the 2020 BiOp is even more legally suspect because rather than *require* that all SMCRA permits include the protective measures provided by FWS, the 2020 BiOp explicitly allows the State to *disregard* such protective measures and issue the permit anyway. This undermines the protections that would be afforded through an actual Section 7 consultation with measures that must be implemented through terms and conditions set forth by FWS in an ITS. 50 C.F.R. § 402.14(i).

Indeed, both the Virginia and West Virginia SRAs have initiated the dispute resolution process and attempted to reject measures deemed necessary by FWS to protect listed species for several permits. *See*, *e.g.*, FWS_28431; FWS_27616. For example, in the case of the Ball Ridge mine—which consists of 2,700+ acres of underground and surface mining less than half a mile

upstream from designated critical habitat for the ESA-listed Big Sandy crayfish, FWS_21644; FWS_21648—FWS determined that the measures outlined in the proposed PEP were not sufficient to protect Big Sandy crayfish from water quality impacts and proposed additional species-specific protective measures to minimize take, including water quality criteria for conductivity, total dissolved solids, and sulfates. FWS_21642-43; FWS_21404. The State, however, objected to the imposition of these measures and initiated the dispute resolution process. FWS_21750. As a result, the permit ended up being approved without the specific pollutant limits that FWS had determined were necessary to ensure against jeopardy, FWS_21748,[12] showing the inherent danger in allowing the States to determine what measures should be imposed on SMCRA permits through PEPs.

The dispute resolution process set forth in the 2020 BiOp therefore constitutes an unlawful delegation of authority and renders it inadequate to ensure that measures necessary to prevent jeopardy to listed species and adverse modification of critical habitat will be implemented for SMCRA permits in delegated States, in violation of the clear requirements of the ESA. The 2020 BiOp is therefore facially invalid and should be vacated.

***

For the foregoing reasons, the Court should find that Defendants' attempt to confer Section 7 incidental take coverage on States and private mine operators is unlawful and that the 2020 BiOp is inadequate and facially invalid. The Court should vacate the 2020 BiOp as it applies to State-delegated SMCRA programs. While the Court may therefore grant Plaintiffs'

[12] While FWS ultimately caved and allowed the State to impose an alternative requirement that the mining company perform a "root cause analysis" in the event of failed water quality testing rather than implementing the water quality criteria, FWS_21748, the fact remains that the specific water quality criteria that FWS had deemed necessary to ensure against jeopardy were not included in the PEP or permit.

Motion for Summary Judgment on this basis alone, it is also the case, as explained below, that Defendants have failed even to comply with the express requirements of the 2020 BiOp and are therefore in violation of the ESA for that reason as well.

## II. Because Defendants Have Failed to Implement the 2020 BiOp, Defendants are in Violation of Section 7(a)(2) and Reinitiation of Consultation is Required.

The 2020 BiOp is clear: to meet the substantive requirements of the ESA to avoid jeopardy and impairment of critical habitat, certain critical steps must be fulfilled by delegated States with oversight from OSMRE and "coordination" with FWS. 16 U.S.C. § 1536(a)(2). However, FWS and OSMRE have failed to ensure that the BiOp is even being implemented according to its terms. As a result, the record shows that mines that certainly "may affect" listed species were operating without the protective measures that form the foundation of the 2020 BiOp. Given FWS's own statements about the devastating impacts of coal mining on Guyandotte River and Big Sandy crayfish and the 2020 BiOp's reliance on the implementation of PEPs to prevent jeopardy, the fact that Plaintiffs identified so many mines operating within just three miles of Guyandotte River crayfish and Big Sandy crayfish critical habitat without these critical wildlife protection plans leaves no doubt that the BiOp is not being complied with and the continued existence of these species is still being jeopardized by SMCRA-regulated coal mining.

### A. OSMRE is Failing to Provide the Oversight the 2020 BiOp Requires to Ensure Against Jeopardy and Adverse Modification.

#### 1. OSMRE Has Allowed Dozens of Mines That "May Affect" Guyandotte River Crayfish to Operate in West Virginia Without PEPs.

