**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, LANNY E. ERDOS, in his official capacity as Director of the Office of Surface Mining Reclamation and Enforcement, UNITED STATES FISH AND WILDLIFE SERVICE, DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, and BRIAN NESVICK, in his official capacity as Director of the U.S. Fish and Wildlife Service, <br><br> Defendants. | Civil Action No. 1:23-cv-03343 |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Court's Minute Order of February 11, 2026, Federal Rule of Civil Procedure 56, and LCvR 7(h), Defendants hereby oppose Plaintiffs' motion for summary judgment (ECF 42), and cross-move for summary judgment. Defendants' opposition and cross-motion are supported by the accompanying memorandum of points and authorities.

**Table of Contents**

**Page**

I.    Introduction...........................................................................................................................1

II.   Statutory Background...........................................................................................................2

    A.    Surface Mining Control and Reclamation Act of 1977 ...........................................2

        1.    Cooperative Federalism ...................................................................................2

        2.    Permitting, Including Technical Assistance.................................................5

        3.    Citizen Enforcement .......................................................................................8

    B.    Endangered Species Act............................................................................................8

    C.    Coordination Between SMCRA and the ESA ........................................................11

III.  Factual Background.............................................................................................................11

    A.    ESA Consultation History .......................................................................................11

    B.    2020 Biological Opinion ..........................................................................................12

IV.   Standard of Review.............................................................................................................16

V.    Argument .............................................................................................................................17

    A.    Defendants Are Entitled to Judgment on Count III .................................................17

        1.    The Second Circuit Upheld a BiOp Analogous to the 2020 BiOp.............................17

        2.    Plaintiffs' Attacks on the 2020 BiOp Lack Any Basis in Fact or Law.........................21

            a.    Non-Federal Entities May Receive Incidental Take Coverage.............................21

            b.    A Programmatic BiOp May Include an Incidental Take Statement....................22

            c.    The 2020 BiOp and ITS Include All Required Elements ......................................24

            d.    Plaintiffs May Not Attack SMCRA's Implementing Regulations.......................30

            e.    FWS Has Not Delegated Any Authority.................................................................32

    B.    Defendants are Entitled to Judgment on Counts I and II.......................................35

        1.    OSM Has Exercised Oversight In Accordance with SMCRA and as

            Analyzed in the 2020 BiOp ..........................................................................................36

        2.    Counts I and II Are Outdated and Not Actionable Under the ESA............................38

            a.    Plaintiffs Ignore OSM's Corrective Action............................................................38

            b.    OSM Is Fully Complying with ESA Section 7(a)(2) ............................................40

            c.    OSM and FWS Reasonably Determined that Reinitiation of ESA Consultation

            Is Not Required..............................................................................................................43

    C.    Plaintiffs Are Not Entitled to Relief and Vacatur Would Not Be Appropriate .................45

VI.   Conclusion............................................................................................................................45

## Table of Authorities

**Cases**                                                     **Page(s)**

*All. for the Wild Rockies v. Marten*, 685 F. Supp. 3d 971 (D. Mont. 2023).................................43

*Allied-Signal v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)..........................45

*Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32 (D.C. Cir. 2018).......................................28

*Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92 (D.D.C. 2007)....................................... 16, 44

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................................10, 32, 34

*Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001)........................................................3

*Cabinet Mtns. Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982)......................................16

*Chamber of Comm. v. Dep't of Energy*, 627 F.2d 289 (D.C. Cir. 1980)....................................41

*\*City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006) ................................................26, 32, 43

*Cnty. of Los Angeles v. Davis*, 440 U.S. 625 (1979) ..................................................................41

*Conservation Cong. v. Finley*, 774 F.3d 611 (9th Cir. 2014)......................................................45

*\*Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018) ...........................passim

*Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794 (9th Cir. 2009).....................40

*Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1 (D.D.C. 2025)..................................passim

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009)....................23

*Env'tl Def. Fund v. Costle*, 657 F.2d 275 (D.C. Cir. 1981).........................................................16

*Fox v. Palmas Del Mar Props., Inc.*, 620 F. Supp. 2d 250 (D.P.R. 2009)....................................41

*Friends of Merrymeeting Bay v. Topsham Hydro Partners Ltd. P'ship*,
No. 2:11-cv-37-GZS, 2013 WL 145623 (D. Me. Jan. 14, 2013)..............................................42

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) ............................................................... 33, 34

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49 (1987)...............................40

*Hodel v. Va. Surface Min. & Reclamation Ass'n*, 452 U.S. 264 (1981)..........................................3

*Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246 (D.C. Cir. 1988) ..................................................33

*In re: Permanent Surface Mining Regul. Litig.*, 653 F.2d 514 (1981) ..........................................31

*Innovator Enters. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014) .....................................................16

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 120 F. Supp. 2d 1005 (M.D. Fla. 2000) ......................45

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................30

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ....................................................... 29, 35

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) ......................................................43

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980)...........................................................29

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) ...................................... 23, 33

*Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893 (9th Cir. 2020) .........................................................23

*Nat'l Mining Ass'n v. Interior*, 70 F.3d 1345 (D.C. Cir. 1995).......................................................31

*Pub. Emps. for Envtl. Resp. v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014) ..........................................33

*Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996) ...............................................................10, 21, 22

*Wy. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81 (D.D.C. 2003)..................................................45

**Statutes**

5 U.S.C. § 706................................................................................................................16
5 U.S.C. § 706(2)(A)........................................................................................................16
5 U.S.C. § 801..............................................................................................................12

16 U.S.C. § 1532(7) .........................................................................................................9
16 U.S.C. § 1532(13) ........................................................................................................8
16 U.S.C. § 1532(19) ........................................................................................................8
16 U.S.C. § 1533(d) .........................................................................................................8
16 U.S.C. § 1536(a)(2)..............................................................................................9, 11, 23
16 U.S.C. § 1536(b)(4) .........................................................................................9, 10, 21, 23
16 U.S.C. § 1536(b)(4)(i) ..................................................................................................27

16 U.S.C. § 1536(b)(4)(iv) ................................................................................................................30

16 U.S.C. § 1536(b)(4)(C) ................................................................................................................10

16 U.S.C. § 1536(o)(2) ............................................................................................................9, 10, 21

16 U.S.C. § 1538(a)(1)(B) ..................................................................................................................8

16 U.S.C. § 1538(a)(1)(C) ..................................................................................................................8

16 U.S.C. § 1538(a)(1)(G) ..................................................................................................................8

16 U.S.C. § 1539(a)(1)(B) ..............................................................................................................9, 10

16 U.S.C. § 1539(a)(2)(A) ................................................................................................................10

16 U.S.C. § 1539(a)(2)(B)(iv) ..........................................................................................................10

16 U.S.C. § 1539(c) ..........................................................................................................................10

16 U.S.C. § 1540(g)(1)(A) ................................................................................................................40

16 U.S.C. § 1540(g)(2)(A)(i) ............................................................................................................40


30 U.S.C. § 1201(f) ............................................................................................................................2

30 U.S.C. § 1202(a) ............................................................................................................................2

30 U.S.C. § 1211(c)(1) ........................................................................................................................8

30 U.S.C. § 1252(e) ............................................................................................................................3

30 U.S.C. § 1253(a) ............................................................................................................................3

30 U.S.C. § 1253(a)(1) ........................................................................................................................3

30 U.S.C. § 1255 ................................................................................................................................3

30 U.S.C. §§ 1256-1264 ......................................................................................................................2

30 U.S.C. §§ 1256-1266 ......................................................................................................................2

30 U.S.C. § 1256(b) ............................................................................................................................7

30 U.S.C. § 1257(b) ............................................................................................................................5

30 U.S.C. § 1264(c) ............................................................................................................................8

30 U.S.C. §§ 1265-1266 ......................................................................................................................2

30 U.S.C. § 1265(b) ............................................................................................................................5

30 U.S.C. § 1265(b)(24) ..................................................................................................................2, 6

30 U.S.C. § 1266(b) ............................................................................................................................5

30 U.S.C. § 1266(b)(11) ..................................................................................................................2, 6

30 U.S.C. § 1267 ............................................................................................................................3, 14

30 U.S.C. § 1267(h)(1) ..............................................................................................8, 40

30 U.S.C. § 1270 ...........................................................................................................40

30 U.S.C. § 1270(a) .....................................................................................................40

30 U.S.C. § 1270(a)(1) ..................................................................................................8

30 U.S.C. § 1271 ........................................................................................................3, 40

30 U.S.C. § 1271(a) ..................................................................................................19, 39

30 U.S.C. § 1271(a)(1) ........................................................................................4, 5, 8, 40

30 U.S.C. § 1271(a)(2) ...................................................................................................5

30 U.S.C. § 1271(a)(3) ...................................................................................................5

30 U.S.C. § 1271(b) ......................................................................................................19

30 U.S.C. § 1276(a)(1) .................................................................................................31

30 U.S.C. § 1276(e) ........................................................................................................8

## Regulations

30 C.F.R. § 730.5 ............................................................................................................3

30 C.F.R. part 733 ...........................................................................................................8

30 C.F.R. § 733.5 ..............................................................................................4, 42, 43

30 C.F.R. § 733.12 ......................................................................................................42, 43

30 C.F.R. § 733.12 (2020) ...........................................................................................37

30 C.F.R. § 733.12(a) .....................................................................................................4

30 C.F.R. § 733.12(b) .....................................................................................................4

30 C.F.R. § 733.12(b) (2020) .......................................................................................37

30 C.F.R. § 733.13(a)(1) ................................................................................................3

30 C.F.R. § 733.13(a)(2) ................................................................................................4

30 C.F.R. § 733.13(e) ....................................................................................................4

30 C.F.R. part 773 ..........................................................................................................5

30 C.F.R. § 773.5 ..........................................................................................................11

30 C.F.R. § 773.6 ............................................................................................................7

30 C.F.R. § 773.6(a) ........................................................................................................7

30 C.F.R. § 773.6(a)(3)(ii) ..............................................................................7, 12, 13, 42

30 C.F.R. § 773.6(b) ........................................................................................................7

30 C.F.R. § 773.15(j) ...............................................................................................passim

30 C.F.R. § 774.10(a)(1) ........................................................................................................7

30 C.F.R. § 774.13.................................................................................................................7

30 C.F.R. § 774.13(b)(2) ......................................................................................................42

30 C.F.R. § 774.15............................................................................................................ 7, 8

30 C.F.R. § 774.15(b)(3) ......................................................................................................42

30 C.F.R. part 779 .................................................................................................................5

30 C.F.R. part 780 .................................................................................................................5

30 C.F.R. § 780.16........................................................................................................passim

30 C.F.R. § 780.16(a) ..........................................................................................................19

30 C.F.R. § 780.16(a)-(b) ......................................................................................................6

30 C.F.R. § 780.16(a)(1) .................................................................................................. 5, 42

30 C.F.R. § 780.16(a)(2)(i) ............................................................................................5, 7, 33

30 C.F.R. § 780.16(b) ............................................................................................................6

30 C.F.R. § 780.16(b)(1) ........................................................................................................6

30 C.F.R. § 780.16(b)(3)(i)-(ii) ..............................................................................................6

30 C.F.R. § 780.16(b)(3)(ii) ...................................................................................................6

30 C.F.R. § 780.16(c) ................................................................................................. 7, 33, 42

30 C.F.R. § 816.97(b)..................................................................................................passim

30 C.F.R. § 840.11(a)-(b) ......................................................................................................4

30 C.F.R. § 842.11(b)..........................................................................................................40

30 C.F.R. § 842.11(b)(1) .................................................................................................. 4, 5

30 C.F.R. § 842.11(c)(1)(i)-(ii)..............................................................................................4

30 C.F.R. § 842.12 ...............................................................................................................40

30 C.F.R. § 843.12(a)(2) ........................................................................................................4


50 C.F.R. § 17.22(b)............................................................................................................10

50 C.F.R. § 402.02................................................................................................9, 12, 23, 24

50 C.F.R. § 402.03................................................................................................................9

50 C.F.R. § 402.13(c) ............................................................................................................9

50 C.F.R. § 402.14(a) ............................................................................................................9

50 C.F.R. § 402.14(a)-(b)......................................................................................................9

50 C.F.R. § 402.14(c)(4) .................................................................................................................24

50 C.F.R. § 402.14(g) ........................................................................................................................9

50 C.F.R. § 402.14(g)(7) .................................................................................................................23

