**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>           *Plaintiffs,*<br><br>     v.<br><br>U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, *et al.*,<br><br>           *Defendants.* | )<br>)<br>)<br>)<br>)   Civil Case No.: 1:23-cv-03343-SLS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGEMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

I.    Plaintiffs Are Entitled to Summary Judgment Pursuant to the D.C. Circuit's Decision in *Center for Biological Diversity*.................................................................................. 2

    A.    The 2020 BiOp and Technical Assistance Process Are Unlawful Pursuant to the Circuit Court's Decision in *Center for Biological Diversity*..................................... 6

    B.    The 2020 BiOp's ITS Is Unlawful Pursuant to the Circuit Court's Decision in *Center for Biological Diversity*. .................................................................................. 13

    C.    Plaintiffs Are Not Challenging the SMCRA Regulations, Which Must Still be Complied With. ....................................................................................................... 18

    D.    The 2020 BiOp Unlawfully Delegates Defendants' ESA Duties to the States. ....... 20

    E.    The Appropriate Remedy is Vacatur of the 2020 BiOp and ITS…………………..25

II.    Defendants Have Not "Resolved" the Violations of the 2020 BiOp; In Any Case, New Information Mandates Reinitiation of Consultation. ......................................................... 27

    A.    Plaintiffs' Claims Are Not "Wholly in the Past," Nor Are They Moot.................... 29

    B.    The Lack of Compliance with the 2020 BiOp Is Jeopardizing Listed Species in Violation of the ESA. .............................................................................................. 34

    C.    Defendants' Determinations That Reinitiation Is Not Warranted Are Erroneous.... 37

CONCLUSION.................................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................ 26, 27

*Allina Health Servs. v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) ..................................................................................... 25

*Am. Bird Conservancy, Inc. v. FCC,*
  516 F.3d 1027 (D.C. Cir. 2008) ..................................................................................... 25

*Am. Great Lakes Ports Ass'n v. Schultz,*
  962 F.3d 510 (D.C. Cir. 2020) ....................................................................................... 25

*Am. Rivers v. FERC,*
  895 F.3d 32 (D.C. Cir. 2018) ......................................................................................... 15

*Arrington v. District of Columbia,*
  597 F. Supp. 2d 52 (D.D.C. 2009) ................................................................................. 22

*Bancoult v. McNamara,*
  227 F. Supp. 2d 144 (D.D.C. 2002) ............................................................................... 22

*Bridgeport Hosp. v. Becerra,*
  108 F.4th 882 (D.C. Cir. 2024) ...................................................................................... 26

*City of Tacoma v. FERC,*
  460 F.3d 53 (D.C. Cir. 2006) ......................................................................................... 13

*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1988) .......................................................................................... 8

*Cooling Water Intake Structure Coal. v. EPA,*
  905 F.3d 49 (2d Cir. 2018) ............................................................................................... 1

*Ctr. for Biological Diversity v. EPA,*
  861 F.3d 174 (D.C. Cir. 2017) .................................................................................. 23, 30

*Ctr. for Biological Diversity v. Regan,*
  734 F. Supp. 3d 1 (D.D.C. 2024) .................................................................................. 8, 12

*Ctr. for Biological Diversity v. Ross,*
  349 F. Supp. 3d 38 (D.D.C. 2018) .................................................................................. 36

*Ctr. for Biological Diversity v. Ross,*
  480 F. Supp. 3d 236 (D.D.C. 2020) ............................................................................... 25

*Ctr. for Biological Diversity v. Zeldin,*
  No. 24-5101, 2026 WL 850257,__ F.4th __ (D.C. Cir. Mar. 27, 2026) ........................... passim

*Env't Def. Fund v. FERC,*
  2 F.4th 953 (D.C. Cir. 2021) .......................................................................................... 26

*Gerber v. Norton,*
  294 F.3d 173 (D.C. Cir. 2002) ....................................................................................... 22

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021) ................................................................................................... 23

*Honeywell Int'l v. NRC,*
  628 F.3d 568 (D.C. Cir. 2010) ............................................................................................ 30

*Loper Bright Enters v. Raimondo*,
  603 U.S. 369 (2024) ............................................................................................................ 19

*Marin Audubon Soc'y v. FAA*,
  121 F.4th 902 (D.C. Cir. 2024) ........................................................................................... 27

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
  142 F.3d 449 (D.C. Cir. 1998) ..................................................................................... 30, 31

*N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) .............................................................................................11

*Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ............................................................................................ 18

*Or. Nat. Desert Ass'n v. Kimbell*,
  593 F. Supp. 2d 1217 (D. Or. 2009) .................................................................................... 36

*Pub. Emps. for Env't Responsibility v. Beaudreau*,
  25 F. Supp. 3d (D.D.C. 2014) ............................................................................................. 22

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ............................................................................................................ 23

*U.S. Sugar Corp. v. EPA*,
  844 F.3d 269 (D.C. Cir. 2016) ............................................................................................ 26

*United States v. Lawrence*,
  1 F.4th 40 (D.C. Cir. 2021) ................................................................................................. 30

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019 ............................................................................................ 25

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ............................................................................................... 36

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................................ 25

5 U.S.C. § 706(2)(D) ................................................................................................................ 18

16 U.S.C. § 1536(a)(2) ............................................................................................ 8, 22, 23, 38, 39

16 U.S.C. § 1536(b)(4)(C)(ii) ............................................................................................... 22, 24

16 U.S.C. § 1536(b)(4)(C)(iv) .............................................................................................. 22, 24

**Regulations**

30 C.F.R. § 733.5 ............................................................................................................ 28

30 C.F.R. § 733.12 .......................................................................................................... 28

30 C.F.R. § 773.19(c) ...................................................................................................... 35

30 C.F.R. § 780.16 .................................................................................................... 10, 21

30 C.F.R. § 784.21 .................................................................................................... 10, 21

50 C.F.R. § 402.02 ...................................................................................................... 9, 14

50 C.F.R. § 402.14 .......................................................................................................... 22

50 C.F.R. § 402.14(g) .................................................................................................. 9, 11

50 C.F.R. § 402.14(h) ...................................................................................... 7, 9, 13, 14

50 C.F.R. § 402.14(i) ...................................................................................................... 23

50 C.F.R. § 402.14(i)(1)(i) ............................................................................................. 14

50 C.F.R. § 402.14(i)(1)(ii) ............................................................................................ 18

50 C.F.R. § 402.14(i)(5) ............................................................................................ 14, 18

50 C.F.R. § 402.14(i)(7) ........................................................................................ 9, 14, 16

50 C.F.R. § 402.16 .................................................................................................... 18, 38

**Rules**

Fed. R. Evid. 201 ............................................................................................................ 35

**Federal Register**

80 Fed. Reg. 18710 (Apr. 7, 2015) ............................................................................... 32

**Other Authorities**

U.S. Fish and Wildlife Service & National Marine Fisheries Service, *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* (1998) ............................................................. 11

**INTRODUCTION**

As Plaintiffs demonstrated in their opening brief, Defendants are relying on an unlawful Biological Opinion and Incidental Take Statement issued in 2020 ("2020 BiOp and ITS") for the Surface Mining Control and Reclamation Act ("SMCRA") regulatory program that do not comply with the Endangered Species Act ("ESA") and implementing regulations. Even if the 2020 BiOp was valid, new information that has emerged since its issuance shows that Defendants have failed to implement it, which is adversely affecting protected species and designated critical habitats in a manner not previously considered. At minimum, that requires reinitiation of Section 7 consultation.

The D.C. Circuit Court's recent decision in *Center for Biological Diversity v. Zeldin*, No. 24-5101, 2026 WL 850257, __ F.4th __ (D.C. Cir. Mar. 27, 2026) (hereinafter, "*Center for Biological Diversity*"), confirms that Plaintiffs are entitled to summary judgment here. That case concerned a nearly identical programmatic biological opinion for the State of Florida's assumption of the Clean Water Act Section 404 program (the "404 BiOp"), which likewise attempted to confer Section 7 incidental take coverage on State permitting authorities and private permittees without providing a site-specific and species-specific analysis on listed species impacts and utilizing an ITS that failed to include specific limits on the extent of allowable take. As the Court of Appeals held, that is inconsistent with the ESA and the ESA's implementing regulations.

The Court further held that relying on a subsequent technical assistance "coordination" process, as Defendants did here, is contrary to the ESA and arbitrary and capricious. The Court also expressly rejected the analysis in the case Defendants principally rely on here, *Cooling Water Intake Structure Coalition v. EPA,* 905 F.3d 49 (2d Cir. 2018) (hereinafter "*Cooling*

1

*Water*"), finding it was wrongly decided and undermining Defendants' arguments in support of the 2020 BiOp and ITS. Consistent with the Circuit Court's decision in *Center for Biological Diversity*, the 2020 BiOp and ITS must be vacated.

Because the Court of Appeals' ruling leaves no doubt that Plaintiffs are entitled to summary judgment on Count III, the Court need not consider Counts I and II. If the Court nonetheless addresses those claims, the evidence before the Court demonstrates that Defendants have failed even to comply with the deficient 2020 BiOp, and that this failure has put listed species at even greater peril.

