**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, LANNY E. ERDOS, in his official capacity as Director of the Office of Surface Mining Reclamation and Enforcement, UNITED STATES FISH AND WILDLIFE SERVICE, DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, and BRIAN NESVICK, in his official capacity as Director of the U.S. Fish and Wildlife Service,<br><br>Defendants. | Civil Action No. 1:23-cv-03343 |

**<u>DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## Table of Contents

**Page**

Introduction ........ 1

Argument ........ 1

I. *Zeldin* Does Not Control this Case ........ 1

A. *Zeldin* Involved a Distinct Proposed Agency Action ........ 3

B. *Zeldin* Involved a Distinct Technical Assistance Process ........ 5

C. *Zeldin* Does Not Inform this Court's Review of the 2020 BiOp's Effects Analysis ........ 12

D. *Zeldin*'s ITS Precluded Reinitiation of Consultation, Unlike Here ........ 13

II. OSM Has Exercised Its Oversight Authority Over the Virginia, West Virginia, and Kentucky Programs as FWS Expected and Analyzed in the 2020 BiOp and ITS ........ 16

III. Plaintiffs Are Not Entitled to Any Relief and Vacatur Would Not Be Appropriate ........ 22

Conclusion ........ 25

## Table of Authorities

**Cases** **Page(s)**

*All. for the Wild Rockies v. Marten*, 685 F. Supp. 3d 971 (D. Mont. 2023) ....21

*Allied-Signal v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) .... 23, 24

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ....9

*Bennett v. Spear*, 520 U.S. 154 (1997) ....11

*Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001) ....9

*Chamber of Comm. v. Dep't of Energy*, 627 F.2d 289 (D.C. Cir. 1980) ....21

*City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006) ....11

*Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2nd Cir. 2018) ....3

*Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1 (D.D.C. 2025) ....6

*Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236 (D.D.C. 2020) ....25

*Ctr. for Biological Diversity v. U.S. Off. of Surface Mining Recl. & Enf't*, No. CV 23-3343 (SLS), 2025 WL 1503802 (D.D.C. May 27, 2025) ....20

*Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026) ....passim

*J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) ....passim

*King v. Palmer*, 950 F.2d 771 (D.C. Cir. 1991) ....2

*Marks v. United States*, 430 U.S. 188 (1977) ....2

*Mayo v. Jarvis*, 177 F. Supp. 3d 91 (D.D.C. 2016) ....22

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ....13

*Nat. Res. Def. Council v. Kempthorne*, No. 1:05-CV-1207 OWW GSA, 2007 WL 4462391 (E.D. Cal. Dec. 14, 2007) ....24

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326 (D.C. Cir. 2006) .... 23, 25

*Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232 (D.D.C. 2015) ....23

*Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469 (D.D.C. 2014) ........ 23

*Oceana, Inc. v. Ross*, No. CV 15-0555 (PLF), 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ........ 22

*Ohio Valley Envtl. Coal. v. Coal-Mac, Inc.*, 775 F. Supp. 2d 900 (S.D. W.Va. 2011) ........ 9

*Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014) ........ 23

**Statutes**

16 U.S.C. § 1536(a)(1) ........ 6
16 U.S.C. § 1536(a)(2) ........ 3, 4
16 U.S.C. § 1536(b)(3)(A) ........ 12
16 U.S.C. § 1536(b)(3)(B)(4) ........ 22
16 U.S.C. § 1536(b)(4) ........ 24
16 U.S.C. § 1536(o)(2) ........ 24
30 U.S.C. § 1202(a) ........ 6
30 U.S.C. § 1253(a) ........ 4, 9
30 U.S.C. § 1253(a)(7) ........ 10
30 U.S.C. § 1265(b) ........ 9
30 U.S.C. § 1267(e) ........ 8
30 U.S.C. § 1271 ........ 9
30 U.S.C. § 1271(a)(1) ........ 8, 15
30 U.S.C. § 1271(a)(2) ........ 15
30 U.S.C. § 1271(a)(3) ........ 15

**Regulations**

30 C.F.R. § 730.5 ........ 4, 10
30 C.F.R. § 733.5 ........ 15, 16, 19
30 C.F.R. § 733.12 ........ 19
30 C.F.R. § 733.12(a) ........ 16
30 C.F.R. § 733.12(b) ........ 8, 16
30 C.F.R. § 733.12(b)(3)(v) ........ 9
30 C.F.R. § 733.12(b)(3)(vi) ........ 9
30 C.F.R. § 733.12(c) ........ 9
30 C.F.R. § 733.13 ........ 9, 11
30 C.F.R. § 733.13(a)(1) ........ 15
30 C.F.R. § 733.13(a)(2) ........ 15
30 C.F.R. § 733.13(e) ........ 16
30 C.F.R. § 773.6(a)(3) ........ 8
30 C.F.R. § 773.15(j) ........ 8, 19
30 C.F.R. § 774.13(c) ........ 19
30 C.F.R. § 780.16(a) ........ 7
30 C.F.R. § 780.16(a)(2)(i) ........ 21
30 C.F.R. § 780.16(b) ........ 8
30 C.F.R. § 780.16(c) ........ 8, 21

30 C.F.R. § 816.97(b) .......... 8
30 C.F.R. § 817.97(b) .......... 8
30 C.F.R. § 840.11(a)-(b) .......... 15
30 C.F.R. § 842.11(b)(1) .......... 15
30 C.F.R. § 842.11(c)(1)(i)-(ii) .......... 15
30 C.F.R. § 843.12(a)(2) .......... 15
50 C.F.R. § 402.14(a) .......... 11
50 C.F.R. § 402.14(i)(7) .......... 13
50 C.F.R. § 402.15(a) .......... 11
50 C.F.R. § 402.16(a) .......... 14
50 C.F.R. § 402.16(a)(2) .......... 21

**Federal Register**

44 Fed. Reg. 14902 (Mar. 13, 1979) .......... 6, 7, 10
90 Fed. Reg. 8433 (Jan. 20, 2025) .......... 24

**Other Authorities**

42 Am. Jur. 2d *Injunctions* § 278 .......... 23

## Introduction

This case poses two basic questions: Did the U.S. Fish & Wildlife Service ("FWS") have a rational basis for determining that the Office of Surface Mining Reclamation and Enforcement's ("OSM" or "OSMRE") regulatory program for implementing Title V of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA") is structured in a way that ensures surface coal mining and reclamation operations in states that have been granted primacy under SMCRA are not likely to jeopardize the continued existence of species listed under the Endangered Species Act ("ESA") or destroy or adversely modify their designated critical habitat, and did the agencies have a rational basis for determining that OSM is not required to reinitiate ESA Section 7 consultation on its implementation of Title V? The answer to both questions is yes, and Defendants should be granted summary judgment. For nearly 50 years, OSM has been effectively overseeing state programs under its Title V program to ensure that state permitting decisions, which are not themselves subject to ESA Section 7, avoid jeopardizing and destroying or adversely modifying critical habitat.