OSMRE's compliance investigation—in direct response to Plaintiffs' notice letter—confirms that dozens of mines that could jeopardize the continued existence of the highly imperiled Guyandotte River crayfish were operating without the protective measures the 2020 BiOp requires. Plaintiffs identified 107 permits in West Virginia operating with outflows within

just three miles of Guyandotte River crayfish critical habitat that did not have PEPs. OSMRE_30797. Of those, OSMRE confirmed that 32 had undergone renewal since the release of the 2020 BiOp, but the SRA unilaterally determined that *none* of those permits were required to undergo the 2020 BiOp's technical assistance "coordination" process with FWS. *See* OSMRE_31519-25. Those SRA determinations are not supported by record evidence and are inconsistent with FWS's best available science, which, as discussed, shows that mines up to *12 miles* from critical habitat can result in significant adverse impacts. *See* FWS_36839. OSMRE failed to perform its oversight and compliance role, as obligated under the 2020 BiOp, and therefore mining activities that certainly "may affect" listed species were allowed to occur without protective measures in place to ensure against jeopardy, as the 2020 BiOp requires.

Implementing these protective measures is critical; the species only survives in two streams in West Virginia, and those steams are already heavily impacted by coal mining. *See* FWS_37467-71 (documenting coal mining harms to Guyandotte River crayfish in its last remaining habitat); FWS_27651-52 (documenting chronic sediment pollution in the headwaters of the Guyandotte River crayfish's designated critical habitat). FWS itself has stated that this species is "already pretty close to spiraling down the extinction vortex so it may be that no additional impacts can satisfy the jeopardy standard." *See* Curry Decl. ¶¶ 25-26, Ex. A.[13] FWS likewise stated that the populations in the two remaining stream habitats "are very tentative with

[13] The Court may consider these extra-record statements since ESA citizen suit claims—particularly regarding ongoing violations, as is the case here—are not limited to the administrative record. *See, e.g., Ctr. for Biological Diversity v. Ross,* 349 F. Supp. 3d 38, 45 (D.D.C. 2018) (holding that claims regarding ongoing violations of the ESA are not limited to the record); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) (holding that the court "may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim"). The Court may also take judicial notice of these statements for background purposes pursuant to Fed. R. Evid. 201, since they are direct quotes from an expert government agency, the accuracy of which cannot be reasonably questioned.

a lot of active threats," which led a senior FWS biologist to state: "I am concerned that if we had another incident we could lose this species for good." *Id.* She further stated that "I am not sure how we would come up with PEPs for mines in the last occupied watersheds that would allow take but still be sufficient to avoid jeopardy (if we are not already in that situation as a baseline condition)." *Id*. Therefore, even having PEPs is likely insufficient to avoid jeopardy; however, there can be no doubt that failing to ensure that these mines implement protective measures is a death sentence for this highly imperiled species.

West Virginia's unilateral determination that "coordination" was not required for these 32 mines not only puts the species at risk but was based on a mischaracterization of the 2020 BiOp. For nearly all of these 32 mines, the State determined that it did not have to seek technical assistance and develop PEPs because there were "no pending significant revisions at time of renewal." OSMRE_31519-25. But that misconstrues the 2020 BiOp, which requires the SRA to engage in the "coordination" process at the time of permit renewal (which must occur every 5 years under SMCRA, 30 C.F.R. § 773.19(c)) following the implementation of the BiOp, regardless of whether there is a significant revision at the time of renewal. *See* FWS_36621-22 (requiring SRAs to initiate the technical assistance process at the time of "permit issuance, permit renewals, and significant permit revisions"). OSMRE's failure to ensure that West Virginia engaged in "coordination" when permit renewals occurred resulted in over 30 mines operating within just three miles of Guyandotte River crayfish critical habitat without the required PEP in place, which illustrates its inability to provide the oversight the 2020 BiOp relies on to ensure that species are not being jeopardized in violation of the ESA.