50 C.F.R. § 402.14(g)-(h) .................................................................................................................9

50 C.F.R. § 402.14(i) ................................................................................................................. 10, 27

50 C.F.R. § 402.14(i)(1) ...................................................................................................................27

50 C.F.R. § 402.14(i)(1)(iv) ....................................................................................................... 21, 30

50 C.F.R. § 402.14(i)(4) ...................................................................................................................21

50 C.F.R. § 402.14(i)(5) ...................................................................................................................10

50 C.F.R. § 402.14(i)(6) ...................................................................................................................21

50 C.F.R. § 402.14(i)(7) ............................................................................................................ 23, 24

50 C.F.R. § 402.15(a) ................................................................................................................ 10, 32

50 C.F.R. § 402.16.............................................................................................................................18

50 C.F.R. § 402.16(a) ................................................................................................................ 16, 28

50 C.F.R. § 402.16(a)(1)-(4) ..................................................................................................... 10, 44

50 C.F.R. § 402.16(a)(2) ..................................................................................................................43

## Federal Register

44 Fed. Reg. 14902 (Mar. 13, 1979) ................................................................................19, 30, 31

50 Fed. Reg. 7274 (Feb. 21, 1985).................................................................................................31

52 Fed. Reg. 47352 (Dec. 11, 1987) ..............................................................................................31

81 Fed. Reg. 93066 (Dec. 20, 2016) ..............................................................................................31

82 Fed. Reg. 54924 (Nov. 17, 2017)...............................................................................................31

90 Fed. Reg. 8433 (Jan. 20, 2025) ..................................................................................................45

## Legislative Materials

H.R.J. Res. 38, 115th Cong. (2017) ...............................................................................................12

**Table of Acronyms**

APA             Administrative Procedure Act

BiOp            Biological Opinion

CBD             Center for Biological Diversity

CWA             Clean Water Act

EPA             Environmental Protection Agency

ESA             Endangered Species Act

FWS             U.S. Fish & Wildlife Service

ITP             Incidental Take Permit

ITS             Incidental Take Statement

NMFS            National Marine Fisheries Service

OSM/OSMRE       Office of Surface Mining Reclamation and Enforcement

PEP             Protection and Enhancement Plan

RPM             Reasonable and Prudent Measure

SMCRA           Surface Mining Control and Reclamation Act

SRA             State Regulatory Authority

SSPM            Species-Specific Protection Measures

## I.      Introduction

Plaintiff environmental groups' challenge to a programmatic 2020 U.S. Fish & Wildlife Service ("FWS") biological opinion ("2020 BiOp") on the Office of Surface Mining Reclamation and Enforcement's ("OSM" or "OSMRE") regulatory framework for implementing Title V of the Surface Mining Control and Reclamation Act ("SMCRA"), and OSM's reliance on that BiOp to meet the requirements of the Endangered Species Act ("ESA") is misplaced and without merit.

Though Plaintiffs attack the 2020 BiOp, it is apparent that they simply dislike the cooperative federalism design Congress chose for SMCRA, which allows states to assume primary responsibility for regulating surface coal mining and reclamation within their borders, subject to minimum federal standards and oversight. The U.S. Secretary of the Interior ("Secretary") duly codified a technical assistance process under SMCRA nearly half a century ago to ensure that he meets his continuing obligations under ESA Section 7(a)(2) in overseeing state permitting decisions that are not themselves subject to Section 7(a)(2) requirements. Over the ensuing five decades, the SMCRA technical assistance process has been an integral means of ensuring that species listed under the ESA are protected. Plaintiffs prefer ESA Section 7 consultation or Section 10 permitting over SMCRA's technical assistance process, but their recourse is with Congress. The SMCRA technical assistance process reflects SMCRA's congressional design, and the 2020 BiOp met all ESA requirements in analyzing the SMCRA regulatory framework, just like an analogous BiOp the Second Circuit upheld in *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018).

This Court should reject Plaintiffs' meritless and thinly veiled collateral attack on SMCRA's regulations under the guise of a challenge to the 2020 BiOp, as well as Plaintiffs' outdated and baseless attempt to overturn the 2020 BiOp over a state regulatory program issue that arose in 2023 and was swiftly corrected well over two years ago. The 2020 BiOp anticipated that such issues may arise, and it found that the Secretary's mechanisms for correcting such issues under SMCRA's

1

regulatory framework were sufficient to meet the Secretary's obligations under ESA Section 7(a)(2). OSM's swift investigation and implementation of action plans underscores the reasonableness of this conclusion. The law and facts support the agency's decisions here and, thus, the Court should uphold the BiOp and grant summary judgment to Defendants.

## II.    Statutory Background

### A.  Surface Mining Control and Reclamation Act of 1977

SMCRA establishes "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). Title V of SMCRA regulates these effects (and the surface effects of underground coal mining operations) through two basic mechanisms: a permitting system (*id.* at §§ 1256-1264) and a series of environmental protection performance standards (*id.* at §§ 1265-1266). To engage in surface coal mining and reclamation operations, an operator must first apply for, and be granted, a permit. Any permitted operations must meet enumerated performance standards and any additional requirements that the regulatory authority may promulgate. *See generally id.* at §§ 1256-66. Among other requirements, operators must not only "minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values" "to the extent possible using the best technology currently available," but "achieve enhancement of such resources where practicable." *Id.* at §§ 1265(b)(24), 1266(b)(11).

#### 1.  Cooperative Federalism

Congress' intent in enacting SMCRA was that "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States." *Id.* § 1201(f). Therefore, Congress designed SMCRA to operate through a system of cooperative federalism under which states may assume primary jurisdiction ("primacy") to regulate surface coal mining and reclamation operations on non-federal and non-Indian lands within their borders, subject to federal approval and oversight.

*Id.* § 1253(a). In such "a program of cooperative federalism," states can – "within limits established by federal minimum standards" – "enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Va. Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 289 (1981). To achieve primacy, a state must develop a regulatory program that is no less stringent than the requirements of SMCRA and no less effective in meeting SMCRA's requirements than the federal regulations. 30 U.S.C. §§ 1253(a)(1), 1255; 30 C.F.R. § 730.5. Currently, 24 states have achieved primacy; as relevant here, those states include Virginia (1981), West Virginia (1981), and Kentucky (1982).[1] OSM_0024657-58. If a state or tribe does not have primacy, OSM will operate a federal program, as in Tennessee, Washington, and on all Indian lands. *Id.*

Once the Secretary has approved a state's regulatory program, the state has "exclusive jurisdiction over the regulation of surface coal mining" on state and private lands, meaning that the state's laws and regulations for implementing the program become operative for regulating surface coal mining, including the issuance of surface mining permits, and state officials administer the program. 30 U.S.C. §§ 1252(e), 1253(a); *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288–89 (4th Cir. 2001). "Thus, SMCRA provides for *either* State regulation of surface coal mining within its borders *or* federal regulation, but not both." *Bragg*, 248 F.3d at 288–89. In states with primacy, OSM is responsible for overseeing the effectiveness of the state's implementation, administration, and enforcement of its counterparts to the federal regulations. 30 U.S.C. §§ 1267, 1271.

OSM conducts both programmatic and mine-specific oversight of state programs. Programmatically, OSM evaluates administration of a state's regulatory program at least annually. 30 C.F.R. § 733.13(a)(1). However, an interested person can initiate an evaluation of a state program at

---

[1] Herein, Defendants will cite to SMCRA and the federal regulations; however, each state regulatory program has its own set of laws and regulations that have been approved by the Secretary as meeting or exceeding the minimum protections under SMCRA and the federal regulations. Those state counterpart regulations govern surface coal mining and reclamation operations in each state with federal oversight and enforcement authority as enumerated in SMCRA and the federal regulations.

any time by providing a statement of facts alleging that a state is not effectively implementing, administering, maintaining, or enforcing any part of its approved program. *Id.* § 733.13(a)(2). Additionally, if the OSM Director becomes aware of a "State regulatory program issue" (*id.* § 733.5), he or she should take steps to ensure the issue does not escalate into a situation that would give him or her reason to believe the State Regulatory Authority ("SRA") is not effectively implementing, administering, enforcing, or maintaining all or a portion of its state program. *Id.* § 733.12(a).

If a state regulatory program issue is identified, the OSM Director, or his or her delegate, is authorized to employ any number of compliance strategies to ensure that the SRA corrects the identified issue in a timely and effective manner. *Id.* § 733.12(b). The Director or delegate will develop and institute an "action plan" if he or she does not expect that the SRA will resolve the issue within 180 days after identification or that the issue is likely to result in a violation of the approved state program. *Id.*; *see also id.* § 733.5. If, after following the appropriate procedures in the federal regulations, OSM finds that a state is not effectively administering any or all of its approved program, the Director will either substitute federal enforcement for all or part of the state program or recommend that the Secretary withdraw approval of the state program. *Id.* at § 733.13(e).

Regarding specific mines, in states with primacy, state inspectors must perform an average of at least one partial inspection per month and an average of at least one complete inspection per calendar quarter of each active surface coal mining and reclamation operation. 30 C.F.R. §§ 840.11(a)-(b), 842.11(c)(1)(i)-(ii). If OSM receives information from any source that gives it "reason to believe that any person is in violation of any requirement" of SMCRA or a SMCRA permit condition, OSM must notify the SRA of the potential violation. 30 U.S.C. § 1271(a)(1). The state must respond to this notice within ten days; OSM will then review the response and determine whether the state took "appropriate action" to correct the violation or had shown good cause for why it has not taken such action. *Id.*; *see also* 30 C.F.R. §§ 842.11(b)(1), 843.12(a)(2). If the state fails

4

to take appropriate action or to show good cause for such failure within ten days, OSM "shall immediately order Federal inspection of the surface coal mining operation at which the alleged violation is occurring unless the information available to the Secretary is a result of a previous Federal inspection of such surface coal mining operation." 30 U.S.C. § 1271(a)(1); *see also* 30 C.F.R. § 842.11(b)(1). This process is waived if the possible violation presents imminent harm. *Id.*

If a federal inspection reveals a violation of SMCRA or a SMCRA permit condition that "creates an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources," OSM must immediately order a cessation of mining operations. 30 U.S.C. § 1271(a)(2). If the violation does not create imminent harm or danger, OSM will issue a notice of violation to the permittee setting forth a reasonable time for abatement and opportunity for a public hearing. *Id.* § 1271(a)(3).

### 2. Permitting, Including Technical Assistance

Before a surface or underground mining permit may be issued, the applicant must provide an extensive array of information to demonstrate that it will meet SMCRA's performance standards. *Id.* §§ 1265(b), 1266(b), 1257(b). This information includes baseline information about hydrology, geology, vegetation, soils, water quality, existing land uses, threatened and endangered species/critical habitat occurrences, and habitat suitability using a variety of field methods. *See, e.g.,* *id.* § 1257(b); 30 C.F.R. parts 773, 779, & 780.[2]

Applicants must submit site-specific fish and wildlife resource information for the permit and adjacent area, including species listed or proposed for listing under the ESA or their designated critical habitats. 30 C.F.R. § 780.16(a)(2)(i). The fish and wildlife resource information must be sufficient to design a protection and enhancement plan ("PEP"), with scope and level of detail determined by the SRA in consultation with the FWS. *Id.* § 780.16(a)(1). A PEP is a mandatory

---

[2] For efficiency, references to surface mining regulations in 30 C.F.R. parts 779, 780, and 816 also apply to the underground mining counterparts in 30 C.F.R. parts 783, 784, and 817.

element of all permit applications. *Id.* § 780.16(a)-(b). The PEP describes "how, to the extent possible using the best technology currently available, the operator will minimize disturbances and adverse impacts on fish and wildlife and related environmental values, including compliance with the Endangered Species Act, during the surface coal mining and reclamation operations and how enhancement of these resources will be achieved where practicable." *Id.* § 780.16(b); *accord* 30 U.S.C. §§ 1265(b)(24), 1266(b)(11).

The PEP must not only include protective measures that will be used during the active mining phase of operation (e.g., the establishment of buffer zones, selective location and design of haul roads and powerlines, and monitoring of surface water quality and quantity), but also enhancement measures that will be used during the reclamation and postmining phase of operation to develop aquatic and terrestrial habitat where practicable. 30 C.F.R. § 780.16(b)(3)(i)-(ii). SMCRA regulations explain that "[s]uch measures may include restoration of streams and other wetlands, retention of ponds and impoundments, establishment of vegetation for wildlife food and cover, and the replacement of perches and nest boxes." *Id.* § 780.16(b)(3)(ii). The PEP must be drafted in a manner consistent with the performance standards specified in the federal SMCRA regulations, including the requirement that no mining activity be likely to jeopardize the continued existence of ESA-listed species or to result in the destruction or adverse modification of designated critical habitats of such species in violation of the ESA. *Id.* §§ 780.16(b)(1); 816.97(b).