## ARGUMENT

**I.      Plaintiffs Are Entitled to Summary Judgment Pursuant to the D.C. Circuit's Decision in *Center for Biological Diversity*.**

Although Defendants attempt to characterize the claims in Count III as Plaintiffs "simply dislik[ing] the cooperative federalism design Congress chose for SMCRA," Def. Br. at 1, Dkt. No. 45, that same cooperative federalism design is imbued in the very Clean Water Act program at issue in *Center for Biological Diversity*. It is not the cooperative federalism approaches in SMCRA or the Clean Water Act that Plaintiffs have taken issue with; it is the Government's failure to comply with its obligations under the ESA in administering permitting programs under those laws. That is the issue before the Court in this case, and the D.C. Circuit Court's decision in *Center for Biological Diversity* leaves no doubt that the 2020 BiOp and ITS fail to comply with the ESA and implementing regulations and must be vacated.

In *Center for Biological Diversity*, the D.C. Circuit ruled on the validity of an analogous programmatic biological opinion and ITS that, likewise, failed to provide a site-specific and species-specific analysis or to set endangered species take limits, and relied on a subsequent technical assistance "coordination" process to provide Section 7 take coverage to State

permitting authorities and private permittees. The Court held that biological opinion and ITS to be irreconcilable with the ESA for the same reasons Plaintiffs have argued that the 2020 BiOp and ITS are unlawful here. Pls. Op. Br. at 21-26, Dkt. No. 42. And, importantly, the Circuit Court confirms Defendants' extensive reliance on the Second Circuit's decision in *Cooling Water* to be misplaced. *See, e.g.,* Def. Br. at 17-21. *Cooling Water* "does not bind" the D.C. Circuit, and so what must now be followed is this Circuit's determination that a biological opinion that "sets standards less protective than those prescribed by the ESA cannot displace the ESA itself." *Center for Biological Diversity*, 2026 WL 850257, at *15 (explaining that *Cooling Water* not only "stands alone" and is nonbinding in this Circuit, but its reasoning is "at odds with applicable regulations and our own precedents") (citations omitted); *id.* at *22 (concurrence by Judge Wilkins concluding the same).

In short, all of Defendants' arguments in reliance on *Cooling Water* are without merit under Circuit precedent and must be disregarded. As the government itself has recognized, "this Court should not consider out-of-Circuit case law when there is controlling authority from the D.C Circuit." Def. Mot. to Strike at 11, Dkt. No. 44.

There can be no question that the biological opinion and ITS vacated by the D.C. Circuit in *Center for Biological Diversity* (the "404 BiOp") are functionally identical to the 2020 BiOp and ITS at issue here and suffer from the same inadequacies. As the Factual Background section of the Circuit Court's decision in *Center for Biological Diversity* shows, the 404 BiOp used the same exact template as used for the 2020 BiOp. The 404 BiOp provided the same "broad, up-front ESA liability protection" for future permittees through a programmatic Section 7 consultation. *Center for Biological Diversity*, 2026 WL 850257, at *6. And just as with the 2020 BiOp, the 404 BiOp's scheme for providing Section 7 incidental take coverage to non-federal

3

entities "would not involve additional Section 7 consultations," and "defer[red] species-specific analysis and the formulation of take limitations to a [later] 'technical assistance process'" that was "less rigorous than a Section 7 consultation but would nonetheless 'provide project applicants the needed liability protection from claims arising under the ESA even though the activity is authorized pursuant to a state permit.'" *Id.* at *6-7.

Any attempt by Defendants to distinguish the *Center for Biological Diversity* decision—and the biological opinion and ITS vacated there—from the case at hand is misdirected. First, Defendants argue that case dealt with the initial delegation of a Clean Water Act permitting program to a State, whereas the delegation (or, in SMCRA speak, "primacy") here happened long-ago and, therefore, the 2020 BiOp "did not purport to analyze future permitting decisions which, in primacy states, are nonfederal actions not subject to project-specific ESA Section 7 consultation." Def. Br. at 23.[1] Defendants' argument holds no water because it is wrong as to the scope of the action under consultation, which includes incidental take coverage for all future State-issued SMCRA permits. The idea that those future permitting decisions can play no role in the analysis required under the 2020 BiOp is, as with the 404 BiOp, belied by the requirements of the ESA, its implementing regulations, the scope of other analysis in the 2020 BiOp, and the ongoing nature of the SMCRA "coordination" process with FWS. If anything, the 2020 BiOp is even more far-reaching than the one at issue in the Court of Appeals, since that dealt with a single state being delegated permitting authority, whereas the 2020 BiOp applies to multiple

---

[1] That the agency action at issue in *Center for Biological Diversity* included a State's assumption application did not factor into the Circuit Court's decision other than as to the appropriate remedy (*i.e.*, vacating the assumption of the Clean Water Act 404 program by Florida because the BiOp/ITS were invalid). It was not otherwise part of the analysis as why the 404 BiOp and ITS violated the ESA and its implementing regulations.

states and grants sweeping incidental take coverage to all permitting decisions in all of them.

Hence, the legal deficiencies discerned by the D.C. Circuit apply with even greater force here.

Second, that SMCRA does have some implementing regulations related to the technical

assistance process does not distinguish it in any material respect from the process found to be

unlawful in *Center for Biological Diversity*. To begin with, the Circuit Court did not base its

decision related to the unlawful nature of the technical assistance process on whether EPA had

regulations related to that process, but rather found the process itself to be deficient under the

ESA. *Center for Biological Diversity*, 2026 WL 850257, at *15 ("A technical assistance process

that sets standards less protective than those prescribed by the ESA cannot displace the ESA

itself."). Indeed, it was in reaching that conclusion that the Court expressly declined to adopt the

reasoning in *Cooling Water* that Defendants rely on in asserting this distinction. *Id.*; Def. Br. at

17-18. In any event, as Defendants conceded, Def. Br. at 32-33, the dispute resolution process set

forth in Appendix B to the 2020 BiOp provides that the States ultimately hold the power to

accept or reject the conditions (*i.e.*, species-specific protective measures) that FWS believes are

necessary to ensure against jeopardy, and that process was generated outside of SMCRA's

regulatory structure, aligning it directly with the 404 BiOp invalidated in *Center for Biological

Diversity.*

Furthermore, just as with the 2020 BiOp, the 404 BiOp's no-jeopardy determination was

not premised on any site-specific or species-specific effects analysis, which was not provided

because of alleged "lack of information" about future permitting actions. *Center for Biological

Diversity*, 2026 WL 850257, at *8; *see also* Def. Br. at 26 (similarly defending the 2020 BiOp's

"use of a guild approach" as "reasonable given the lack of information about future permitting

actions"). Rather, the State and/or applicant would provide all relevant information regarding

5

impacts to protected species and habitats with the permit application to FWS, including proposed conservation measures to avoid and minimize impacts to listed species. *Id.* at *8. Based on that information, the State would decide whether protected species and habitats would be adversely affected, with FWS playing an advisory role through the "coordination" process, allowing FWS to require additional protective measures. *Id.* at *8-9. As with the 2020 BiOp, the 404 BiOp found that the technical assistance "coordination" process would be as protective as Section 7 consultation and therefore concluded that the program was sufficiently structured to avoid jeopardy to ESA-listed species. *Id*. This is exactly the same design as the 2020 BiOp. *See* Def. Br. at 12-16 (describing the 2020 BiOp's scheme for Section 7 compliance, which is analogous to the Circuit Court's description of the 404 BiOp). Therefore, the decision in *Center for Biological Diversity* cannot be distinguished and is directly on point and dispositive here.

At bottom, the question before the court in *Center for Biological Diversity* was the same question before the Court in this case: whether the reliance on programmatic biological opinion/ITS that deferred an analysis of the effects of State permitting decisions and the establishment of specific take limits to a subsequent technical assistance "coordination" process that is *not* itself Section 7 consultation comported with the requirements of the ESA. *Center for Biological Diversity*, 2026 WL 850257, at *13. The Court held that incidental take could not be provided in this manner and vacated the 404 BiOp and ITS. The same result must be reached here.

### A. The 2020 BiOp and Technical Assistance Process Are Unlawful Pursuant to the Circuit Court's Decision in *Center for Biological Diversity.*

The Circuit Court's majority decision on the inadequacy of the 404 BiOp parallels the arguments made by Plaintiffs regarding the inadequacy of the 2020 BiOp and its failure to comply with the ESA and applicable regulations. As Plaintiffs here have argued, the 2020 BiOp

fails to provide the project-specific and species-specific analysis (*i.e.*, a "detailed discussion of the effects of the action on listed species or critical habitat") that the ESA requires in a biological opinion to support a no-jeopardy determination and issuance of take coverage under Section 7. Pls. Op. Br. at 21 (citing 50 C.F.R. § 402.14(h)). This is clear from the 2020 BiOp itself, which states that "the paucity of information regarding future mining projects that is available at the time of this programmatic consultation does not allow the Service to identify the specific locations in which future mining projects will occur, the specific activities associated with a particular mining permit, and the number of individuals that might be affected by such activities in order for the Service to conduct species and site-specific analyses." FWS_36684.

Defendants argue, in total reliance on *Cooling Water*, that because the 2020 BiOp is at a programmatic level, it need not provide a detailed analysis of the effects of the action—*i.e.*, a project-specific and species-specific analysis—and may rely on the technical assistance "coordination" process to fill that gap. Def. Br. at 24-25. According to Defendants, their decision to exclude an analysis of the full effects of the SMCRA program is warranted because they considered future permitting decisions and their effects to be "nonfederal actions not subject to project-specific ESA Section 7 consultation." *Id.* at 23. But this is a disingenuous reading of the 2020 BiOp.