Plaintiffs dislike coal mining and the fact Congress allowed, under SMCRA, states to assume primary jurisdiction for regulating surface coal mining and reclamation operations within their borders. But Plaintiffs cannot show that OSM's comprehensive regulatory framework for overseeing state programs is insufficient to meet OSM's obligations under the ESA. Plaintiffs' attempt to graft Section 7 consultation requirements onto state permitting decisions is contrary to congressional design. And try as they might, Plaintiffs cannot show that reinitiation of consultation is required.

## Argument

### I. *Zeldin* Does Not Control this Case

The Court has directed the parties "to address the significance, if any" of *Ctr. for Biol. Div'ty v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026). 3/27/2026 Minute Order. In short, *Zeldin* does not control this case. As Defendants have explained, *Zeldin* concerns a unique proposed action and regulatory

framework that do not fit the action and framework at issue in this case. ECF 45 at 19-21, 24-26, 31-32, 34-35. Moreover, *Zeldin*'s assessment of the biological opinion ("BiOp") was so highly fractured it cannot inform this Court's review of FWS' biological opinion ("2020 BiOp") in this case.

Indeed, *Zeldin* did not reach a majority opinion on the merits of the BiOp. Judge Henderson concluded in her dissent that it was "procedurally and substantively sound." *Zeldin*, 171 F.4th at 407, 395-396. Judge Pan criticized the BiOp in Part III.B.1 of the opinion (*id.* at 377-379), but Judge Wilkins declined to join the substance of that section of the opinion (only its judgment) because his views of the statutory scheme and the remaining issues differed from those of the other judges. *Id.* at 383, 387. And yet, throughout their opposition/reply brief, Plaintiffs hold up Judge Pan's discussion in Part III.B.1 as "the majority decision of the Circuit Court." *See*, *e.g.*, ECF 47 at 9-10. It is not. Part III.B.1 carries little, if any, precedential value. As the D.C. Circuit has explained:

> The Supreme Court has instructed that, when its own decisions lack a majority rationale, the controlling opinion is the position taken by "those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted). Even if one were to apply that approach to fragmented circuit panel decisions—which is an open question in this court—it governs only "when one opinion is a logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991). Here, neither concurrence is a logical subset of the other—they address entirely different putative defects in the district court's order. Neither concurrence, therefore, can meaningfully inform the resolution of any future case.

*J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *3 (D.C. Cir. Nov. 14, 2025).

Because Judge Wilkins did not provide a concurring analysis of the BiOp in *Zeldin* at all (but only concurred in the judgment of in Part III.B.1), 171 F.4th at 387, there is no majority analysis of the BiOp in *Zeldin* that could "meaningfully inform the resolution" of Plaintiffs' challenge to the merits of the 2020 BiOp. In their haste to declare victory in this case under *Zeldin*, Plaintiffs ignore that Judge Henderson dissented from Part III.B.1 and that Judge Wilkins did not join its substance. Contrary to Plaintiffs' assertions, this Court is not bound by Part III.B.1, and Judge Pan's analysis

there is inapposite to this case in any event, as explained more fully below.[1] Indeed, Judge Pan did not establish a categorical ruling, but rather allowed that "structural safeguards in the form of deferred site-and species-specific assessments might be sufficient in some circumstances." *Id.* at 379. This case is one of those circumstances. Judge Pan's criticisms of the technical assistance process and BiOp in *Zeldin* do not fit the technical assistance process under SMCRA and the 2020 BiOp in this case. ECF 45 at 2-8, 11.

### A. *Zeldin* Involved a Distinct Proposed Agency Action

*Zeldin* did not involve a proposed agency action akin to OSM's longstanding implementation of its Title V program here. Instead, *Zeldin* involved a one-time decision by the action agency to transfer permitting authority to Florida. Because of this fundamental difference in the proposed agency action, Judge Pan's analysis in *Zeldin* is inapt here. Judge Pan focused on how the proposed action in *Zeldin* would change the *status quo*; before the transfer, individual permit decisions were federal actions *subject to* Section 7 consultation, but after the transfer, they would be state actions, which are *not subject to* Section 7. Judge Pan viewed this as a "novel plan" to "dilute the requirements of Section 7." *Zeldin*, 171 F.4th at 362, 379.

That criticism does not apply here. There is no analogous "novel plan" here that would cause a change in the *status quo* from a world with project-specific Section 7 consultation to a world without. For nearly half a century before the 2020 BiOp, the *status quo* under SMCRA was a world without project-specific Section 7 consultation in the 24 states with primacy. Permitting decisions by those states have not been subject to ESA Section 7 in accordance with Congress' design limiting Section 7 to federal actions. 16 U.S.C. § 1536(a)(2). Simply stated, any accusation that OSM and FWS are "diluting the requirements of Section 7" here must fail. Congress designed SMCRA to be

[1] Similarly, Plaintiffs overplay their hand about *Zeldin*'s impact on the precedential effect of *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2nd Cir. 2018), which was discussed in section III. B.1 and was specific to the facts in *Zeldin*. Defendants maintain that *Cooling Water* was correctly decided and is persuasive under the facts of this case.

implemented primarily by the states and ESA Section 7 to apply only to federal actions, so for nearly five decades states with primacy have been appropriately following a technical assistance process mandated by the federal regulations implementing SMCRA rather than Section 7 consultations to ensure that listed species and designated critical habitats are protected. ECF 45 at 19; *see also* 30 U.S.C. § 1253(a) & 30 C.F.R. § 730.5.

Plaintiffs argue that the 2020 BiOp must include project-specific and species-specific analyses. ECF 47 at 8. But that grievously misunderstands the facts and laws at play here.[2] OSM has not proposed to authorize, fund, or carry out any permitting decisions in primacy states; OSM is not the permitting authority there. Technical assistance is used for permitting decisions in those states precisely because those state decisions are *not* federal actions taken by OSM. Those decisions are not subject to site-specific Section 7 consultation absent a federal nexus—such as leased federal coal—under SMCRA's cooperative federalism design and Section 7's limitation to federal actions. Because ESA Section 7 applies only to actions "authorized, funded, or carried out" by federal agencies, 16 U.S.C. § 1536(a)(2), any duty to comply with Section 7 for purposes of this litigation, falls to OSM as the federal agency. The 2020 BiOp was only required to analyze OSM's proposed federal action, not individual permitting decisions made by state regulatory authorities ("SRAs").

OSM's proposed action was to continue providing "oversight of State program compliance with requirements related to the protection and enhancement of proposed or listed species and proposed or designated critical habitats" and to implement the SMCRA Coordination and Dispute Resolution Processes. OSM_0025701. OSM's proposed action also included review of situations where OSM operates as the permitting authority in non-primacy states or on Indian lands, though this litigation does not concern that function. OSM completes site-specific Section 7 consultations

[2] Plaintiffs misconstrue the sentence they quote from the 2020 BiOp, which merely acknowledges that OSM implements SMCRA Title V in two separate contexts: (1) states where OSM retains permitting authority; and (2) states with primacy. ECF 47 at 7.

on its permitting decisions, so the 2020 BiOp did not need to analyze those individual permitting decisions either. The 2020 BiOp analyzed OSM's implementation and oversight of the Title V program, focusing on the permitting process that is used by OSM and the states, rather than specific permitting decisions. OSM_0025704.