And these mines certainly required PEPs when the permits were renewed. For example, one of the mines at issue is S402586, which has an outflow into White Oak Creek, a tributary of

Pinnacle Creek just 1-mile from the Guyandotte River crayfish's critical habitat. *See* Dodson Decl. ¶ 36; Hepler Decl. Ex. A (map). The permit is "active" with 1,194.95 acres of disturbed land. OSMRE_31009. This mine has been cited for several permit violations over the past few years, including drainage control and sediment releases into White Oak Creek. Dodson Decl. ¶ 37, Ex. A.[14] The mine was also cited for a permit violation when the permittee failed to clean out sediment control structures, resulting in Pond 1, which is just 2.58 miles from Guyandotte River crayfish critical habitat in Pinnacle Creek, becoming full and sediment reaching the top of the spillway. *Id*. This mine is therefore a prime illustration of coal mining activities near Guyandotte River crayfish critical habitat that "may affect" the species and cause the very imperilment that led to the listing of the species as endangered. Yet even though this mine has had issues with sediment retention, the record shows that when the permit was renewed on February 11, 2022, the West Virginia SRA avoided implementing a PEP as the 2020 BiOp requires under the erroneous contention that "coordination" was not required because there was no significant revision at the time of renewal. OSMRE_31521. Thus, it is readily apparent that OSMRE failed to fulfill its oversight and compliance responsibilities, in a clear violation of the 2020 BiOp.

Another example includes permit S400508, which has an outflow just 1.29 miles from Guyandotte River crayfish critical habitat. *See* Dodson Decl. ¶ 38; Hepler Decl. Ex. B (map). This permit was renewed on November 17, 2021, and the record shows that the permit is not only "active," but that the applicant is "moving coal," and that only 471.3 of the mine's 862.9 acres have been disturbed, which suggests that further disturbance is likely to occur as coal

[14] The Court may consider information regarding SMCRA permit violations since ESA citizen suit claims are not limited to the administrative record, and/or the Court may take judicial notice of such materials pursuant to Fed. R. Evid. 201 since the referenced violations are set forth in documents produced by the State regulatory authority, the accuracy of which cannot be reasonably questioned. *See supra* at fn. 13.

continues to be "moved" from the site. OSMRE_31009. This mine has a history of violations with sediment runoff into Guyandotte River crayfish critical habitat. For example, the mine was cited for a non-compliant discharge due to the permittee's failure to maintain sediment controls, resulting in a violation of State water standards. Dodson Decl. ¶ 38, Ex. B. Indeed, the violation notice stated that sediment proceeded downstream approximately 5 miles, well into the Guyandotte River crayfish's critical habitat. *Id.* Yet the record shows that West Virginia erroneously determined that no PEP was warranted for this mine when it was renewed in 2021 based on the fact that no pending significant revision was pending at the time of renewal. *See* OSMRE_31521. Since this mine not only "may affect" Guyandotte River crayfish critical habitat but has in fact *already* adversely affected such habitat, a PEP was clearly required to be developed at the time of permit renewal pursuant to the 2020 BiOp. OSMRE's failure to provide the oversight that the 2020 BiOp relies on to ensure that mines such as this have the necessary protective measures in place exemplifies the breakdown of the 2020 BiOp's scheme to prevent jeopardy and violates the ESA.

There was likewise no basis for the failure to require a PEP for West Virginia Permit E004500. Dodson Decl. ¶ 39; Hepler Decl. Ex. C (map). This permit is "active" with 174.18 of the mine's 214.32 acres disturbed, suggesting that further disturbance is likely to occur. OSMRE_31009. In 2023, an "imminent harm cessation order" was issued for that permit due to sediment laden water being allowed to bypass sediment control structures and flow directly into the Guyandotte River crayfish's critical habitat. Dodson Decl. ¶ 39, Ex. C. Given the proximity of this mine to that critical habitat and its history of sediment releases, there is no support for the West Virginia SRA's decision that a PEP was not required when the permit was renewed on June 3, 2022, as the record shows. *See* OSMRE_31520.

These are just illustrative examples of the more than 30 mines identified by Plaintiffs that are within 3 miles of critical habitat, that were renewed after the 2020 BiOp was implemented, and that the record shows did not have PEPs developed despite the requirements of the 2020 BiOp. *See* OSMRE_31519-25; OSMRE_31009.[15] And while some of these 32 mines are in the reclamation phase, that does not provide any justification for not implementing a PEP to ensure that measures are in place to protect endangered species. Indeed, the 2020 BiOp itself states that "shorthand terms such as 'mining', 'coal mining', and other similar uses of these terms all signify 'surface coal mining *and reclamation* operations.'" FWS_36605 (emphasis added). This underscores that the BiOp applies to reclamation activities as well as active mining. Yet the record shows that the West Virginia SRA did not seek "coordination" for mines undergoing reclamation and did not ensure that there would be no off-site impacts from all such mines. OSMRE_31009. And for active mines, the record shows that the SRA repeatedly determined that there would be no disturbances that may cause off-site sedimentation, *see id.*, which is not supported with any record evidence and is contrary to the best available science on mine impacts as discussed herein.