In addition to a PEP, an application must identify species-specific protection measures ("SSPMs") if incidental take of a listed species is reasonably certain to occur. SSPMs are "activities deemed necessary to avoid, minimize, and monitor the effects of the proposed mining action on ESA-listed and proposed species." OSM_0025716. As the 2020 BiOp explains, the proposed PEP and other provisions of the permit may be sufficiently protective to avoid any incidental take from occurring altogether, such that incidental take coverage and associated SSPMs to minimize incidental

6

take are not required. *Id.* However, if incidental take is reasonably certain to occur because of the mining operation and the SRA and the applicant seek to have the incidental take covered by the incidental take statement ("ITS") from the 2020 BiOp, as quantified by the appropriate FWS field office during the technical assistance process, then FWS and the SRA must identify SSPMs for inclusion in the SMCRA permit. 30 C.F.R. § 780.16(a)(2)(i), (c); OSM_002578. Where SSPMs are applicable, they are mandatory permit conditions. OSM _0025718, 0025805-06.

The permit application process under SMCRA is open to public participation. *See* 30 C.F.R. § 773.6. Public notice must be provided of applications for new permits, significant revisions of existing permits, and renewals of permits (*id.* § 773.6(a)), after which there is an opportunity to submit comments and objections (*id.* § 773.6(b)). SRAs must directly notify FWS when a permit is administratively complete. *Id.* § 773.6(a)(3)(ii). FWS may request the fish and wildlife resource information in the permit application (which includes the PEP and site-specific information necessary to analyze effects to ESA-listed species or critical habitats), and FWS may provide written comments or objections on the permit application. *Id.* §§ 773.6(a)(3)(ii), 773.6(b), 780.16(c).

Permits are typically issued for a five-year term (30 U.S.C. § 1256(b)) and, after a permit is issued, the SRA must ensure that the permit continues to comply with all SMCRA requirements, including fish and wildlife provisions, at required mid-term reviews (30 C.F.R. § 774.10(a)(1)), renewals (*id.* § 774.15), and applications for significant revisions (*id.* § 774.13). SMCRA regulations further require that if, at any time, a mine operator becomes aware of an ESA-listed species in the permit action area that was not considered during the application process, the operator must promptly make a report to the SRA. *Id.* § 816.97(b). The SRA will then coordinate with FWS on whether, and under what conditions, the operator may proceed. *Id.*

Under the regulatory framework, SRAs must ensure that these requirements are met at permit review (*id.* § 774.10(a)(1)), applications for a permit revision (*id.* § 774.13), or requests for

7

permit renewal (*id.* § 774.15). In turn, OSM must ensure that state programs are implemented, administered, enforced, and maintained in accordance with SMCRA, the SMCRA-implementing regulations, and the provisions of the approved state programs. 30 U.S.C. § 1211(c)(1); 30 C.F.R. part 733; OSM Directive Reg-8. As explained above, the public can request a Federal inspection of a specific mine or notify OSM if it has reason to believe "any person is in violation of any requirement" of SMCRA or a SMCRA permit condition. 30 U.S.C. §§ 1267(h)(1), 1271(a)(1).

### 3. Citizen Enforcement

In addition to the options for public input above, SMCRA provides multiple avenues for interested persons to ensure that states and OSM are fully implementing the law. Any person with an interest adversely affected by a final decision of an SRA may administratively contest a permitting decision. *Id.* § 1264(c). In primacy states, actions of SRAs are subject to judicial review by a court of competent jurisdiction in accordance with the laws of that state where administrative remedies have been exhausted. *Id.* § 1276(e). In addition, SMCRA includes a citizen suit provision that authorizes suits against the United States or any other governmental instrumentality or agency, consistent the eleventh amendment to the Constitution, "which is alleged to be in violation of the provisions of this chapter or of any rule, regulation, order or permit issued pursuant thereto." *Id.* § 1270(a)(1).

### B. Endangered Species Act

Section 9 of the ESA makes it unlawful to "take"[3] members of a fish or wildlife species listed as endangered without authorization and, pursuant to ESA Section 4(d), this prohibition may be extended to species that are listed as threatened. 16 U.S.C. §§ 1538(a)(1)(B), (C), (G); 1533(d). This prohibition applies to any "person," including corporations, States and their instrumentalities, and the United States and its agencies. *Id.* § 1532(13). As explained below, exemptions for take of listed

---

[3] "Take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

species that occurs "incidentally" to otherwise lawful activities are available under ESA Sections 7 and 10. 16 U.S.C. §§ 1536(b)(4), (o)(2); 1539(a)(1)(B).

Section 7(a)(2) requires federal agencies ("action agencies") to ensure that any "action" they authorize, fund, or carry out "is not likely to jeopardize the continued existence of" a species listed under the ESA or "result in the destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2). To facilitate compliance, action agencies must consult with either FWS or the National Marine Fisheries Service ("NMFS"), or both ("consulting agencies"), whenever they authorize, fund, or carry out a discretionary action that "may affect" an ESA-listed species or its designated critical habitat. *Id.* § 1532(7); 50 C.F.R. §§ 402.14(a), 402.02, 402.03.

Consultation can be completed either formally or informally. Formal consultation is required if a federal action "may affect" and is "likely to adversely affect" listed species or designated critical habitat. *Id.* §§ 402.13(c), 402.14(a)-(b). During formal consultation, the consulting agency assesses the effects of the action agency's proposed action in the context of the current status of the species or critical habitat, the environmental baseline, and the cumulative effects. *Id.* § 402.14(g). A consultation can address a singular federal agency action or a federal agency's "multiple actions on a program, region, or other basis." *Id.* § 402.02. The latter type of consultation is known as a programmatic consultation. Programmatic consultations allow the Services to consult on the effects of: "(1) multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and (2) a proposed program, plan, policy, or regulation providing a framework for future proposed actions." *Id.*

Formal consultation concludes with the issuance of a written BiOp by the consulting agency assessing whether the proposed action is likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat. *Id.* § 402.14(g)-(h). After consultation concludes, the action agency must determine "whether and in what manner to proceed with the

9

action in light of its Section 7 obligations and the Service's biological opinion." *Id.* § 402.15(a). "The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees)," because then it would not be able to take advantage of the protections afforded by an ITS. *Bennett v. Spear*, 520 U.S. 154, 170 (1997).

The consulting agency also issues an ITS to the action agency where it has concluded in a BiOp that the action under consultation will satisfy ESA Section 7(a)(2) but is reasonably certain to result in some amount of incidental take. The ITS "specifies the impact of such incidental taking on the species," reasonable and prudent measures ("RPM") that the consulting agency "considers necessary or appropriate" to minimize the impact of the take, and terms and conditions to implement the RPMs. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i). The ESA states that "any taking that is in compliance with the terms and conditions specified in [the ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5). This exemption may extend to private applicants covered by the federal action. 16 U.S.C. § 1536(b)(4); *Ramsey v. Kantor*, 96 F.3d 434, 441-42 (9th Cir. 1996).

An action agency must reinitiate a completed Section 7 consultation if it retains discretionary federal involvement or control over "the action," or such discretionary federal involvement or control is authorized by law, and enumerated conditions are triggered. 50 C.F.R. § 402.16(a)(1)-(4).

ESA Section 10 authorizes the Services to issue incidental take permits ("ITP"). 16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. § 17.22(b). An applicant for an ITP must submit a habitat conservation plan that addresses enumerated criteria, including the impacts from the taking and the steps the applicant will take to minimize and mitigate such impacts. 16 U.S.C. § 1539(a)(2)(A). The consulting agency may issue an ITP only after providing public review and comment on the permit application and having made enumerated findings, including that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539 (a)(2)(B)(iv), (c). An

ITP also requires the issuing agency to complete an internal Section 7(a)(2) consultation to ensure that issuing the ITP is not likely to jeopardize or destroy or adversely modify any critical habitat.

### C.  Coordination Between SMCRA and the ESA

SMCRA's regulations require regulatory programs to "provide for the coordination of review and issuance of permits for surface coal mining and reclamation operations with applicable requirements of the Endangered Species Act of 1973." 30 C.F.R. § 773.5. To that end, the SMCRA regulations incorporate the touchstone requirement of ESA Section 7(a)(2), prohibiting surface mining activity that is "likely to jeopardize the continued existence of endangered or threatened species listed by the Secretary or which is likely to result in the destruction or adverse modification of designated critical habitats of such species in violation of" the ESA. *Id.* § 816.97(b); *compare with* 16 U.S.C. § 1536(a)(2). Therefore, before an SRA can approve any surface mining permit application, it must find, in writing, based on information in the application, that the "operation would not affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the [ESA]." 30 C.F.R. § 773.15(j).

## III.    Factual Background

### A.  ESA Consultation History

OSM has completed at least four formal ESA Section 7(a)(2) consultations with FWS on its implementation of Title V of SMCRA, in 1979, 1996, 2016, and 2020. The 1996 consultation considered the promulgation of implementing regulations for Title V. After considering the protections in those regulations, FWS concluded in its 1996 BiOp that they were sufficient to ensure against a likelihood that the surface mining program would jeopardize the continued existence of any ESA-listed species or destroy or adversely modify any designated critical habitat.

In 2016, OSM significantly revised its SMCRA regulations, triggering reinitiation of consultation, which resulted in a new BiOp. However, the revised 2016 SMCRA regulations were

11

disapproved by the President's signing of joint resolution, H.R. J. Res. 38, under the Congressional Review Act, 5 U.S.C. § 801, *et seq*. With the 2016 regulations thus nullified, OSM reinitiated ESA Section 7 consultation with FWS in April 2017 on the pre-2016 regulations. OSM_0024651.

### B.  2020 Biological Opinion

The 2017 reinitiated consultation culminated in the 2020 BiOp which, relevant here, explains that the proposed action included OSM's "oversight of State program compliance with requirements related to the protection and enhancement of proposed or listed species and proposed or designated critical habitats" and "implementation of two documents developed by OSM in consultation with the Service," the SMCRA Coordination and Dispute Resolution Processes. OSM_0025701.[4]

Given the nature of the federal action under consultation, which covers an array of activities nationwide conducted over large geographic areas and long periods of time, the number, location, timing, frequency, and intensity of which could not be predicted and analyzed, the 2020 BiOp followed a programmatic approach, consistent with the ESA Section 7 implementing regulations. OSM_0025704; 50 C.F.R. § 402.02. As a programmatic consultation, the goal was not to assess the impacts of specific projects on specific species or habitats, but rather to examine "whether and to what degree OSM has structured its regulatory program to ensure that its implementation is not likely to jeopardize the continued existence of proposed or listed species or result in the destruction or adverse modification of proposed or designated critical habitat." OSM_0025704.

As a key part of its examination, FWS considered the effectiveness of the longstanding technical assistance process under the SMCRA regulations in primacy states whereby SRAs and permit applicants must develop PEPs in consultation with FWS to meet ESA requirements. *See* 30 C.F.R. § 780.16; OSM_0025804. The technical assistance process governs the site-specific review of all individual applications for permit issuance, renewals, and significant revisions. 30 C.F.R.

---

[4] This litigation does not concern OSMRE's direct implementation and enforcement of the SMCRA regulations in federal program states or on Indian lands. ECF 13 at ¶ 106.

§ 773.6(a)(3)(ii). The SMCRA Coordination Process clarifies four aspects of how this regulatory requirement is implemented to ensure smooth, timely, and consistent implementation and ESA compliance. OSM_0025717, 0025804-06.

During the process, the SRA and FWS evaluate the fish and wildlife information in the project application and the proposed PEP. In essence, the process gives FWS an opportunity to help the SRA and applicant meet ESA requirements. 30 C.F.R. §§ 773.15(j), 816.97(b). FWS "review[s] the effects of the action and cumulative effects on the listed species or designated critical habitat and the State regulatory authority's written findings that the exploration, mining, and reclamation activities will not jeopardize the continued existence of an endangered or threatened species and make[s] a determination on the likelihood of the proposed operation to jeopardize the continued existence of listed species, or destroying or adversely modifying of designated critical habitats." OSM_0025718, 0025805. In addition, as new species are listed or proposed for listing or new critical habitat is proposed or designated that may be affected by existing mining operations, operators and/or SRAs must "coordinate with the local [FWS] Field Office to determine if the permit and other related documents (e.g., PEP, where applicable) need to be reexamined, particularly where these resources were not addressed in the previous technical assistance" process. *Id.* at 0025721.