As the 2020 BiOp provides, "[t]he proposed action is OSMRE's continued implementation of Title V of SMCRA, and includes activities where OSMRE retains permitting authority, *as well as where States and Tribes have primacy*." FWS_36609 (emphasis added). And even further, in its analysis—including its attempt to reach a "no jeopardy" finding through reliance on the technical assistance "coordination" process—FWS did not end its analysis at whether the SMCRA regulations and OSM's oversight were sufficient to meet the requirements

of the ESA in the 2020 BiOp, but instead, as Defendants admit, established a process for providing take coverage to non-federal entities for future permitting decisions made by States that were outside the reach of Section 7. Def. Br. at 28 ("*Cooling Water* is the relevant authority here, where any incidental take results from state and private actions that are not subject to ESA Section 7(a)(2), with federal oversight."). The 2020 BiOp, therefore, clearly encompassed these future permitting decisions even though they are not subject to further Section 7 consultation; it just did not adequately analyze the project-specific and species-specific effects of this action, which the Court in *Center for Biological Diversity* found to be unlawful.

Taking this analysis to its next logical step, the Circuit Court's majority decision in *Center for Biological Diversity* held that, under these circumstances, a lack of information about future permitting decisions could not be used to avoid the Section 7 regulatory requirements, undermining any practicality arguments by Defendants. *Center for Biological Diversity*, 2026 WL 850257, at *14-15. Indeed, as the lower court decision affirmed by the Circuit Court further described: "The ESA does not require perfect foresight—only that the FWS use the best available information to create an assessment of jeopardy. In light of the ESA requirement that the FWS use the best scientific and commercial data available to insure that protected species are not jeopardized, 16 U.S.C. § 1536(a)(2), the FWS cannot simply 'ignore available biological information or fail to develop projections' of the effects of the agency action." *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 42 (D.D.C. 2024) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)). The Circuit Court's decision in *Center for Biological Diversity* renders Defendants' attempts to defend the missing analysis in the BiOp inapposite.

According to the Circuit Court, Section 7 specifically requires FWS to take certain actions before making a no-jeopardy determination, including issuing a BiOp that "shall include"

8

a "detailed discussion of the effects of the action on listed species or critical habitat," *Center for Biological Diversity*, 2026 WL 850257, at \*14 (citing 50 C.F.R. § 402.14(h)), something that neither the 404 BiOp nor the 2020 BiOp accomplished. Therefore, a programmatic biological opinion that fails to provide a site-specific and species-specific analysis based on the best available science does not comply with the express language of the regulations or the ESA.

The Circuit Court further clarified that the ESA regulations governing programmatic consultations do not allow FWS to avoid the effects analysis that Section 7 requires and may only delay that analysis to the project-specific stage *if it will be subject to further Section 7 consultation—i.e.*, not some non-ESA technical assistance "coordination" process that does not comport with Section 7's "exacting requirements." See *id.* at \*15 (citing 50 C.F.R. §§ 402.14(g), 402.14(i)(7)); *see also id.* at \*15 ("At bottom, such a watered-down procedure does not comport with agency regulations on programmatic approvals, which expressly subject deferred actions to "'further section 7 consultation.'") (citing 50 C.F.R. § 402.02)). The Circuit Court, therefore, went on to say that not only was species- and project-specific information required to be analyzed in the 404 BiOp, but also that FWS's reliance on an administratively established technical assistance "coordination" process—a process established outside of the confines of the ESA—to be an unlawful construction of Section 7, and that FWS's reasoning in support of such a scheme was "demonstrably incorrect." *Center for Biological Diversity*, 2026 WL 850257, at \*14.

The majority decision of the D.C. Circuit, accordingly, held that relying on a subsequent technical assistance "coordination" process to fill the gaps in the programmatic biological opinion was unlawful and arbitrary and capricious. *See id.* at \*14-15. Section 7 requires that FWS add the effects of the action to the environmental baseline to analyze the effects of the

action, and to use the best available science to evaluate each permit. *Id.* at \*14. But since the technical assistance process established under both the 404 BiOp and the 2020 BiOp do not impose these regulatory requirements, and FWS *may*, but is not required, to provide such technical assistance, the process is fatally inadequate. *Id.* at \*14-15; FWS_36708 (2020 BiOp Appx. A, relying on 30 C.F.R. §§ 780.16 and 784.21, which only require the State to provide a PEP *if FWS requests one*, but establishing no mandate for FWS to review all SMCRA permits to ensure that sufficient measures are in place to avoid jeopardy). In sum, a "technical assistance process that sets standards less protective than those prescribed by the ESA cannot displace the ESA itself." *Center for Biological Diversity*, 2026 WL 850257, at \*15.

And here, the technical assistance process is even less protective than for the 404 BiOp, *see* Pls. Op. Br. at 28, since, in that case, "if the FWS decided to weigh in and found that an application 'may cause an adverse effect to [a] species,' then that decision 'would be determinative' and the project would be required to 'include additional protective measures or Florida [would] reject the permit.'" *Center for Biological Diversity*, 2026 WL 850257, at \*8. In contrast, as discussed *infra* and as Defendants concede, Def. Br. at 32-33, the dispute resolution process, which appears in Appendix B to the 2020 BiOp and is not otherwise reflected in the SMCRA regulations, allows States to *reject* measures that FWS considers necessary to prevent jeopardy or impairment of critical habitat. If, as the Court of Appeals held, a subsequent technical assistance process in which the FWS could, at least in theory, ultimately control the outcome was *still* insufficient to satisfy Section 7's requirements, the same must be so for a process that expressly allows States to disregard FWS's determination as to what measures are necessary to address impacts on federally listed species.

Importantly, in reaching its conclusion about the adequacy of the 404 BiOp, not only did the D.C. Circuit disagree with the analysis in *Cooling Water*, *Center for Biological Diversity*, 2026 WL 850257, at *15,[2] but, in doing so, it found that the programmatic consultation in *Cooling Water* and the 404 BiOp at issue in *Center for Biological Diversity* were based on the same template—the very same template as the 2020 BiOp at issue here. *Id.* at *6 ("Florida's proposed plan was modeled on a similar 'programmatic consultation' that was blessed by the Second Circuit's decision in *Cooling Water* ...").[3] Indeed, Defendants here concede that the BiOp in *Cooling Water* was the foundation of the 404 BiOp vacated in *Center for Biological Diversity*, Def. Br. at 17, and used the same framework as the 2020 BiOp, *id.* at 19. Thus, as Defendants appear to agree, as the 404 BiOp fares in the D.C. Circuit, so too must the 2020 BiOp. And because engaging in programmatic consultations "does not excuse [FWS] from performing an effects analysis that is consistent with Section 7's requirements," *Center for Biological Diversity*, 2026 WL 850257, at *15 (citing 50 C.F.R. § 402.14(g); *N. Slope Borough v. Andrus*, 642 F.2d 589, 608–09 (D.C. Cir. 1980)), this Court should find that Defendants violated the ESA in failing to perform such an analysis here.

Defendants' further attempt to rely on Appendices C, D, and E of the BiOp to suggest that this case may be distinguished from the 404 BiOp because they contain some generic species

---

[2] As Judge Wilkins explained in his concurrence, "*Cooling Water*'s reasoning cannot be squared with longstanding agency procedure that 'a programmatic consultation will not substitute for an individual project consultation, unless the programmatic analysis lays out the species-specific standards within which all individual activities will be conducted.'" *Center for Biological Diversity*, 2026 WL 850257, at *22 (citing Endangered Species Consultation Handbook, p. E-17 (1998)).

[3] Judge Henderson's opinion, concurring in part and dissenting in part, states that the BiOp at issue in *Cooling Water* "served as the template" for the 404 BiOp. *Center for Biological Diversity*, 2026 WL 850257, at *28.

information is entirely unfounded. Def. Br. at 25-26. Those appendices provide general information on the status of listed species and critical habitats and "a general discussion of stressors," but do not contain any actual analysis of the effects of any specific current or prospective coal mines on listed species at a project-specific or species-specific level and therefore cannot justify a departure from the Circuit Court's decision on the 404 BiOp. *Center for Biological Diversity*, 2026 WL 850257, at *14 (for Section 7 consultation, "the Services 'shall include' a 'detailed discussion of the effects of the action on listed species or critical habitat' in the BiOp").

Rather than analyze species-specific impacts, FWS used the information in Appendix C to establish "guilds" of listed species (*i.e.*, generalized groupings based on habitat associations) and used those guilds in Appendices D and E to provide the same level of discussion that both the district court and the Court of Appeals critiqued in the 404 BiOp. FWS_36629 (2020 BiOp stating it "evaluated the effects of the action on guilds of ESA-proposed and -listed species and designated and proposed critical habitat"); *Regan*, 734 F. Supp. 3d at 42 ("To start, the BiOP states that the FWS merely 'evaluated the effects of the action on *guilds* of ESA-proposed and-listed species and designated and proposed critical habitat.'"). However, as Judge Moss explained in *Regan*, "an analysis at the guild-level fails the statutory and regulatory demand to assess the environmental baseline, effects, and cumulative effects at the species-level." *Id.* "Without those essential components, the BiOp fails to meet the minimum statutory and regulatory requirements." *Id.* at 44. That is consistent with the Circuit Court's decision regarding the need to provide a species-specific analysis in a BiOp. *See Center for Biological Diversity*, 2026 WL 850257, at *14-15.

Defendants' reliance on *City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006), to suggest that the D.C. Circuit has endorsed a guild approach to the species-specific analysis required in a biological opinion is far off the mark. Def. Br. at 26. That decision pertained to whether a BiOp could rely on species-specific inferences concerning migration rates and related survival rates, and apply that to similar species in close geographic proximity. *Id.* at 77. The Court specifically found that this constituted "[m]inimal reliance" on such inferences, *id.*, whereas here Defendants rely completely on a generalized review at the guild level with no species-specific analysis at all. Importantly, the inferences at issue in *City of Tacoma* were being used to make an effects determination for each species rather than being used to *avoid* doing a species-specific analysis, as in the case here, and, therefore, that decision in no way supports relying on an analysis at the guild level to satisfy the requirements of Section 7 for a programmatic BiOp.