To give its opinion of OSM's compliance with Section 7's substantive mandates, FWS examined whether and to what degree OSM had structured its SMCRA regulatory program to avoid a likelihood of listed species being jeopardized or their designated critical habitat being destroyed or adversely modified by the SRAs. OSM_0025704. OSM's requirement that primacy states complete a technical assistance process under SMCRA is a lawful way for OSM to meet these obligations, and the 2020 BiOp could reasonably rely on that process to find Section 7 compliance. There is no reason to assume, as Plaintiffs do, that site-specific Section 7 consultation is the only way to avoid a likelihood of jeopardy or destruction or adverse modification of critical habitat. SMCRA's technical assistance process can and does satisfy these requirements.

In sum, whatever precedential or persuasive value *Zeldin* may hold does not apply to this case because the legal and factual impacts of the "novel plan" to transfer permitting authority to Florida are fundamentally inapposite to OSM's longstanding oversight of states previously granted primacy under SMCRA. Judge Pan's analysis of a world with site-specific Section 7 consultation versus a world without simply does not fit here. The 2020 BiOp considered the entirety of OSM's proposed action, which did not include OSM making permitting decisions in primacy states.

### B. *Zeldin* Involved a Distinct Technical Assistance Process

Judge Pan found in Part III.B.1 that the technical assistance process in *Zeldin* was "not 'as protective' as the Section 7 consultation process" because it had been "specifically designed to be 'streamlined' and less 'burdensome.'" 171 F.4th at 377. Initially, that analysis does not inform this case because it was not joined in substance by Judge Wilkins and Judge Henderson expressly

disagreed with it. *Trump*, 2025 WL 3198891 at *3. Judge Henderson found that these arguments have "no purchase," and that FWS' commitment to the technical assistance process in *Zeldin* was sufficient. 171 F.4th at 406. Judge Henderson noted that FWS' commitment to participate in the technical assistance process is entitled to a presumption of regularity. *Id.* at 396. The same is true here. Indeed, FWS field offices have been actively engaged in the technical assistance process with SRAs, providing expert advice based on the best available science. ECF 45 at 39.

In addition, as explained above, Judge Pan's comparison of the technical assistance process in *Zeldin* to site-specific Section 7 consultation does not translate to this case, where there had been no site-specific Section 7 consultation in primacy states for nearly half a century before the 2020 BiOp due to their assumption of primacy under SMCRA. And unlike the technical assistance process in *Zeldin*, which had not been "codified as part of the rulemaking, creating legally binding responsibilities for all parties," *Ctr. for Biological Div'ty v. Regan*, 734 F. Supp. 3d 1, 47 (D.D.C. 2025), the SMCRA technical assistance process has been a codified component of SMCRA's regulatory framework since 1979 to implement not just SMCRA, but the ESA as well. 44 Fed. Reg. 14902, 14910, 14963, 15013 (Mar. 13, 1979) ("With regard to State programs, State permits are covered by the opening sentence of Section 7(a) of ESA, which provides that 'the Secretary shall review other (i.e. non-ESA) programs administered by him and utilize such programs in furtherance of the purposes of the Act.' State programs will be part of the permanent national regulatory program under Title V of the Act and, therefore, will be among the other programs which must further the purposes of ESA"). SMCRA Title V is such an "other program" (i.e., a non-ESA program). *See, e.g.*, 30 U.S.C. § 1202(a).

Indeed, in promulgating a technical assistance process under SMCRA, the Secretary expressly invoked his authority under ESA Section 7(a)(1). 44 Fed. Reg. at 14910, 15013. The Secretary cited the ESA as well as SMCRA in explaining his authority for requiring regulatory

programs to "provide for the coordination of review and issuance" of mining permits with the applicable requirements of the ESA, noting that "OSM can issue regulations under Section 7(a) of ESA itself, as it provides for action by the Secretary to 'administer' his non-ESA programs to further the purposes of the ESA." *Id.* at 15013, 15349-50. The Secretary also explained that, in addition to implementing SMCRA, this coordination requirement "implements the requirements of certain other Federal laws which impose duties upon entities implementing the SMCRA, to ensure protection of resources regulated under those other laws," including the ESA. *Id.* at 15011.

The longstanding technical assistance process codified in SMCRA's regulations includes a comprehensive suite of mandatory requirements to ensure ESA protections. Plaintiffs erroneously assert that states determine whether SMCRA's technical assistance process is required in the first instance (ECF 47 at 22), ignoring that the SMCRA regulations expressly mandate that "[e]ach application *shall* include fish and wildlife resource information for the permit area and adjacent area" and that "[t]he scope and level of detail for such information *shall* be determined by the regulatory authority *in consultation with* State and *Federal agencies with responsibilities for fish and wildlife* and *shall* be sufficient to design the protection and enhancement plan [("PEP")] required under paragraph (b) of this section." 30 C.F.R. § 780.16(a) (emphases added).

Applications "shall" include a PEP, and PEPs "shall" be consistent with the regulatory requirements that: (1) "[n]o surface mining activity shall be conducted which is likely to jeopardize the continued existence of endangered or threatened species listed by the Secretary or which is likely to result in the destruction or adverse modification of designated critical habitats of such species in violation of the Endangered Species Act of 1973," and (2) "operator[s] shall promptly report to the regulatory authority any State-or federally-listed endangered or threatened species within the permit area of which the operator becomes aware" and, "[u]pon notification, the regulatory authority shall consult with appropriate State and Federal fish and wildlife agencies and, after consultation, shall

identify whether, and under what conditions, the operator may proceed." *Id.* §§ 780.16(b), 816.97(b) and 817.97(b). States "shall" provide the fish and wildlife resource information and the PEP to FWS for review within 10 days of a request. *Id.* § 780.16(c); *see also id.* § 773.6(a)(3) (regulatory authorities "shall" provide notice of administratively complete applications for permits, significant revisions, or renewals). Where species-specific protection measures ("SSPMs") are applicable, any state that seeks the incidental take protection of the 2020 incidental take statement ("ITS") must accept a FWS-approved SSPM during technical assistance as a binding permit condition. OSM _0025718, 0025805.

Even though ESA Section 7 does not apply to state permitting decisions absent a federal nexus, SMCRA's regulations prohibit SRAs from approving applications for permits or significant revisions unless they "affirmatively demonstrate[] and the regulatory authority finds, in writing," that the operation would "not affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the Endangered Species Act of 1973." 30 C.F.R. § 773.15(j). This determination is required for *all* relevant permitting decisions, even if no adverse effects to listed species or designated critical habitats are anticipated. SRAs cannot make this determination without involving FWS. This is unlike *Zeldin*, where FWS was not required to respond to Florida's determinations that the permit would not affect listed species or designated critical habitats, unless it disagreed. *Zeldin*, 171 F.4th at 386.