In sum, the failure to develop PEPs for over 30 mines in close proximity to Guyandotte River crayfish critical habitat as the 2020 BiOp requires is likely to lead to increased sedimentation and harm that will jeopardize the continued existence of this species and adversely modify its designated critical habitat. The fact that OSMRE did not provide the required

[15] Additional examples include two new West Virginia permits (S500121 and S300619) and two applications for "significant revision[s]" of existing permits (U501311 and S500811), all of which post-dated the 2020 BiOp and were noticed by Plaintiffs, where OSMRE's compliance investigation report details that FWS told West Virginia that no PEPs were required even though they are in close proximity to critical habitat and therefore certainly "may affect" Guyandotte River crayfish. OSMRE_31519.

oversight and allowed these mines to operate without the necessary protective measures is a glaring violation of the 2020 BiOp and the ESA, 16 U.S.C. § 1536(a)(2), and constitutes new information that reveals effects of the delegated SMCRA programs that may affect listed species or critical habitat in a manner or to an extent not previously considered, requiring reinitiation of consultation. 50 C.F.R. § 402.16.

**2. OSMRE Has Allowed Dozens of Mines That "May Affect" Big Sandy Crayfish to Operate in Kentucky in Violation of the 2020 BiOp.**

A similar situation is occurring in Kentucky, where coal mining has devastated the habitat of the Big Sandy crayfish. Plaintiffs' investigation found that over 100 mines were operating with outflows into streams/tributaries within 3 miles of Big Sandy crayfish critical habitat in Kentucky without the protective measures that the 2020 BiOp requires. OSMRE_30805. OSMRE's subsequent investigation found that for 94 of those permits, the Kentucky SRA had unilaterally determined that "no species-specific PEP would be required … unless a permittee proposes a revision or amendment to the mining plan in the future which would trigger a new consultation with USFWS as part of the permit approval process." OSMRE_31527. As discussed *supra*, that determination arbitrarily ignores that the 2020 BiOp requires the SRA to initiate the technical assistance "coordination" process for all permit *renewals* following implementation of the BiOp, and not just for revisions or amendments. *See* FWS_36621-22. The fact that OSMRE did not respond directly to that mischaracterization and failed to take action to ensure that PEPs were in place for these mines upon permit renewal is yet another glaring violation of the agency's oversight duties under the 2020 BiOp.

Regardless, OSMRE stated that the Kentucky SRA decided to reassess the need for PEPs for those 94 permits and initiated informal discussions with FWS in response to Plaintiffs' notice letter. OSMRE_31527. That process identified 15 mines that had been operating for years

without PEPs that "may affect" Big Sandy crayfish and thus required protective measures to ensure against jeopardy, demonstrating that OSMRE had failed to provide sufficient oversight to ensure compliance with the 2020 BiOp for many mines. *Id.* However, the SRA failed to provide any explanation for its decision on these or the remaining 79 permits,[16] and FWS provided only "verbal approval" (i.e., without any written support) to the SRA for its determination that no PEPs were required for the remaining 79 permits, allowing then to continue to operate without the protective measures the 2020 BiOp requires. *Id*.

The determination that no PEPs were required for these 79 mines further shows that the scheme for ESA compliance set forth in the 2020 BiOp is not being implemented. As discussed, FWS has stated that coal mining impacts can occur as far as 12 miles downstream from coal mining activities, and Section 7 requires decisions to be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). To comply with this requirement, FWS "cannot ignore available biological information," because to do so would violate the ESA by "failing to adequately assess whether the agency action was likely to jeopardize the continued existence of any threatened or endangered species, as required by section 7(a)(2)." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). Therefore, all 79 of these should have been required to apply the protective measures of the 2020 BiOp given their close proximity and potential for harm to crayfish habitat.

---

[16] As noted in the 2020 BiOp, the SMCRA regulations require that before any new mining permit, permit renewal, or significant revision can be approved, the SRA must find, "'in writing, on the basis of information set forth in the application or from information otherwise available that is documented in the approval,'" that the "'operation would not affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the [ESA].'" FWS_36624 (quoting 30 C.F.R. §§ 773.15(j), 774.13(c)).