After considering the entire permitting action (including the required PEP), FWS determines if any incidental take of a listed species is reasonably certain to occur. If so, FWS then works in close coordination with the SRA to identify SSPMs to minimize the incidental take, including reporting and monitoring. *Id.* If the SRA accepts FWS' SSPMs, then they must be incorporated as mandatory conditions of the permit, often as part of the PEP. *Id.* If the SRA does not accept the SSPMs, it must explain to FWS why and request FWS's concurrence. *Id.*

If FWS does not concur, the SRA or FWS may elevate the issue pursuant to the Dispute Resolution Process, which was developed to efficiently and effectively resolve any disagreements

13

between SRAs and FWS over FWS' recommended SSPMs. OSM_0025719, 0025807-09. This process includes four sequential levels of potential elevation, if needed: 1) Field Offices; 2) Regional Offices; 3) Headquarters; and 4) the Secretary. *Id.* At each of the first three levels, the SRA can accept the proposed resolution of the dispute and request FWS' agreement, reject the proposed resolution and request elevation, or reject the proposed resolution and approve the permit. *Id.* The same options apply at Level 4, except that further elevation is not available. Importantly, as explained below, if an SRA was to decline FWS' recommended SSPMs, it and the mine operator would not receive incidental take coverage under the ITS that accompanied the 2020 BiOp. The SRA would have effectively "opted out" of the SMCRA Coordination Process. The SRA and mine operator would remain subject to the ESA's Section 9 "take" prohibition as well as SMCRA's prohibitions against affecting the continued existence of listed species and destroying or adversely modifying their critical habitats, as determined under the ESA. 30 C.F.R. § 773.15(j). These entities could, in that case, seek incidental take exemption under ESA Sections 10(a)(1)(A) and 10(a)(1)(B) or through a separate ESA Section 7(a)(2) consultation if another federal nexus exists. OSM_0025781.

As part of the 2020 BiOp, FWS also considered SMCRA's requirement that SRAs conduct regular inspections to ensure that operations are in compliance with SMCRA, the state regulatory program, and all conditions of an exploration approval or permit, as well as OSM's site-specific and programmatic oversight responsibility, which further shields fish, wildlife, and related environmental values and resources in the event that an SRA fails to effectively implement, administer, or enforce its approved program. OSM_0025721-23, 0025758-60; *see also supra* § II.A.1; 30 U.S.C. § 1267.

After thoroughly evaluating all the relevant factors and the best scientific information available, FWS concluded that "OSMRE's implementation of Title V of SMCRA through its existing regulations is not likely to jeopardize the continued existence of proposed or listed species and or destroy or adversely modify designated or proposed critical habitat." OSM_0025778. With the no-

14

jeopardy 2020 BiOp, FWS issued an ITS that explained, in pertinent part, that it was infeasible to conduct species and site-specific analyses of anticipated incidental take due to the paucity of available information about the specific locations of future mining projects and the associated activities, as well as the number of individuals that might be affected. *Id.* at 0025780. Therefore, for "proposed mining activities in which the State regulatory authority has primacy and for which incidental take of ESA-listed species is reasonably certain to occur, the amount and extent of incidental take anticipated from these proposed actions will be quantified by the Service and evaluated on a project-specific basis through the SMCRA Coordination Process conducted between the Service and the State regulatory authorities and mandated in OSM's regulations implementing Title V of SMCRA" when the pertinent information to allow for such analysis is available. *Id.*

The ITS specifies that OSM, SRAs, and mine operators "will be afforded an exemption from the prohibition against take resulting from surface mining activities subject to regulation under SMCRA when those surface mining activities are carried out in accordance with the implementing regulations as described in OSM's 2020 biological assessment, provided that they comply with the Reasonable and Prudent Measures and associated Terms and Conditions" of the ITS. *Id.* at 0025781. The RPMs require, among other things, that OSM use its oversight authority to minimize impacts to listed species by evaluating and assisting states in administering the SMCRA regulations and implementing, enforcing, and maintaining approved state programs. *Id.* The required terms and conditions that implement the RPMs specify that any prohibited take of listed species incidental to a state-issued surface mining permit will not be exempted by the ITS unless the SRA receives FWS' concurrence before issuing the permit. *Id.* at 0025782. Also, OSM must produce an annual evaluation report for FWS that "includes, at a minimum, a discussion of any known issues implementing the technical assistance or dispute resolution process" and meet with FWS at least annually to discuss progress implementing the 2020 BiOp and any potential issues. *Id.*

15

OSM must reinitiate consultation if any regulatory factor is triggered under 50 C.F.R. § 402.16(a), and also potentially if certain assumptions of the 2020 BiOp are proven incorrect, including that SRAs will adhere to the SMCRA Coordination Process, and that the protective measures, monitoring, and reporting developed through that process will avoid a likelihood of jeopardy to listed and proposed species and destruction and adverse modification of designated or proposed critical habitat. OSM_0025759, 0025783.

## IV.     Standard of Review

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, provides the standards for review of Plaintiffs' claims, including their ESA citizen suit claims. *Cabinet Mtns. Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982). Relevant here, the APA provides that a court may set aside final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the APA's "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Env'tl Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted). A reviewing court is forbidden from "substituting its judgment for that of the agency." *Id.* at 283. Rather, the APA standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree." *Id.* A court in this District has explained that, "[w]ith regard to FWS decisions in particular, '[g]iven the expertise of the [FWS] in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the [FWS]." *Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), *aff'd* 530 F.3d 991 (D.C. Cir. 2008) (citations omitted).

In APA cases, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Innovator Enters. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014).

16

## V.    Argument

### A.  Defendants Are Entitled to Judgment on Count III

Plaintiffs lead with a claim that the 2020 BiOp and ITS are "facially invalid." ECF 13 ¶¶ 151-59; ECF 42-1 at 14-21. The Second Circuit rejected similar arguments from the Center for Biological Diversity ("CBD") in an analogous case, *Cooling Water*, 905 F.3d 49, and this Court should reject Plaintiffs' arguments here for the same reasons. Plaintiffs pin their hopes on this Court disregarding the Second Circuit's decision and following a district court decision – currently on appeal – that concerns a BiOp on the proposed transfer of federal permitting authority under the Clean Water Act ("CWA") to Florida, subject to a non-codified technical assistance process. *Ctr. for Biol. Div'ty v. Regan*, 734 F. Supp. 3d 1 (D.D.C. 2025). This proposed transfer of permitting authority in *Regan* is fundamentally distinct from OSM's continuing oversight of states granted primacy under SMCRA nearly half a century ago, subject to a technical assistance process codified equally as long ago.

### 1.  The Second Circuit Upheld a BiOp Analogous to the 2020 BiOp

In *Cooling Water*, the Second Circuit considered a challenge brought by environmental groups – including CBD – to a BiOp that analyzed the effects of a federal rule pertaining to the permitting of cooling water intake structures. 905 F.3d 49. Analogous to the SMCRA framework, the structures can be permitted under the CWA either by the federal Environmental Protection Agency ("EPA") or by states with EPA-approved programs, subject to EPA's oversight. Like in this case, the BiOp in *Cooling Water* analyzed at a programmatic level whether EPA's regulatory framework was structured in such a way that it would avoid a likelihood of jeopardy to ESA-listed species and destruction or adverse modification of critical habitat. The framework included a technical assistance process to address the effects of individual permits. In particular, the Services were committed to reviewing permit applications in approved states, analyzing the site-specific effects on listed species, quantifying any reasonably certain incidental take at the permit level, and recommending control

17

measures and requirements for monitoring and reporting, where appropriate. *Id.* at 71-72. The Services could raise any concerns with EPA, which could then coordinate with the state to comply with the CWA and ESA. *Id.* The technical assistance process was "critical to the Services' no-jeopardy conclusion" in the BiOp, because FWS's coordination and EPA's oversight served as an important backstop against the likelihood of jeopardy. *Id.*

The plaintiffs challenged that BiOp with claims that echo the claims here, including that it unlawfully deferred the jeopardy analysis and assessment of impacts to individual species to the permit specific review stage, and the technical assistance process was not the equivalent of Section 7 consultation. *Id.* at 71-75. The Second Circuit rejected these claims for reasons that fully apply here. Essentially, the claims were "really challenges to the Services' 'programmatic' approach to the biological opinion," which was an appropriate form of consultation. *Id.* at 71. The same is true here.

The Second Circuit concluded that the BiOp in *Cooling Water* did not need to include site-specific analysis of an individual permit's effects on listed species because adherence to the technical assistance process was assured, given that the process was both part of EPA's proposed action that underwent consultation and a condition of the BiOp's no-jeopardy finding. *Id.* at 72. If the technical assistance process was not followed, consultation could be reinitiated and individual permits could be challenged. *Id.* If anything, the assurances here are even stronger. The technical assistance process is not only part of OSM's proposed action that underwent consultation and a key assumption in FWS' no-jeopardy finding, it is a longstanding, codified requirement of SMCRA's implementing regulations. If the process is not followed, an oversight action by OSM will follow and, if the issue is not corrected through OSM's oversight such that a trigger for reinitiation under 50 C.F.R. § 402.16 is met, then consultation can be reinitiated and individual permit decisions can be challenged.

In their attempt to distinguish *Cooling Water*, Plaintiffs reveal a profound misunderstanding of the SMCRA and ESA frameworks. Plaintiffs erroneously assert that the technical assistance

18

process here "is contained in a biological opinion that was not part of any OSM rulemaking concerning the delegation of the SMCRA program to States." ECF 42-1 at 19. Technical assistance has been a codified component of the SMCRA Title V framework since the original final SMCRA regulations were promulgated in 1979. 44 Fed. Reg. 14902, 14910, 15013 (Mar. 13, 1979). Plaintiffs also erroneously assert that participation in the technical assistance process is voluntary at the election of SRAs. ECF 42-1 at 19. The SMCRA regulations expressly mandate that "[e]ach application *shall* include fish and wildlife resource information for the permit area and adjacent area" and that "[t]he scope and level of detail for such information *shall* be determined by the regulatory authority *in consultation with* State and *Federal agencies with responsibilities for fish and wildlife* and shall be sufficient to design the protection and enhancement plan required under paragraph (b) of this section." 30 C.F.R. § 780.16(a) (emphases added).

Moreover, Plaintiffs ignore (or are unaware) that SMCRA's regulations prohibit surface mining activity that is likely to jeopardize or destroy or adversely modify designated critical habitats (*id.* § 816.97(b)) and require that an SRA make a written finding that the "operation would not affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the [ESA]" before an SRA can approve any surface mining permit application, *id.* § 773.15(j). Finally, SMCRA provides OSM with certain site-specific and programmatic authorities for oversight of state regulatory programs that must be used to correct violations or programmatic issues. 30 U.S.C. § 1271(a) and (b). In short, the SMCRA framework is every bit as protective as that in *Cooling Water*, if not more so.

*Regan* does not help Plaintiffs. *Regan* found the case "distinguishable on its facts" from *Cooling Water*. While the government disagrees and is appealing, the *Regan* court's grounds for distinguishing *Cooling Water* distinguish *Regan* from this case as well. 734 F. Supp. 3d at 46. First, *Regan* found that the technical assistance process there had not been "codified as part of the

19

rulemaking, creating legally binding responsibilities for all parties," unlike in *Cooling Water*. *Id*. at 47. This would distinguish *Regan* from the instant case as well. 30 C.F.R. § 780.16. Second, the agency action under consultation in *Regan* was "approval of a state assumption application," whereas in *Cooling Water* it was a rule regulating the permitting of cooling water intake structures. *Id*. This basis for distinguishing *Regan* from *Cooling Water* would distinguish *Regan* from the instant case as well.