In sum, because the 2020 BiOp does not include the project-specific and species-specific analysis (*i.e.*, a "detailed discussion of the effects of the action on listed species or critical habitat") that the ESA requires in a biological opinion to support a no-jeopardy determination, 50 C.F.R. § 402.14(h), the BiOp is not consistent with Section 7's requirements. Pursuant to *Center for Biological Diversity*, Defendants may not rely on the technical assistance process to fill those gaps: this "watered-down" approach is "arbitrary and capricious because it violated applicable [ESA] regulations" and was developed "without observance of procedure required by law." *Center for Biological Diversity*, 2026 WL 850257, at *15 (citations omitted).

B.    **The 2020 BiOp's ITS Is Unlawful Pursuant to the Circuit Court's Decision in** ***Center for Biological Diversity.***

The 2020 BiOp's ITS is also unlawful for the same reasons the Circuit Court unanimously found the 404 BiOp's ITS to be unlawful in *Center for Biological Diversity*. As Plaintiffs have argued, the 2020 BiOp's ITS does not comply with the express regulatory

13

requirement that the ITS must set forth the "amount or extent of anticipated take" or a "clear standard for determining when the level of anticipated take has been exceeded" to ensure against jeopardy. Pls. Op. Br. at 23 (citing 50 C.F.R. §§ 402.14(h), 402.14(i)(1)(i)).[4] As with their arguments regarding the BiOp, Defendants argue that this was not required at the programmatic level and can be accomplished through the subsequent technical assistance "coordination" process pursuant to *Cooling Water*. Def. Br. at 27. The Circuit Court's decision in *Center for Biological Diversity* fully undermines that position and supports Plaintiffs' arguments.

Because Defendants' arguments regarding the failure of the ITS to quantify the amount of anticipated take rely entirely on the Second Circuit's decision in *Cooling Water*, which the D.C. Circuit rejected in *Center for Biological Diversity*, those arguments must fail. Def. Br. at 26-28. The D.C. Circuit confirmed that "the initial estimate of 'the amount or extent' of incidental take is an important feature of any ITS because that take amount triggers immediate reinitiation of consultation between the Services and the action agency under Section 7." *Center for Biological Diversity*, 2026 WL 850257, at *16 (citing 50 C.F.R. § 402.14(i)(5); *Am. Rivers v.*

---

[4] Plaintiffs also argued that pursuant to the ESA implementing regulations, incidental take coverage should not be provided at the programmatic level but, rather, should be "addressed in subsequent section 7 consultation, as appropriate"—*i.e.*, when actions are taken pursuant to the program (here, the issuance of project-specific SMCRA permits). Pls. Op. Br. at 24-25 (citing 50 C.F.R. § 402.14(i)(7)). Defendants' response—that the issuance of incidental take coverage at the programmatic level is warranted here because this is not a "framework programmatic action" (though they also state it is not a mixed programmatic action), Def. Br. at 23-24—is inapposite given the ITS is unlawful, as discussed herein; however, the Circuit Court also rejected this argument and found that this scheme for ESA compliance is most certainly a "framework programmatic action," since it involves the issuance of subsequently granted project-specific permits (*i.e.*, "approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time," 50 C.F.R. § 402.14(i)(7)) and, therefore, requires "further section 7 consultation" to comply with the regulatory requirements, which cannot be accomplished through a technical assistance "coordination" process. *See Center for Biological Diversity*, 2026 WL 850257, at *15 ("At bottom, such a watered-down procedure does not comport with agency regulations on programmatic approvals, which expressly subject deferred actions to 'further section 7 consultation.'") (citing 50 C.F.R. § 402.02)).

14

*FERC*, 895 F.3d 32, 48-49 (D.C. Cir. 2018)). The Circuit Court found that the 404 BiOp's ITS violated this regulatory requirement based on the same reasoning that Defendants rely on for the 2020 BiOp: an inability at the programmatic review level to estimate the number of individuals that might be affected by the permitted activities. *See Center for Biological Diversity*, 2026 WL 850257, at *16-17; FWS_36684 (2020 BiOp's ITS stating that "the paucity of information regarding future mining projects that is available at the time of this programmatic consultation does not allow the Service to identify the specific locations in which future mining projects will occur, the specific activities associated with a particular mining permit, and the number of individuals that might be affected by such activities in order for the Service to conduct species and site-specific analyses"); Def. Br. at 26 (discussing the "analogous paucity of information here"). The D.C. Circuit found that a lack of information did not excuse compliance with the ESA regulations. *Center for Biological Diversity*, 2026 WL 850257, at *16-17.

The Circuit Court further found the government's argument "dubious" because the ESA only requires that FWS use the "best available information" to make such estimates, and it had "reams" of information at its disposal from prior consultations, and for highly imperiled species, such the Florida panther with only 150 individuals remaining, "it is not difficult to imagine a cumulative take limit per year for the entire state (or for particular regions of the State)." *Center for Biological Diversity*, 2026 WL 850257, at *16. The same is true here. As Defendants acknowledge, the SMCRA regulations that have been in place for decades require States and/or permittees to collect information on the potential harm to listed species from coal mining activities and to provide such information to FWS. *See* Def. Br. at 5-6 (describing the fish and wildlife resource information collected by applicants pursuant to SMCRA).

15

FWS, therefore, similarly has "reams" of information available to it on the impacts of coal mining on protected species and their habitats, undermining any claim that estimating incidental take is impossible. *See* Def. Br. at 25-26 (discussing the information contained in Appendices C, D, and E to the 2020 BiOp, which apparently could have been used to provide some of the analysis the ESA actually requires). That is particularly the case for species such as the Guyandotte River crayfish, which survives in only 2 stream segments, and, therefore, it would be even easier for FWS to set cumulative take limits at a regional level than for the Florida panther discussed in *Center for Biological Diversity*, 2026 WL 850257, at *16. Regardless, as the Circuit Court stated, if FWS felt it was unable to estimate an incidental take amount, the resolution is not to issue an ITS without any take limits, but to defer the required analysis to a subsequent Section 7 consultation pursuant to the ESA regulations. *Id.* (citing 50 C.F.R. § 402.14(i)(7)). Here, FWS likewise did not comply with this regulatory requirement.

As with the 404 BiOp, the 2020 BiOp relies not on subsequent Section 7 consultation but on the technical assistance "coordination" process to establish the required take limits. *See* FWS_36684; Def. Br. at 28 ("The ITS necessarily limits incidental take to the amount that is reasonably certain to occur as a result of individual permitting actions."). Not only is this factually flawed, since the record shows that many PEPs do not actually contain take limits, *see* Pls. Op. Br. at 10, 23-4,[5] but the Circuit Court found that it is legally inadequate because it does

---

[5] Defendants point to a single example of a PEP that does contain take limits, Def. Br. at 27-28; however, they fail to address the fact that Plaintiffs showed several examples of PEPs in the record that did not do so. This inconsistency shows that Defendants have failed to implement the 2020 BiOp in a manner that FWS itself said was necessary to avoid jeopardizing the continued existence of listed species. Defendants' assertion that the record does not show that any permit applicant has exceeded a take limit quantified during the technical assistance process is therefore inapposite, Def. Br. at 28, since the record shows that the 2020 BiOp and most PEPs do not contain any take limits and, therefore, there is nothing to exceed, which is inconsistent with the ESA's requirements. *See Center for Biological Diversity*, 2026 WL 850257, at *16 ("Thus, the

not comply with ESA Section 7 and applicable ESA regulations. *Center for Biological Diversity*, 2026 WL 850257, at *16 ("But the ITS addresses excessive-take levels through the technical assistance process, which falls short of a renewed Section 7 consultation."); *id.* at *21 (Wilkins concurrence: "Neither the statute nor the regulations allow the action agency to state that take limits will be determined at a later time, and then deem Section 7 consultations finished."). Sustaining this approach would allow States to "obtain the benefits of a Section 7 consultation (*i.e.*, a programmatic ITS that provides permittees with incidental-take liability protection), without the attendant costs (*i.e.*, continued monitoring, with the possibility of reinitiated Section 7 consultations, to protect listed species or critical habitats)." *Id.* at *17. And even if a PEP did provide an allowed extent of incidental take, Defendants note that an exceedance of that limit would only require the State to "revisit the technical assistance process for the permit," Def. Br. at 28, which is not the same as reinitiating Section 7 consultation and, therefore, does not meet the statutory requirements. *See Center for Biological Diversity*, 2026 WL 850257, at *16-17.

Furthermore, as with the 404 BiOp's ITS, the 2020 BiOp's ITS not only fails to provide the required take limits but also fails to identify specific "reasonable and prudent measures" to minimize the impacts of incidental take. Rather, it merely assumes that appropriate measures will be developed through the technical assistance "coordination" process, FWS_36685-86,[6] which

---

initial estimate of 'the amount or extent' of incidental take is an important feature of any ITS …").