After a permit has been issued, the SRA must issue written notice to an operator of any violation of any requirement of the permit or permit condition, state program, or SMCRA. 30 U.S.C. § 1267(e). If OSM has reason to believe that an operator is in violation of SMCRA, it must notify the SRA, which must correct the violation within ten days or show good cause for not acting. *Id.* § 1271(a)(1). If OSM becomes aware of a state regulatory program issue, it will typically first work with the state to correct the issue, using an appropriate compliance strategy. 30 C.F.R. § 733.12(b). If a corrective action plan is appropriate, it must include, among other things, a schedule for

completing all required actions, a clear explanation that failure to resolve the issues through an action will trigger the provisions in Section 733.13, and progress resolving the issue must be tracked in the annual evaluation report from OSM. *Id.* at §§ 733.12(b)(3)(v) and (vi), (c). This could include where the technical assistance process is not followed or where the permitted operations are not ensuring against a likelihood of jeopardy to listed species or destruction or adverse modification of designated critical habitat.

Plaintiffs spend nearly six pages arguing, in essence, that the only way OSM can comply with ESA Section 7 is for each state permitting decision to undergo site-specific Section 7 consultation. ECF 47 at 20-26. Plaintiffs are trying to apply Section 7 to actions Congress did not intend it to apply to and, to make matters worse, in a way in which Congress did not design it to work. As Defendants previously explained, (ECF 45 at 30-32), this is a misguided attack on the SMCRA-implementing regulations that ignores SMCRA's mandate that the Secretary develop and implement a cooperative federalism program where states have "exclusive jurisdiction" over permitting and the regulation of surface coal mining operations with OSM exercising an oversight role.[3] *See* 30 U.S.C. §§ 1253(a), 1271. In developing that program, the Secretary drew from 30 U.S.C. § 1265(b) and other requirements of SMCRA and the direction in Section 7(a)(1) of the ESA that the Secretary should "review other programs administered by him and utilize such programs in furtherance of the

[3] Defendants recognize that the BiOp in *Zeldin* also analyzed a cooperative federalism statute—the Clean Water Act ("CWA")—but "[t]he statutory federalism of SMCRA is quite unlike the cooperative regime under" the CWA. *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 294 (4th Cir. 2001) (observing that, in *Arkansas v. Oklahoma*, 503 U.S. 91 (1992), the Court "noted that one of the [CWA's] regulations 'effectively *incorporated*' State law into the unitary federal enforcement scheme, making State law, in certain circumstances, federal law. *Id.* at 110 (emphasis added)," whereas under "SMCRA, in contrast, Congress designed a scheme of mutually exclusive regulation by either the U.S. Secretary of the Interior or the State regulatory authority, depending on whether the State elects to regulate itself or to submit to federal regulation"); *see also Ohio Valley Envtl. Coal. v. Coal-Mac, Inc.*, 775 F. Supp. 2d 900, 904 (S.D. W.Va. 2011) ("The scheme under the SMCRA is somewhat different from the CWA, exhibiting greater deference to the states"). Further, SMCRA does not allow OSM to reassert jurisdiction over all or a portion of a state program unless it has followed the procedures in 30 C.F.R. § 733.13.

purposes of the [ESA]", to promulgate SMCRA regulations requiring a thorough technical assistance process designed to protect ESA-listed species and habitats. 44 Fed. Reg. at 15012-13.

Judge Henderson had it right: Plaintiffs' laundry list of "challenges to the Biological Opinion are wrong in fact and law. Legally, the ESA violations they identify are absent from the plain text of the Act." *Zeldin*, 171 F.4th at 394; *contra* ECF 47 at 20-26. Plaintiffs contend that the technical assistance process in SMCRA's implementing regulations is an "unlawful delegation" of Defendants' ESA duties to the states. *Id* at 20.[4] This makes no sense. While OSM's regulatory framework for overseeing state programs is subject to ESA Section 7, permitting decisions by the states without a federal nexus are not. OSM cannot have delegated ESA Section 7 obligations over state permitting decisions that are not subject to Section 7 to begin with.

Though Plaintiffs profess to not be challenging SMCRA's implementing regulations, they contend that, to comply with the ESA, SMCRA's codified technical assistance process must: (1) require that OSM—rather than the states—determine whether technical assistance is required in the first instance; (2) require that FWS—rather than the states—make certain findings during that process, and (3) forbid states from being able to decline FWS' conservation measures. ECF 47 at 10, 20-21. These arguments disregard SMCRA's clear requirement that state programs be consistent with and no less effective than the federal technical assistance regulations and its clear directive that SRAs have exclusive jurisdiction over permitting. *See* 30 U.S.C. § 1253(a)(7); 30 C.F.R. § 730.5.

In addition, Plaintiffs attempt to impose ESA Section 7 on state SMCRA permitting decisions contrary to the plain language of the ESA. And Plaintiffs mischaracterize the requirements of Section 7. Where Section 7 applies, it is the action agency that is responsible for determining

[4] Plaintiffs are spurred on by Judge Pan's statement after her opening hypothetical that FWS "abdicated its responsibility to enforce the ESA" by "essentially delegat[ing] that job to Florida." *Zeldin*, 171 F.4th at 363. But Judge Wilkins did "not think that the framing of the issues in Judge Pan's opening hypothetical [was] quite apt," and Judge Henderson did not join that portion of the opinion, *id.* at 385 n.1, so what Plaintiffs tout as "the Circuit Court's decision" is just one judge's observation that does not "inform the resolution" of this case. *Trump*, 2025 WL 3198891 at *3.

whether it is required to consult in the first instance. 50 C.F.R. § 402.14(a). FWS' role as a consulting agency is advisory. After consultation, an action agency is not bound to accept a BiOp but rather is "technically free to disregard the Biological Opinion and proceed with its proposed action." *Bennett v. Spear*, 520 U.S. 154, 170 (1997); ECF 45 at 32-35. Thus, the ESA gives the action agency the "final say" to determine "whether and in what manner to proceed with the action in light of its Section 7 obligations and the Service's biological opinion." 50 C.F.R. § 402.15(a); *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006) (action agency "must not blindly adopt the conclusions of the consultant agency" in a BiOp to demonstrate ESA Section 7(a)(2) compliance, but rather it must establish its reliance on the BiOp was not arbitrary and capricious). Allowing states to decline FWS' conservation recommendations is analogous and consistent with the ESA. An SRA that disregards FWS' recommendations during the SMCRA technical assistance process would *not* receive ESA Section 9 incidental take coverage under the ITS, analogous to an action agency that disregards a BiOp. Unless that SRA obtains any necessary take coverage under ESA Section 10, it would also be at risk of OSM initiating an action to take over or withdraw all or part of its SMCRA state program for inadequate implementation. 30 C.F.R. § 733.13.