FWS's failure to follow its own best available science, without explanation or support, has thereby resulted in mining activities occurring without the measures in place that the 2020 BiOp requires to prevent jeopardy. The fact that FWS allowed the Kentucky SRA to forego instituting protective measures for 79 mines without even documenting the basis for its decision, as well OSMRE's failure to ensure that the protective measures of SMCRA and the BiOp were being implemented, constitutes a breakdown of the scheme that is intended to ensure against jeopardy, in direct violation of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

**3. OSMRE Has Routinely Failed to Engage in Essential Oversight Activities and Has Not Remedied the Violations Noticed by Plaintiffs.**

In response to Plaintiffs' notice letter, OSMRE requested information from the SRAs regarding the basis for their determinations on the need for PEPs for the mines identified by Plaintiffs that continue to operate in close proximity to listed species' habitat without the required protective measures. OSMRE_31519-35. The very fact that OSMRE had to seek out this information from the SRAs in response to Plaintiffs' notice letter once again illustrates the critical issue here: that the agency is failing to provide the oversight that the 2020 BiOp requires.

What this shows is that OSMRE did not have sufficient information readily available regarding the States' compliance with the 2020 BiOp, even though the BiOp explicitly relies on OSMRE providing oversight to ensure compliance. And the agency only undertook a compliance review *after* Plaintiffs threatened to sue for failure to comply with the ESA. Further, even upon notification of the concerns raised by Plaintiffs, the agency only undertook an investigation into the limited list of mines included in Plaintiffs' notice letter, failing entirely to consider permits outside of the 3 mile area used by Plaintiffs to identify violations or compliance issues for mines that "may affect" listed species other than the protected crayfish. *See* FWS_37028 (Plaintiffs' notice letter specifically stating that the provided list "by no means captures all SMCRA-

permitted operations that may affect" listed species because it was limited to mines within 3 miles upstream from crayfish critical habitat); *see also* OSMRE_31519-35 (OSMRE's compliance investigation report, which only analyzed permits noticed by Plaintiffs). This is a far cry from demonstrating the agency has engaged in the essential oversight and compliance activities required by the 2020 BiOp.

Moreover, in undertaking its review, OSMRE appears to have simply repeated the rationalizations provided by the States regarding the need for PEPs for the noticed mines, without any analysis in the record to show that OSMRE was actively engaged in ensuring compliance with the 2020 BiOp. As a result, OSMRE's investigation failed to address whether the SRA's determinations regarding the mines were justifiable based on the best available science, which—as discussed above—they were not.

In at least one instance, OSMRE accepted without question the West Virginia SRA's determination that a PEP was not required for a mine that certainly "may affect" Guyandotte River crayfish critical habitat, based on the erroneous assertion that FWS had agreed with a "no effect" determination, even though the record shows that is *not at all* what occurred. *See* OSMRE_31519 ("[F]ollowing technical assistance with USFWS regarding S500121, USFWS determined the action would not impact the [Guyandotte River crayfish]"). What *actually* occurred is that FWS informed the SRA that a PEP *was* required because of the potential for adverse impacts to Huff Creek, which is designated unoccupied "high priority" critical habitat that is incredibly important for the continued survival of the species. *See* FWS_32687 ("Huff Creek is a high priority stream important to [Guyandotte River crayfish] recovery"); FWS_32764 (stating that a PEP for this mine should "focus on avoidance, minimization, and conservation measures in order to avoid adversely modifying the designated critical habitat located

downstream on Huff Creek"). The West Virginia Department of Environmental Protection ("WVDEP") responded that "the company was instructed to prepare a PEP for permit S500121," FWS_32667, and the record indicates that a PEP was prepared and sent to FWS at some point because "portions of the permit would discharge into Huff Creek upstream of critical habitat." FWS_32695.