Indeed, the unique nature of the proposed action in *Regan* was essential to its ruling. Because EPA was proposing to grant future permitting authority to Florida, the court found that the BiOp needed to address species-specific and cumulative effects of this "future phase" of the proposed action. *Regan*, 734 F. Supp. 3d at 44. Right or wrong, that finding cannot apply here, where the 2020 BiOp does not analyze a proposal to grant permitting authority under SMCRA to any state. The three states referenced in Plaintiffs' complaint – Virginia, West Virginia, and Kentucky – were each granted primacy under SMCRA nearly 40 years before the 2020 BiOp (and Plaintiffs are not challenging those approval decisions in this lawsuit). Thus, the *Regan* court's key finding – that the BiOp there failed to consider EPA's entire action – cannot apply to the 2020 BiOp in this case. OSM has had a regulatory framework under SMCRA Title V for overseeing primacy states for nearly half a century, and the 2020 BiOp considered the entirety of OSM's continued implementation of this framework. As OSM's future responsibilities were not being altered here, the 2020 BiOp appropriately followed a programmatic approach that looked holistically at the overall effectiveness of OSM's *existing regulatory framework* for overseeing state programs. That framework includes a detailed mechanism for continually assessing the effects of individual projects on individual species and critical habitats and OSM's oversight to ensure against the likelihood of jeopardizing listed species and destroying or adversely modifying critical habitat. *Supra* §§ II.A.1-3, III.B.

In sum, *Cooling Water* is on point here and should guide this Court's decision. In distinguishing itself from *Cooling Water*, *Regan* distinguishes itself from this case as well. Also, as shown below (*infra* § V.A.2.c-e), the *Regan* BiOp is factually distinguishable from the 2020 BiOp.

### 2.  Plaintiffs' Attacks on the 2020 BiOp Lack Any Basis in Fact or Law

#### a.  Non-Federal Entities May Receive Incidental Take Coverage

Plaintiffs incorrectly contend that, as a matter of law, non-federal entities may not receive incidental take coverage under an ITS. ECF 13 at ¶ 153. The ESA states that the Secretary "shall" provide an ITS to "the Federal agency and the applicant concerned" if he concludes that the proposed action and the incidental taking of listed species will not violate Section 7(a)(2). 16 U.S.C. § 1536(b)(4); *accord* 50 C.F.R. § 402.14(i)(1)(iv), (i)(4). Nowhere does the statute limit the take exemption to just the Federal agency and applicant. Rather, the statute expressly states that "*any taking* that is in compliance with the terms and conditions specified" in the ITS is not prohibited. 16 U.S.C. § 1536(o)(2) (emphasis added); *accord* 50 C.F.R. § 402.14(i)(6). This language is dispositive of Plaintiffs' argument. In fact, the ESA regulations make it abundantly clear that "any taking" that is in compliance with an ITS "is not a prohibited taking under the Act, *and no other authorization or permit under the Act is required.*" 50 C.F.R. § 402.14(i)(6) (emphasis added).

Plaintiffs ignore the only circuit court authority on this issue, which squarely held that the "issuance of an incidental take statement under § 7 of the ESA may in appropriate circumstances permit parties that are neither federal agencies nor applicants to engage in incidental takes consistent with the statement without applying for section 10 permits." *Ramsey*, 96 F.3d at 437. In *Ramsey*, NMFS issued an ITS following Section 7 consultation exempting take of listed salmonids incidental to other fisheries. After NMFS issued the ITS, Washington and Oregon promulgated state fishing regulations and litigation ensued over whether the states could receive take coverage under the ITS or had to seek Section 10 permits. The plaintiffs argued that, "as a matter of law," the ITS could

21

serve only to permit incidental takings by federal agencies and applicants and that the states had to obtain Section 10 permits. *Id.* at 441. The Ninth Circuit disagreed. It ruled that the language of Section 7 "does not limit the protection afforded by an incidental take statement to federal agencies or applicants," but rather uses the phrase "any taking," which indicates the taking is exempted whether it is committed "by a federal agency, private applicant, or other party," so long as it occurs in compliance with the terms and conditions of the ITS. *Id. Regan* cited *Ramsey* for this very proposition. *Regan*, 734 F. Supp. 3d at 20.

The Ninth Circuit noted that the ESA's implementing regulations "expressly provide that a taking that is in compliance with a § 7 incidental take statement need not be authorized by a § 10 permit or any other permit in order to be exempt from § 9's prohibition." *Ramsey*, 96 F.3d at 437. Thus, because the states' actions were contemplated by and in compliance with the incidental take statement issued pursuant to § 7, they were not required to obtain Section 10 permits to issue their fishing regulations. *Id.* at 442. The Ninth Circuit noted that its "relatively expansive interpretation of § 7" was in line with practical reality, observing that, between 1988 and 1993, over 70,000 Section 7 consultations were conducted compared to 20 Section 10 permits requested through 1991 and only 36 issued as of September 1994. *Id.* at 442 n.15.

In sum, the plain language of the ESA and its regulations contradict Plaintiffs' claim that non-federal entities may not receive incidental take coverage through the 2020 ITS. This Court should reject the argument just as the Ninth Circuit rejected an analogous argument in *Ramsey*. Indeed, the Second Circuit upheld the analogous ITS in *Cooling Water* against similar challenges.

### b. A Programmatic BiOp May Include an Incidental Take Statement

Plaintiffs are similarly wrong in arguing that, as a matter of law, a programmatic BiOp cannot include an ITS. As noted above, the ESA states that the Secretary "shall" issue an ITS anytime he concludes that a proposed action and the incidental taking of listed species will not

22

violate Section 7(a)(2). 16 U.S.C. § 1536(b)(4); *accord* 50 C.F.R. § 402.14(g)(7). Nowhere does the statute prohibit programmatic BiOps from including an ITS.

With nothing in the statute to point to, Plaintiffs rest their argument on a portion of an ESA regulation that does not even apply here, 50 C.F.R. § 402.14(i)(7). Plaintiffs cite the portion of the regulation concerning "framework programmatic action," which does not include OSM's proposed action in primacy states. Indeed, this Court will not find any mention of framework programmatic action or Section 402.14(i)(7) in the 2020 BiOp. A framework programmatic action "approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation." *Id.* §§ 402.14(i)(7), 402.02. OSM did not propose to authorize, fund, or carry out the development of any "future action" in primacy states. In primacy states, the SMCRA regulations limit OSM's role under Title V to oversight, and FWS analyzed the entirety of that proposed action in the 2020 BiOp. The 2020 BiOp did not purport to analyze future permitting decisions which, in primacy states, are nonfederal actions not subject to project-specific ESA Section 7 consultation.[5] *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 653 (2007). Section 7 consultation is not required if there is no discretionary action by a federal agency or the federal action will not affect listed species or critical habitat. *Ctr. for Biol. Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009); *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 922 (9th Cir. 2020); 16 U.S.C. § 1536(a)(2). In short, Plaintiffs' argument is based on a portion of Section 402.14(i)(7) that does not apply to the facts of this case.

Moreover, Section 402.14(i)(7) would not *prohibit* FWS from issuing an ITS with the 2020 BiOp even if it did apply. The regulation merely states that an ITS is "*not required* at the programmatic level" for framework programmatic actions. 50 C.F.R. § 402.14(i)(7) (emphasis

---

[5] On Indian lands and in any state where OSMRE remains the permitting authority under SMCRA, its permitting decisions are subject to further section 7 consultation. OSMRE_0025704.

added). The regulation leaves issuance of an ITS for such action to FWS' discretion, depending on whether "any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate." *Id.* As noted, there is no subsequent Section 7 consultation in primacy states because permit issuance is not federal action. In those states, FWS evaluates, quantifies, and minimizes incidental take on specific projects through SSPMs developed under the SMCRA's technical assistance process.

Plaintiffs conspicuously ignore the fact that Section 402.14(i)(7) expressly *requires* an ITS at the programmatic level for "mixed programmatic action." *Id.* The regulation states that, if such an action is reasonably certain to cause take and the program actions are not subject to further Section 7 consultation, then an ITS "is required." *Id.* A mixed programmatic action includes "Federal action that approves action(s) that will not be subject to further section 7 consultation." *Id.* § 402.02. While OSM's proposed action does not fall within this definition, as explained above, the regulation further refutes Plaintiffs' claim that a programmatic BiOp may not include an ITS.

### c. The 2020 BiOp and ITS Include All Required Elements

Plaintiffs again mischaracterize the law when they argue that, as a matter of law, every BiOp must include "project- and species-specific analysis." ECF 42-1 at 21-26. Nowhere does the ESA or its regulations include such a requirement. The regulations expressly authorize programmatic consultation, which is a longstanding and accepted form of consultation under the ESA to assess the impacts of an entire program as opposed to specific projects. *Supra* § II.B; 50 C.F.R. § 402.14(c)(4). Plaintiffs claim that Section 402.14(h)(iii) requires all BiOps to include project-specific analysis, but the regulation merely states that a BiOp must include "[a] detailed discussion of the effects of the action on listed species or critical habitat." *Id.* The key phrase is "effects of *the action*." *Id.* (emphasis added). In this case, OSM's action was entirely programmatic; OSM neither proposed to authorize, fund, or carry out any future permitting decisions on specific projects nor proposed to transfer

24

federal permitting authority under SMCRA to any state. OSM_0025701. The *Regan* court faulted the BiOp in that case for making "no effort to undertake *any* species-specific effects analyses whatsoever" (734 F. Supp. 3d at 58), but as the Second Circuit observed in *Cooling Water*, that is simply a reflection of the "programmatic' approach to the biological opinion" (905 F.3d at 71), which does not require project-specific analysis. In *Cooling Water*, the Services concluded it was infeasible to perform a categorical assessment of thermal impacts due to the lack of information about the relative size and amount of overlap of listed species and critical habitat with facility and cooling water intake locations and other factors. *Cooling Water* found this conclusion was "[f]ar from … arbitrary," and was a "scientific determination deserving deference." *Id.* at 74 (citations omitted).

Moreover, factual differences make Plaintiffs' comparison of the 2020 BiOp to the BiOp in *Regan* inapt. The *Regan* court found the BiOp in that case deficient because, "of the over one hundred protected species in Florida, the BiOp names just a handful and, even for those, offers little analysis." *Id.* at 43. While the government disagrees with this criticism, it cannot be applied to the 2020 BiOp, which individually identified 194 ESA-listed and proposed species (66 of which had proposed or designated critical habitat) that overlapped with the action area and that may be affected by the proposed action. OSM_0025726-48. And while the *Regan* court may have faulted the BiOp there for not including "any species-specific analyses of the baseline status of species or effects of the EPA's action" (734 F. Supp. 3d at 27), the 2020 BiOp here includes a more detailed discussion in Appendix C of the status, distribution, life history, habitat, threats, and critical habitat of this large number of species and critical habitats, with references to the best available science, organized by functional guilds based primarily on taxa groups (*i.e.*, animals) or habitat associations (*i.e.*, plants). OSM_0025726, 0025810-74. Taxa and habitat group categories for guilds (37 in total) varied according to FWS' thoughtful consideration of the similarities in expected exposure or response to the effects of the activities covered by the action. *Id.* Certain taxa groupings were broader (*e.g.*,

25

passerines, raptors, shorebirds, salamanders, crayfish, bats, mussels, etc.), while others had a narrower focus, as appropriate (*e.g.*, cuckoos, sage grouse, carrion beetles, or jumping mice). The guild for crustaceans that may be affected by this action included just three species of crayfish: the Big Sandy crayfish, the Guyandotte River crayfish, and the slenderclaw crayfish. *Id.* at 0025913.

It was hardly irrational for FWS to exercise its expert judgment to address species with similar life histories together. *Accord City of Tacoma v. FERC*, 460 F.3d 53, 77 (D.C. Cir. 2006) ("We conclude, however, that a BiOp is not fatally flawed when it relies, as the BiOps do here, on inferences drawn from observations of the same (or a similar) species, in close geographic proximity, adapting to analogous facilities and conditions"). Indeed, FWS' use of a guild approach to analyze effects of the action on listed species was reasonable given the lack of information about future permitting actions and the programmatic nature of the 2020 BiOp, which focused on the implementation of OSM's regulatory program, including the SMCRA Coordination Process, during which FWS field offices identify and evaluate potential impacts from the issuance, renewal, and significant revision of individual permits for specific projects on individual ESA-species and designated critical habitats. The 2020 BiOp, including Appendix D, included a comprehensive discussion of the environmental baseline, including activities associated with effects of prior surface coal mining and the surface effects of underground mining on species and critical habitat. OSM_0025749-58, 0025875-86. The 2020 BiOp, including Appendix E, discussed the effects of OSM's action, including a general discussion of stressors to listed species and designated critical habitat that are reasonably certain to occur as a result of SMCRA permitting within the action area, as well as an exposure and response analysis for each grouping. *Id.* at 0025761-65, 0025887-0025934.