[6] The *only* Reasonable and Prudent Measure included in the ITS for the 2020 BiOp that pertains to States with primacy is that OSM will use its oversight authority to evaluate State programs. FWS_36685. It provides no actual measures to address incidental take at the project-specific or species-specific level. The Terms and Conditions of the ITS then rely on the technical assistance "coordination" process to establish species-specific protective measures. FWS_36685-86.

does not comply with the ESA regulations. *See Center for Biological Diversity*, 2026 WL 850257, at *16 (citing 50 C.F.R. § 402.14(i)(1)(ii)).[7]

In sum, as with the 404 BiOp's ITS, the 2020 BiOp's ITS is arbitrary and capricious because it "openly violates applicable regulations regarding take amounts and the reinitiation of consultation." *Center for Biological Diversity*, 2026 WL 850257, at *17 (citing *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). "It also violates the APA because the FWS developed the ITS 'without observance of procedure required by law.'" *Id.* (citing 5 U.S.C. § 706(2)(D)). Plaintiffs are, therefore, entitled to summary judgment.

## C.    Plaintiffs Are Not Challenging the SMCRA Regulations, Which Must Still be Complied With.

Defendants' arguments regarding Plaintiffs' supposed request to "strike down" the technical assistance process in the SMCRA regulations is a red herring and a misguided attempt to draw the Court's attention away from the ESA violations at issue here. Def. Br. at 30. Plaintiffs' case takes no issue with the SMCRA regulations, and the technical assistance "coordination" process contained therein, *for purposes of complying with SMCRA*. However, as is clear from the Circuit Court's decision in *Center for Biological Diversity*, that technical

---

[7] The only arguable distinction between the 404 BiOp and the 2020 BiOp is that the 404 BiOp explicitly relieves the FWS of any duty to participate in reinitiated Section 7 consultation, *see Center for Biological Diversity*, 2026 WL 850257, at *16, whereas here the 2020 BiOp's ITS includes a reinitiation trigger, as set forth in the regulations at 50 C.F.R. § 402.16. FWS_36687. However, this is an inapposite distinction. The 2020 ITS's reinitiation trigger language is meaningless because it merely states that reinitiation is required "if the amount or extent of incidental take *for this Opinion* is exceeded," *id.* (emphasis added), yet the opinion does not set *any* amount or extent of incidental take, so that trigger could never be met. Therefore, the 2020 BiOp's ITS suffers from the same shortcomings regarding the need to reinitiate consultation when the allowed amount of incidental take is exceeded that the Circuit Court found to be unlawful in *Center for Biological Diversity*. 2026 WL 850257 at *16 ("[A]ddress[ing] excessive take levels through the technical assistance process [] falls short of a renewed Section 7 consultation," as the ESA requires.") (citing 50 C.F.R. §§ 402.14(i)(5), 402.16)).

18

assistance "coordination" process cannot suffice to provide States and coal mine operators with ESA Section 7 take coverage through a legally inadequate biological opinion and ITS, as discussed above. Thus, it is not Plaintiffs' claim that the technical assistance "coordination" process at issue in this case violates SMCRA, but that the BiOp and ITS rely on an unlawful interpretation and application of the ESA. Therefore, while permittees and SRAs must still comply with the SMCRA regulations (including the need to seek technical assistance from FWS), those non-federal entities must also seek an incidental take permit pursuant to Section 10 or obtain take exemption through a separate Section 7 consultation (as available)—either of which processes would be informed by the information gathered through the technical assistance process set forth in the SMCRA regulations—in order to comply with the ESA.

In making this argument, Defendants also overlook the import of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Pursuant to *Loper Bright*, this Court is not to give any deference to Defendants' interpretation of how to apply the ESA to SMCRA permitting and must determine *de novo* whether the proposed implementation of the Section 7 process is consistent with the law. *Loper Bright*, 603 U.S. at 370-71 (holding that Courts must decide all relevant questions of law). There is simply no support anywhere in the ESA—or in the Services' regulations implementing the ESA—for the use of a technical assistance "coordination" process to provide Section 7 take coverage in the manner set forth in the 2020 BiOp. Therefore, as Plaintiffs argue, the Court may not give any deference to Defendants' attempt to do so, pursuant to Supreme Court precedent. Pls. Op. Br. at 22-23.

Furthermore, the fact that the technical assistance "coordination" process has been codified in the SMCRA regulations is meaningless to whether it can be used to provide ESA take coverage where the program has been delegated and the State is issuing the permits. *Contra* Def.

19

Br. at 30. That the D.C. Circuit has upheld the SMCRA regulations as a general matter has nothing to do with the ESA issue in this case. *Id.* Contrary to Defendants' argument, Plaintiffs are not collaterally attacking the regulations or arguing that the technical assistance "coordination" process fails to comply with SMCRA. *Contra* Def. Br. at 30-31. Rather, just as the Court of Appeals held the 404 BiOp/ITS was illegal under the ESA without addressing the legality of the general regulations underlying the Clean Water Act 404 program, so too does the 2020 BiOp/ITS violate the ESA, irrespective of whether the SMCRA regulations are lawful for unrelated reasons.

### D.    The 2020 BiOp Unlawfully Delegates Defendants' ESA Duties to the States.

The Circuit Court's decision in *Center for Biological Diversity* also underscores that Defendants have unlawfully delegated their ESA duties to the States, undermining Defendants' impertinent claim that Plaintiffs' arguments regarding unlawful delegation "border on frivolous." Def. Br. at 32. Indeed, the Circuit Court specifically stated that by creating a functionally identical scheme for ESA Section 7 compliance for the 404 BiOp, FWS "abdicated its responsibility to enforce the ESA," and "essentially delegated that job" to the State without ensuring it would "protect endangered and threatened species in the manner specified by the ESA." *Center for Biological Diversity*, 2026 WL 850257, at *1. Thus, the Circuit Court's decision confirms that relying on a technical assistance "coordination" process outside the framework of Section 7 is an unlawful delegation that allows States and SMCRA Permittees "to evade the ESA's exacting procedures for protecting listed species," and must be vacated. *Id.*

Moreover, the record in this case confirms that the 2020 BiOp unlawfully delegates Defendants' ESA duties to the States in a manner that is even more detrimental for listed species than the 404 BiOp at issue in *Center for Biological Diversity*. First, the 2020 BiOp unlawfully

20

delegates the decision of whether to even enter into the technical assistance "coordination" process to the States, which does not ensure that all mines that may affect listed species undertake "coordination" and implement measures necessary to protect listed species from jeopardy. This is clear from the BiOp itself, which explicitly states that it is up to the State to initiate the technical assistance "coordination" process. FWS_36686 ("State regulatory authorities must engage the Service in review and comment on proposed SMCRA permit actions …"). In fact, the BiOp does not even *require* FWS to ensure that States are implementing protective measures to prevent jeopardy and only provides for voluntary review of permit applications if the *State* opts to initiate the "coordination" process. *See* FWS_36708 (2020 BiOp Appx. A, relying on 30 C.F.R. §§ 780.16 and 784.21, which only require the State to provide a PEP if FWS requests one, but establishing no mandate for FWS to review all SMCRA permits to ensure that sufficient measures are in place to avoid jeopardy).

As a result of this delegation to the States (and the lack of OSM oversight, *see* Pls. Op. Br. at Part II(A)), mines that certainly may affect listed species are not implementing the required protective measures. For example, the record shows that for 94 mine permits in Kentucky noticed by Plaintiffs that are in close proximity to critical habitat for the Big Sandy crayfish, the State had unilaterally determined that it did not have to enter into the technical assistance "coordination" process. OSMRE_31527. However, in response to Plaintiffs' notice letter, Kentucky decided to reassess those determinations, and that process identified *15 mines* that had been inadvertently operating for years without undergoing "coordination" but did indeed require protective measures to ensure against jeopardy. OSMRE_31527.[8] Therefore, the record confirms

---

[8] As set forth in Plaintiffs' opening brief, FWS' failure to require the remaining 79 mine permits to undertake "coordination" was an arbitrary and capricious determination that violates the best available science. Pls. Op. Br. at 36-38. Defendants failed entirely to respond to this argument,

21

that as a result of the 2020 BiOp's delegation of the decision as to whether to even engage in the technical assistance "coordination" process in the first instance to the States (rather than OSM as a responsible federal agency that would normally be required to initiate Section 7 consultation, *see* 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14), the State failed to engage in that process, in violation of the 2020 BiOp and the ESA, and listed species are not being adequately protected. Such delegation is unlawful under well-settled Circuit precedent. *See, e.g., Gerber v. Norton*, 294 F.3d 173, 184-86 (D.C. Cir. 2002) ("When a statute requires an agency to make a finding as a prerequisite to action, it must do so.").

Second, even where the State decides to actually engage in "coordination," the dispute resolution process set forth in Appendix B to the 2020 BiOp (which is not found in the SMCRA regulations and, therefore, has not been codified, just as with the 404 BiOp's "coordination" process) allows the State to *reject* protective measures that FWS determines are necessary to prevent jeopardy and still issue the permit. *See* FWS_36711-13; Pls. Op. Br. at 26-29. As explained, that is contrary to the requirements of the ESA, and unlawfully delegates the final say as to what protective measures will be implemented to ensure against jeopardy to the State, rather than FWS as the expert wildlife agency having the final say, as mandated by Congress. *See* 16 U.S.C. § 1536(b)(4)(C)(ii), (iv); *Pub. Emps. for Env't Responsibility v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014) (holding that FWS had improperly delegated its statutory responsibility under Section 7 to set forth measures for mitigating impacts on listed species in a biological opinion).

---

thereby conceding the point. *See Arrington v. District of Columbia*, 597 F. Supp. 2d 52, 58 (D.D.C. 2009) ("[I]f the [party opposing a motion for summary judgment] files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded ….") (quoting *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002)).