At bottom, Plaintiffs cannot fault the SMCRA technical assistance process for not being ESA Section 7 consultation, which it is not required to be. SMCRA's technical assistance process can and does avoid jeopardy and destruction or adverse modification of designated critical habitat. That states can determine how to proceed in light of FWS's recommendations at the end of that process does not render the process incapable of protecting species. Since the 2020 BiOp was issued, FWS and SRAs have worked together, following the Appendix A and Appendix B processes to implement the technical assistance process, effectively resolving any disputes. SRAs have an incentive to work with FWS and adopt recommended SSPMs because they would otherwise risk losing their incidental take coverage under the ESA and primacy under SMCRA Title V.

### C. *Zeldin* Does Not Inform this Court's Review of the 2020 BiOp's Effects Analysis

Judge Pan faulted the BiOp in *Zeldin* for not including a "detailed discussion of the effects of the action on listed species or critical habitat." 171 F.4th at 377. Judge Wilkins did not join in the substance of this critique and Judge Henderson dissented from it. Thus, Judge Pan's critique does not "inform the resolution" of this case. *Trump*, 2025 WL 3198891 at *3.

In fact, Judge Henderson persuasively explained that there is "no statutory hook" for a requirement that a BiOp must include project and species-specific analysis, concluding instead that FWS can "plainly" issue a programmatic finding of no jeopardy based on structural safeguards. *Zeldin*, 171 F.4th at 394. Section 7 merely requires a BiOp "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). The plaintiffs' objections to the guild approach questioned the "degree of detail rather than the lack of it." *Zeldin*, 171 F.4th at 399 (citation omitted). Judge Henderson found that the ESA allows a BiOp to follow a guild approach to assess species impacts and the "district court's insistence that FWS tick off each and every species with its own separate analysis is simply a judge-made requirement." *Id.* at 400. Judge Henderson's conclusion that "Congress has not required federal agencies to make remote, perhaps improbable, predictions in conducting their ESA review" is a reasonable reading of the ESA. *Id.* at 389.

Plaintiffs assert that "[t]he Circuit Court further clarified that the ESA regulations governing programmatic consultations do not allow FWS to avoid the effects analysis that Section 7 requires and may only delay that analysis to the project-specific stage *if it will be subject to further Section 7 consultation*." ECF 47 at 9 (citing *Zeldin*, 171 F.4th at 378). That is wrong on three accounts. First, there was no finding by "the Circuit Court." Plaintiffs refer to a statement by Judge Pan that was not joined in substance by any other judge and is not controlling here. Second, Plaintiffs mischaracterize what Judge Pan wrote. She wrote that the ESA regulations "contemplat[e]" that ITSs for framework programmatic actions "are not required at the programmatic level" because incidental takings "will

be addressed in subsequent section 7 consultation, as appropriate," which merely paraphrases 50 C.F.R. § 402.14(i)(7). *Zeldin*, 171 F.4th at 378. Third, this regulation does not apply here because OSM has not proposed to take a framework programmatic action. ECF 45 at 23-24. Even if the regulation did apply, the plain language of the regulation would not *prohibit* FWS from issuing an ITS, it would simply not *require* it. The "Circuit Court" did not consider this issue in *Zeldin* and thus could not have rejected Defendants' argument in this case as Plaintiffs erroneously contend. ECF 47 at 14 n.4. Judge Pan cited the portion of the regulation concerning framework programmatic action without providing any explanation, much less a finding, that *Zeldin* involved a framework programmatic action. The definition of framework programmatic action cannot apply here because permitting decisions in primacy states are not a "future action" by OSM subject to subsequent section 7 consultation. ECF 45 at 23.

### D. *Zeldin*'s ITS Precluded Reinitiation of Consultation, Unlike Here

While the *Zeldin* panel agreed that the ITS in that case fell short by not quantifying the amount of incidental take, identifying specific reasonable and prudent measures ("RPMs"), or obligating FWS to participate in reinitiated Section 7 consultations, Judge Pan allowed that "structural safeguards in the form of deferred site-and species-specific assessments might be sufficient in some circumstances." 171 F.4th at 379. Indeed, the D.C. Circuit has held that ESA compliance must be assessed in the context of the applicable statutory scheme and future checks and balances and mitigating measures "adopted in pursuance thereof." *N. Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980). In this case, as analyzed in the 2020 BiOp and ITS in the context of the cooperative federalism statutory scheme of SMCRA, OSM's thorough and longstanding regulations for oversight of state programs were designed with the ESA in mind and include adequate safeguards and future checks and balances to ensure ESA compliance. ECF 45 at 3-8.

Judge Wilkins faulted the ITS in *Zeldin* for providing that, "even if a later-specified take limit is exceeded, the federal agencies were not required to reinitiate consultation." 171 F.4th at 386. The ITS here, however, would require reinitiation if any of the triggers in 50 C.F.R. § 402.16(a) are met. The ITS expressly states that the reinitiation triggers in Section 402.16(a) "apply to the action described in this Opinion." OSM_0025783. The reinitation triggers in the regulations and set forth in the ITS itself include if the amount or extent of incidental take for the BiOp is exceeded or if a new species is listed or critical habitat designated that may be affected by the action identified in the BiOp. *Id.* In accordance with the Title V program and the 2020 BiOp, FWS quantifies reasonably certain incidental take for individual permitting decisions during the technical assistance process, and FWS and the states "review reports and track the levels" of incidental take for individual permitting actions. *Id.* at 0025781. If that take limit is exceeded, the state must "contact the [FWS field office] within 48 hours to review the need for additional SSPMs." *See, e.g.*, FWS_0031395, 0034800, 0031615. In addition, if the take limit is exceeded, OSM may also need to conduct oversight to ensure that the state is in compliance with SMCRA and discuss with FWS whether the exceedance indicates that reinitiation of consultation is warranted at the programmatic level under Section 402.16(a), including whether there is any new information or effects of the action not previously considered in the 2020 BiOp and whether the assumptions about the program in the 2020 BiOp remain true. *Id.* at 0025783. The programmatic ITS necessarily limits incidental take to the amount that is reasonably certain to occur because of individual permitting actions, as quantified and documented by FWS under the SMCRA framework.

As analyzed in the 2020 BiOp, SMCRA's regulations provide a comprehensive suite of additional structural checks and safeguards. ECF 45 at 3-5. For instance, in primacy states, inspectors must perform regular inspections of each active surface coal mining and reclamation operation. 30 C.F.R. §§ 840.11(a)-(b), 842.11(c)(1)(i)-(ii). If OSM receives information that gives it

"reason to believe that any person is in violation of any requirement" of SMCRA or a SMCRA permit condition—which can include SSPMs for ESA-listed species—OSM must notify the SRA of the potential violation. 30 U.S.C. § 1271(a)(1). The state must respond to this notice within ten days and explain whether it took "appropriate action" to correct the violation or had "good cause" for not doing so. *Id.*; *see also* 30 C.F.R. §§ 842.11(b)(1), 843.12(a)(2). If the state fails to respond or their response is inadequate, OSM "shall immediately order Federal inspection of the surface coal mining operation at which the alleged violation is occurring unless the information available to the Secretary is a result of a previous Federal inspection of such surface coal mining operation." 30 U.S.C. § 1271(a)(1); *see also* 30 C.F.R. § 842.11(b)(1). This process is waived if the possible violation presents imminent harm. *Id.*

If a federal inspection reveals a SMCRA violation that "creates an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources," OSM must immediately order a cessation of operations. 30 U.S.C. § 1271(a)(2). If the violation does not create imminent harm, OSM must issue a notice to the permittee an set forth a reasonable time for abatement. *Id.* § 1271(a)(3).