However, the PEP approval process was apparently delayed, so the State attempted to accelerate permit renewal, arguing that the mining activities—which would include valley fills—would only affect unoccupied critical habitat, so no take was likely to occur. FWS_32680. FWS responded that workloads and limited capacity were delaying the PEP review, but then added that while the "potential impacts should be assessed for the species and critical habitat," it questioned whether WVDEP was making a "no effect" determination, and if so, then "no further action for [FWS] needs to occur, pursuant to ESA section 7." *Id.*

Under the 2020 BiOp, FWS only becomes involved if the SRA initiates the technical assistance "coordination" process upon making a "may affect" determination, and FWS does not provide concurrences on "no effect" determinations. *See WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 94 (D.D.C. 2012); FWS_36708 (providing that the technical assistance process must be initiated by the SRA). Thus, despite the close proximity of Guyandotte River crayfish critical habitat downstream of this mine, the mine was approved by the State without the PEP being implemented. This provides a concrete example of how OSMRE's failure to provide the oversight required under the 2020 BiOp undermines the basic premise of the 2020 BiOp's jeopardy prevention scheme. Instead of ensuring that this mine had a PEP as required, the agency simply accepted, without any analysis, the State's assertion that FWS had signed off on a "no effect" determination, even though in reality FWS had stated that a PEP was indeed required. *See*

*Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1031 (2d Cir. 1983) (rejecting the "cavalier manner" in which the agency had reached its conclusion and its failure to make an independent evaluation).

In other instances, OSMRE provided inconsistent and/or unsupported contentions regarding the status of compliance with the 2020 BiOp. For example, mine U501311 in West Virginia is less than 1 mile from Guyandotte River crayfish critical habitat, is actively moving coal, and does not have a PEP. OSMRE_31009. While OSMRE stated that consultation for this mine was conducted and is current, it also stated that FWS determined that a PEP was unnecessary. OSMRE_31519. There is, however, nothing in the record to support that determination. Therefore, it appears that OSMRE once again blindly accepted the SRA's assertion. Regardless, even if FWS *had* determined that the mine did not require a PEP (which is not supported by the record), there is no basis for that decision given the close proximity of the mine to Guyandotte River crayfish critical habitat.

And while OSMRE did end up drafting corrective action plans for Virginia, West Virginia, and Kentucky in response to Plaintiffs' notice letter, *see* OSMRE_31670-76, 31681-87, 31702-08, that only serves to confirm that prior to Plaintiffs' notice of these violations, OSMRE had failed to provide the oversight that the BiOp relies on for ESA compliance. Indeed, the corrective action plans *confirm* that they were necessary "[t]o correct this State regulatory program issue," including by reevaluating prior determinations for existing SMCRA permits to determine if they may affect listed crayfish. *See* OSMRE_31671, 31682, 31703.

However, the corrective action plans merely reiterate what the 2020 BiOp and the SMCRA regulations *already* require and provide nothing new to suggest that OSMRE will actually be able to fulfill the oversight role that the record shows it has thus far failed to

accomplish. And to the extent that the plans require the States to revisit prior determinations on the need for "coordination," they leave it to the SRAs to develop and implement that process, which continues to allow the States to make determinations that are not consistent with the best available science regarding impacts to the affected species. Indeed, the corrective action plans still allow the SRAs to unilaterally determine whether to engage in "coordination" with FWS and fail to acknowledge that impacts from mines can occur up to and beyond 12 miles downstream from mines. The plans merely reiterate the status quo, and this blatant attempt to paper over the failure to provide the oversight and protections that the 2020 BiOp relies on by merely restating, in a new package, the SRA's and the agencies' existing obligations that they have failed to adhere to for years cannot save Defendants.

OSMRE simply has no mechanism in place to ensure that it can provide the oversight of State SMCRA programs that the 2020 BiOp requires, and the agency still does not appear to have undertaken a full accounting of what mines may be operating without protective measures to ensure against jeopardy. Since the 2020 BiOp only requires the States to provide information on mining facilities that may affect listed species directly to FWS, FWS_20201, and OSMRE is not notified when such a permit is under consideration, OSMRE has no opportunity to review the States' decisions in order to determine whether they are faithfully executing the regulatory requirements of the 2020 BiOp on a permit-by-permit basis.