Plaintiffs then attempt to attack the 2020 ITS with arguments similar to those that the Second Circuit rejected in *Cooling Water*, and that fail here for the same reasons. There can be no dispute that the 2020 ITS includes all required elements (*i.e.*, RPMs and terms and conditions to

implement those measures). OSM_0025780-82; 16 U.S.C. § 1536(b)(4)(i); 50 C.F.R. § 402.14(i). Principally, Plaintiffs contend that the ITS fails to quantify the amount of anticipated take. ECF 42-1 at 23. The Second Circuit rejected a similar argument in *Cooling Water*:

> The ITS here explains that the "paucity of information" about facilities with [cooling water intake structures] prevented the Services from quantifying anticipated take at this juncture, and it contemplates that the Services' field offices will quantify incidental take at individual facilities as part of the technical assistance process. […] Given the Services' commitment to the technical assistance process, their justification for not immediately quantifying take is adequate.

905 F.3d at 77.

As in that case, there was an analogous paucity of information here about "the specific locations in which future mining projects will occur, the specific activities associated with a particular mining permit, and the number of individuals that might be affected by such activities." OSM_0025780. Analogous to *Cooling Water*, "the amount and extent of incidental take anticipated . . . will be quantified by the Service and evaluated on a project-specific basis through the SMCRA Coordination Process" when the pertinent information to allow for such analysis is available. *Id.* FWS is committed to the technical assistance process, as it has been codified in SMCRA's implementing regulations for well over four decades. 30 C.F.R. § 780.16.

The ESA does not require that an ITS specify a numerical take limit; it requires only that it "specif[y] the impact of such incidental taking on the species." 16 U.S.C. § 1536(b)(4)(i); *accord* 50 C.F.R. § 402.14(i)(1). Here, the ITS explains why a numerical limit was infeasible at the programmatic level and – consistent with the programmatic approach of the 2020 BiOp – states that the amount and extent of incidental take from individual mining permits will be quantified and evaluated on a project-specific basis during the technical assistance process, when the pertinent information to allow for such analysis is available. OSM_0025759-60. To cite one example of the SMCRA technical assistance process, the FWS West Virginia Field Office provided SSPMs and

27

quantified take limits for Big Sandy crayfish for the Southern Minerals, Inc., Surface Mine No. 4. FWS_0031389, 0031391-92.

Plaintiffs' suggestion that the ITS sets no limit on take and no associated trigger for reinitiating consultation (ECF 42-1 at 23) is incorrect. The ITS necessarily limits incidental take to the amount that is reasonably certain to occur as a result of individual permitting actions, as quantified and documented by FWS under the SMCRA framework. SRAs and FWS will "review reports and track the levels of take estimated through the SMCRA Coordination Process and exempted by" the ITS. OSM_0025781. If the amount or extent of incidental take from individual permitting actions is exceeded, then the SRA and applicant must revisit the technical assistance process for the permit. *Id.* at 0025783.

There is no evidence in the administrative record that any permit applicant has exceeded the amount of incidental take quantified during the technical assistance process; however, if this was to occur, the SRA would be required to "contact the [FWS field office] within 48 hours to review the need for additional SSPMs." *See, e.g.*, FWS_0031395, 0034800, 0031615. In addition, OSM would need to conduct oversight to ensure that the SRA is complying with SMCRA and discuss with FWS whether the exceedance indicates that reinitiation is warranted at the programmatic level under 50 CFR 402.16(a), including whether there is any new information or effects of the action not previously considered in BO and whether the assumptions about the program in the BiOp remain true. *Id.* at 0025783. Plaintiffs' citation to *Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018) (ECF 42-1 at 23) is misplaced, as that case did not involve programmatic consultation under a cooperative federalism regime like this case. Rather, it involved incidental take resulting from a specific, federally licensed hydroelectric project. *Cooling Water* is the relevant authority here, where any incidental take results from state and private actions that are not subject to ESA Section 7(a)(2), with federal oversight.

28

The D.C. Circuit has held that ESA compliance must be assessed in the context of the applicable statutory scheme and future checks and balances and mitigating measures "adopted in pursuance thereof." *N. Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980). Under the statutory schemes of SMCRA and the ESA, the action under consultation was neither OSM's authorization of any individual mining permit nor its transfer of permitting authority under SMCRA to a state. Rather, the proposed action was OSM's implementation of it SMCRA Title V program, which includes "the SMCRA Coordination Process conducted between the Service and the State regulatory authorities and mandated in OSMRE's regulations implementing Title V of SMCRA." OSM_0025780; *accord id.* at 0025705. The site-specific analyses of individual mining projects in the context of the SMCRA statutory scheme provide the requisite future checks and balances and mitigating measures for ESA compliance under *Andrus*, 642 F.2d at 609.

Plaintiffs' assertion that incidental take may not be exempted at the programmatic level but rather only "in subsequent section 7 consultation" (ECF 42-1 at 24-25) has no factual or legal basis here, where individual permitting decisions in primacy states are not federal actions subject to ESA Section 7(a)(2). Plaintiffs' assertion that the technical assistance process "is found nowhere in the [ESA] or regulations" (*id.*) reveals a profound lack of awareness of the SMCRA framework, which codifies technical assistance consistent with Congress' cooperative federalism design in SMCRA. *See* 30 C.F.R. § 780.16. Plaintiffs may dislike Congress' choice to allow states to make permitting decisions under SMCRA, but their recourse lies not in a court decree, but in "the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The Secretary is administering the two laws Congress has charged him with, as written.

Lastly, the ITS includes necessary and appropriate "terms and conditions" to implement the RPMs. For instance, the ITS includes an RPM requiring OSM to "use its authorities to minimize impacts to listed species through oversight of State and Tribal programs" (OSM_0025781),

29

analogous to the RPM the Second Circuit approved in *Cooling Water*, which required EPA to "exercise its oversight authority under the CWA in connection with the Rule's technical assistance process." 905 F.3d at 77. In addition, SRAs must engage FWS in review and comment on proposed SMCRA permit actions in accordance with the SMCRA Coordination Process (including incorporating any required SSPMs to receive incidental take coverage), and OSM must produce an annual evaluation report for FWS that "includes, at a minimum, a discussion of any known issues implementing the technical assistance or dispute resolution process." OSM_0025782. OSM also must meet with FWS at least annually to "discuss progress implementing this Opinion and any potential issues." *Id.* In *Cooling Water*, the Second Circuit found administrative conditions of the ITS, including an analogous "detailed annual reporting requirement," met ESA requirements. 905 F.3d at 77; *accord* 16 U.S.C. § 1536(b)(4)(iv); 50 C.F.R. § 402.14(i)(1)(iv).

### d.  Plaintiffs May Not Attack SMCRA's Implementing Regulations

Plaintiffs improperly ask this Court to strike down the "technical assistance 'coordination' process" under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), as an unlawful interpretation of the ESA. ECF 42-1 at 22. The Court should summarily dismiss this argument as it is a new claim that Plaintiffs did not notice or plead. Moreover, this new claim lacks any basis in fact or law.

The Secretary codified technical assistance in regulations that implement SMCRA. *Supra* § II.A.2; 30 C.F.R. § 780.16. Technical assistance has been a central component of the SMCRA Title V framework since the original final SMCRA regulations in 1979. 44 Fed. Reg. at 14910, 15013. Under those 1979 regulations, mining permit applicants were required to provide resources information, the scope of which would be determined by the SRA "in consultation with appropriate fish and wildlife agencies," and a plan for how those resources, including ESA-listed species and critical habits would be protected, after which the SRA would determine its adequacy "in consultation with State and Federal fish and wildlife management and conservation agencies having

responsibilities for the management and protection of fish and wildlife or their habitats which may be affected or impacted by the proposed surface coal mining and reclamation operations." *Id.* at 15037, 15052, 15379; *see generally id.* at 15100, 15356, 15359,. This is effectively the same process in place today. *See* 30 C.F.R. § 780.16.

The D.C. Circuit upheld the Secretary's 1979 regulations requiring surface mining permit applicants to submit items of information beyond those enumerated in SMCRA itself, such as fish and wildlife information, as a lawful exercise of his authority. *In re: Permanent Surface Mining Regul. Litig.*, 653 F.2d 514, 527 (1981) (*en banc*), *cert. denied*, 454 U.S. 822 (1981). Six years later, OSM revised and clarified the regulations in a new rulemaking. 50 Fed. Reg. 7274 (Feb. 21, 1985); 52 Fed. Reg. 47352 (Dec. 11, 1987).[6]

Plaintiffs here have neither noticed nor pleaded any challenge under SMCRA or to SMCRA's regulations, and they may not challenge SMCRA's regulations collaterally by attacking FWS' 2020 BiOp. Moreover, Plaintiffs do not – indeed cannot – show that the SMCRA technical assistance process codified in federal regulations fails to comply with SMCRA,[7] nor can they show that the process violates ESA Section 7, as permitting actions by SRAs are nonfederal actions outside of Section 7. Plaintiffs' support is simply a quotation from *Regan* that cannot apply to SMCRA. ECF 42-1 at 22 (citing *Regan*, 734 F. Supp. 3d at 48). There is no basis upon which to analogize the decades-old, codified technical assistance process under SMCRA to the technical assistance process in *Regan*, which had not been codified. In addition, while the proposed action in *Regan* was the transfer of federal permitting authority to the State of Florida, OSM did not propose any affirmative action here such as approval of a project or new state program. This is a critical

---

[6] Significant amendments to these regulations were made later in 2016, but they were nullified in 2017. 81 Fed. Reg. 93066 (Dec. 20, 2016); 82 Fed. Reg. 54924, 54949 (Nov. 17, 2017).

[7] *See, e.g., Nat'l Mining Ass'n v. Interior*, 70 F.3d 1345, 1350-1351 (D.C. Cir. 1995) (30 U.S.C. § 1276(a)(1) requires parties to bring facial challenges to SMCRA implementing regulations within 60 days of the rule's promulgation).

factual difference that renders the *Regan* court's criticisms inapplicable to SMCRA's technical assistance or the 2020 BiOp. Here, no impacts of the proposed federal action are postponed to a later phase; the 2020 BiOp considers the entire federal action.

In sum, Plaintiffs' claim that the codified SMCRA technical assistance process somehow misinterprets the ESA is not properly before this Court and, in any case, devoid of merit. The Secretary codified this process more than 45 years ago as a lawful way to implement congressional directives in SMCRA. *Regan* is inapposite to the SMCRA Title V framework.

### e. FWS Has Not Delegated Any Authority

Plaintiffs' claim that FWS has "delegate[d] away its duty to ensure against jeopardy" borders on frivolous. ECF 42-1 at 27. The claim grossly mischaracterizes the basic workings of SMCRA Title V and ESA Section 7 as well as the plain language of the 2020 BiOp. The Second Circuit rejected an analogous argument in *Cooling Water*, 905 F.3d at 77, and this Court should as well.

First, "the ultimate responsibility for compliance with the ESA falls on the action agency," and it "must not blindly adopt the conclusions of the consultant agency" in a BiOp to demonstrate ESA Section 7(a)(2) compliance, but rather it must establish its reliance on the BiOp was not arbitrary and capricious. *City of Tacoma*, 460 F.3d at 76. Thus, Section 7(a)(2) gives action agencies the final say on what measures they implement. BiOps are advisory. As the Supreme Court has explained, "[t]he action agency is technically free to disregard the Biological Opinion and proceed with its proposed action." *Bennett*, 520 U.S. at 170. To that end, the Section 7 implementing regulations state that, after consultation, it is up to the action agency to determine "whether and in what manner to proceed with the action in light of its Section 7 obligations and the Service's biological opinion." 50 C.F.R. § 402.15(a). Plaintiffs' claim that a BiOp is binding misstates the law.