Defendants make much of the fact that if the State decides to issue the permit without requiring the measures that FWS deems necessary to ensure against jeopardy, the State and permittee would not receive the Section 9 take liability protections of the 2020 BiOp. Def. Br. at 33. But that misses the point. ESA Section 7 imposes a substantive mandate on all federal agencies to "insure" that *their* actions are not likely to cause jeopardy to listed species and/or adverse modification of critical habitat. *See Growth Energy v. EPA*, 5 F.4th 1, 26 (D.C. Cir. 2021) (discussing the duty that Section 7 of the ESA imposes on federal agencies to prevent harm to endangered species, reflecting a "conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies") (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 177-78 (D.C. Cir. 2017) (agencies must engage in Section consultation to comply with the ESA statutory mandate to ensure against jeopardy); 16 U.S.C. § 1536(a)(2) (each federal agency "*shall*, in consultation with and with assistance of the Secretary, insure that any action … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species") (emphasis added).

Thus, irrespective of whether Section 9 take liability would be possible if the State refused to include the measures that FWS proposes, the federal action approved in the 2020 BiOp expressly allows the State to take that risk and allows mining activities to move forward absent the protections that FWS determined to be necessary to prevent jeopardy. As Plaintiffs explained in their opening brief, the conflict resolution process set forth in Appendix B of the 2020 BiOp thereby unlawfully delegates ultimate authority to the States to determine what protective measures will be included in a SMCRA permit and to disregard measures that FWS

23

finds necessary to protect listed species that would be enforceable through the normal Section 7 process to ensure against jeopardy. *See* 16 U.S.C. § 1536(b)(4)(C)(ii), (iv); 50 C.F.R. § 402.14(i).

This aspect of the 2020 BiOp makes it even *less* capable of providing the protections mandated by the ESA than the 404 BiOp/ITS struck down by the Circuit Court in *Center for Biological Diversity. See* Pls. Op. Br. at 28-29. At least in that case, FWS retained ultimate ability to compel the inclusion of "additional protective measures," or Florida would have to "reject the permit." *Center for Biological Diversity*, 2026 WL 850257, at *8. The 2020 BiOp lacks even that modest safeguard. It is therefore an even more egregious violation of the substantive mandate of ESA Section 7 to "insure" against jeopardy and loss of critical habitat.

Moreover, Defendants' assertion that the dispute resolution process does not even pertain to ESA consultation and, therefore, cannot constitute an unlawful delegation, Def. Br. at 32, is blatantly absurd given that it is part of the scheme that Defendants rely on to provide ESA Section 7 take coverage to States and mine operators through the 2020 BiOp. And while the same technical assistance process was relied on in *Center for Biological Diversity*, the Circuit Court did not find that this excused compliance with the ESA regulations. *See Center for Biological Diversity*, 2026 WL 850257, at *14-18.

In attempting to avoid the requirements of Section 7 for the dispute resolution process, Defendants concede that "permitting decisions by SRAs in primacy states are state actions exempt from Section 7(a)(2) requirements." Def. Br. at 33. Defendants apparently fail to grasp the ramifications of this admission. If the State's permitting decision is exempt from Section 7, then there is no basis for granting Section 7 incidental take coverage for those actions, which, as Plaintiffs have argued, require compliance with Section 10 as non-federal actions. Defendants are attempting to have it both ways, arguing that Section 7 does not apply to State permit

24

decisions and, therefore, the State may disregard measures that FWS deems necessary to protect listed species from being decimated, but that the States should nonetheless be able to receive Section 7 coverage through that same process. The Circuit Court's decision in *Center for Biological Diversity* shows why that argument makes no legal or practical sense and runs contrary to the regulations that specifically require such measures to be enforceable through an ITS in order to receive Section 7 take coverage. The 2020 BiOp unlawfully delegates away Defendants' ESA duties, does not comply with the ESA and the implementing regulations, and should be vacated.

### E.  The Appropriate Remedy is Vacatur of the 2020 BiOp and ITS.

As the Circuit Court noted in *Center for Biological Diversity*, when an agency's action is unlawful, "vacatur is the normal remedy" because Congress directed courts to "hold unlawful and set aside agency action" that is "not in accordance with law[.]" *Center for Biological Diversity*, 2026 WL 850257, at *18 (citing *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014); 5 U.S.C. § 706(2)(A)); *see also Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 244 (D.D.C. 2020) ("The ordinary practice is to vacate unlawful agency action," which "holds when the law rendering the agency action 'unlawful' is the Endangered Species Act") (citing *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (other citations omitted)); *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1034-35 (D.C. Cir. 2008) (vacating agency decision for NEPA and ESA violations).

The Circuit Court noted that remand without vacatur is only allowed in "limited circumstances," and doing so is an "exceptional remedy." *Center for Biological Diversity*, 2026 WL 850257, at *18 (citing *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518-19 (D.C. Cir. 2020)). To determine whether remand without vacatur is warranted, a court looks to the

factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, including: (1) the "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) the "disruptive consequences of an interim change that may itself be changed." 988 F.2d 146, 150-51 (D.C. Cir. 1993) (cleaned up). However, under Circuit precedent, a court would only assess the *Allied-Signal* factors "if an agency's error is 'curable.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *U.S. Sugar Corp. v. EPA*, 844 F.3d 269, 270 (D.C. Cir. 2016)). Therefore, whether vacatur would cause disruptive consequences is only relevant "insofar as the agency may be able to rehabilitate its rationale." *Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021).

As the Circuit Court found in *Center for Biological Diversity*, the violations of the 2020 BiOp and ITS at issue here "require[] the normal remedy of vacatur." *Center for Biological Diversity*, 2026 WL 850257, at *18. These deficiencies are "serious" and Defendants "cannot sufficiently explain [their] actions on remand." *Id.* Because the BiOp here was based on the same "flawed effects analysis and inaccurate assumptions about the efficacy of the technical assistance process" as the 404 BiOp at issue in *Center for Biological Diversity*, and likewise allows States and permittees to "claim exemptions from take liability, without requiring those permittees to meet applicable requirements under either Section 7 or Section 10 of the ESA," *id.,* the same result is appropriate—vacatur of the 2020 BiOp and ITS.

Given the Circuit Court's decision in *Center for Biological Diversity*, there is no "serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. Defendants' ESA violations are not "curable" because, as discussed, Defendants may not grant States and mine permittees Section 7 incidental take coverage for State-issued SMCRA permits through a programmatic biological opinion and a non-statutory technical

26

assistance "coordination" process.[9] Because Defendants cannot show "at least a serious possibility" that they will be able to reach the same outcome on remand, the Court "must vacate" the 2020 BiOp and need not consider whether any disruptive consequences would result from vacatur within the meaning of *Allied-Signal*. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 918 (D.C. Cir. 2024) (quoting *Allied-Signal*, 988 F.2d at 151).

***

The D.C. Circuit's decision in *Center for Biological Diversity* is dispositive, and consistent with that decision, the Court must hold that the 2020 BiOp and ITS are unlawful and enter summary judgment in favor of Plaintiffs. There is, therefore, no need for the Court to consider Claims I and II. However, because Defendants have made unfounded and erroneous arguments regarding Claims I and II and their failure to comply with the express requirements of the 2020 BiOp, Plaintiffs provide the following arguments in response in the event the Court does reach those claims.

**II.    Defendants Have Not "Resolved" the Violations of the 2020 BiOp; In Any Case, New Information Mandates Reinitiation of Consultation.**

As set forth in Plaintiffs' opening brief, the record shows that there have been systemic violations of even the legally deficient process established by the 2020 BiOp, and that this

---

[9] Pursuant to the 2020 BiOp, if a State is unable to comply with the ITS it would have to "seek protections from the take prohibitions of the ESA by obtaining take authorization pursuant to Section 10(a)(1)(A) and 10(a)(1)(B) of the ESA or exemption through a separate ESA Section 7(a)(2) consultation if another Federal nexus exists." FWS_36685. Thus, because the 2020 BiOp and ITS are unlawful and must be vacated, unless a particular mine has some other federal nexus, States and permittees *must* utilize Section 10, as Congress intended for non-federal entities to comply with the ESA. *See* Pls. Op. Br. at 15-21.

27

constitutes "new information" mandating reinitiation of consultation. Defendants have no persuasive response.[10]

West Virginia did not engage in the technical assistance "coordination" process for dozens of mines operating in close proximity to the last two remaining stream habitats of the highly endangered Guyandotte River crayfish that certainly "may affect" the species, and therefore did not implement the species-specific protective measures that the 2020 BiOp requires to prevent jeopardy. *See* Pls. Op. Br. at 30-36. The same is true for even more SMCRA permits issued in Kentucky that "may affect" Big Sandy crayfish. *Id*. at 36-38. Therefore, it is readily apparent that Defendants failed to ensure that the BiOp is being implemented according to its terms, which is jeopardizing listed species in violation of the ESA.[11]

In response, Defendants make the outlandish claim that the 2020 BiOp somehow "anticipates" this widespread failure to comply with the need to impose protective measures through the technical assistance "coordination" process, simply because the SMCRA regulations contain enforcement provisions for permit violations. Def. Br. at 43. That argument makes no legal or practical sense, and Defendants fail to cite anything in the BiOp that would support that contention. While Defendants are correct that the SMCRA regulations have a process for addressing violations of that statute at 30 C.F.R. §§ 733.5 and 733.12, Def. Br. at 43, those

---

[10] Defendants erroneously contend that Plaintiffs are improperly relying on information outside the administrative record. As Plaintiffs explains in their response to the government's motion to strike, Plaintiffs' claims that OSM is in violation of the 2020 BiOp, and thus obligated to reinitiate consultation, are ESA citizen suit claims not bound by an administrative record.