In addition, at a programmatic level, OSM evaluates administration of a state's regulatory program at least annually. 30 C.F.R. § 733.13(a)(1). However, an interested person can seek an evaluation of a state program at any time by providing a statement of facts alleging that a state is not effectively implementing, administering, maintaining, or enforcing any part of its approved program. *Id.* § 733.13(a)(2). Additionally, if OSM becomes aware of a "State regulatory program issue" (*id.* § 733.5), it should take steps to ensure that the issue does not escalate into a situation that would give it reason to believe that the SRA is not effectively implementing, administering, enforcing, or maintaining all or a portion of its state program. *Id.* § 733.12(a).

If a state regulatory program issue is identified, OSM is authorized to employ any number of compliance strategies to ensure that the SRA corrects the identified issue in a timely and effective manner. *Id.* § 733.12(b). OSM will develop and institute an "action plan" if it is unlikely that the SRA will resolve the issue within 180 days or if the issue is likely to result in a violation of the approved state program. *Id.*; *see also id.* § 733.5. If, after following the appropriate procedures in the federal regulations, OSM finds that a state is still not effectively administering any or all of its approved program, OSM will either substitute federal enforcement for all or part of the state program or recommend that the Secretary withdraw approval of the state program. *Id.* at § 733.13(e).

Plaintiffs offer a new argument that, if FWS was unable to quantify incidental take for individual projects and species within the programmatic 2020 BiOp and ITS, the resolution is to "defer the required analysis to a subsequent Section 7 consultation pursuant to the ESA regulations." ECF 47 at 16. This argument has no basis in law. Plaintiffs fail to explain how there could be subsequent Section 7 consultation on state permitting decisions that lack a federal nexus.[5] Plaintiffs' claim that SMCRA's technical assistance process "falls short of a renewed Section 7 consultation" (*id.* at 17) is an inapt critique for the reasons explained above.

## II. OSM Has Exercised Its Oversight Authority Over the Virginia, West Virginia, and Kentucky Programs as FWS Expected and Analyzed in the 2020 BiOp and ITS

Plaintiffs invite the Court to grant them summary judgment based solely on Count III and not reach Counts I and II. ECF 47 at 2, 27. This is not surprising, as Counts I and II are outdated and without merit. Plaintiffs submitted certain allegations in a notice of intent to sue OSM over

[5] Judge Wilkins wondered in *Zeldin* whether the action agency's decision to object to a state permit or the consulting agency's assessment of incidental take during technical assistance could trigger future Section 7 consultation. 171 F.4th at 387. Any question here of whether OSM or FWS could have a duty to complete Section 7 consultation in connection with an individual permitting decision in a primacy state is beyond the scope of this litigation, which does not include such a claim.

three state programs (Virginia,[6] West Virginia, and Kentucky) and two listed crayfish species. ECF 45 at 36-38. OSM swiftly investigated the allegations, identified a state regulatory program issue, and implemented action plans to correct it. *Id.* at 38-40. That was almost two and a half years ago.

Nonetheless, Plaintiffs continue to press Counts I and II despite the implementation of the action plans. This displays a stubborn unwillingness to accept the reality that the state regulatory program issue identified as a result of their allegations has been corrected. Plaintiffs want to use the confusion that was identified in three states (out of a total of 24 with primacy) about when, besides at permit issuance and significant revisions, technical assistance was required relevant to two recently listed species (out of 194 species listed and proposed for listing that may be affected by implementation of SMCRA Title V), and a discrete subset of mining permits (those issued before the 2020 BiOp that had not significantly revised since) to tear down OSM's nationwide program for implementing SMCRA Title V. Doing so would be a dramatic and legally unjustified overreaction. Plaintiffs want to live in the past, but the ESA is forward looking. Counts I and II identify no ongoing ESA violation. ECF 45 at 35-45.

Any contention that OSM's action plans did not correct the state regulatory program issue OSM identified lacks merit. The action plans require each state to, among other things: (1) restart the SMCRA Coordination Process for all existing permits where ESA-related permit information was not reviewed at the last permit renewal or significant revision or listing of proposed species or designated critical habitat; (2) establish a policy that ensures applicants for renewal of existing mine permits use FWS' updated official species list and include information to determine whether additional SSPMs are necessary and, if so, sufficiently protective of the species; and (3) create a required procedure whereby permittees of existing mines that overlap with the range or critical habitat of a newly listed or proposed species or critical habitat produce an updated official species

[6] Plaintiffs do not dispute that they have abandoned their allegations concerning the Commonwealth of Virginia. ECF 45 at 35 n.10.

list. OSM_0031482. All three states agreed to complete all tasks in their action plans within one year of their implementation. *Id.* at 0031676, 0031687 and 0031708.

Faced with the reality that the action plans resolved their allegations, Plaintiffs ignore the plans and retreat to their allegations that preceded the plans. Plaintiffs first argue that the fact that the plans were needed at all is proof that the SMCRA Title V program is ineffective and requires reinitiating Section 7 consultation. This argument is meritless.[7] The ESA requires proof of an *ongoing* violation. ECF 45 at 40-42. Counts I and II do not supply proof of an ongoing failure to exercise OSM's oversight authority because OSM had already implemented the action plans two months *before* Plaintiffs filed their complaint. *Id.* at 41-43.

If OSM had *failed* to investigate Plaintiffs' allegations and *failed* to take action to correct a state regulatory program issue, that would be one thing, but the administrative record demonstrates that, immediately after identifying state a regulatory program issue in the three states, OSM began working with the SRAs to develop action plans, set deadlines to achieve corrective action milestones, and set up meetings to track compliance and address any issues. *See e.g.*, OSM_0031445-48, 31450-53, 31455-58, 31478-84, 31493, 31558-65, 31573-78, 31579-88. It is beyond dispute that Defendants implemented action plans in Virginia, West Virginia, and Kentucky well over two years ago. That the action plans were needed in the first place is not evidence of an ongoing violation—it is a moot point. OSM has corrected any misimpression these three states may have been under

[7] Contrary to Plaintiffs' claim that "Defendants failed entirely to respond" to their argument that OSM and FWS had failed to address whether Kentucky had properly determined that 79 permits did not require additional SSPMs for the listed crayfish (ECF 47 at 21 n.8, at 30 n.12), Defendants directly addressed it. ECF 45 at 39. Plaintiffs ignore Defendants' response and the fact that FWS reviewed the 79 permits Plaintiffs identify and provided a written concurrence in Kentucky's determinations. OSM_0031729. Plaintiffs similarly persist in erroneously contending that the West Virginia SRA "unilaterally" determined that 32 permits did not require SSPMs for the crayfish. ECF 47 at 33-35. The action plan for West Virginia required that these 32 permits undergo technical assistance, which will include FWS. *Id.* Moreover, the administrative record shows that FWS field offices were actively engaged in the technical assistance process with SRAs in Kentucky (FWS_0027759-28415) and West Virginia (FWS_0028416-37527), providing expert advice based on the best available science. ECF 45 at 39.

about when the technical assistance process was required to be completed. ECF 45 at 38-39. Plaintiffs identify no evidence showing that this misunderstanding is likely to recur despite the action plans, offering only cynical speculation that cannot support a claim for relief. ECF 47 at 34.