Indeed, OSMRE only reviews the compliance status of each State's Title V program on an annual basis—*see* FWS_36626, 30 C.F.R. § 733.13(a)(1)—and those annual reports fail to capture whether the States are initiating the 2020 BiOp's technical assistance "coordination"

process where necessary to comply with the 2020 BiOp.[17] While the corrective action plans suggest that OSMRE has a "current practice" of conducting "oversight inspections," including a "permit file review" to include an evaluation of the SRA's written determination of effects on listed species and produce an "oversight inspection report"—*see* OSMRE_0031675, 31686, 31707—the record contains no such reports and provides no evidence that such inspections have ever occurred. If they *do* occur, it remains unclear how OSMRE failed to previously find that corrective action was required or to discover the dozens of mines had failed to comply with the 2020 BiOp upon permit renewal as discussed herein. The record simply provides nothing to suggest that the same compliance issues will not continue into the future. Since OSMRE has no way to learn that such a permit is violating the 2020 BiOp, it is impossible for the agency to provide sufficient oversight. As a result, imperiled species will continue to be jeopardized by coal mining, just as they have been for decades.

Without any mechanism to ensure oversight, OSMRE cannot fulfill the duties upon which the 2020 BiOp relied to ensure against jeopardy and adverse modification, as the ESA requires. 16 U.S.C. § 1536(a)(2). This further constitutes new information that reveals effects of the delegated SMCRA programs that may affect listed species or critical habitat in a manner or to an extent not previously considered, requiring reinitiation of consultation. 50 C.F.R. § 402.16.

## III. The Presumptive Remedy for Defendants' ESA Violations is Vacatur.

Vacatur of the 2020 BiOp is the presumptive remedy for Defendants' violations of the ESA. *See Regan*, 734 F. Supp. 3d at 62; *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d

[17] While these annual reports contain sections on off-site impacts, inspection and enforcement, and regulatory problems, they remain silent regarding the impacts to listed species from coal mining and state compliance with the 2020 BiOp. *See*, *e.g.*, OSMRE_28409-10; OSMRE_28417-23; OSMRE_28428-29. Even sections on the ESA do little more than describe the 2020 BiOp, with no information on compliance. *See*, *e.g.*, OSMRE_28431-32.

236, 244 (D.D.C. 2020) ("The ordinary practice is to vacate unlawful agency action," which "holds when the law rendering the agency action 'unlawful' is the Endangered Species Act") (citing *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (other citations omitted)); *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1034-35 (D.C. Cir. 2008) (vacating agency decision for NEPA and ESA violations); *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693 (D.C. Cir. 1997) (noting the practice of the court is ordinarily to vacate unlawful agency action).

Remand without vacatur is an "exceptional remedy," *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020), that is allowable "only if an agency's error is 'curable.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *U.S. Sugar Corp. v. EPA*, 844 F.3d 269, 270 (D.C. Cir. 2016)); *see also Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (allowing remand without vacatur only when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand"). Here, Defendants' ESA violations are not "curable" because, as discussed, States and private entities may not receive Section 7 take coverage for State-issued SMCRA permits through a programmatic biological opinion and a non-statutory "coordination" process. Because Defendants cannot show "at least a serious possibility" that they will be able to reach the same outcome on remand, the Court "must vacate" the 2020 BiOp and need not consider whether any disruptive consequences would result from vacatur within the meaning of *Allied-Signal*. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 918 (D.C. Cir. 2024) (quoting *Allied-Signal*, 988 F.2d at 151).

## CONCLUSION

For the foregoing reasons, the 2020 BiOp is facially unlawful and must be vacated. Even if it were otherwise valid, OSMRE and FWS have failed to implement the 2020 BiOp in a manner that FWS itself said was necessary to avoid jeopardizing the continued existence of listed species and impairing their critical habitats. This violates the ESA, 16 U.S.C. § 1536(a)(2), and, at minimum, requires reinitiation of consultation to develop a lawful and more effective method for ESA compliance, 50 C.F.R. § 402.16. The alternative is likely extinction.

March 4, 2025.

Respectfully Submitted,

/s/ Hannah Connor
Hannah Connor (DC Bar #1014143)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 681-1676
Email: hconnor@biologicaldiversity.org

/s/ Jared M. Margolis
Jared M. Margolis (admitted *pro hac vice*)
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
Phone: (802) 310-4054
Email: jmargolis@biologicaldiversity.org

*Attorneys for Plaintiffs*

**Certificate of Service**

I certify that on March 4, 2026, I filed the foregoing with the Court's CMS/ECF system, which will notify each party.

/s/ Jared M. Margolis
Jared M. Margolis