Second, the Dispute Resolution Process referenced in the 2020 BiOp does not even pertain to ESA consultation. Rather, it pertains to the longstanding and codified technical assistance process

under SMCRA. *See* 30 C.F.R. § 780.16(a)(2)(i), (c). SMCRA technical assistance is separate and distinct from ESA consultation; permitting decisions by SRAs in primacy states are state actions exempt from Section 7(a)(2) requirements. *Home Builders*, 551 U.S. at 653 n.4. Thus, the fact that an SRA may decline FWS' recommendations under SMCRA technical assistance plainly cannot be a delegation of FWS' consultation authority under the ESA. Plaintiffs' attempt to conflate SMCRA's technical assistance process for state actions under Congress' cooperative federalism design with ESA Section 7 consultation – which applies only to federal actions – is disingenuous at best. ECF 42-1 at 27 (citing *Pub. Emps. for Envtl. Resp. v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014) & *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002)).[8]

Third – and crucially – the 2020 ITS does not allow an SRA to disregard FWS' recommendations during the SMCRA technical assistance process and still receive ESA Section 9 incidental take coverage. This cannot be understated. Plaintiffs attempt to mislead the Court into believing that the 2020 BiOp and ITS allow SRAs to disregard FWS' recommendations and still receive ITS protections. That is emphatically not so. The ITS is clear that, if an SRA was to disregard any SSPM required under the ITS, *it would not receive incidental take coverage.* OSM_0025782 ("If the dispute resolution concludes with the State regulatory authority rejecting the proposed resolution and issuing the permit without Service concurrence, the Service recognizes that the State regulatory authority may decide to issue the permit, but any prohibited take of listed species incidental to that permit action will not be exempted through this incidental take statement"). In such a case, the SRA would have exercised its right to "opt out," and it and the mine operator would remain subject to the ESA's Section 9 "take" prohibition as well as SMCRA's prohibitions against affecting the continued existence of listed species and destroying or adversely modifying their critical habitats, as determined under the ESA. 30 C.F.R. § 773.15(j). These entities could, in that case, seek

---

[8] *Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C. Cir. 1988) is neither a SMCRA nor an ESA case and has no relevance here.

incidental take exemption under ESA Sections 10(a)(1)(A) and 10(a)(1)(B) or through a separate ESA Section 7(a)(2) consultation if another federal nexus exists. OSM_0025781.

This case bears no resemblance to *Gerber*, 294 F.3d 173, where FWS issued a Section 10 permit exempting incidental take after the developer rejected FWS' proposed alternative of moving a road to reduce takings. No Section 10 permit or project-specific Section 7 consultation is before this Court. As noted above, the ITS here extends no take coverage to an SRA that opts out of the SMCRA Coordination Process. If an SRA chooses not to follow, or is unable to comply with the ITS, it may seek a Section 10 permit or coverage under a separate ESA Section 7 consultation if a federal nexus exists. OSM_0025781. In reality, it is unlikely that an SRA or mining operator would proceed in disregard of FWS' recommendations because they would lack incidental take coverage and be subject to oversight under SMCRA as well as liability under the ESA for any unlawful take. *See Bennett*, 520 U.S. at 170 (noting that "'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment").[9]

Plaintiffs' attempted comparison of the 2020 BiOp with the BiOp in *Regan* is equally misguided. ECF 42-1 at 28. As explained above, the SMCRA technical assistance process has been codified for decades. That was not true of the technical assistance process in *Regan*. And contrary to Plaintiffs' contention, in this case, where SSPMs are applicable, any SRA that seeks the incidental take protection of the ITS must accept an FWS-approved SSPM during technical assistance as a binding permit condition. OSM _0025718, 0025805.

In sum, Plaintiffs' claim that FWS has delegated its authority under the ESA to SRAs is specious. The Court should reject the claim just as the Second Circuit rejected an analogous claim in *Cooling Water*. The 2020 BiOp and ITS fully accord with the law. If Plaintiffs prefer a different

---

[9] Plaintiffs misleadingly suggest that the Virginia and West Virginia SRAs approved the Ball Ridge mine after rejecting FWS' recommendation, obscuring in a footnote that FWS, in its expert opinion, concurred that an alternative SSPM requirement would avoid likely jeopardy and habitat destruction or adverse modification (ECF 42-1 at 29 n.12), and that the Dispute Resolution Process worked.

framework than the ones Congress created in SMCRA and the ESA, their recourse is in "the halls of Congress," not a court decree. *Lujan*, 497 U.S. at 891.

## B. Defendants are Entitled to Judgment on Counts I and II

Plaintiffs allege in Counts I and II that, in April 2023, they identified state-issued permits in three states – Virginia,[10] West Virginia, and Kentucky – that did not indicate whether SSPMs were in place relating to two ESA-listed species of crayfish. Based on this, Plaintiffs ask the Court to throw out the entire 2020 BiOp and require OSM to complete a new consultation with FWS on its implementation of SMCRA Title V nationwide. ECF 13 at ¶¶ 134, 136, 142; ECF 42-1 at 30-43.

In short, these claims fail because the SMCRA regulatory framework and the 2020 BiOp anticipate this type of issue, and OSM resolved it two and a half years ago under the framework's established procedures. Specifically, OSM moved quickly to have corrective action plans in place in each state by September 2023. The action plans require each state to restart the technical assistance process under SMCRA to ensure documentation exists to demonstrate all permits that require SSPMs for the crayfish have them. OSM's oversight actions show that the framework analyzed in the 2020 BiOp is being properly implemented, and it confirms the BiOp's conclusions. The issue is not likely to recur and, hence, there is no justification for judicial entanglement. Plaintiffs disingenuously recount the events that prompted OSM to take corrective action without acknowledging that, upon reviewing the information submitted to it, OSM swiftly took corrective action. The Court should disregard these outdated arguments. The ESA does not authorize review of alleged violations that are wholly in the past; rather, it demands proof of an ongoing violation. That necessary proof is absent here.

---

[10] Plaintiffs appear to have abandoned their allegations concerning the Commonwealth of Virginia by not referencing them their motion for summary judgment.

### 1. OSM Has Exercised Oversight In Accordance with SMCRA and as Analyzed in the 2020 BiOp

The crux of Counts I and II is that Plaintiffs alleged in April 2023 that they had identified mine permits issued by SRAs in Virginia, West Virginia, and Kentucky that "lacked PEPs" for either or both the Guyandotte River crayfish and the Big Sandy crayfish (collectively, "the crayfish"). FWS_0037028; OSM_0031479. The SMCRA framework includes a process for responding to such allegations (*supra* § II.A.1), and OSM followed it to a tee. OSM promptly acknowledged receipt of Plaintiffs' claims and began reviewing the information submitted and gathering additional information, committing to provide Plaintiffs with the results of its investigation by August 2023. OSM_0030878. As promised, OSM completed timely review of all 388 permits Plaintiffs identified, even though Plaintiffs had selected permits unscientifically, based solely on their location within three miles of the crayfishes' critical habitat rather than an appropriate analysis, such as those with likely impact pathways from specific mines, which depends on many factors. *Id.* at 0031478-80. Indeed, using appropriate criteria, OSM reviewed 460 permits in total within the range of the species to determine if PEPs and any required SSPMs were in place. *Id.* at 0031479.

OSM found that, contrary to Plaintiffs' allegations, all of the permits had PEPs in place. *Id.* at 0031478. Though Plaintiffs claimed PEPs were missing, they apparently meant that there was no evidence of additional SSPMs for the crayfish. But Plaintiffs had jumped to the conclusion that SSPMs were missing before establishing any that SSPMs were required. Most permits do not require SSPMs because general protective measures, such as sediment control structures, required for a SMCRA permit and often included outside the PEP, prevent any incidental take from occurring. SSPMs must be identified only where incidental take is reasonably certain to occur. *Id.*

OSM found that the states had followed the appropriate regulations and procedures under SMCRA and the 2020 BiOp for permits issued or significantly revised after the 2020 BiOp, and that none were missing any required SSPMs. *Id.* at 0031480. However, for those permits issued *before* the

2020 BiOp *and* that had not been significantly revised, the states had not adequately documented whether the permits (which all included PEPs) were sufficient to prevent a likelihood of jeopardy to the crayfish or destruction or adverse modification of their critical habitat. *Id.* Importantly, this was *not* a finding of an ESA issue such as unlawful take, much less jeopardy or adverse modification of critical habitat. Rather, OSM found only that there was insufficient written documentation of compliance under SMCRA with the state equivalents of 30 C.F.R. §§ 773.15(j) and 774.13(c).

In accordance with the SMCRA regulations, OSM determined that this lack of documentation constituted a state regulatory program issue as defined in 30 C.F.R. § 733.5 (2020), and exercised its oversight authority to pursue compliance strategies with each SRA to ensure that they corrected the identified SMCRA issue in a timely and effective manner. *Id.* § 733.12 (2020); OSM_0031482-83. Given that it was expected to take the states more than 180 days to review the large number of permits, OSM determined that action plans for each state were appropriate. 30 C.F.R. § 733.12(b) (2020); OSM_0031482. OSM notified the states of the state regulatory program issue in August 2023 and required that action plans be in place by September 15, 2023. *Id.* at 0031450, 0031681 (Virginia); 0031455, 0031702 (West Virginia); 0031455, 0031670 (Kentucky)). The action plans require each state to, among other things: (1) restart the SMCRA Coordination Process for all existing permits where ESA-related permit information was not reviewed at the last permit renewal or significant revision or listing of proposed species or designated critical habitat; (2) establish a policy that ensures applicants for renewal of existing mine permits use FWS' updated official species list and include information to determine whether additional SSPMs are necessary and, if so, sufficiently protective of the species; and (3) create a required procedure whereby permittees of existing mines that overlap with the range or critical habitat of a newly listed or proposed species or critical habitat produce an updated official species list. *Id.* at 0031482.

37

OSM notified Plaintiffs of its oversight response and advised that the action plans would "fully resolve the State regulatory program issues identified in our evaluation" and "bring the States into compliance with applicable statutory and regulatory requirements under SMCRA, including all requirements related to the protection and enhancement" of proposed and listed species and their critical habitats. *Id.* at 0031487-88. OSM further advised Plaintiffs it would "track and report upon the progress of the implementation of the action plans within each state's Annual Evaluation Report, available through OSMRE's website and at the applicable OSMRE office." *Id.* at 0031489. If OSM determined that the action plan did not correct the state regulatory program issue, the provisions of 30 C.F.R. § 733.13 could be triggered, which include substituted federal enforcement of a state program and withdrawal of state program approval. *Id.*

### 2. Counts I and II Are Outdated and Not Actionable Under the ESA

The events above squarely refute Counts I and II. They show that: (1) the SMCRA framework includes adequate mechanisms to address state regulatory program issues such as the one identified in this case, as the 2020 BiOp found; (2) OSM properly exercised its oversight authority under the SMCRA framework to ensure compliance with SMCRA's technical assistance process; and (3) there is no evidence that OSM is violating ESA Section 7(a)(2) or must reinitiate consultation.

### a. Plaintiffs Ignore OSM's Corrective Action

Plaintiffs spend eight pages (ECF 42-1 at 30-38) discussing the very events that led OSM to develop the action plans. Indeed, Plaintiffs base their discussion on the results of OSM's own investigation into their allegations. OSM_0031519-35. These events are outdated and immaterial. Plaintiffs contend that the West Virginia SRA and the Kentucky SRA made so-called "unilateral" determinations that 32 permits and 79 permits, respectively, did not require PEPs for the listed crayfish. ECF 42-1 at 32, 36. Plaintiffs contend the SRAs were under the misimpression that technical assistance was required at the time of permit revision rather than at permit renewal. *Id.* The

38

September 2023 action plans addressed the very permits Plaintiffs reference. OSM_0031478, 82-83. Thus, any misimpression that the SRAs may have previously been under was corrected by following SMCRA's longstanding framework for oversight. *Id.* at 0031761-62. Plaintiffs are wrong to assert that the identified permits were lacking PEPs and also that FWS provided no written response to the Kentucky SRA's determination that the 79 permits did not require SSPMs for the crayfish. ECF 42-1 at 37-38; *contra* OSM_0031478; FWS0027938. FWS field offices have been actively engaged in the technical assistance process with SRAs, providing their expert advice based on the best available science. FWS_0027759-28415 (Ky); FWS_0028416-37527 (W. Va); FWS_0021009-37458 (Va).