[11] Defendants' assertion that the mines noticed by Plaintiffs were selected based on an "unscientific" process, Def. Br. at 36, is belied by the Declaration of Mr. Dodson, which explains at length the scientific process that was used to identify mines that "may affect" listed crayfish because they have outflows to streams/tributaries that are within a conservative 3 miles of critical habitat for the Guyandotte River crayfish and Big Sandy crayfish. *See* Dodson Decl. at ¶¶ 28-31, Dkt. No. 42-3.

provisions merely provide that OSM may use corrective action plans to address violations of the SMCRA regulations generally, and are not specific to compliance with the ESA or the 2020 BiOp. While those regulations may "anticipate" SMCRA violations and provide a means for addressing them (as would any permit program), to suggest that FWS therefore "anticipated" that the 2020 BiOp would be routinely violated is preposterous.

In fact, the plain language of the BiOp itself shows that it did not, in fact, "anticipate" any such violations, but rather specifically relied on the fact that SRA's "must engage" in the technical assistance "coordination" process for all permit decisions that may affect listed species, and that OSM would ensure that States did so through its oversight authority. *See* FWS_36685-86, FWS_36708-10. It was only on the assurance that the technical assistance process would be completed for all such permits that FWS was able to make a no-jeopardy determination for the SMCRA program, and the BiOp in no way suggests any expectation that States would fail to do so for dozens, if not hundreds, of permits with OSM failing to even recognize that this was occurring until Plaintiffs made the agency aware that the 2020 BiOp was being violated. To suggest that the 2020 BiOp expected this level of non-compliance is simply groundless.

### A.   Plaintiffs' Claims Are Not "Wholly in the Past," Nor Are They Moot.

Defendants' insinuation that the corrective action plans somehow moot the claims at issue or render relief inappropriate because they "completely and irrevocably eradicated the effects of the alleged violation" is unsupported by the record. Def. Br. at 40-41. As Defendants note, the ESA citizen suit provision allows suits to abate an ongoing violation. That is precisely what this case concerns. Plaintiffs brought suit over Defendants' failure to properly implement the 2020 BiOp, as evidenced by dozens of mines in West Virginia and Kentucky that were operating

29

without having complied with the BiOp.[12] Defendants point to no evidence suggesting that *any* of these violations have been remedied through the corrective action plans that OSM now relies on to suggest that Plaintiffs' claims have been fully resolved.

Indeed, while Defendants now argue that all such violations are "wholly in the past," Def. Br. at 35, 40, that is not supported by the record, which does not indicate that any of the mines noticed by Plaintiffs that failed to undergo the required technical assistance "coordination" process have done so following the implementation of the corrective action plans. As such, there is an ongoing violation that the Court can address through injunctive relief, including ordering reinitiation of consultation based on a plethora of new information reflecting that the process has not worked as contemplated. *See* Def. Br. at 40-41; *Ctr. v. EPA*, 861 F.3d 174 (recognizing that an ongoing violation of the ESA may be enjoined and that injunctive relief is appropriate when there is a "definitive threat" to listed species under the current administration of agency policies or actions).

For the same reason, this case is certainly not moot. *Contra* Def. Br. at 40-41.[13] It is Defendants' burden to demonstrate mootness, and under Supreme Court and Circuit precedent, that burden is a "heavy" one. *See, e.g., Honeywell Int'l v. NRC,* 628 F.3d 568, 576 (D.C. Cir. 2010) ("The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot.") (quoting *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998)).

---

[12] Defendants fail entirely to address Plaintiffs' arguments regarding the lack "coordination" for 79 mines in Kentucky and FWS's arbitrary and capricious determination for these mines. Defendants thereby concede these arguments and cannot raise any new arguments in their reply brief. *See, e.g., United States v. Lawrence*, 1 F.4th 40, 46 n.3 (D.C. Cir. 2021) (arguments raised for the first time on reply are forfeited).

[13] Defendants set out the standard for legal and prudential mootness, Def. Br. at 40-41, but fail to then show how or whether that test has been met here and cannot do so because the matter is certainly not moot.

Defendants have not remotely carried it. There is simply nothing in the record that would indicate that the corrective action plans have "completely and irrevocably eradicated the effects of the alleged violation," or that there is a reasonable expectation that such violations will not recur. *See Motor & Equip. Mfrs. Ass'n*, 142 F.3d at 459. As explained in Plaintiffs' opening brief, the corrective action plans merely restate, in a new package, the States' and the Defendants' existing obligations that they have failed to adhere to for years. *See* Pls. Op. Br. at 42.[14] Defendants have, in fact, confirmed that the corrective action plans "follow[] SMCRA's longstanding framework for oversight." Def. Br. at 39. But even FWS has acknowledged that this "longstanding framework" has not been followed and that species have, therefore, not received the protections necessary to ensure against jeopardy for decades.

As FWS stated in 2016 when it reinitiated consultation on the 1996 BiOP, which, as Defendants acknowledge, was predicated on the same "coordination" process as the 2020 BiOp that has been in place for decades:

> [s]everal species in coal mining regions have been listed since conclusion of the 1996 consultation, suggesting the protections afforded to fish and wildlife resources from the existing SMCRA regulations and implementation of the 1996 Biological Opinion may not be as protective as previously considered. Given the contribution of surface coal mining to the decline of some species and the new listing of species that previously did not require protection under the ESA, and evidence that the technical assistance process outlined in the 1996 Biological Opinion is not being followed, it is no longer possible to rely on the 1996 Biological Opinion to conclude that the existing regulatory environment (prior to 2016 MOU and Stream Protection Rule implementation) would not result in jeopardy or adverse modification of ESA-listed resources.

FWS_20243-44. Ultimately, the Service concluded that adverse effects to ESA-listed species and critical habitat were not being properly evaluated, monitored, and minimized; and that permit

---

[14] Plaintiffs therefore did not "ignore" the corrective action plans, as Defendants erroneously contend. Def. Br. at 38. Rather, Plaintiffs explained why those plans do not resolve the claims at issue.

compliance was not being enforced. FWS_20333. The Service based this conclusion in part on its findings that "despite the environmental protections granted by SMCRA and the permit review process set forth in the 1996 BiOp, surface coal mining operations continue to negatively impact threatened and endangered species and the habitats upon which they depend." FWS_20318. The Service highlighted the listing of the Guyandotte River crayfish and Big Sandy crayfish, finding that their plight "illustrate[s] the inadequacy of the current SMCRA regulatory environment in protecting fish and wildlife and the habitats upon which they depend." FWS_20333.

Yet despite all of statements made by FWS regarding the inadequacy of the 1996 BiOp's "coordination" process for protecting listed species, the 2020 BiOp again relies on an analogous scheme for ESA compliance based on the same SMCRA regulations—and as Plaintiffs have shown, imperiled species are still not being adequately protected. And while Defendants make much of the fact that the technical assistance "coordination" process has been in use for "decades" under the SMCRA regulations, they fail to see that this does not support the continued reliance on that failed process to ensure against jeopardy, since it has been demonstrably shown to be inadequate to protect wildlife. It is this head-in-the-sand approach that has resulted in the decimation of species populations and habitats from coal mining. *See* FWS_36839 (FWS' statement indicating that coal mining pollution can cause "decimation" of freshwater habitat and wipe out entire aquatic endangered species populations as far as 12 miles downstream from coal mining operations); *see also* 80 Fed. Reg. 18710, 18726-28 (Apr. 7, 2015) (documenting the widespread harm that coal mining can cause to listed species); FWS_36658-62 (2020 BiOp discussing the impacts of coal mining); FWS_20315-318 (2016 SMCRA BiOp describing the devastating impacts of coal mining, which is "continuing to result in physical and chemical

effects on surface waters," including through "direct impacts to streams," and concluding that mining activities "continue to negatively impact threatened and endangered species and the habitats upon which they depend").

The record here shows that this long-standing failure to ensure that coal mining does not cause adverse harm clearly continued under the 2020 BiOp, and as a result, imperiled wildlife are being jeopardized. For Defendants to now suggest that these violations of the BiOp are not likely to recur is unreasonable, and certainly unsubstantiated, given FWS's statements in the 2016 BiOp discussed above, which show that Defendants' reliance on the technical assistance process set forth in the SMCRA regulations is not sufficient to meet the ESA's mandate to ensure against jeopardy. Defendants ignore that the record shows this has been an ongoing problem for the SMCRA program. Therefore, Defendants' assertion that these violations are not likely to recur rings hollow. The record shows that there is an ongoing, systemic failure to comply with the requirements of SMCRA and the BiOp, and there is nothing to suggest that this will not continue. It, therefore, remains impossible to conclude that "the existing regulatory environment … would not result in jeopardy or adverse modification of ESA-listed resources," as FWS previously stated. FWS_20243-44.

Furthermore, nothing in the corrective action plans indicates that they can or have completely and irrevocably eradicated this decades-long systemic failure to properly implement protections for listed species. While the corrective action plans provide that the States are to restart the SMCRA "coordination" process for all existing permits where ESA-related permit information was not reviewed at the last permit renewal or significant revision, that does not ensure that the permits that Plaintiffs included in their notice letter were actually reevaluated as part of that process or that further violations will not occur in the future. Indeed, the record

33

shows that for the 32 permits within 3 miles of Guyandotte River crayfish critical habitat that were operating without protective measures in violation of the 2020 BiOp and the best available science, the State had erroneously determined that such measures were not required, and so it is not clear how having the State "restart" that process would make any difference since there is nothing to prevent them from making the same determination again. And as discussed, OSM has *systematically* failed to provide the required oversight to ensure the State makes the right decision. *See* Pls. Op. Br. at 30-43.