The fact that the action plans were needed is not even evidence of a *past* ESA violation. OSM found only that there was insufficient written documentation of compliance under SMCRA with the state equivalents of 30 C.F.R. §§ 773.15(j) and 774.13(c) for some permits. The absence of SSPMs is not, in and of itself, evidence of impacts to listed species or critical habitat because an operation may not require crayfish-specific SSPMs for any number of reasons. ECF 45 at 41. Indeed, there was no finding of an ESA issue, such as unlawful take, much less jeopardy of listed species or adverse modification of critical habitat. Implementation of the action plans is evidence that OSM's process worked as FWS expected it would in the 2020 BiOp. *Id.* at 36-38.

In arguing that OSM and FWS must have anticipated the exact nature of the state regulatory program issue that arose under the ESA (ECF 47 at 29), Plaintiffs fail to grasp the programmatic nature of the 2020 BiOp. The goal of the 2020 BiOp was to examine "whether and to what degree OSM has structured its regulatory program to ensure that its implementation is not likely to jeopardize the continued existence of proposed or listed species or result in the destruction or adverse modification of proposed or designated critical habitat." OSM_0025704. Part of that regulatory program is the process for implementing action plans to resolve any state regulatory program issue that may be identified. *Id.* at 0025767, 71-72; ECF 45 at 4. Having such a process implies, of course, that it might be needed. The SMCRA regulations expressly anticipate that OSM may identify issues during oversight resulting from an SRA's "implementation, administration, enforcement, or maintenance of all or any portion of its State regulatory program that is not consistent with the basis for OSMRE's approval of the State program," and the regulations include mechanisms for correcting such issues. 30 C.F.R. §§ 733.5, 733.12. FWS was necessarily required to

consider whether, if it was needed, it would resolve such issues without violating ESA Section 7's substantive requirements. OSM_0025770-72 (OSM's monitoring and enforcement, including action plans, "included a mechanism to adequately monitor and enforce permit compliance for activities covered by OSMRE's Program"). FWS did not concluded in the 2020 BiOp that if an action plan is ever needed, OSM's program no longer complies with ESA Section 7 and requires a new consultation and BiOp.

Plaintiffs attempt to save Counts I and II by claiming there is no evidence that the three states have completed their review of all permits subject to the action plans. ECF 47 at 30. This claim is disingenuous because the administrative records in this case extend only to November 8, 2023—the date of Plaintiffs' complaint.[8] That was less than two months after the action plans were put in place on September 15, 2023. Nonetheless, the administrative record demonstrates that, in those two months, OSM worked closely with the states and FWS to ensure that the action plans would be implemented effectively. *See* OSM_0031545-46, 0031729-32, 0031746-50, 0031755-56, 0031761-62, 0031759-60, 0031828-29, 0031835-39, 0031733, 0031738-39, 0031740-41, 0031742-43, 0031744-45. OSM also hosted meetings between OSM, FWS and states (*see*, *e.g.*, *id.* 31737 and 31752), and meetings between all three states to facilitate compliance with corrective action plans (*id.* 0031757-58).

The fact that the administrative record does not span the subsequent two and a half years of the states' implementation of the action plans and document their completion is not evidence that OSM is failing to exercise its oversight authority or that OSM is somehow in ongoing violation of the ESA. Even if the Court was to deem implementation of the action plans ongoing, that would not allow Plaintiffs to escape a finding of prudential mootness. ECF 45 at 41. Again, the salient point is that OSM exercised its oversight authority by putting the action plans in place, which

[8] The Court found this end date reasonable. *Ctr. for Biol. Div'ty v. U.S. Off. of Surface Mining Recl. & Enf't*, No. CV 23-3343 (SLS), 2025 WL 1503802, at *18 (D.D.C. May 27, 2025).

"counsel[s] the Court to stay its hand, and to withhold relief it has the power to grant" out of "considerations of prudence and comity for coordinate branches of government." *Chamber of Comm. v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980).

The agencies considered whether the state regulatory program issue required reinitiating consultation and rationally determined it did not because it did not "reveal[] effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." ECF 45 at 38-45; 50 C.F.R. § 402.16(a)(2); *All. for the Wild Rockies v. Marten*, 685 F. Supp. 3d 971, 978 (D. Mont. 2023). As FWS explained, this trigger was not met because there was no evidence that OSM had changed its implementation of SMCRA Title V and FWS was not aware of any information that listed species or critical habitat were being adversely impacted. OSM_0030927. Plaintiffs have no response to Defendants' case law supporting their argument that reinitiation of consultation is not required for every regulatory program issue. ECF 45 at 45.

Plaintiffs' contention that the 2020 BiOp "is"—present tense—not being "properly implemented" (ECF 47 at 35) because OSM identified a state regulatory program issue over two years ago involving three states, two species, and discrete subset of permits—which has been addressed with action plans—has no basis in fact; it just ignores OSM's corrective actions. Plaintiffs' follow-on assertion that "species are being jeopardized" (*id.*) is just rhetoric unsupported by factual evidence. Plaintiffs try to excuse their inability to point to any factual evidence of a take exceedance by any mining operation by asserting that the 2020 BiOp's ITS and PEPs lack any take limits. *Id.* at 38. This ignores reality. Where incidental take is reasonably certain to occur because of the mining operation and the SRA and the applicant seek to have the incidental take covered by the ITS from the 2020 BiOp, the take is quantified by the appropriate FWS field office during the technical assistance process, and FWS and the SRA must identify SSPMs, which become mandatory SMCRA permit conditions. 30 C.F.R. § 780.16(a)(2)(i), (c); OSM_002578. Where SSPMs are applicable, they

are mandatory permit conditions. OSM_0025718, 0025805-06. SRAs and FWS "review reports and track the levels of take estimated through the SMCRA Coordination Process and exempted by" the ITS. OSM_0025781. Under the ESA, FWS cannot authorize any additional incidental take for a permit unless it can determine that the permitting action is not likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(B)(4). This is an important backstop on the ITS, the technical assistance process, and the SMCRA Title V program implementation.