In a strained attempt to bolster their argument, Plaintiffs resort to extra-record declarations and exhibits of so-called "illustrative examples" of permits they find objectionable. ECF 42-2 to 42-10. The Court should reject Plaintiffs' untimely submission of such materials after it already denied Plaintiffs' motion to complete and supplement the administrative record. *See* ECF 24, 33-34. Concurrently with this filing, Defendants are filing a motion to strike these impermissible materials and related arguments. Additionally, these "illustrative examples" add no value to this case. They are simply Plaintiffs' cherry-picked collection of various SMCRA enforcement actions (*i.e.*, notices of violation or cessation orders) issued by the West Virginia SRA to operators over a five-year period, some of which even predated the 2020 BiOp. These examples indicate that the SRA identified SMCRA violations, took appropriate enforcement actions, and ensured that the violations were corrected at the state level. As such, OSM did not need to become involved.[11] OSM's obligation is to intervene only where an SRA is unable or unwilling to correct a violation. 30 U.S.C. § 1271(a). The enforcement actions provide no evidence that the decades old SMCRA framework has somehow stopped working; instead, they represent how the framework has operated for nearly half a century.

---

[11] Plaintiffs' claim that the Ball Ridge Mine was "approved without the specific pollutant limits that FWS had determined were necessary to ensure against jeopardy" (ECF 42-1 at 29) is a clear misrepresentation. *Contra* FWS_21748. Technical assistance can be iterative. *See supra* n.8.

Violations are an inevitable part of any regulatory program. That is why SMCRA includes mechanisms for identifying violations and curing them. *Id.* § 1271. SMCRA also provides detailed procedures for any person having an interest that may be adversely affected to pursue to compel compliance with SMCRA. *Id.* § 1270; *supra* § II.A. Thus, if Plaintiffs believe any requirement of SMCRA is being violated, they may report it to the SRA or to OSM through the federal inspection or citizen complaint processes (30 U.S.C. §§ 1267(h)(1), 1271(a)(1); 30 C.F.R. §§ 842.11(b), 842.12)), and if they believe OSM is failing to perform a non-discretionary act or duty, they may file a citizen suit *under SMCRA.* 30 U.S.C. § 1270(a). Plaintiffs should not be allowed to bypass SMCRA's detailed scheme and collaterally challenge individual operations by attacking FWS' programmatic 2020 BiOp.

To the extent Plaintiffs acknowledge OSM's action plans at all, Plaintiffs erroneously allege that the plans "only addressed the specific permits that Plaintiffs identified" as opposed to all permits that could affect the crayfish or their critical habitat. ECF 13 at ¶ 137; ECF 42-1 at 38. As noted above, the corrective action plans expressly require the states to "restart the SMCRA Coordination Process for *all existing permits* where a review of ESA-related permit information was not completed at the last permit renewal or significant revision or listing of proposed species or designated critical habitat." OSM_0031482 (emphasis added).

### b.  OSM Is Fully Complying with ESA Section 7(a)(2)

Plaintiffs essentially contend that the need for action plans is, *ipso facto*, an ESA violation. Not so. The ESA's citizen suit provision provides a limited waiver of sovereign immunity "to enjoin any person . . . who is alleged to *be in violation* of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A), (g)(2)(A)(i) (emphasis added); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 58-59 (1987) (phrase "to be in violation" only permits a plaintiff to bring a suit "to enjoin or otherwise abate an ongoing violation"); *accord Ctr. for Biol. Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 804 (9th Cir. 2009)

40

("[t]he ESA allows a citizen suit for the purpose of obtaining injunctive relief only" and, "[o]f course, that is forward looking") (citations omitted). Alleged violations that are wholly in the past are not actionable under the ESA. *Fox v. Palmas Del Mar Props., Inc.*, 620 F. Supp. 2d 250, 262 (D.P.R. 2009) (dismissing ESA citizen suit claim based on past alleged violations). Additionally, a dispute is moot where: (1) there is no reasonable expectation that the alleged violation will recur; and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citations omitted). Even where a case is not actually moot, a court may still dismiss under the doctrine of prudential mootness if the case is "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the Court to stay its hand, and to withhold relief that it has the power to grant." *Chamber of Comm. v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)).

Here, there is no evidence that OSM is committing an ongoing violation of ESA Section 7(a)(2). As noted above, OSM did *not* make a finding of unlawful take of the listed crayfish, much less jeopardy or destruction or adverse modification of critical habitat. Rather, OSM found only that documentation of compliance with the state equivalents of 30 C.F.R. §§ 773.15(j) and 774.13(c) was missing for some permits. The absence of SSPMs is not, in and of itself, evidence of impacts to listed species or critical habitat because an operation may not require crayfish-specific SSPMs for any number of reasons. For example, an operation may not be actively mining or the mine site may have no impact pathway (such as a hydrologic connection) by which the crayfish could be affected. Alternatively, the existing SMCRA permit, including the PEP, for the mining operation may be reasonably certain to avoid any incidental take of crayfish or impacts to their critical habitat such that SSPMs for the crayfish are unnecessary. Here, Plaintiffs identify no evidence that crayfish are being unlawfully taken, much less that they are being jeopardized or that their critical habitat is being destroyed or adversely modified. *See, e.g.*, ECFR 13 at ¶ 34 (Plaintiffs alleging "it remains unknown

41

where harm to highly imperiled species may be taking place"). Counts I and II are predicated on a state regulatory program issue that OSM addressed with the states in September 2023. OSM's action plans have eradicated the narrow state regulatory program issue that it had identified, and there is no reasonable expectation that the issue will recur.

Plaintiffs are plainly wrong to suggest that the 2020 BiOp does not anticipate regulatory program issues and that there is no mechanism for effective oversight. *Supra* § II.A; 30 C.F.R. §§ 816.97(b), 733.5, 733.12. SRAs may not, as Plaintiffs claim, "unilaterally determine whether to engage in 'coordination' with FWS." ECF 42-1 at 42. The SMCRA regulatory framework (analyzed in the 2020 BiOp) mandates that: (1) FWS be notified of all applications for permits, significant revisions, or renewals; (2) applicants develop fish and wildlife resource information for the permit area and adjacent area, with the scope and level of detail determined by the SRA "in consultation with" FWS; and (3) FWS be provided the resource information and PEP upon request. 30 C.F.R. §§ 773.6(a)(3)(ii); 774.13(b)(2); 774.15(b)(3); 780.16(a)(1), (c). SRAs must accept FWS' SSPMs to receive incidental take coverage under the 2020 ITS.

The action plans continue to ensure that SRAs are following the SMCRA regulatory framework, as analyzed in the 2020 BiOp. OSM_0031482. These plans are the appropriate remedy for the state regulatory program issue identified; no further relief is appropriate. *See, e.g.*, *Friends of Merrymeeting Bay v. Topsham Hydro Partners Ltd. P'ship*, No. 2:11-cv-37-GZS, 2013 WL 145623, at *5-6 (D. Me. Jan. 14, 2013) (declining to issue injunctive relief to remedy past takings where the plaintiff's ESA Section 9 claim had become moot). "In OSMRE's 42 years of experience administering the provisions of SMCRA, including OSMRE's oversight responsibilities, OSMRE has rarely encountered situations when the Service has notified OSMRE of an SRA not following the provisions of 30 C.F.R. §§ 780.16 and 784.21, related to the requirements for fish and wildlife information in permitting applications—which . . . include coordination with the Service."

OSM_0024661. The action plans are direct and irrefutable evidence of OSM exercising its oversight authority as contemplated in the 2020 BiOp.

An action agency complies with Section 7(a)(2) if its reliance on a BiOp is reasonable. *City of Tacoma*, 460 F.3d at 75-76. An agency acts reasonably as long as it does not rely on factors Congress did not intend it to consider, entirely fail to consider an important aspect of the problem, or offer an explanation that runs counter to the evidence before it or that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). OSM's reliance on the 2020 BiOp easily meets this standard, especially where it and FWS each reasonably determined that reinitiated ESA consultation is not required.

### c. OSM and FWS Reasonably Determined that Reinitiation of ESA Consultation Is Not Required

Plaintiffs contend that OSM must reinitiate consultation on its implementation of SMCRA Title V because Plaintiffs' April 2023 claims presented "new information"; however, the "mere existence of new information does not necessarily trigger reinitiation of consultation . . . [t]he crux of the matter is whether the new information reveals effects that were not previously considered." *All. for the Wild Rockies v. Marten*, 685 F. Supp. 3d 971, 978 (D. Mont. 2023) (citation omitted); *accord* 50 C.F.R. § 402.16(a)(2) (reinitiation required if new information "reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered").

OSM rationally determined that Plaintiffs' allegations did not meet this standard, explaining that "this type of oversight of State regulatory programs was evaluated under, and is consistent with, the 2020 BiOp." OSM_0031488. The SMCRA regulations expressly anticipate that OSM may identify issues during oversight resulting from an SRA's "implementation, administration, enforcement, or maintenance of all or any portion of its State regulatory program that is not consistent with the basis for OSMRE's approval of the State program," and the regulations include mechanisms for correcting such issues. 30 C.F.R. §§ 733.5, 733.12. In the 2020 BiOp, FWS had

43

concluded that this regulatory framework would satisfy ESA Section 7(a)(2), and OSM was duly following the framework. OSM_0031484. With specific regard to the four regulatory triggers for reinitiating consultation set forth in 50 C.F.R. § 402.16(a)(1)-(4), OSM found that: (1) there was no information that the amount or extent of incidental take authorized under the 2020 ITS had been exceeded; (2) no new information revealed effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the action that underwent consultation (*i.e.*, implementation of the SMCRA Title V program) had not been modified in a manner that would cause an effect to listed species or critical habitat that was not considered in the 2020 BiOp; and (4) no new species had been listed or critical habitat designated that could be affected in a manner not considered in the 2020 BiOp. *Id.*

FWS also determined that OSM was not required to reinitiate consultation. OSM_0030926. FWS explained in a letter to Plaintiffs that, even if their allegations were true, they would not alter the conclusions of the 2020 BiOp. *Id.* FWS concluded that, to the extent OSM's evaluation of Plaintiffs' claims "reveals problems in complying with the fish and wildlife requirements of SMCRA, the SMCRA Title V Regulatory Program contains appropriate mechanisms to correct them on a permit-by-permit and programmatic basis." *Id.* at 0030927; *accord* OSM_0026491. In particular, FWS noted that OSM is required to submit annual reports to FWS and participate in an inter-agency meeting at least annually to discuss 2020 BiOp implementation. *Id.* at 0030927. FWS determined that OSM's implementation of SMCRA Title V had not changed and was not affecting listed species and designated critical habitat in a manner or to an extent FWS had not considered previously. OSM_0030927. Additionally, FWS was not aware of any information that listed species or critical habitat were being adversely impacted. *Id.* FWS' determination is due "a strong presumption" given its expertise in the area of wildlife conservation and management and the deferential standard of review. *Am. Wildlands*, 478 F. Supp. 2d at 96 (citation omitted).

44

Automatically requiring OSM to reinitiate consultation on its implementation of SMCRA Title V any time it identifies a state regulatory program issue would defeat the purpose of the 2020 BiOp and the SMCRA regulations for OSM oversight. *See Conservation Cong. v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014) ("50 C.F.R. § 402.16 does not require agencies to stop and reinitiate consultation for "every modification of or uncertainty in a complex and lengthy project"); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 120 F. Supp. 2d 1005, 1025 (M.D. Fla. 2000) (violation of a term and condition of an ITS did not automatically violate ESA Section 7(a)(2) and trigger reinitiation of consultation because "potential violations are a reality" and when violations "do occur, they cannot fairly be characterized as 'new information' which the Service had not previously considered"); *Wy. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 95 (D.D.C. 2003) (new information about the importance of an area as grizzly habitat did not trigger reinitiation because the BiOp "recognized and took into account the uncertainties" as to potential value of habitat; fact that FWS did not request reinitiation provided a rational basis for action agency's decision not to reinitiate).

### C.      Plaintiffs Are Not Entitled to Relief and Vacatur Would Not Be Appropriate

Plaintiffs are not entitled to any relief for the reasons above, and it is thus unnecessary to discuss appropriate remedies. Under no circumstances should this Court cast America's coal industry into regulatory uncertainty during this time of national energy emergency by vacating the 2020 BiOp. *Allied-Signal v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993); 90 Fed. Reg. 8433 (Jan. 20, 2025). Indeed, the BiOp covers OSM's direct implementation of the SMCRA regulations in federal program states or on Indian lands, which is not even challenged in this lawsuit.

## VI.     Conclusion

For these reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: March 25, 2026

45

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/ *Robert P. Williams*
ROBERT P. WILLIAMS
Sr. Trial Attorney (SBN 474730 (DC))
U.S. Department of Justice
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 532-3101
Email: robert.p.williams@usdoj.gov

**Attorneys for Defendants**