In sum, the record does not indicate that the mines at issue underwent the required "coordination" process following the implementation of the corrective action plans, and there is nothing to suggest that the corrective action plans altered the scheme for ESA compliance ratified by the 2020 BiOp that has been a failure for decades. As discussed above, the 2020 BiOp unlawfully delegates the decision as to whether to engage in the technical assistance "coordination" process to the States, *see supra* at 20-25, and the corrective action plans do not alter that defect. Therefore, the violations at issue here have not been resolved. Defendants' argument that these clear violations of the BiOp are somehow in the past and now moot simply finds no support in the record.

**B.    The Lack of Compliance with the 2020 BiOp Is Jeopardizing Listed Species in Violation of the ESA.**

According to the 2020 BiOp, the only way to ensure that the SMCRA program will not jeopardize listed species or destroy their critical habitat is for all mines that may affect listed species to go through the technical assistance "coordination" process and implement the necessary species-specific protective measures. FWS_36601, FWS_36621-22, FWS_36685-86. Therefore, Defendants' failure to ensure that the 2020 BiOp is being properly implemented,

34

which is clear from the dozens of permits that did not undergo "coordination" as the BiOp requires, is correspondingly a failure to ensure against jeopardy. *See* Pls. Op. Br. at 30-36

As set forth in Plaintiffs' opening brief, the mines noticed by Plaintiffs were certainly required to engage in the technical assistance "coordination" process when their permits were renewed because they all have outflows within just 3 miles of listed crayfish critical habitat— well within the 12-mile distance that FWS's best available science shows can result in significant adverse impacts. *See* FWS_36839; Pls. Op. Br. at 12, 31-32. The States failed to do so based on a mischaracterization of the 2020 BiOp. For nearly all of these 32 mines, the State determined that it did not have to seek technical assistance and develop PEPs because there were "no pending significant revisions at time of renewal," even though the 2020 BiOp requires the SRA to engage in the "coordination" process at the time of permit renewal (which must occur every 5 years under SMCRA, 30 C.F.R. § 773.19(c)) following the implementation of the BiOp, regardless of whether there is a significant revision at the time of renewal. *See* FWS_36621-22; Pls. Op. Br. at 32. This is sufficient to show that the BiOp is not being properly implemented, and that species are being jeopardized in violation of the ESA.

Defendants take issue with extra-record evidence that Plaintiffs referred to regarding examples of those 32 mines that did not go through "coordination," which shows that these mines clearly pose a significant threat to Guyandotte River crayfish. As discussed further in Plaintiffs' response to Defendants' motion to strike, filed herewith, the permit violation information provided with the Dodson Declaration consists of publicly available records obtained from the State's website, and therefore, the Court may take judicial notice of such information pursuant to Fed. R. Evid. 201, since the referenced violations are set forth in documents produced by the State regulatory authority, the accuracy of which cannot be

reasonably questioned. Regardless, since this is an ESA citizen-suit case regarding an ongoing violation of a mandatory duty, review is not limited to the administrative record. *See, e.g., Ctr. for Biological Diversity v. Ross,* 349 F. Supp. 3d 38, 45 (D.D.C. 2018) ("*Ross*"); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) (holding that the court "may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim.").[15]

Defendants' attempt to keep the Court from considering the potential harm to Guyandotte River crayfish and their critical habitat from mines that failed to undertake "coordination" in violation of the 2020 BiOp, Def. Br. at 39, is misguided. Indeed, the fact that the record does not contain information pertaining to permit violations for these mines, which were noticed by Plaintiffs, shows that OSM failed to provide the oversight that the 2020 BiOp required even after the agency was made aware of the violations. Rather than actually investigate whether these mines posed a risk to listed crayfish, which the violations certainly demonstrate, OSM blindly accepted the States' determination that "coordination" was not required for these mines. *See* Pls. Op. Br. at 41. But that determination was clearly arbitrary and capricious.

The fact that these violations were allegedly addressed by the State is, therefore, inapposite, since that supports Plaintiffs' contention that the State's determination not to engage in "coordination" for these mines was baseless given the State was certainly aware of these

---

[15] As in *Ross*, the request for injunctive relief here requires Plaintiffs to show whether there is a definitive threat to listed species "under Defendants' current administration of their agency policies and past actions." *Ross,* 349 F. Supp. at 45-46. "[C]onfining the record to past agency determinations is far less appropriate when plaintiffs seek an injunction based on present-day agency actions and the risk of future harm." *Id.* at 46 (citing *Or. Nat. Desert Ass'n v. Kimbell*, 593 F. Supp. 2d 1217, 1219 (D. Or. 2009) (finding that magistrate judge did not err in holding that plaintiffs' Section 7 claim supported "introduc[ing] evidence obtained after administrative decisions were issued," as "extra-record evidence is necessary for plaintiffs to meet the burden of proof required for obtaining injunctive relief pursuant to the ESA citizen-suit provision")).

violations and the potential for harm—including violations that resulted in sediment reaching critical habitat. *See* Pls. Op. Br. at 32-34. Plaintiffs are not thereby collaterally challenging individual operations, as Defendants confusingly contend. Def. Br. at 40. Rather, Plaintiffs merely provided publicly available information on examples of the 32 mines that were operating without the protective measures that the 2020 BiOp states are necessary to prevent jeopardy to listed crayfish to ensure the Court is fully informed regarding the ramifications of Defendants' failure to ensure the 2020 BiOp was being followed.

Regardless, Plaintiffs are not relying on the permit violation information to establish that Defendants are jeopardizing listed crayfish. Indeed, Plaintiffs have no need to do so: pursuant to the 2020 BiOp, the only way to ensure against jeopardy is for mines that may affect listed species to go through the technical assistance "coordination" process to establish the required species-specific protective measures to minimize and prevent impacts. Therefore, the fact that so many mines that were required to undergo that process failed to do so is proof in and of itself that species are not being protected from jeopardy as the ESA requires. The extra-record evidence Plaintiffs included merely references documents obtained directly from a State and provides technical background information showing the agency failed to consider all relevant factors. Therefore, even if the Court were to disregard the permit violations for these mines, it would not alter the ultimate conclusion that must be reached regarding Defendants' failure to ensure that the 2020 BiOp is being faithfully implemented.

## C. Defendants' Determinations That Reinitiation Is Not Warranted Are Erroneous.

Lastly, Defendants contend that the Court should simply accept their assertions regarding the need for reinitiation of Section 7 consultation. Def. Br. at 43-44. That is baseless. Given the extensive evidence that the 2020 BiOp has not been implemented in a manner that protects listed

species, Defendants' determinations regarding the need to reinitiate consultation are clearly arbitrary and capricious. For example, Defendants claim that OSM "rationally determined" that reinitiation was not warranted because the failure to comply with the BiOp was "anticipate[d]" and that "there was no information that the amount or extent of incidental take authorized under the 2020 ITS had been exceeded." Def. Br. at 43-44. But as discussed *supra*, those arguments are inapposite. The 2020 BiOp certainly did not "anticipate" widespread noncompliance, nor did it say it was relying on conservation groups such as Plaintiffs to have to make OSM aware that the BiOp was being routinely flouted. And the lack of information about exceeding incidental take limits is not surprising, as it is a function of the (unlawful) lack of any such take limit in the 2020 BiOp's ITS and the PEPs. *See supra* at 14-18.

The reality is that, were it not for Plaintiffs' diligence in uncovering multiple failures to comply with the process established in the 2020 BiOp, Defendants would still be none the wiser. The notion that this documented breakdown in Defendants' own process for protecting endangered species and their habitats was all anticipated when the BiOp was issued is difficult to take seriously, let alone warrant deference from the Court. The fact is that the process has proven to be deeply and inherently flawed.

As discussed above, the record shows that there has been an ongoing, systemic failure to comply with the ESA for SMCRA-regulated coal mining activities. That must stop now to ensure that imperiled species do not continue to be decimated by coal mining in violation of the ESA. 16 U.S.C. § 1536(a)(2). At minimum, Defendants are required to reinitiate consultation to develop a lawful and more effective method for ESA compliance. 50 C.F.R. § 402.16. The alternative is likely extinction.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' opening brief, the 2020 BiOp and ITS are unlawful and must be vacated. Even so, Defendants have failed to implement the 2020 BiOp in a manner necessary to avoid jeopardizing the continued existence of listed species, in violation of the ESA. 16 U.S.C. § 1536(a)(2). The Court should, therefore, deny Defendants' cross-motion for summary judgment and grant Plaintiffs' motion for summary judgment.


April 13, 2025.                                    Respectfully Submitted,

                                                   /s/ Hannah Connor
                                                   Hannah Connor (DC Bar #1014143)
                                                   Center for Biological Diversity
                                                   1411 K Street NW, Suite 1300
                                                   Washington, DC 20005
                                                   Tel: (202) 681-1676
                                                   Email: hconnor@biologicaldiversity.org

                                                   /s/ Jared M. Margolis
                                                   Jared M. Margolis (admitted *pro hac vice*)
                                                   Center for Biological Diversity
                                                   2852 Willamette St. # 171
                                                   Eugene, OR 97405
                                                   Phone: (802) 310-4054
                                                   Email: jmargolis@biologicaldiversity.org

                                                   *Attorneys for Plaintiffs*