In sum, Counts I and II are predicated on an issue that OSM addressed with three states in September 2023. Plaintiffs attempt to maintain these outdated claims by relying on wholly past events and confusing the exercise of regulatory oversight with an absence of oversight. OSM's oversight actions and state-issued violations are evidence of a functioning regulatory program with diligent oversight, not a *lack* of enforcement. Compliance issues are an inevitable part of any regulatory program. FWS recognized this in its 2020 BiOp and found that OSM's Title V program includes adequate mechanisms for identifying and curing such issues, as occurred in this case.

## III. Plaintiffs Are Not Entitled to Any Relief and Vacatur Would Not Be Appropriate

As Defendants have shown, Plaintiffs are not entitled to any relief, and it is thus unnecessary to discuss appropriate remedies. However, for the sake of argument, vacatur would not be appropriate here. Courts in this District frequently remand BiOps and ITSs to the consulting agency without vacatur. *See, e.g.*, *Oceana, Inc. v. Ross*, No. CV 15-0555 (PLF), 2020 WL 5995125 (D.D.C. Oct. 9, 2020). In *Oceana*, the court remanded the BiOp and ITS without vacatur, even though it found that the ITS was "inherently flawed because it does not function as an automatic trigger and no amount of further explanation by the agency can remedy this flaw," because vacatur would "disrupt the shrimp trawl fisheries and erase the protections for sea turtles" that the BiOp and ITS provided. *Id.* at *23-24; *see also Mayo v. Jarvis*, 177 F. Supp. 3d 91, 139 (D.D.C. 2016), *amended*, 203 F. Supp. 3d

31 (D.D.C. 2016), *vacated & aff'd sub nom. Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017); *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 255 (D.D.C. 2015); *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 115 (D.D.C. 2014); *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 499 (D.D.C. 2014).

Also, the D.C. Circuit has "long held that '[a]n injunction must be narrowly tailored to remedy the specific harm shown.'" *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citations omitted); *accord* 42 AM. JUR. 2D INJUNCTIONS § 278 (injunctions are subject to the principles of equity and, as such, must be "narrowly tailored," "molded to the necessities of the particular case," and "should be no more burdensome to the defendant than necessary . . . ."). Here, the 2020 BiOp and ITS are not limited to OSM's oversight of primacy states; they also cover OSM's direct implementation of the SMCRA regulations in federal program states and on Indian lands. This lawsuit does not implicate that part of OSM's action. Thus, vacating the 2020 BiOp and ITS would be impermissibly overbroad. Plaintiffs ignore this key point.

*Zeldin* would not support vacatur in this case. There, the D.C. Circuit vacated the agency action (*i.e.*, the Environmental Protection Agency's ("EPA") proposed transfer of permitting authority to Florida) along with the BiOp and ITS. Here, by contrast, the Secretary's 24 approvals of state programs under SMCRA over the last 50 years are not before this Court, and OSM will remain statutorily obligated to continue conducting oversight of those state programs after this litigation is concluded. In addition, the decades-old SMCRA implementing regulations containing the technical assistance process will also remain in place, as will the thousands of permitting decisions that OSM and the SRAs in the 24 states have made over the last half century using that process. OSM also will remain statutorily obligated to implement SMCRA as the regulatory authority in federal program states and on Indian lands. Again, Plaintiffs ignore these crucial points.

Given these facts, vacating the 2020 BiOp and ITS would be highly disruptive to OSM, America's coal industry, and the energy and steel-making sectors of the economy. *Allied-Signal v. U.S.*

*Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993). Vacatur would not only create significant regulatory confusion and uncertainty by suddenly leaving OSM, 24 states, and our nation's mining companies without ESA coverage, it would risk halting, or seriously impeding, the development of a critical energy source during this time of national energy emergency, as well as reclamation activities to restore and enhance environmental conditions. Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 20, 2025). Under these circumstances, equity would warrant giving OSM and FWS the opportunity to rectify any flaws identified in the 2020 BiOp or ITS while those documents remain in place. *Nat. Res. Def. Council v. Kempthorne*, No. 1:05-CV-1207 OWW GSA, 2007 WL 4462391, at *1 (E.D. Cal. Dec. 14, 2007) (remanding BiOp and ITS without vacatur "[t]o avoid the potentially draconian consequences of operating the [water projects] without incidental take authority"). While the *Zeldin* panel vacated the BiOp there, that should not foreclose FWS from substantiating the 2020 BiOp on remand here if this Court requires it, because the *Zeldin* panel did not reach a majority opinion on the merits of the BiOp.[9] *Trump*, 2025 WL 3198891 at *3.

If the Court identifies any flaws in the ITS here, it should, given the factual differences between this case and *Zeldin*, provide FWS an opportunity to correct those flaws while the ITS remains in place. The *Zeldin* panel found that vacating the BiOp and ITS was not likely to have any disruptive consequences because the panel found it unclear whether EPA would be "able to reinstate the contemplated permitting program consistent with the requirements of the ESA," and because it would not be "unduly disruptive for Section 404 permitting authority to revert to the Corps, which was responsible for issuing such permits before Florida implemented the program

[9] Judge Wilkins reasoned that the BiOp in *Zeldin* should be vacated because "its no jeopardy finding is dependent upon the deficient ITS" (171 F.4th at 384), but that misunderstands the consultation process. An ITS is provided "*after* consultation under subsection (a)(2)," 16 U.S.C. § 1536(b)(4) (emphasis added), and thus a BiOp does not depend on an ITS for its jeopardy finding. An ITS simply provides an exemption from liability under Section 9 for "any taking that is in compliance with the terms and conditions specified in" the ITS for an action that has been found to meet Section 7's requirements. *Id.* at § 1536(o)(2).

under review." 171 F.4th at 383. This rationale is inapposite here where the proposed action, regulatory framework, and statutory commands would remain in place notwithstanding any vacatur of the 2020 BiOp and ITS. Against this disruption to OSM, 24 SRAs, and mining operators, including their thousands of employees, Plaintiffs identify no evidence in the administrative record showing that remanding without vacatur would result in irreparable harm to them or to listed species. Indeed, any such claim would be belied by the fact that Plaintiffs requested to hold this case in abeyance and opposed resuming the litigation even after it had been stayed for some eight months. ECF 35, 38.

But if the Court determines that vacatur is warranted, it should be narrowly tailored to just those portions of the 2020 BiOp and ITS that concern OSM's oversight of states with primacy, *Neb. Dep't of Health & Hum. Servs.*, 435 F.3d at 330, and the vacatur should be stayed for a period of six months to allow FWS and OSM to address the Court's ruling and minimize the disruptive consequences. *See Ctr. for Biol. Div'ty v. Ross*, 480 F. Supp. 3d 236, 246 (D.D.C. 2020) (vacating BiOp but exercising equitable discretion to stay the vacatur by nine months to allow the consulting agency to complete amendments to take reduction plan according to the agency's proposed timeframe).

**Conclusion**

For these reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: April 27, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Robert P. Williams*
ROBERT P. WILLIAMS
Sr. Trial Attorney (SBN 474730 (DC))

Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 532-3101
Email: robert.p.williams@usdoj.gov

*Attorneys for Defendants*