APPEAL,CLOSED,TYPE–C

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:23–cv–03343–SLS</u>
### *Internal Use Only*

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al v. U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT et al | Date Filed: 11/08/2023 |
| | Date Terminated: 05/29/2026 |
| | Jury Demand: None |
| Assigned to: Judge Sparkle L. Sooknanan | Nature of Suit: 893 Environmental Matters |
| Cause: 16:1540 Endangered Species Act | Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

**CENTER FOR BIOLOGICAL DIVERSITY**
    represented by **Perrin W. de Jong**
PERRIN W. DE JONG
P.O. Box 6414
Asheville, NC 28816
828–252–4646
Fax: 828–537–4289
Email: <u>perrin@fastmail.com</u>
*TERMINATED: 08/20/2025*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared Margolis**
CENTER FOR BIOLOGICAL DIVERSITY
2852 Willamette Street
P.O. Box 171
Eugene, OR 97405
802–310–4054
Email: <u>jmargolis@biologicaldiversity.org</u>
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hannah Mary Margaret Connor**
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street NW
Suite 1300
Washington, DC 20005
202–641–6176
Email: <u>hconnor@biologicaldiversity.org</u>
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**APPALACHIAN VOICES**
    represented by **Perrin W. de Jong**
(See above for address)
*TERMINATED: 08/20/2025*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared Margolis**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hannah Mary Margaret Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT** | represented by | **Robert Pendleton Williams**<br>U.S. DEPARTMENT OF JUSTICE<br>Environment & Natural Resources Division<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, DC 20044<br>202–532–3101<br>Email: robert.p.williams@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **GLENDA OWENS**<br>*in her official capacity as Acting Director of he Office of Surface Mining Reclamation and Enforcement* | represented by | **Robert Pendleton Williams**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES FISH AND WILDLIFE SERVICE** | represented by | **Robert Pendleton Williams**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **DEB HAALAND**<br>*in her official capacity as Secretary of the U.S. Department of the Interior* | represented by | **Robert Pendleton Williams**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **MARTHA WILLIAMS**<br>*in her official capacity as Director of the* | represented by | **Robert Pendleton Williams**<br>(See above for address) |

*U.S. Fish and Wildlife Service*                               *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/08/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ADCDC−10479494) filed by CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(Connor, Hannah) (Entered: 11/08/2023) |
| 11/08/2023 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY (Connor, Hannah) (Entered: 11/08/2023) |
| 11/08/2023 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jared Margolis, Filing fee $ 100, receipt number ADCDC−10480057. Fee Status: Fee Paid. by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Declaration, # 2 Exhibit)(Connor, Hannah) (Entered: 11/08/2023) |
| 11/08/2023 | | Case Assigned to Judge Amit P. Mehta. (zrtw) (Entered: 11/08/2023) |
| 11/08/2023 | 4 | SUMMONS (4) Issued Electronically as to DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zrtw) (Main Document 4 replaced on 11/8/2023) (zrtw). (Entered: 11/08/2023) |
| 11/08/2023 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Perrin de Jong, Filing fee $ 100, receipt number ADCDC−10482587. Fee Status: Fee Paid. by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Declaration, # 2 Exhibit)(Connor, Hannah) (Entered: 11/08/2023) |
| 11/08/2023 | | MINUTE ORDER granting 5 Motion for Leave to Appear Pro Hac Vice. Attorney Perrin de Jong is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amit P. Mehta on 11/8/23. (lcapm2) (Entered: 11/08/2023) |
| 11/09/2023 | 6 | NOTICE of Appearance by Perrin W. de Jong on behalf of All Plaintiffs (de Jong, Perrin) (Entered: 11/09/2023) |
| 11/15/2023 | | MINUTE ORDER granting 3 Motion for Leave to Appear Pro Hac Vice. Attorney Jared Margolis is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amit P. Mehta on 11/15/23. (lcapm2) (Entered: 11/15/2023) |
| 11/15/2023 | 7 | NOTICE of Appearance by Jared Margolis on behalf of APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY (Margolis, Jared) (Entered: 11/15/2023) |
| 12/13/2023 | 8 | CERTIFICATE OF SERVICE by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY . (Attachments: # 1 Exhibit A)(de Jong, Perrin) (Entered: 12/13/2023) |

| | | |
|---|---|---|
| 12/13/2023 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 11/17/2023., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 11/17/2023. ( Answer due for ALL FEDERAL DEFENDANTS by 1/16/2024.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. All Defendants. (See docket entry 8 to view document). (mg) (Entered: 12/14/2023) |
| 12/19/2023 | 10 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Attachments: # 1 Text of Proposed Order)(Williams, Robert) (Entered: 12/19/2023) |
| 12/20/2023 | | MINUTE ORDER granting 10 Unopposed Motion for Extension of Time to File Response to Complaint. Defendants U.S. Office of Surface Mining Reclamation and Enforcement and U.S. Fish and Wildlife Service shall submit their response to the complaint by February 15, 2024. Signed by Judge Amit P. Mehta on 12/20/23. (lcapm2) (Entered: 12/20/2023) |
| 02/15/2024 | 11 | ANSWER to Complaint by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS.(Williams, Robert) (Entered: 02/15/2024) |
| 02/20/2024 | 12 | ORDER. Cases filed that seek review on an administrative record, as here, are exempt from the requirements of Federal Rule of Civil Procedure 26(f) and Local Civil Rule 16.3. See LCvR 16.3(b)(1). The parties therefore shall submit a proposed schedule for dispositive motions on or before March 5, 2024. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 2/20/24. (lcapm2) (Entered: 02/20/2024) |
| 02/20/2024 | | Set/Reset Deadlines: Proposed schedule for dispositive motions due by 3/5/2024. (smc) (Entered: 02/20/2024) |
| 03/04/2024 | 13 | AMENDED COMPLAINT *First Amended Complaint* against All Defendants filed by CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES.(de Jong, Perrin) (Entered: 03/04/2024) |
| 03/05/2024 | 14 | Joint STATUS REPORT *with Proposed Briefing Schedule* by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (de Jong, Perrin) (Entered: 03/05/2024) |
| 03/05/2024 | 15 | PROPOSED BRIEFING SCHEDULE by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (See docket entry 14 to view document). (mg) (Entered: 03/05/2024) |
| 03/06/2024 | 16 | ORDER entering the schedule proposed in the parties 14 Joint Status Report. The schedule for further proceedings in this matter is as follows: (1) Defendants shall serve the administrative record(s) on or before June 10, 2024; (2) Plaintiffs shall notify Defendants of any objections to the administrative record(s) on or before July 17, 2024; (3) any motion challenging the adequacy of the administrative record(s) shall be filed on or before August 1, 2024; (4) Plaintiffs Motion for Summary Judgment is due on or before October 1, 2024; (5) Defendants Opposition to Plaintiffs Motion and any Cross−Motion for Summary Judgment is due on or before December 2, 2024; (6) |

4

| | | |
|---|---|---|
| | | Plaintiffs Reply in Support of Summary Judgment and Opposition to any Cross–Motion for Summary Judgment is due on or before February 3, 2025; and (7) Defendants Reply in Support of any Cross–Motion for Summary Judgment is due on or before April 1, 2025. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 3/6/24. (lcapm2) (Entered: 03/06/2024) |
| 03/06/2024 | | Set/Reset Deadlines/Hearings: Deadlines from Order filed on 3/6/2024 set. (zed) (Entered: 03/11/2024) |
| 03/18/2024 | 17 | ANSWER to 13 Amended Complaint by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS.(Williams, Robert) (Entered: 03/18/2024) |
| 05/22/2024 | 18 | Unopposed MOTION to Amend/Correct 16 Order,,,, / *Unopposed Motion to Amend the Scheduling Order* by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Attachments: # 1 Text of Proposed Order)(Williams, Robert) (Entered: 05/22/2024) |
| 05/23/2024 | 19 | ORDER granting Defendants' 18 Unopposed Motion to Amend the Scheduling Order. The court orders the following with respect to further proceedings in this matter: (1) Defendants shall serve their administrative records on counsel for Plaintiffs on or before July 10, 2024; (2) Plaintiffs shall notify Defendants of any objections to the administrative records on or before August 26, 2024; (3) Any motion challenging the adequacy of the administrative records shall be filed on or before September 10, 2024; (4) Plaintiffs' Motion for Summary Judgment is due on or before November 12, 2024; (5) Defendants' Opposition to Plaintiffs' Motion and any Cross–Motion for Summary Judgment is due on or before January 20, 2025; (6) Plaintiffs' Reply in Support of Summary Judgment and Opposition to any Cross–Motion for Summary Judgment is due on or before March 24, 2025; and (7) Defendants' Reply in Support of any Cross–Motion for Summary Judgment is due on or before May 16, 2025. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 5/23/24. (lcapm2) (Entered: 05/23/2024) |
| 05/23/2024 | | Set/Reset Deadlines: Administrative Record due by 7/10/2024. Motion Challenging adequacy of administrative record due by 9/10/2024. Summary Judgment motions due by 11/12/2024. Response/Cross Motion to Motion for Summary Judgment due by 1/20/2025. Reply/Response to Motion for Summary Judgment due by 3/24/2024. Reply to Cross Motions due by 5/16/2025. (smc) (Entered: 05/23/2024) |
| 07/10/2024 | 20 | ADMINISTRATIVE RECORD / *NOTICE OF LODGING CERTIFIED ADMINISTRATIVE RECORD INDEXES* by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Attachments: # 1 Exhibit USOSMRE Certified Administrative Record Index, # 2 Exhibit USFWS Certified Administrative Record Index)(Williams, Robert) (Entered: 07/10/2024) |
| 09/06/2024 | 21 | Unopposed MOTION for Extension of Time to File *a Record Motion* by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Text of Proposed Order Granting Extension to File Record Motion)(de Jong, Perrin) (Entered: 09/06/2024) |
| 09/06/2024 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER granting 21 Unopposed Motion for Extension of Time to File Record Motion. Plaintiffs shall file any motion challenging the administrative records by September 26, 2024. Signed by Judge Amit P. Mehta on 9/6/2024. (lcapm2) (Entered: 09/06/2024) |
| 09/13/2024 | | Set/Reset Deadlines: Plaintiff's Motions due by 9/26/2024. (zakb) (Entered: 09/13/2024) |
| 09/20/2024 | 22 | Unopposed MOTION for Extension of Time to *file a motion on the administrative records* by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Text of Proposed Order Granting Extension to File Record Motion)(de Jong, Perrin) (Entered: 09/20/2024) |
| 09/23/2024 | | MINUTE ORDER granting 22 Unopposed Motion for an Extension of Time to File a Record Motion. Plaintiffs' time to file a motion challenging the administrative record is hereby extended to October 10, 2024. Signed by Judge Amit P. Mehta on 09/23/24. (lcapm3) (Entered: 09/23/2024) |
| 09/26/2024 | | Set/Reset Deadlines: Motion challenging administrative record due by 10/10/2024. (zakb) (Entered: 09/26/2024) |
| 10/01/2024 | 23 | Joint MOTION for Extension of Time to *File Record Motion and Opposition* by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Text of Proposed Order)(Margolis, Jared) (Entered: 10/01/2024) |
| 10/02/2024 | 24 | ORDER granting 23 Joint Motion for Extension of Time to File Record Motion and Opposition. Plaintiffs shall file any motion challenging the administrative records by October 31, 2024. Defendants' brief in opposition shall be due by December 6, 2024. See the attached order for additional details. Signed by Judge Amit P. Mehta on 10/2/2024. (lcapm2) (Entered: 10/02/2024) |
| 10/31/2024 | 25 | MOTION Complete and Supplement the Administrative Record by CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES. (Attachments: # 1 Memorandum in Support of motion to complete and supplement the record, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Text of Proposed Order)(de Jong, Perrin). Added MOTION to Take Judicial Notice on 11/4/2024 (mg). (Entered: 10/31/2024) |
| 11/19/2024 | | VACATED PURSUANT TO MINUTE ORDER FILED 11/22/2024.....MINUTE ORDER TO SHOW CAUSE. On May 23, 2024, the court entered an Order setting November 12, 2024 as the deadline for Plaintiffs' Motion for Summary Judgment. ECF No. 19. Prior to that deadline, Plaintiffs sought additional time to file a motion challenging the adequacy of the administrative record, which the court granted on October 2, 2024. ECF No. 24. The October 2, 2024 Order provided, however, that "[o]ther than the deadline modified herein, any and all provisions of the Scheduling Order remain unaltered and in full force and effect." *Id.* Thus, the October 2, 2024 Order did not enlarge Plaintiffs' time to file their motion for summary judgment, which is now past due. Plaintiffs shall show cause by November 26, 2024, why this matter should not be dismissed for want of prosecution. Signed by Judge Amit P. Mehta on 11/19/2024. (lcapm2) Modified on 12/3/2024 (zakb). (Entered: 11/19/2024) |
| 11/21/2024 | | Set/Reset Deadlines: Response to Show Cause due by 11/26/2024. (zakb) (Entered: 11/21/2024) |

| | | |
|---|---|---|
| 11/21/2024 | 26 | RESPONSE TO ORDER TO SHOW CAUSE filed by CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES. (de Jong, Perrin) (Entered: 11/21/2024) |
| 11/22/2024 | | MINUTE ORDER. The court overlooked the portion of the initial scheduling order providing that dispositive motions briefing would be stayed if a party files a motion challenging the adequacy of the administrative record, as has occurred. The November 19, 2024 Minute Order to Show Cause is therefore vacated. Signed by Judge Amit P. Mehta on 11/22/2024. (lcapm2) (Entered: 11/22/2024) |
| 12/06/2024 | 27 | Memorandum in opposition to re 25 Motion for Miscellaneous Relief,, Motion to Take Judicial Notice, filed by U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, GLENDA OWENS, UNITED STATES FISH AND WILDLIFE SERVICE, DEB HAALAND, MARTHA WILLIAMS. (Attachments: # 1 Exhibit OSMRE Certifications of Administrative Record, # 2 Exhibit 8/26/24 Letter from de Jong to Williams, # 3 Exhibit 9/12/24 Letter from Williams to de Jong, # 4 Exhibit 9/18/24 Letter from Williams to de Jong, # 5 Exhibit 9/19/24 Letter from de Jong to Williams, # 6 Exhibit 9/24/24 Email from Williams to de Jong, # 7 Exhibit 8/18/23 OSMRE Memorandum Regarding Reinitiation of Endangered Species Act Consultation, # 8 Exhibit 8/18/23 Letter from Owens to de Jong)(Williams, Robert) (Entered: 12/06/2024) |
| 12/13/2024 | 28 | REPLY re 27 Memorandum in Opposition,,,, *to Plaintiffs' Motion to Complete and Supplement the Administrative Record* filed by CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES. (de Jong, Perrin) (Entered: 12/13/2024) |
| 01/08/2025 | | Case directly reassigned to Judge Sparkle L. Sooknanan. Judge Amit P. Mehta is no longer assigned to the case. (ztnr) (Entered: 01/08/2025) |
| 02/03/2025 | | MINUTE ORDER: In light of the case reassignment, it is hereby ORDERED that the parties shall file a joint status report by March 5, 2025 to update the Court on the status of the proceedings, including whether there have been any developments since the filing of 25 the Motion to Complete and Supplement the Administrative Record. Signed by Judge Sparkle L. Sooknanan on 2/3/2025. (lcas) (Entered: 02/03/2025) |
| 03/05/2025 | 29 | Joint STATUS REPORT by CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES. (de Jong, Perrin) (Entered: 03/05/2025) |
| 05/08/2025 | | MINUTE ORDER: In light of the Plaintiffs' 25 Motion to Complete and Supplement the Administrative Record, the Court ORDERS the Defendants to file the administrative record by May 15, 2025. They should submit both a digital copy and a paper copy. The text in the digital copy should be searchable. And the paper copy should be organized in binders with tabs and sent to chambers. Signed by Judge Sparkle L. Sooknanan on 5/8/2025. (lcas) (Entered: 05/08/2025) |
| 05/09/2025 | 30 | MOTION for Reconsideration re Order,, Set Deadlines, by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Williams, Robert) (Entered: 05/09/2025) |
| 05/09/2025 | | MINUTE ORDER granting the Defendants' 30 Motion for Reconsideration of Order. The Court ORDERS the Defendants to file a digital copy of the administrative record by May 15, 2025. The digital copy should be searchable. Signed by Judge Sparkle L. Sooknanan on 5/9/2025. (lcas) (Entered: 05/09/2025) |
| 05/14/2025 | 31 | |

| | | |
|---|---|---|
| | | NOTICE *OF SERVING ADMINISTRATIVE RECORDS* by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS re Order on Motion for Reconsideration,, Set/Reset Deadlines, Order,, Set Deadlines, (Williams, Robert) (Entered: 05/14/2025) |
| 05/20/2025 | | MINUTE ORDER: In light of the Plaintiffs' 25 Motion to Complete and Supplement the Administrative Record, the Court ORDERS the Parties to file a joint status report by May 22, 2025, at 5:00 PM, identifying the following files in the Administrative Record: (1) any "mine site evaluations... OSMRE prepared between 2020 and 2023," Def.'s Opp'n at 8, that do "relate to violations of PEPs or impacts to ESA–listed species or designated critical habitats," *id.* at 10, flagging the category to which each mine site evaluation relates; (2) OSMRE's 2022 West Virginia Annual Evaluation Report, which should include "Table 5," *id.* at 15; and (3) OSMRE's 2021 West Virginia Annual Report, which should "include[] a discussion of the number of violations issued by the state and by [the] OSMRE, and the types of evaluations, and compare[] those violations to historic totals," *id.* at 20. Signed by Judge Sparkle L. Sooknanan on 5/20/2025. (lcas) (Entered: 05/20/2025) |
| 05/22/2025 | 32 | Joint STATUS REPORT by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Williams, Robert) (Entered: 05/22/2025) |
| 05/27/2025 | 33 | MEMORANDUM OPINION re the Plaintiffs' 25 Motion to Complete and Supplement the Administrative Record. See the attached document for details. Signed by Judge Sparkle L. Sooknanan on 5/27/2025. (lcas) (Entered: 05/27/2025) |
| 05/27/2025 | 34 | ORDER denying the Plaintiffs' 25 Motion to Complete and Supplement the Administrative Record. See the 33 Memorandum Opinion for details. Signed by Judge Sparkle L. Sooknanan on 5/27/2025. (lcas) (Entered: 05/27/2025) |
| 05/29/2025 | | MINUTE ORDER: The Court ORDERS the Parties to file any motions for summary judgment by June 30, 2025; any oppositions by July 30, 2025; and any replies by August 13, 2025. Signed by Judge Sparkle L. Sooknanan on 5/29/2025. (lcas) (Entered: 05/29/2025) |
| 06/06/2025 | 35 | Unopposed MOTION to Hold in Abeyance *Summary Judgment Briefing* by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Exhibit Case No. 24–5101 Transcript, # 2 Text of Proposed Order)(Margolis, Jared) (Entered: 06/06/2025) |
| 06/13/2025 | | MINUTE ORDER granting the Plaintiffs' 35 Unopposed Motion to Hold in Abeyance Summary Judgment Briefing. The Court stays the case until the D.C. Circuit issues its decision in *Center for Biological Diversity v. EPA*, No. 24–5101. The Court ORDERS the Plaintiffs to file a notice within five days of the decision. And the Court ORDERS the Plaintiffs to file their motion for summary judgment within 21 days of the decision; the Defendants to file their opposition and cross–motion for summary judgment within 42 days of the decision; the Plaintiffs to file their reply in support of their motion for summary judgment and their opposition to the cross–motion for summary judgment within 56 days of the decision; and the Defendants to file their reply in support of their cross–motion for summary judgment within 63 days of the decision. Signed by Judge Sparkle L. Sooknanan on 6/13/2025. (lcas) (Entered: 06/13/2025) |

| 07/30/2025 | 36 | MOTION to Modify *Summary Judgment Briefing Schedule* by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Williams, Robert) (Entered: 07/30/2025) |
|---|---|---|
| 07/31/2025 | | MINUTE ORDER: In light of the Defendants' 36 Motion to Modify the Summary Judgment Briefing Schedule, the Court ORDERS the Defendants to file a supplemental memorandum in support of their motion by August 7, 2025. This Supplemental Memorandum should explain why the Defendants now oppose the stay the Court entered given they did not oppose it at the time it was being considered. Signed by Judge Sparkle L. Sooknanan on 7/31/2025. (lcas) (Entered: 07/31/2025) |
| 08/04/2025 | 37 | SUPPLEMENTAL MEMORANDUM re Order,, Set Deadlines, by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Williams, Robert) Modified event title on 8/6/2025 (znmw). (Entered: 08/04/2025) |
| 08/13/2025 | 38 | Memorandum in opposition to re 36 MOTION to Modify *Summary Judgment Briefing Schedule* filed by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Declaration of Jared Margolis)(Margolis, Jared) (Entered: 08/13/2025) |
| 08/15/2025 | 39 | REPLY to opposition to motion re 36 Motion to Modify filed by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Williams, Robert) (Entered: 08/15/2025) |
| 08/20/2025 | 40 | NOTICE OF WITHDRAWAL OF APPEARANCE as to APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. Attorney Perrin W. de Jong terminated. (de Jong, Perrin) (Entered: 08/20/2025) |
| 08/26/2025 | | MINUTE ORDER denying the Defendants' 36 Motion to Modify Summary Judgment Briefing Schedule. The Defendants have provided no reason why the Court should modify its prior stay order, which remains in effect in all respects. Signed by Judge Sparkle L. Sooknanan on 8/26/2025. (lcak) (Entered: 08/26/2025) |
| 02/03/2026 | | MINUTE ORDER: The Parties are ORDERED to appear for a status conference on February 11, 2026, at 10:45 AM in Courtroom 14 (in person) before Judge Sparkle L. Sooknanan. Signed by Judge Sparkle L. Sooknanan on 2/3/2026. (lcak) (Entered: 02/03/2026) |
| 02/03/2026 | 41 | Unopposed MOTION for Leave to Appear by Telephone or Video by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Text of Proposed Order)(Margolis, Jared) (Entered: 02/03/2026) |
| 02/04/2026 | | MINUTE ORDER denying the 41 Motion for Leave to Appear by Telephone or Video. The Plaintiffs' counsel fails to explain what existing commitments prevent her from attending the status conference scheduled for February 11, 2026. If counsel is unable to attend the status conference because of specific conflicts, she may file another motion with that information and provide dates when she does not have a conflict. But the Court notes that the Plaintiffs have multiple counsel who have entered appearances, including one with an office address in the District. Signed by Judge Sparkle L. Sooknanan on 2/4/2026. (lcak) (Entered: 02/04/2026) |

| | | |
|---|---|---|
| 02/11/2026 | | Minute Entry for Status Conference held before Judge Sparkle L. Sooknanan on 2/11/2026. Parties discussed posture of the case. In light of the circumstances the Court ORDERS the stay in this case be lifted. Plaintiffs' Motion is due 3/4/2026. Defendants' Cross Motion and Opposition is due 3/25/2026. Plaintiffs' Reply and Opposition to Defendants' Cross Motion is due 4/8/2026. Defendants' Reply is due 4/22/2026. Court Reporter: Elizabeth Davila. (zljn) (Entered: 02/11/2026) |
| 03/04/2026 | 42 | MOTION for Summary Judgment by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Memorandum in Support, # 2 Declaration Dodson Decl., # 3 Exhibit Dodson Decl. Ex. A, # 4 Exhibit Dodson Decl. Ex. B, # 5 Exhibit Dodson Decl. Ex. C, # 6 Declaration Curry Decl., # 7 Declaration Thoma Decl., # 8 Declaration Young Decl., # 9 Declaration Sneed Decl., # 10 Declaration Hepler Decl., # 11 Text of Proposed Order)(Margolis, Jared) (Entered: 03/04/2026) |
| 03/25/2026 | 43 | Memorandum in opposition to re 42 MOTION for Summary Judgment filed by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Attachments: # 1 Text of Proposed Order)(Williams, Robert) (Entered: 03/25/2026) |
| 03/25/2026 | 44 | MOTION to Strike 42 MOTION for Summary Judgment / Motion to Strike Plaintiffs' Extra Record Declarations and Exhibits by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Attachments: # 1 Text of Proposed Order)(Williams, Robert) (Entered: 03/25/2026) |
| 03/25/2026 | 45 | Cross MOTION for Summary Judgment by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Attachments: # 1 Text of Proposed Order)(Williams, Robert) (Entered: 03/25/2026) |
| 03/27/2026 | | MINUTE ORDER: The Court instructs the Parties to address the significance, if any, of the D.C. Circuit's decision in Center for Biological Diversity v. Zeldin (No. 24–5101) in the Plaintiffs' Reply and Opposition to the Defendants' Cross Motion and the Defendants' Reply to the Plaintiffs' Opposition. The Parties' deadlines are extended as follows. The Plaintiffs' Reply and Opposition to the Defendants' Cross Motion shall be filed by April 13, 2026. The Defendants' Reply shall be filed by April 27, 2026. Signed by Judge Sparkle L. Sooknanan on 3/27/2026. (lcak) Modified text to correct signature date on 3/30/2026 (zljn). (Entered: 03/27/2026) |
| 04/06/2026 | 46 | MOTION for Extension of Time to File Response/Reply as to 44 MOTION to Strike 42 MOTION for Summary Judgment / Motion to Strike Plaintiffs' Extra Record Declarations and Exhibits by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Text of Proposed Order)(Margolis, Jared) (Entered: 04/06/2026) |
| 04/06/2026 | | MINUTE ORDER granting the 46 Motion for Extension of Time. The Plaintiffs shall file their opposition to the 44 Motion to Strike by April 13, 2026. The Defendants shall file a reply by April 27, 2026. Signed by Judge Sparkle L. Sooknanan on 4/6/2026. (lcak) (Entered: 04/06/2026) |
| 04/13/2026 | 47 | Memorandum in opposition to re 45 Cross MOTION for Summary Judgment filed by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Margolis, Jared) (Entered: 04/13/2026) |

| | | |
|---|---|---|
| 04/13/2026 | 48 | REPLY to opposition to motion re 42 Motion for Summary Judgment, filed by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Margolis, Jared) (Entered: 04/13/2026) |
| 04/13/2026 | 49 | Memorandum in opposition to re 44 MOTION to Strike 42 MOTION for Summary Judgment / *Motion to Strike Plaintiffs' Extra Record Declarations and Exhibits* filed by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Margolis, Jared) (Entered: 04/13/2026) |
| 04/27/2026 | 50 | REPLY to opposition to motion re 45 Motion for Summary Judgment, filed by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Williams, Robert) (Entered: 04/27/2026) |
| 04/27/2026 | 51 | REPLY to opposition to motion re 44 Motion to Strike, filed by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS. (Williams, Robert) (Entered: 04/27/2026) |
| 05/11/2026 | 52 | JOINT APPENDIX by CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Exhibit Index, # 2 Exhibit FWS Records, # 3 Exhibit OSMRE Records)(Margolis, Jared) (Entered: 05/11/2026) |
| 05/29/2026 | 53 | MEMORANDUM OPINION re the Plaintiffs' 42 Motion for Summary Judgment, the Defendants' 45 Cross–Motion for Summary Judgment, and the Defendants' 44 Motion to Strike. See the attached document for details. Signed by Judge Sparkle L. Sooknanan on 5/29/2026. (lcal) (Entered: 05/29/2026) |
| 05/29/2026 | 54 | ORDER granting the Plaintiffs' 42 Motion for Summary Judgment, denying the Defendants' 45 Cross–Motion for Summary Judgment, and denying the Defendants' 44 Motion to Strike as moot. See the 53 Memorandum Opinion for details. Signed by Judge Sparkle L. Sooknanan on 5/29/2026. (lcal) (Entered: 05/29/2026) |
| 06/11/2026 | 55 | MOTION for Extension of Time to *File Motion for Fees and Costs* by APPALACHIAN VOICES, CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Text of Proposed Order)(Margolis, Jared) (Entered: 06/11/2026) |
| 06/12/2026 | | MINUTE ORDER granting the 55 Motion for Extension of Time. The Plaintiffs' deadline to move for fees and expenses is extended to ninety days after there is a final, non–appealable judgment in this matter. Signed by Judge Sparkle L. Sooknanan on 6/12/2026. (lcak) (Entered: 06/12/2026) |
| 07/15/2026 | 56 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 53 Memorandum & Opinion, 54 Order on Motion for Summary Judgment,, Order on Motion to Strike,,, by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, MARTHA WILLIAMS, UNITED STATES FISH AND WILDLIFE SERVICE. Fee Status: No Fee Paid. (Attachments: # 1 Exhibit 5/29/2026 Memorandum Opinion, # 2 Exhibit 5/29/2026 Order)(Williams, Robert) (Entered: 07/15/2026) |
| 07/15/2026 | 57 | MOTION to Stay re 53 Memorandum & Opinion, 54 Order on Motion for Summary Judgment,, Order on Motion to Strike,,, *Pending Appeal* by DEB HAALAND, GLENDA OWENS, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA |

| | | |
|---|---|---|
| | | WILLIAMS. (Attachments: # 1 Memorandum in Support, # 2 Declaration of John Tirpak, # 3 Declaration of Justin Adams, # 4 Declaration of Curt Coccodrilli, # 5 Declaration of Robert Thompson, # 6 Text of Proposed Order)(Williams, Robert) (Entered: 07/15/2026) |
| 07/16/2026 | | MINUTE ORDER: On May 29, 2026, the Court granted the Plaintiffs' 42 Motion for Summary Judgment and denied the Defendants' 45 Cross–Motion for Summary Judgment. *See* ECF Nos. 53, 54. On July 15, 2026, the Defendants filed a 56 Notice of Appeal and a 57 Motion to Stay the Court's Order Pending Appeal. The Court ORDERS the Plaintiffs to respond to that 57 Motion by July 29, 2026, and the Defendants to file any reply by August 5, 2026. Signed by Judge Sparkle L. Sooknanan on 7/16/2026. (lcal) (Entered: 07/16/2026) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, LANNY E. ERDOS, in his official capacity as Director of the Office of Surface Mining Reclamation and Enforcement, UNITED STATES FISH AND WILDLIFE SERVICE, DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, and BRIAN NESVICK, in his official capacity as Director of the U.S. Fish and Wildlife Service,<br><br>Defendants. | Civil Action No. 1:23-cv-03343 |

## DEFENDANTS' NOTICE OF APPEAL

Pursuant to Federal Rules of Appellate Procedure 3 and 4 and 28 U.S.C. § 1291, notice is hereby given that Defendants appeal to the United States Court of Appeals for the District of Columbia Circuit from the District Court's order entered on May 29, 2026 in the above-captioned action (Docket No. 54), and the underlying memorandum opinion entered on May 29, 2026 (Docket No. 53), copies of which are attached.

Dated: July 15, 2026

                                        Respectfully submitted,

                                        ADAM R.F. GUSTAFSON
                                        Principal Deputy Assistant Attorney General
                                        U.S. Department of Justice
                                        Environment & Natural Resources Division

2

/s/ *Robert P. Williams*
ROBERT P. WILLIAMS
Sr. Trial Attorney (SBN 474730 (DC))
U.S. Department of Justice
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 532-3101
Email: robert.p.williams@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, *et al.*,

       *Plaintiffs*,

   v.

U.S. OFFICE OF SURFACE MINING
RECLAMATION AND ENFORCEMENT,
*et al.*,

       *Defendants*.

Civil Action No. 23-3343 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

The Endangered Species Act of 1973 entrusts federal agencies with the critical task of identifying and preserving endangered and threatened species across our country. This case is about whether the Act permits those agencies to delegate certain authorities and responsibilities to state regulators in the field of coal mining. The Plaintiffs in this case are two environmental groups—the Center for Biological Diversity and Appalachian Voices—that are concerned about the risks that coal mining activities pose to threatened species living in Appalachian streams and rivers, including the Guyandotte River crayfish, Big Sandy crayfish, and candy darter. They claim that the dwindling number of streams and rivers where these creatures live are at risk of pollution by displaced sediment, chemical run-off, and other aftereffects of mining. And they contend that even brief lapses in regulatory oversight could cause significant harm to these threatened species, including their complete elimination.

The Plaintiffs brought this lawsuit to challenge a written Biological Opinion by the U.S. Fish and Wildlife Service finding that the mining regulatory program administered by the U.S.

Office of Surface Mining Reclamation and Enforcement is unlikely to jeopardize the continued existence of threatened species. The Plaintiffs assert that the Biological Opinion flouts carefully designed procedures in the Endangered Species Act and impermissibly approves entrusting state regulators with responsibilities that lie with the federal Defendants. The Parties now cross-move for summary judgment. For the reasons below, the Court concludes that the Biological Opinion is arbitrary and capricious and must be set aside.

## BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    The Endangered Species Act (ESA)

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It "seeks to protect species of animals against threats to their continuing existence caused by man." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558 (1992). Congress tasked two agencies with administering the ESA: the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS). *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007). "The NMFS administers the ESA for protected marine and anadromous species (ones that migrate between freshwater and saltwater); and the FWS administers the ESA with respect to all other protected species." *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 365 (D.C. Cir. 2026) (citing 50 C.F.R § 402.01(b)).

"[A] species can be 'listed' as either 'endangered' or 'threatened'" under the ESA. *Id.* at 364–65 (quoting 16 U.S.C. § 1533). The Act defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range" and a threatened species as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). Once a

2

species has been "listed," it gains "significant protections" under the ESA, *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 749 F. Supp. 3d 26, 36 (D.D.C. 2024), which "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "a program for the conservation of such endangered species and threatened species," 16 U.S.C. § 1531(b).

Section 9 of the ESA makes it unlawful for "any person," including private parties, States, and federal agencies, to "take" an endangered species. *Id.* § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). And "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995). Violators of this prohibition may face civil or criminal penalties. *See* 16 U.S.C. § 1540.

"Recognizing that some take can occur as a result of otherwise lawful activities, Congress created two paths to ensure that 'incidental take' does not jeopardize protected species or adversely modify or destroy critical habitat: The first path, under Section 7, applies to federal agency actions, and the second, under Section 10, applies to non-federal actions." *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 15 (D.D.C. 2024) (first citing 16 U.S.C. § 1536; and then *id.* § 1538), *aff'd sub nom., Zeldin*, 171 F.4th 356. Both Section 7 and Section 10 "offer the promise of liability protection for incidental take" if certain requirements are met. *Id.* (first citing 16 U.S.C. §§ 1536(o)(2), 1539(a); and then 50 C.F.R. § 402.14(i)(5)).

### a. Section 7 Consultation

Section 7 of the ESA "prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." *Nat'l Ass'n of Home Builders*,

551 U.S. at 652. Section 7(a)(2) provides that "[e]ach Federal agency shall, in consultation with and with the assistance of [the FWS or the NMFS], insure that any action authorized, funded, or carried out by such an agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.02. "Action" is defined to cover "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid." 50 C.F.R. § 402.02. And an action "jeopardize[s] the continued existence of" an endangered or threatened species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* The agency proposing the action is known as the "action agency," and the agency providing consultation—either the FWS or the NMFS—serves as the "consulting agency." *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 474 n.3 (D.D.C. 2014).

The action agency must first determine whether formal consultation is required. To do this, "[e]ach federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). "If the action agency determines—and the consulting agency concurs—that 'the proposed action is not likely to adversely affect any listed species or critical habitat,' then no formal consultation is required." *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 16 (quoting 50 C.F.R. § 402.14(b)(1)). But if the action agency "concludes after an initial review that its action 'may affect listed species or critical habitat,' that agency must engage in 'consultation' with [the FWS or the NMFS]." *Id.* (quoting 50 C.F.R. § 402.14(a)); *see also* 50 C.F.R. § 402.02 (defining "Service" as either the FWS or the

4

NMFS, "as appropriate"). A formal consultation under Section 7 is triggered for a discrete federal agency action or "an agency's multiple actions on a program, region, or other basis." 50 C.F.R. § 402.02.

### b.    Biological Opinion

The first step of a Section 7 formal consultation requires the consulting agency to prepare a written Biological Opinion (BiOp) that evaluates whether the planned agency action is "likely to jeopardize the continued existence" of a protected species or result in the "destruction or adverse modification" of its critical habitat. *See* 16 U.S.C. § 1536(a)(2)–(4). "The process of preparing a BiOp is a rigorous endeavor." *Zeldin*, 171 F.4th at 365. The consulting agency must:

> (1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the [action] agency and the applicant.
>
> (2) Evaluate the current status and environmental baseline of the listed species or critical habitat.
>
> (3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.
>
> (4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.14(g). Additionally, the consulting agency must "[f]ormulate a statement concerning incidental take, if such take is reasonably certain to occur." *Id.* § 402.14(g)(7).

The D.C. Circuit has referred "to the third BiOp requirement as the 'effects analysis.'" *Zeldin*, 171 F.4th at 366 (citing 50 C.F.R. § 402.14(g)(3)). And it has described that analysis as "encompass[ing] two types of effects." *Id.* "First, the 'effects of the action' include 'all consequences to listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* (alteration in original)

5

(quoting 50 C.F.R. § 402.02). Such effects "may occur later in time and may include consequences occurring outside the immediate area involved in the action." 50 C.F.R. § 402.02. "Second, the 'cumulative effects' on the listed species include 'those effects of future State or private activities, *not* involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.'" *Zeldin*, 171 F.4th at 366 (emphasis in original) (quoting 50 C.F.R. § 402.02).

Once the consulting agency has completed the effects analysis, it must "[a]dd the effects of the action and cumulative effects to the environmental baseline" and then, "in light of the status of the species and critical habitat," formulate its "opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). "In other words, the [consulting agency] must determine whether the planned action 'reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.'" *Zeldin*, 171 F.4th at 366 (quoting 50 C.F.R. § 402.02). Finally, the consulting agency must set forth its opinion in a BiOp, summarizing the information on which its jeopardy determination is based, and detailing "how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h).

"In the event of a 'jeopardy' determination, the consulting agency 'shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency].'" *Zeldin*, 171 F.4th at 366 (alterations in original) (quoting 16 U.S.C. § 1536(b)(3)(A)). "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from

6

the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." *Id.* (alteration in original) (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 652). "Importantly, in 'formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures,' the [consulting agency] [is] required to 'use the best scientific and commercial data available.'" *Id.* (quoting 50 C.F.R. § 402.14(g)(8)); *see also* 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

### c.     Incidental Take Statement

If the consulting agency makes a "no-jeopardy" determination but concludes that incidental take is nonetheless "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7), it must proceed to "the second step of the Section 7 consultation process" and provide an "incidental take statement" or ITS, *Zeldin*, 171 F.4th at 366; *see also* 50 C.F.R. § 402.14(i); 16 U.S.C. § 1536(b)(4). This step is necessary where a proposed action "may still cause some harm to the [listed] species" "[e]ven if [it] will not 'jeopardize the continued existence' of [the] listed species." *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1080 (D.C. Cir. 2021).

When an ITS is required, the consulting agency must include it as part of the BiOp, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1), and the ITS must "(i) specif[y] the extent of the anticipated take, (ii) identif[y] any 'reasonable and prudent measures' that the wildlife agency considers 'necessary or appropriate to minimize such impact,' and (iii) set[] forth detailed 'terms and conditions' that the action agency or licensed private party must undertake to implement those reasonable and prudent measures," *Shafer*, 992 F.3d at 1080 (quoting 16 U.S.C. § 1536(b)(4)). The ITS must specify "the impact of incidental taking as the amount or extent of such taking" on the species. 50 C.F.R. § 402.14(i)(1)(i). And the ITS may do that through a "surrogate (e.g., similarly

7

affected species or habitat or ecological conditions)" so long as it adequately explains why it must use a surrogate and it still "sets a clear standard for determining when the level of anticipated take has been exceeded[.]" *Id.*

"[T]he action agency or applicant must 'monitor the impacts of incidental take' and 'report the progress of the action and its impact on the species to the [consulting agency] as specified in the [ITS].'" *Zeldin*, 171 F.4th at 367 (second alteration in original) (quoting 50 C.F.R. § 402.14(i)(4)). "The action agency 'must reinitiate consultation *immediately*' if the 'amount or extent of incidental taking' specified in the ITS, as required by the regulations, 'is exceeded.'" *Id.* at 367 (emphasis in original) (quoting 50 C.F.R. § 402.14(i)(5)); *see also* 50 C.F.R. § 402.16(a)(1). The action agency must also reinitiate consultation under other circumstances, including: "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence;" or "[i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(a). Such reinitiation "shall be requested" by the action agency. *Id.*

"Ultimately, if [a consulting agency] provide[s] a no-jeopardy determination and issue[s] an ITS, then the ITS offers a safe harbor to those who participate in the planned agency action: Parties that comply with the terms and conditions specified in the ITS are exempted from civil and criminal liability under the ESA for any incidental takings, and they need not seek any other authorization or permit under the ESA." *Zeldin*, 171 F.4th at 367; *see also* 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(6).

### d.      Programmatic Consultation

A formal consultation under Section 7 is also necessary for "an agency's multiple actions on a program, region, or other basis." 50 C.F.R. § 402.02. This "is known as a 'programmatic consultation,'" under which the consulting agency may "consult on the effects of programmatic actions, such as '[m]ultiple similar, frequently occurring, or routine actions,' and proposed frameworks 'for future proposed actions.'" *Zeldin*, 171 F.4th at 367 (alteration in original) (quoting 50 C.F.R. § 402.02). The ESA's implementing "[r]egulations recognize that such 'multiple actions' might not be ready for full Section 7 consultation at the outset and may need to defer the required Section 7 analysis until a later time." *Id.* For example, the regulations contemplate authorization of federal programs for which "incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate." 50 C.F.R. § 402.14(i)(7); *see also id.* § 402.02 (defining "Framework programmatic action"). Importantly, however, "neither the statute nor any applicable regulation provides that 'programmatic' consultations allow the [consulting agency] to avoid the rigorous requirements of Section 7 consultation entirely." *Zeldin*, 171 F.4th at 367.

### e.      Section 10 Consultation

Section 10 establishes a different pathway for "private parties, states, and other nonfederal actors." *Id.* at 367–68 (first citing 16 U.S.C. § 1539(a); and then 50 C.F.R. § 402.14(i)(5)). "Under Section 10, a nonfederal actor may obtain a permit from the [FWS or the NMFS] that allows incidental takings to occur without subjecting the actor to liability under the ESA." *Id.* at 368 (citing 16 U.S.C. § 1539(a)(1)(B)). The permit process is significant. An applicant "must submit a conservation plan that describes the impacts of potential incidental takings, the steps the applicant will take to minimize and mitigate those impacts, alternatives to the planned activity,

9

why the applicant is not taking those alternatives, and any other measures that the [consulting agency] 'may require as being necessary or appropriate.'" *Id.* (citing 16 U.S.C. § 1539(a)(2)(A)). "The [consulting agency] must publish notice of the Section 10 permit application in the Federal Register and provide opportunity for public comment." *Id.* (citing 16 U.S.C. § 1539(c), (a)(2)(B)). "And the [consulting agency] must make certain findings before they can issue a permit that allows incidental takings, including that the takings 'will not appreciably reduce the likelihood of the survival and recovery of the species in the wild,' and that 'the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking.'" *Id.* (citing 16 U.S.C. § 1539(a)(2)(B)).

### 2.    The Surface Mining Control and Reclamation Act (SMCRA)

The Court provided a more detailed summary of the SMCRA in an earlier opinion in this case and assumes familiarity with that opinion. *See Ctr. for Biological Diversity v. U.S. OSMRE*, No. 23-cv-3343, 2025 WL 1503802, at *3–4 (D.D.C. May 27, 2025), ECF No. 33. In short, Congress enacted the SMCRA "to establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 105 F.3d 691, 693 (D.C. Cir. 1997) (quoting 30 U.S.C. § 1202(a)). The Department of Interior's Office of Surface Mining Reclamation and Enforcement (OSMRE) "administers and enforces" the SMCRA. *Id.* (citing 30 U.S.C. § 1211(c)).

"As part of its comprehensive regulatory scheme, the SMCRA provides for federal coordination with the states." *Coal River Mountain Watch v. U.S. Dep't of the Interior*, 146 F. Supp. 3d 17, 20 (D.D.C. 2015). "After an interim period of direct federal regulation, states are authorized by the [SMCRA] to assume a major regulatory role." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 701 (1988). "With the Secretary [of the Interior]'s approval, . . . state[s] [may]

10

assume[] primary responsibility for SMCRA enforcement and rulemaking." *Id.* at 701. States that have achieved this status are known as "primacy" states. *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 70 F.3d 1345, 1347 (D.C. Cir. 1995). But the OSMRE must still ensure that these state programs are properly administered and that violations of the SMCRA are corrected. *See* 30 U.S.C. §§ 1211(c), 1267, 1271 (describing the Secretary of the Interior's duties to oversee approved state programs).

### B.    Factual Background

#### 1.    The Effects of Coal Mining

The Plaintiffs are both non-profit 501(c)(3) corporations committed to overlapping environmental goals. *See* Am. Compl. ¶¶ 17–18, ECF No. 13. The Center for Biological Diversity "works to secure a future for all species, great or small, hovering on the brink of extinction." *Id.* ¶ 17. And Appalachian Voices is "committed to protecting the land, air, and water of the central and southern Appalachian region," with "a focus on reducing coal mining's impact on the region, including to species listed under the ESA." *Id.* ¶ 18. In this case, the Plaintiffs are particularly concerned about the ways that coal mining has negatively impacted threatened and endangered species in West Virginia, Kentucky, and Virginia. *See id.* ¶ 67.

The Plaintiffs allege that "coal mining activities have led to severe habitat degradation and dramatic population declines across the ranges of the Guyandotte River crayfish, Big Sandy crayfish, and candy darter." *Id.* ¶ 70. According to the Plaintiffs, coal mining has had a particularly negative impact on the Guyandotte River crayfish, which now survives in only two streams in West Virginia. *Id.* They point to hundreds of SMCRA-related actions as evidence that "the coal industry has a track record of chronic non-compliance with the requirements of [the] SMCRA across the ranges of both the Guyandotte River crayfish and Big Sandy crayfish." *Id.* ¶ 73. Both

11

species of crayfish, as well as the candy darter, are listed as endangered or threatened under the ESA. *See id.* ¶ 69; FWS_36633–34, ECF No. 52.

### 2. The 2020 Biological Opinion

The OSMRE's implementation of its regulatory program for overseeing surface coal mining and reclamation operations has been subject to several ESA Section 7 consultations over the past thirty years, including in 1996 and 2016. FWS_36606–07. The consultation at issue here occurred in 2020, when the OSMRE requested that the FWS review its continued implementation of the SMCRA, including its "direct implementation and enforcement" of SMCRA regulations "in Federal program States and on Indian lands" and its "oversight of State regulatory programs with primacy." *Id*. With respect to the latter, the activities subject to consultation included the OSMRE's "oversight of State program compliance with requirements related to the protection and enhancement of proposed or listed species and proposed or designated critical habitats." FWS_36605. And importantly, that oversight included "implementation of two documents developed by [the] OSMRE in consultation with the [FWS]." *Id*. The first document detailed an "SMCRA/ESA Coordination Process." *Id*. And the second described a "Dispute Resolution Process Relevant to Regulatory Authorities Coordinating SMCRA Permitting with the USFWS." *Id*.

### a. Coordination Process

The Coordination Process, which was attached to the FWS's BiOp as Appendix A, prescribed four steps by which State regulatory authorities and the FWS would coordinate their efforts regarding State permit issuance. First, "State regulatory authorities [would] approach the Service as early as possible in the permit application development process to provide sufficient time for the coordination and permit review and revision process as it relates to threatened or

12

endangered species or designated or proposed critical habitat." FWS_36708. The State authority would notify the FWS whenever it received complete applications to receive, renew, or significantly revise a permit. *Id*. And upon request by the FWS, it would provide the Service with any "fish and wildlife resources information in the permit application, as well as the fish and wildlife protection and enhancement plan." *Id*.

Second, the State authority would, "based upon [its] discretion," provide the FWS with "fish and wildlife resource information" necessary to facilitate the FWS's "timely and efficient review" of each permit application. *Id*. "[I]n most instances," this information would include a description of the action under consideration that addressed: "the areas to be disturbed by mining activities"; "any listed or proposed species or designated critical habitat that may be affected by the action"; the actions the operator and applicant would take to "minimize disturbance and adverse impacts on fish and wildlife," including on "listed or proposed species and designated critical habitat"; and the actions proposed by the permit applicant "to enhance fish, wildlife and related environmental values, where practicable." FWS_36708–09.

Third, the FWS would review the materials provided, notify the State if any additional information was needed, and evaluate "the State regulatory authority's written findings that the exploration, mining, and reclamation activities [would] not jeopardize the continued existence of an endangered or threatened species." FWS_36709. "If, in close coordination with the regulatory authority, the Service and the State regulatory authority determine[d] there [was] a need for additional species-specific protective measures (SSPMs), including reporting and monitoring, the Service and the State regulatory authority [would] develop SSPM[s] to minimize anticipated incidental take." *Id*. "If no additional SSPMs [were] required, the Service [would] provide the State regulatory authority with written confirmation that the technical assistance process ha[d]

13

been successfully completed." *Id*. If, however, the FWS "unilaterally suggest[ed] additional SSPMs" that the State regulatory did not accept, the State would explain why it rejected those measures and the Service and the State would attempt to resolve the issue through the Dispute Resolution Process described below. FWS_36709–10.

Fourth, and finally, the State regulatory authority would "issue a written notification to the Service of its decision to approve or deny an application for a permit if the Service filed comments or objections to the permit application." FWS_36710. And "[b]efore approving any permit application that may affect proposed or ESA-listed species or designated critical habitat, the State regulatory authority [would] make a finding that '[t]he operation would not affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the [ESA].'" *Id*. (third and fourth alterations in original).

### b.    Dispute Resolution Process

The Dispute Resolution Process, which was attached to the FWS's BiOp as Appendix B, was designed to resolve disagreements that arose in step three of the Coordination Process about what measures might be necessary "to minimize disturbances and adverse impacts" on species or habitats caused by permitted activity. FWS_36711. The Dispute Resolution Process provided a four-level "elevation process" if the State regulatory authority and the FWS could not agree on measures that the FWS had recommended. In short, the dispute could be elevated: first, to an OSMRE Field Office Director; second, to OSMRE and FWS Regional Directors; third, to OSMRE and FWS Headquarters; and fourth, to the Secretary of the Interior. FWS_36712–13. At each stage in the elevation process, the FWS officials involved would propose a resolution to the dispute. And at each stage, the State would retain the authority to reject the proposed resolution. This was true even at level four, where the State could either "require implementation of the proposed resolution"

14

offered by the Secretary of the Interior or "reject the proposed resolution and approve the permit." FWS_36713. At that point, the Dispute Resolution Process specified that "[f]urther elevations [would] not be available." FWS_36713.

### c.    Jeopardy Determination

In reviewing the OSMRE's proposed action, the FWS ultimately concluded that the OSMRE's implementation of the SMCRA "through its existing regulations [was] not likely to jeopardize the continued existence of proposed or listed species and or destroy or adversely modify designated or proposed critical habitat." FWS_36682. In reaching that conclusion, the FWS relied on the additional protections that it believed would be provided by the Coordination and Dispute Resolution Processes. It noted that "[i]mplementation of the performance standards required by the SMCRA, on their own, [would] not necessarily eliminate adverse effects on ESA-proposed and listed species and designated and proposed critical habitat." FWS_36670. But the FWS found that the Coordination Process would enable it to provide State regulatory authorities with "additional site-specific and species-specific protective measures, monitoring, and reporting recommendations to further enhance the protection of listed or proposed species or designated or proposed critical habitat." *Id*. And it concluded that the "OSMRE's commitment to exercise its oversight authority to resolve any issues that arise between regulatory authorities and the Service further suggest[ed]" that adverse effects to ESA-protected species and habitats would be "adequately minimized." *Id*.

The FWS left it to subsequent technical assistance and coordination to address issues that might otherwise be addressed during a standard Section 7 consultation. It concluded, for example, that "it [was] not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis" in the BiOp. FWS_36662. This was because the SMCRA's program was

15

"essentially nationwide" and "detailed information on the specific size, scope, and operation of future mining activities" that might be permitted under the program was not available. *Id*. Instead, the FWS noted that "site-specific and species-specific information [would] be available and assessed through the technical assistance process." *Id*.; *see also* FWS_36680.

### d.    Incidental Take Statement

The FWS took a similar approach in the ITS accompanying the BiOp. The Service noted that "the paucity of information regarding future mining projects . . . available at the time of [the] programmatic consultation [did] not allow the Service to identify the specific locations in which future mining projects [would] occur, the specific activities associated with a particular mining permit, and the number of individuals that might be affected by such activities in order for the Service to conduct species and site-specific analyses." FWS_36684. Accordingly, the ITS provided that "[f]or proposed mining activities" in primacy states where "incidental take of ESA-listed species [was] reasonably certain to occur, the amount and extent of incidental take anticipated from [those] proposed actions [would] be quantified by the Service and evaluated on a project-specific basis through the SMCRA Coordination Process." *Id*. Consistent with this approach, the ITS itself did not quantify or estimate a specific amount of incidental take that would be permitted. FWS_36684–85.

The ITS nonetheless provided that the "OSMRE, State regulatory authorities, and mine operators [would] be afforded an exemption from the prohibition against take resulting from surface mining activities subject to regulation under" the SMCRA, so long as the mining activities complied with the BiOp and the "Reasonable and Prudent Measures and associated Terms and Conditions" of the ITS. FWS_36685. The applicable Reasonable and Prudent Measures were that the OSMRE would "use its authorities to minimize impacts to listed species" by "evaluating and

16

assisting States and Tribes in the administration of SMCRA regulations, and the implementation, enforcement, and maintenance" of their approved regulatory programs. *Id*. And the Terms and Conditions required that, to be exempt from Section 9's take prohibitions, the OSMRE and State regulatory authorities needed to engage with the FWS in accordance with the SMCRA Coordination Process in their review and approval of permit applications. FWS_36685-86. If a State regulatory authority disagreed about the necessity of an SSPM recommended by the FWS and, after completing the dispute resolution process, "issu[ed] [a] permit without Service concurrence," the permitted action would "not be exempted" from liability under the ITS. FWS_36686. Finally, the OSMRE would provide an "annual evaluation report to the Service" on "any known issues implementing the technical assistance or dispute resolution process." *Id*.

### e.    Reinitiation

The BiOp concluded by noting that, consistent with 50 C.F.R. § 402.16(a), reinitiation of formal consultation would be required if:

1. The amount or extent of incidental take for [the BiOp was] exceeded;
2. New information reveal[ed] effects of the action that may affect listed species or critical habitat in a manner or to an extent not considered in [the BiOp];
3. The identified action [was] subsequently modified in a manner that cause[d] an effect to the listed species or critical habitat that was not considered in [the BiOp]; or
4. A new species [was] listed or critical habitat designated that may be affected by the action identified in [the BiOp].

FWS_36687. "Potential reinitiation scenarios" could also arise if certain assumptions in the BiOp were "proven incorrect"—*e.g.*, about how State authorities and the OSMRE would adhere to SMCRA regulations and would engage with the FWS through the Coordination and Dispute Resolution Processes. *Id.*; *see also* FWS_36662–64.

17

### C.    Procedural Background

The Plaintiffs filed their Amended Complaint on March 4, 2024, raising three claims. *See* Am. Compl. ¶¶ 133–59. First, they allege that the OSMRE and the FWS violated the ESA and its implementing regulations by failing to reinitiate consultation, which constitutes agency action unlawfully withheld and unreasonably delayed in violation of the Administrative Procedure Act (APA). *Id.* ¶ 142 (first citing 50 C.F.R. § 402.16; and then 5 U.S.C. § 706(1)).  Second, they allege that the OSMRE violated Section 7(a)(2) of the ESA by not providing sufficient oversight for state implementation of the SMCRA programs as required by the 2020 BiOp, thereby failing to "insure that SMCRA-regulated mining operations will not jeopardize the continued existence of listed species or adversely modify their critical habitat." *Id.* ¶ 150 (citing 16 U.S.C. § 1536(a)(2)). And third, they allege that the 2020 BiOp opinion is facially invalid. *Id.* ¶¶ 151–59 (first citing 16 U.S.C. § 1536; and then 5 U.S.C. § 706(2)(A)).

The Defendants filed certified administrative record indices on July 10, 2024, ECF No. 20, and later provided the Court with complete certified copies of the administrative record, ECF No. 31. In May 2025, the Court denied a motion by the Plaintiffs to supplement the administrative record. *See Ctr. for Biological Diversity*, 2025 WL 1503802, at *1, ECF No. 33. And soon after, the Court granted an unopposed motion by the Plaintiffs to hold summary judgment briefing in abeyance pending a decision by the D.C. Circuit that the Plaintiffs expected would bear directly on this case. *See* Min. Order (June 13, 2025). In February—after the Defendants reversed their position and asked that the case proceed, *see* ECF No. 36—the Court lifted the stay, Min. Order (Feb. 11, 2026).

On March 4, 2026, the Plaintiffs moved for summary judgment. Pls.' Mot., ECF No. 42. On March 25, 2026, the Defendants opposed and cross-moved for summary judgment, Defs.'

18

Cross-Mot., ECF No. 45, while simultaneously moving to strike declarations and exhibits that the Plaintiffs had attached to their summary judgment motion, Mot. Strike, ECF No. 44. On March 27, 2026, the D.C. Circuit issued *Center for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026), and the Parties addressed the import of that decision in their final briefs. *See* Min. Order (Mar. 27, 2026). The Parties' motions are now ripe for decision. *See* Pls.' Reply & Opp'n Summ. J., ECF No. 48; Defs.' Reply Summ. J., ECF No. 50; Opp'n Mot. Strike, ECF No. 49; Reply Mot. Strike, ECF No. 51.

**LEGAL STANDARD**

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The D.C. Circuit has held that ESA findings are reviewed under the APA "because the ESA does not specify a standard of review." *Zeldin*, 171 F.4th at 376 (citing *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 574 (D.C. Cir. 2016)).

The APA requires that the Court "set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The same is true of agency action undertaken "without observance of procedure required by law." *Id.* § 706(2)(D). "The question of whether agency action is arbitrary and capricious is a legal one generally made on the administrative record and resolved on summary judgment." *Zeldin*, 171 F.4th at 376 (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1277, 1282 (D.C. Cir. 2005)).

"It is well settled that an agency must adhere to its own regulations, and an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Id.* at 376 (cleaned up). "Moreover, an agency action that 'violates [a statute] is 'not in accordance

19

with law' within the meaning of [the APA]." *Id.* (alterations in original) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979)).

## DISCUSSION

The Plaintiffs contend that they are entitled to summary judgment for two reasons: (1) the 2020 BiOp violates the requirements of the ESA and is thus facially invalid (Claim 3); and (2) even if the 2020 BiOp were not deficient, the Defendants have failed to comply with its express requirements (Claims 1 and 2). The Court agrees that the 2020 BiOp is unlawful and should be vacated and set aside. It thus declines to consider the Plaintiffs' alternative theories.

### A.  *Center for Biological Diversity v. Zeldin*

The Parties' arguments substantially revolve around the import of the D.C. Circuit's recent decision in *Zeldin*. So, the Court begins by summarizing that decision. In *Zeldin*, the state of Florida applied to the U.S. Environmental Protection Agency (EPA) for authority to issue certain permits under Section 404 of "the Clean Water Act that would allow permittees associated with building and mining projects to discharge dredged or fill material into U.S. waters." 171 F.4th at 368. The intended permit recipients "normally would have to obtain an additional permit from the FWS or NMFS under Section 10 of the ESA if they wished to avoid liability for incidental takings resulting from the planned discharges." *Id.* But "Florida considered that extra step 'burdensome,' 'time consuming[,] and resource-intensive.'" *Id.* (alteration in original). It thus "proposed to 'streamline' the ESA's permitting process and to obtain broad, up-front ESA liability protection for all its future CWA permittees" by having the EPA "engage in a 'programmatic' Section 7 consultation with the FWS" aimed at approving Florida's application to assume Section 404 permitting authority. *Id.*

The EPA agreed to consider Florida's proposal and "submitted a request for a formal consultation with the FWS under Section 7 concerning [its] consideration of Florida's Section 404

20

application." *Id.* at 370. After completing its consultation, the FWS published a programmatic BiOp determining "that the EPA's approval of Florida's Section 404 permitting application would not jeopardize protected species or harm critical habitats." *Id.* In reaching this conclusion, "the FWS stated that it was 'not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis in [the] BiOp.'" *Id.* (alterations in original). Instead, it found that site-specific and species-specific effects would be sufficiently assessed and addressed through a "technical assistance" and coordination process in which Florida would have primary responsibility for reviewing and approving Section 404 permit applications and the FWS "would play a largely advisory role." *Id.* at 370-71.

Under the technical assistance process, Florida would receive and review material provided by Section 404 permit applicants that included "a description of the proposed activity, the 'specific areas' affected by the activity, a description of protected species and habitats in the area and ways in which they might be affected, analysis of any cumulative effects, and other 'relevant information,' including, '[w]hen needed, proposed project designs and . . . conservation measures that would avoid and minimize the expected impacts to listed species and their habitats.'" *Id.* at 371 (alterations in original). Based on that information, Florida "would decide whether protected species or habitats would be adversely affected if the permit were granted." *Id.* The FWS, meanwhile, would receive and review all the Section 404 permit applications (which would be sent to the FWS by Florida) and "could . . . participate in the approval process if it chose to do so." *Id.* If, for example, the FWS "found that an application 'may cause an adverse effect to [a] species,'" it could require that the project "include additional protective measures or Florida [would] reject the permit." *Id.* (alteration in original). The FWS could also, "if it wished, provide

21

Florida with technical information and recommend measures that would avoid or minimize effects." *Id.* (cleaned up).

In formulating its BiOp, "[t]he FWS reasoned that the 'assum[ed]' coordination between the FWS and Florida in the technical assistance program was 'as protective as the section 7 interagency consultation process.'" *Id.* (second alteration in original). And based on that supposed efficacy, the Service concluded "that Florida's program was 'sufficiently structured' to avoid jeopardy to ESA-listed species." *Id.* In formulating the BiOp's accompanying ITS, the FWS found that "some incidental take was 'reasonably certain'" to occur from Florida's permitting program. *Id.* But much like the effects analysis, the FWS determined that it could not estimate the incidental take amount "because it was 'not possible for [the] FWS to know what permits would issue and where throughout the life of the program, let alone specific amounts of take resulting from those permits.'" *Id.* at 372. "Instead, the FWS stated that Florida would estimate incidental-take amounts on a permit-by-permit basis and that the FWS would track anticipated take amounts of listed species on a permit-by-permit basis." *Id.* The ITS further provided "that Florida (not the EPA) would reinitiate consultation with the FWS if Florida found that its own permit-level incidental-take estimates were exceeded." *Id.* And it conferred "ESA liability protection for incidental takings of protected species" on all permittees so long as Florida complied with the ITS and the technical assistance program. *Id.*

A coalition of environmental groups filed suit alleging that the EPA's approval of Florida's Section 404 permitting application was unlawful. *Id.* The district court granted summary judgment in the plaintiffs' favor, holding, among other things, "that the FWS's BiOp and ITS must be set aside" because they "failed to comply with applicable standards under the ESA." *Id.* at 372-73. On appeal, the D.C. Circuit affirmed, similarly concluding that both the BiOp and the ITS violated

22

critical ESA requirements. *Id.* at 382–83. While all three judges on the panel wrote separately to explain their reasoning (and Judge Henderson dissented from some of the majority's conclusions), a majority of the *Zeldin* panel agreed on three points pertinent here.

*First*, the panel unanimously concluded that the programmatic ITS issued by the FWS violated several Section 7 regulations. *See id.* at 377, 379–81. Most notably, the ITS did "not quantify 'the amount or extent' of incidental take of ESA-listed species, due to an asserted 'inability to anticipate the locations of future State 404 permit applications,' which 'did not allow the [FWS] to conduct site-and species-specifi[c] analyses to estimate the number of individuals that might be affected by the permitted activities.'" *Id.* at 380 (first alteration in original). Instead, the ITS left the amount of incidental take to be quantified through the "technical assistance process" conducted between the FWS and Florida. *Id.*

The Circuit viewed this as a critical error. It rejected the FWS's explanations for why it could not estimate an incidental-take amount, noting that the ESA requires the FWS to "use the 'best available information'" and that the "FWS had 'reams' of information about protected Florida species at its disposal" that it could have used. *Id.* at 380–81. The Circuit further noted that providing an "initial estimate of 'the amount or extent' of incidental take is an important feature of any ITS because that take amount triggers immediate reinitiation of consultation between the [consulting agency] and the action agency under Section 7." *Id.* at 380 (citing *Am. Rivers v. FERC*, 895 F.3d 32, 48-49 (D.C. Cir. 2018)). As Judge Wilkins noted in his concurrence, the "ESA regulations mandate that the parties must monitor the impact of [an] action on protected species, and if the amount of take exceeds the limit set forth in the ITS, 'the Federal agency must reinitiate consultation immediately.'" *Id.* at 385 (Wilkins, J., concurring) (quoting 50 C.F.R. §§ 402.14(i)(4)–(5)). Complying with that requirement is impossible if the ITS does not even

23

estimate a take limit that can potentially be exceeded. *Id.* (noting that an ITS that lacks "a clear and enforceable incidental take limit . . . violates the ESA"). The *Zeldin* court thus concluded that the FWS's failure to include such a limit in its programmatic ITS governing Florida's permitting program was "arbitrary and capricious" because it "openly violate[d] applicable regulations regarding take amounts and the reinitiation of consultation." *Id.* at 381.[1]

*Second*, both Judge Pan and Judge Wilkins agreed that the BiOp approving Florida's permitting program was unlawful and must be set aside. *See id.* at 377. Judge Pan, in a portion of her opinion not joined by the other judges, identified several reasons why the BiOp was deficient. Chief among them was that the BiOp failed to include "a meaningful site-specific and species-specific effects analysis," as required by 50 C.F.R. § 402.14(g). It instead opted to have site-specific and species-specific information "assessed through the technical assistance process." *Id.* And it left compliance with various other ESA requirements to this "technical assistance program," which Judge Pan found was "not 'as protective' as the Section 7 consultation process." *Id.* Unlike a Section 7 consultation, the technical assistance process required only that Florida "share permit applications with the FWS" and give FWS "the *option* of weighing in to overturn *Florida's* effects determinations." *Id.* at 377-78. The FWS then could, but was not required to, provide Florida with technical information and "recommend[] measures that would avoid or minimize effects." *Id.* at 378. The technical assistance process also did not require that either Florida or the FWS evaluate each Section 404 permit using "the best scientific and commercial data available," as the

---

[1] In explaining how the ITS fell short, Judge Pan (writing for the unanimous court) further noted that the ITS failed to "identify *specific* 'reasonable and prudent measures' to minimize the impact of incidental take," as required by 50 C.F.R. § 402.14(i)(1)(ii). *Zeldin*, 171 F.4th at 380. Rather, it "(1) generally instruct[ed] the EPA, Florida, and other agencies to minimize impacts on protected species, and (2) 'assume[d] that through technical assistance with the State,'" the FWS would help develop appropriate measures to ensure each permit minimized adverse effects and avoided placing ESA-listed species in jeopardy. *Id.* (emphasis in original).

24

FWS "would be required to do in carrying out a proper Section 7 consultation." *Id.* (first citing 16 U.S.C. § 1536(a)(2); and then 50 C.F.R. § 402.14(g)(8)).

Considering these differences, Judge Pan concluded that the technical assistance program was "far less demanding than what is required under Section 7." *Id* And the FWS's reliance on that "less protective" process to ensure ESA compliance was fundamentally different from the Service permissibly finding that the effects of later programmatic actions could be addressed by subsequent Section 7 consultations. *Id.* at. 378–79. Programmatic consultations, Judge Pan noted, "may delay but may not avoid the requirements of Section 7." *Id.* at 378. After all, "[n]either the ESA nor its implementing regulations permit the FWS to dilute the requirements of Section 7" and replace them with a "watered-down" technical assistance procedure that "does not comport with agency regulations or programmatic approvals." *Id.* at 379.

Judge Wilkins did not join Judge Pan's reasoning regarding the BiOp's deficiencies but instead emphasized simply that a BiOp cannot be compliant unless it includes an ITS that specifies the impact of incidental taking and the amount or extent of such taking. *Id.* at 385 (Wilkins, J., concurring) (first citing 16 U.S.C. § 1536(b)(4)(i); and then 50 C.F.R. § 402.14(i)(1)(i)). In other words, Judge Wilkins reasoned that because a BiOp requires a compliant ITS and the ITS at issue was plainly deficient, the BiOp was also deficient and no further analyses of its deficiencies was necessary. *See id.* at 384 ("[V]acatur of the Incidental Take Statement as deficient, . . . results in vacatur of the Biological Opinion because its no jeopardy finding is dependent upon the deficient ITS."). Thus, the most significant way in which Judge Wilkins' view appears to differ from Judge Pan's is that he found her additional analysis unnecessary to reach their shared conclusion that the BiOp was deficient.

25

*Third*, and finally, Judge Pan and Judge Wilkins agreed that the unlawful agency actions at issue needed to be set aside. *Id.* at 382–83. While the *Zeldin* majority identified four agency actions that violated the ESA and the APA—"the BiOp, the ITS, the EPA's failure to consult with the NMFS, and the EPA's approval of Florida's permitting program"[2]—they noted that "[e]ach of those unlawful agency actions require[d] the normal remedy of vacatur." *Id.* The Circuit noted that "the deficiencies of each action [were] serious" and could not be "sufficiently explain[ed] on remand." *Id.* at 383. The FWS's BiOp and "no-jeopardy determination," for example, was based on "a flawed effects analysis and inaccurate assumptions about the efficacy of the technical assistance process." *Id.* The Circuit also found that vacatur was unlikely to cause undue "disruptive consequences" as it was prospective and would "not call into question previously issued Section 404 permits." *Id.*

## B.    The Current Challenge

Turning to this case, the Court finds that *Zeldin* controls and resolves this case in the Plaintiffs' favor. First, the ITS that accompanies the 2020 BiOp violates the ESA because it does not set a clear and enforceable incidental take limit. Second, the 2020 BiOp is itself invalid because it does not include a robust effects analysis and relies on a technical assistance coordination process that is not as protective as Section 7 consultation under the ESA. Third, those deficiencies warrant the normal remedy of vacatur, although in a more limited fashion than was appropriate in *Zeldin*.[3]

---

[2] The latter two actions are not relevant here, so the Court need not address them.

[3] The Parties more broadly disagree about whether non-federal entities may ever receive incidental take coverage based on a Section 7 consultation obtained by a federal agency that is not the permitting authority or if they must instead proceed under Section 10 themselves. *See* Pls.' Mot. 15–21; Defs.' Cross-Mot. 21–22. The Court declines to reach that question given its finding that the 2020 BiOp and ITS at issue are invalid.

In arguing otherwise, the Defendants effectively ask the Court to disregard *Zeldin*. And, curiously, even post-*Zeldin*, they "maintain" that the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), "was correctly decided and is persuasive under the facts of this case." Defs.' Reply 3 n.1. But the Defendants do not bother to explain how that position can be reconciled with *Zeldin*, which concluded that *Cooling Water* is neither binding in this Circuit nor persuasive. 171 F.4th at 378 ("*Cooling Water* does not bind us and its reasoning is at odds with applicable regulations and our own precedents." (citation omitted)); *see also id.* at 386–87 (Wilkins, J., concurring). The Circuit's dim view of *Cooling Water* was consistent with that of the district court in *Zeldin*, which found that the Second Circuit's decision "stands alone" and "is at odds with the statute, regulations, and caselaw." *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 48. This Court agrees.

### 1.    The 2020 ITS

The ITS attached to the 2020 BiOp suffers from the same critical deficiencies as the ITS in *Zeldin*. The ITS does not quantify or even estimate the amount or extent of incidental take of ESA-listed species that is permitted, as the ESA requires. *See* 50 C.F.R. § 402.14(i)(1)(i); *Zeldin*, 171 F.4th at 380. It instead claims an inability to provide such an estimate because of insufficient information about where specific permitted activities might occur in the future and "the number of specific individuals that might be affected by such activities." FWS_36684; *see also Zeldin*, 171 F.4th at 380. And it therefore leaves the amount of incidental take to be quantified later through a technical assistance process conducted by the FWS and a State regulatory authority. FWS_36684–85; *Zeldin*, 171 F.4th at 380.

The *Zeldin* court rejected such an approach as inconsistent with the ESA. Like the ITS in *Zeldin*, the 2020 ITS lacks a clear take limit that, if exceeded, can effectively trigger "immediate

reinitiation of consultation" as required by 50 C.F.R. § 402.14(i)(5). *Zeldin*, 171 F.4th at 380–81 (citing *Am. Rivers*, 895 F.3d at 48–49); *see also id.* at 385 (Wilkins, J., concurring) (noting that an ITS "without a clear and enforceable incidental take limit . . . violates the ESA"). In addition to this critical shortcoming, the ITS also fails to "identify *specific* 'reasonable and prudent measures' to minimize the impact of incidental take." *Id.* at 380 (emphasis added) (quoting 50 C.F.R. § 402.14(i)(1)(ii)). It instead generally instructs the OSMRE to use its oversight "authorities to minimize impacts to listed species." FWS_36685. Just as in *Zeldin*, "[b]ecause the ITS openly violates applicable regulations regarding take amounts and the reinitiation of consultation, it is arbitrary and capricious" in violation of the APA. *Zeldin*, 171 F. 4th at 381.

### 2.    The 2020 BiOp

The 2020 BiOp is also unlawful. As discussed earlier, Judge Pan found the BiOp in *Zeldin* legally deficient because, among other reasons, it did not include a robust effects analysis as required by 50 C.F.R. § 402.14(g), and it left that analysis and compliance with other ESA requirements to a "technical assistance program" that was "not 'as protective' as the Section 7 consultation process." *Zeldin*, 171 F.4th at 377. Both of those things are true here as well.[4]

*First*, as to the effects analysis, the FWS concluded in the 2020 BiOp that "it [was] not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis" in the BiOp. FWS_36662. Instead, the FWS noted "that site-specific and species-specific

---

[4] Though Judge Pan wrote alone on this point in *Zeldin*, the Court finds her analysis highly persuasive. The Defendants note that the Court may not be bound by either concurring opinion in *Zeldin*, citing *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *3 (D.C. Cir. Nov. 14, 2025). Defs.' Reply 2. But *J.G.G.* noted only that two concurrences in a fragmented circuit panel decision may have no "precedential effect" if they "have no meaningful points of agreement." 2025 WL 3198891, at *3 (Pillard, Wilkins & Garcia, JJ., respecting the denial of rehearing en banc). And the Court does not read Judge Wilkins and Judge Pan as "hav[ing] no meaningful points of agreement." *Id.* Either way, the Court finds both concurrences persuasive and sees no compelling reason to disregard them.

information [would] be available and assessed through the technical assistance process." *Id*. This is functionally identical to the approach that Judge Pan rejected in *Zeldin*. *See* 171 F.4th at 377 ("[T]he FWS did not evaluate how the approval of Florida's permitting program would affect listed species or critical habitat" and instead "stated in the BiOp that it was 'not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis in [the] BiOp.'" (second alteration in original)). That approach is equally problematic here.

*Second*, the technical assistance process outlined in the Coordination and Dispute Resolution Processes is less protective than Section 7 consultation under the ESA. As discussed at length above, the Section 7 formal consultation process is rigorous. *See id.* at 365. It requires that the federal agency initiating consultation provide the consulting agency with a substantial amount of information regarding all aspects of the proposed action. *See* 50 C.F.R. § 402.14(c)–(d). The consulting agency is then required to conduct a detailed review of that information; to conduct, if necessary, an on-site inspection; to evaluate the current status and environmental baseline for any listed species or critical habitat that may be affected by the proposed action; and to assess what effects the action might have on those species and habitats. *Id.* § 402.14(g). These tasks require the consulting agency to play a direct and proactive role in reviewing each proposed action and to thereby formulate a well-supported opinion "as to whether the action is likely to jeopardize" the species or habitat in question. *See id*. § 402.14(g)–(h).

Here, the technical assistance process takes key responsibilities assigned to the consulting agency under Section 7 (like conducting effects analyses and making a jeopardy determination) and delegates them to state regulatory authorities to conduct in the first instance. FWS_36708–09. It also leaves the scope of information to be provided to the FWS for each permit to "the discretion of the State regulatory authority." FWS_36708. Thus, the technical assistance process is less

29

43

protective than Section 7 and the Court agrees with Judge Pan that "[a] technical assistance process that sets standards less protective than those prescribed by the ESA cannot displace the ESA itself." *Zeldin*, 171 F. 4th at 379.

Indeed, although the technical assistance process at issue does not suffer from all the same deficiencies as the process in *Zeldin*, *compare, e.g.*, *id.* at 371 (noting the FWS's participation in permit approval process was optional) *with* FWS_36709 (spelling out actions the FWS "will" take as part of approval process), it is even less protective than the process in *Zeldin* in at least one key respect. In *Zeldin*, the technical assistance process gave the FWS the option to overturn effects determinations that Florida made with respect to specific permit applications. 171 F.4th at 377–78. It also empowered the FWS to insist that a project "include additional protective measures" and, if it did not, "Florida [would] reject the permit." *Id.* at 371. Here, the Coordination and Dispute Resolution Processes do not give the FWS such dispositive authority. Rather, even after the Secretary of Interior has proposed that a State regulatory authority require protective measures for a certain mining project, the State may still "reject the proposed resolution and approve the permit." FWS_36713.

In attempting to rebut arguments about the deficiency of the technical assistance process, the Defendants make much of the fact that the SMCRA regulatory program at issue is not a new program like Florida's proposal in *Zeldin*. They emphasize that "states with primacy have been appropriately following a technical assistance process mandated by the federal regulations implementing [the] SMCRA" for "nearly five decades." Defs.' Reply 3–4. The 2020 BiOp expressly acknowledges, however, that the requirements of the SMCRA, "*on their own*, will not necessarily eliminate adverse effects on ESA-proposed and listed species and designated proposed critical habitat." FWS_36670 (emphasis added); *see also* FWS_36673 ("Implementation of the

30

monitoring practices associated with SMCRA, on their own, will not necessarily adequately monitor effects on ESA-proposed and -listed species or designated and proposed critical habitat in all cases."). That is why the BiOp emphasizes the importance of the Coordination and Dispute Resolution Processes—both of which were developed as part of the 2020 consultation, FWS_36607—to ensure that the FWS can help reduce "the impacts of surface mining operations on ESA-proposed and -listed species" and "critical habitat," FWS_36670. And as described above, that technical assistance process is lacking.

For all the above reasons, the Court concludes that the 2020 BiOp is arbitrary and capricious because it lacks an effects analysis and relies on a technical assistance process that is less protective than Section 7 consultation.[5]

## C.    Remedies

Turning to the appropriate remedy, "[w]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *Zeldin*, 171 F.4th at 378 (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). That is because Congress has directed courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). Under certain limited circumstances, a court may remand an agency's action or decision to the agency. *Am. Great*

---

[5] As noted above, Judge Wilkins agreed with Judge Pan that the BiOp in *Zeldin* needed to be set aside, but he reached that conclusion for a different reason. Judge Wilkins reasoned that the validity of the BiOp was so inextricably linked to the validity of its accompanying ITS that the deficient ITS rendered the BiOp deficient. *See Zeldin*, 171 F.4th at 384–86 (Wilkins, J. concurring) ("[V]acatur of the Incidental Take Statement as deficient, . . . results in vacatur of the Biological Opinion because its no jeopardy finding is dependent upon the deficient ITS."). As he explained, "a clear and enforceable take limit" is necessary to enable effective monitoring of the impact of an approved federal action, and thus a consulting Service cannot conclude its consultation (and issue a BiOp) without first setting a clear take limit. *Id.* at 385–86 ("Neither the statute nor the regulations allow the action agency to state that take limits will be determined at a later time, and then deem Section 7 consultations finished."). The Court agrees with Judge Wilkins' reasoning, which provides an independent basis for finding that the 2020 BiOp is deficient.

31

*Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). But "remand without vacatur remains an exceptional remedy." *Id.* at 519. To determine whether remand without vacatur is appropriate, the Court must consider: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). The Court must also ensure that any "injunction" it issues is "narrowly tailored to remedy the specific harm shown." *Neb. Dep't of Health & Hum. Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006).

In *Zeldin*, the Circuit held that the BiOp and the ITS were "each . . . unlawful agency actions" that "require[d] the normal remedy of vacatur." 171 F.4th at 382–83. In applying the *Allied-Signal* factors, the Circuit held: first, that "the deficiencies of each action [were] serious and the EPA [could] not sufficiently explain its actions on remand," and second, that "vacatur would not likely cause undue 'disruptive consequences' from 'an interim change that may itself be changed.'" *Id.* Given that the Court has identified much the same deficiencies with the BiOp and ITS here, it sees no reason to deviate from *Zeldin*'s general finding that vacatur rather than remand is appropriate for the unlawful agency actions at issue.

Even so, the Court deviates from *Zeldin*'s approach on vacatur in one notable way. As discussed, the 2020 BiOp and ITS cover not just the OSMRE's oversight of state regulatory programs with primacy, but also the OSMRE's "direct implementation and enforcement" of the SMCRA "in Federal program States and on Indian lands." FWS_36605. And the BiOp provides different guidance for the OSMRE's implementation of the SMCRA in states where it "retains permitting authority" as compared to its role in overseeing the regulatory programs of primacy States. FWS_36609. Of particular note, the BiOp's assessment of the OSMRE's direct permitting

32

of projects in states where it is the primary regulatory authority does not hinge on the technical assistance process that undergirds its oversight of primacy states. Rather, the BiOp concluded that the OSMRE's direct permitting of mining projects was "not likely to jeopardize" ESA-protected species or habitats because each of those projects would be covered by site-specific "step-down" Section 7 consultations that would assess the effects of the proposed projects. FWS_36682; *see also* FWS_36667 ("For OSMRE-issued permits that may affect ESA-listed species or designated critical habitat, section 7(a)(2) consultation is required and will be performed separately."); FWS_36621; FWS_36629; FWS_36664; FWS_36670; FWS_36678; FWS_36680. Those "project-specific, step-down" Section 7 consultations would also analyze and quantify "any incidental take anticipated to occur" from "mining activities in which [the] OSMRE is the authority issuing permits." FWS_36684–85.

The Plaintiffs do not challenge the 2020 BiOp as it applies to the OSMRE's direct permitting authority. Indeed, the Plaintiffs' facial challenge to the BiOp focuses on how the BiOp "does not 'insure' that SMCRA-permitted mining activities *in states with primacy* are not likely to jeopardize" ESA-protected species and habitats. Am. Compl. ¶ 157 (emphasis added). And the specific harms that the Plaintiffs identify are in primacy states: Kentucky, Virginia, and West Virginia. *Id.* ¶ 67; *see also* FWS_36609–10. Further, the Plaintiffs' summary judgment motion asks that the Court "vacate the 2020 BiOp *as it applies* to State-delegated SMCRA programs." Pls.' Mot. 29 (emphasis added). Accordingly, the Court sees no basis for disturbing the 2020 BiOp or its accompanying ITS as they apply to the OSMRE's regulation of mining activities in non-primacy states. It thus vacates and sets aside only those portions of the 2020 BiOp and the ITS that concern the OSMRE's oversight of primacy states. Finally, to further minimize any "disruptive

33

consequences" from this decision, the Court's vacatur of the BiOp and ITS "is prospective and [does] not call into question previously issued . . . permits." *Zeldin*, 171 F.4th at 383.

*    *    *

The Court recognizes that the burdens imposed by the ESA can often be substantial. But that is by design. As the Supreme Court has noted, "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184. That "is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Id.* The D.C. Circuit's recent decision in *Zeldin* affirms the importance of enforcing all aspects of the ESA—even though that makes it more difficult for federal and state actors to authorize activities, like coal mining, that may adversely affect the endangered and threatened species that the ESA protects. Congress knowingly imposed these burdens based on its recognition of what was at stake for our nation's wildlife. And it is not this Court's place to question or ignore that policy choice.

In issuing this decision, the Court is also cognizant of the federalism concerns that underlie the SMCRA's regulatory scheme for coal mining. But in enacting the SMCRA, Congress did not displace the ESA. Indeed, the Circuit faced similar concerns regarding the Clean Water Act in *Zeldin* and still vacated the agency action at issue. To be clear, the Court's decision today says nothing about the validity of the relevant SMCRA regulations. It says only that the Defendants may not ignore critical aspects of the ESA when administering the SMCRA.

**CONCLUSION**

For all these reasons, the Court grants the Plaintiffs' Motion for Summary Judgment as to Claim 3, ECF No. 42, and denies the Defendants' Cross-Motion for Summary Judgment, ECF No. 45, on that same claim. In light of this ruling, and the Court's conclusion that it warrants vacating and setting aside the 2020 BiOp and ITS as they apply to the OSMRE's oversight of

34

primacy states, the Court declines to reach the merits of Claims 1 or 2 as they essentially present alternative theories for obtaining the same relief. Moreover, because the Court's conclusion regarding Claim 3 is not dependent on any extra-record materials, the Court denies as moot the Defendants' Motion to Strike the Plaintiffs' Extra Record Declaration and Exhibits. ECF No. 44.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:    May 29, 2026

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, *et al.*, <br><br> *Defendants*. |

Civil Action No. 23-3343 (SLS)

Judge Sparkle L. Sooknanan

### ORDER

For the reasons stated in the Court's Memorandum Opinion, ECF No. 53, the Court **GRANTS** the Plaintiffs' Motion for Summary Judgment as to Claim 3, ECF No. 42, and **DENIES** the Defendants' Cross-Motion for Summary Judgment, ECF No. 45, on that same claim. The Court vacates and sets aside the 2020 BiOp and ITS as they apply to the U.S. Office of Surface Mining Reclamation and Enforcement's oversight of primacy states. The Court declines to reach the merits of Claims 1 or 2, which seek the same ultimate relief, and **DENIES** as moot the Defendants' Motion to Strike the Plaintiffs' Extra Record Declaration and Exhibits. ECF No. 44. The Court directs the Clerk of the Court to terminate this case from the active docket.

**SO ORDERED.**

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 29, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, *et al.*, <br><br> *Defendants*. |

Civil Action No. 23-3343 (SLS)

Judge Sparkle L. Sooknanan

## ORDER

For the reasons stated in the Court's Memorandum Opinion, ECF No. 53, the Court **GRANTS** the Plaintiffs' Motion for Summary Judgment as to Claim 3, ECF No. 42, and **DENIES** the Defendants' Cross-Motion for Summary Judgment, ECF No. 45, on that same claim. The Court vacates and sets aside the 2020 BiOp and ITS as they apply to the U.S. Office of Surface Mining Reclamation and Enforcement's oversight of primacy states. The Court declines to reach the merits of Claims 1 or 2, which seek the same ultimate relief, and **DENIES** as moot the Defendants' Motion to Strike the Plaintiffs' Extra Record Declaration and Exhibits. ECF No. 44. The Court directs the Clerk of the Court to terminate this case from the active docket.

**SO ORDERED.**

SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 29, 2026

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, *et al.*,<br><br>        *Defendants*. | Civil Action No. 23‑3343 (SLS)<br><br>Judge Sparkle L. Sooknanan |

## MEMORANDUM OPINION

The Endangered Species Act of 1973 entrusts federal agencies with the critical task of identifying and preserving endangered and threatened species across our country. This case is about whether the Act permits those agencies to delegate certain authorities and responsibilities to state regulators in the field of coal mining. The Plaintiffs in this case are two environmental groups—the Center for Biological Diversity and Appalachian Voices—that are concerned about the risks that coal mining activities pose to threatened species living in Appalachian streams and rivers, including the Guyandotte River crayfish, Big Sandy crayfish, and candy darter. They claim that the dwindling number of streams and rivers where these creatures live are at risk of pollution by displaced sediment, chemical run-off, and other aftereffects of mining. And they contend that even brief lapses in regulatory oversight could cause significant harm to these threatened species, including their complete elimination.

The Plaintiffs brought this lawsuit to challenge a written Biological Opinion by the U.S. Fish and Wildlife Service finding that the mining regulatory program administered by the U.S.

Office of Surface Mining Reclamation and Enforcement is unlikely to jeopardize the continued existence of threatened species. The Plaintiffs assert that the Biological Opinion flouts carefully designed procedures in the Endangered Species Act and impermissibly approves entrusting state regulators with responsibilities that lie with the federal Defendants. The Parties now cross-move for summary judgment. For the reasons below, the Court concludes that the Biological Opinion is arbitrary and capricious and must be set aside.

BACKGROUND

A.    **Statutory and Regulatory Background**

1.    **The Endangered Species Act (ESA)**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It "seeks to protect species of animals against threats to their continuing existence caused by man." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558 (1992). Congress tasked two agencies with administering the ESA: the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS). *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007). "The NMFS administers the ESA for protected marine and anadromous species (ones that migrate between freshwater and saltwater); and the FWS administers the ESA with respect to all other protected species." *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 365 (D.C. Cir. 2026) (citing 50 C.F.R § 402.01(b)).

"[A] species can be 'listed' as either 'endangered' or 'threatened'" under the ESA. *Id.* at 364–65 (quoting 16 U.S.C. § 1533). The Act defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range" and a threatened species as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). Once a

2

species has been "listed," it gains "significant protections" under the ESA, *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 749 F. Supp. 3d 26, 36 (D.D.C. 2024), which "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "a program for the conservation of such endangered species and threatened species," 16 U.S.C. § 1531(b).

Section 9 of the ESA makes it unlawful for "any person," including private parties, States, and federal agencies, to "take" an endangered species. *Id.* § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). And "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995). Violators of this prohibition may face civil or criminal penalties. *See* 16 U.S.C. § 1540.

"Recognizing that some take can occur as a result of otherwise lawful activities, Congress created two paths to ensure that 'incidental take' does not jeopardize protected species or adversely modify or destroy critical habitat: The first path, under Section 7, applies to federal agency actions, and the second, under Section 10, applies to non-federal actions." *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 15 (D.D.C. 2024) (first citing 16 U.S.C. § 1536; and then *id.* § 1538), *aff'd sub nom., Zeldin*, 171 F.4th 356. Both Section 7 and Section 10 "offer the promise of liability protection for incidental take" if certain requirements are met. *Id.* (first citing 16 U.S.C. §§ 1536(o)(2), 1539(a); and then 50 C.F.R. § 402.14(i)(5)).

### a.    Section 7 Consultation

Section 7 of the ESA "prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." *Nat'l Ass'n of Home Builders*,

3

551 U.S. at 652. Section 7(a)(2) provides that "[e]ach Federal agency shall, in consultation with and with the assistance of [the FWS or the NMFS], insure that any action authorized, funded, or carried out by such an agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.02. "Action" is defined to cover "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid." 50 C.F.R. § 402.02. And an action "jeopardize[s] the continued existence of" an endangered or threatened species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* The agency proposing the action is known as the "action agency," and the agency providing consultation—either the FWS or the NMFS—serves as the "consulting agency." *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 474 n.3 (D.D.C. 2014).

The action agency must first determine whether formal consultation is required. To do this, "[e]ach federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). "If the action agency determines—and the consulting agency concurs—that 'the proposed action is not likely to adversely affect any listed species or critical habitat,' then no formal consultation is required." *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 16 (quoting 50 C.F.R. § 402.14(b)(1)). But if the action agency "concludes after an initial review that its action 'may affect listed species or critical habitat,' that agency must engage in 'consultation' with [the FWS or the NMFS]." *Id.* (quoting 50 C.F.R. § 402.14(a)); *see also* 50 C.F.R. § 402.02 (defining "Service" as either the FWS or the

4

NMFS, "as appropriate"). A formal consultation under Section 7 is triggered for a discrete federal agency action or "an agency's multiple actions on a program, region, or other basis." 50 C.F.R. § 402.02.

### b.    Biological Opinion

The first step of a Section 7 formal consultation requires the consulting agency to prepare a written Biological Opinion (BiOp) that evaluates whether the planned agency action is "likely to jeopardize the continued existence" of a protected species or result in the "destruction or adverse modification" of its critical habitat. *See* 16 U.S.C. § 1536(a)(2)–(4). "The process of preparing a BiOp is a rigorous endeavor." *Zeldin*, 171 F.4th at 365. The consulting agency must:

> (1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the [action] agency and the applicant.
>
> (2) Evaluate the current status and environmental baseline of the listed species or critical habitat.
>
> (3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.
>
> (4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.14(g). Additionally, the consulting agency must "[f]ormulate a statement concerning incidental take, if such take is reasonably certain to occur." *Id.* § 402.14(g)(7).

The D.C. Circuit has referred "to the third BiOp requirement as the 'effects analysis.'" *Zeldin*, 171 F.4th at 366 (citing 50 C.F.R. § 402.14(g)(3)). And it has described that analysis as "encompass[ing] two types of effects." *Id.* "First, the 'effects of the action' include 'all consequences to listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* (alteration in original)

(quoting 50 C.F.R. § 402.02). Such effects "may occur later in time and may include consequences occurring outside the immediate area involved in the action." 50 C.F.R. § 402.02. "Second, the 'cumulative effects' on the listed species include 'those effects of future State or private activities, *not* involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.'" *Zeldin*, 171 F.4th at 366 (emphasis in original) (quoting 50 C.F.R. § 402.02).

Once the consulting agency has completed the effects analysis, it must "[a]dd the effects of the action and cumulative effects to the environmental baseline" and then, "in light of the status of the species and critical habitat," formulate its "opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). "In other words, the [consulting agency] must determine whether the planned action 'reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.'" *Zeldin*, 171 F.4th at 366 (quoting 50 C.F.R. § 402.02). Finally, the consulting agency must set forth its opinion in a BiOp, summarizing the information on which its jeopardy determination is based, and detailing "how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h).

"In the event of a 'jeopardy' determination, the consulting agency 'shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency].'" *Zeldin*, 171 F.4th at 366 (alterations in original) (quoting 16 U.S.C. § 1536(b)(3)(A)). "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from

6

the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." *Id.* (alteration in original) (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 652). "Importantly, in 'formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures,' the [consulting agency] [is] required to 'use the best scientific and commercial data available.'" *Id.* (quoting 50 C.F.R. § 402.14(g)(8)); *see also* 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

### c.    Incidental Take Statement

If the consulting agency makes a "no-jeopardy" determination but concludes that incidental take is nonetheless "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7), it must proceed to "the second step of the Section 7 consultation process" and provide an "incidental take statement" or ITS, *Zeldin*, 171 F.4th at 366; *see also* 50 C.F.R. § 402.14(i); 16 U.S.C. § 1536(b)(4). This step is necessary where a proposed action "may still cause some harm to the [listed] species" "[e]ven if [it] will not 'jeopardize the continued existence' of [the] listed species." *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1080 (D.C. Cir. 2021).

When an ITS is required, the consulting agency must include it as part of the BiOp, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1), and the ITS must "(i) specif[y] the extent of the anticipated take, (ii) identif[y] any 'reasonable and prudent measures' that the wildlife agency considers 'necessary or appropriate to minimize such impact,' and (iii) set[] forth detailed 'terms and conditions' that the action agency or licensed private party must undertake to implement those reasonable and prudent measures," *Shafer*, 992 F.3d at 1080 (quoting 16 U.S.C. § 1536(b)(4)). The ITS must specify "the impact of incidental taking as the amount or extent of such taking" on the species. 50 C.F.R. § 402.14(i)(1)(i). And the ITS may do that through a "surrogate (e.g., similarly

7

affected species or habitat or ecological conditions)" so long as it adequately explains why it must use a surrogate and it still "sets a clear standard for determining when the level of anticipated take has been exceeded[.]" *Id.*

"[T]he action agency or applicant must 'monitor the impacts of incidental take' and 'report the progress of the action and its impact on the species to the [consulting agency] as specified in the [ITS].'" *Zeldin*, 171 F.4th at 367 (second alteration in original) (quoting 50 C.F.R. § 402.14(i)(4)). "The action agency 'must reinitiate consultation *immediately*' if the 'amount or extent of incidental taking' specified in the ITS, as required by the regulations, 'is exceeded.'" *Id.* at 367 (emphasis in original) (quoting 50 C.F.R. § 402.14(i)(5)); *see also* 50 C.F.R. § 402.16(a)(1). The action agency must also reinitiate consultation under other circumstances, including: "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence;" or "[i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(a). Such reinitiation "shall be requested" by the action agency. *Id.*

"Ultimately, if [a consulting agency] provide[s] a no-jeopardy determination and issue[s] an ITS, then the ITS offers a safe harbor to those who participate in the planned agency action: Parties that comply with the terms and conditions specified in the ITS are exempted from civil and criminal liability under the ESA for any incidental takings, and they need not seek any other authorization or permit under the ESA." *Zeldin*, 171 F.4th at 367; *see also* 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(6).

8

### d.    Programmatic Consultation

A formal consultation under Section 7 is also necessary for "an agency's multiple actions on a program, region, or other basis." 50 C.F.R. § 402.02. This "is known as a 'programmatic consultation,'" under which the consulting agency may "consult on the effects of programmatic actions, such as '[m]ultiple similar, frequently occurring, or routine actions,' and proposed frameworks 'for future proposed actions.'" *Zeldin*, 171 F.4th at 367 (alteration in original) (quoting 50 C.F.R. § 402.02). The ESA's implementing "[r]egulations recognize that such 'multiple actions' might not be ready for full Section 7 consultation at the outset and may need to defer the required Section 7 analysis until a later time." *Id.* For example, the regulations contemplate authorization of federal programs for which "incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate." 50 C.F.R. § 402.14(i)(7); *see also id.* § 402.02 (defining "Framework programmatic action"). Importantly, however, "neither the statute nor any applicable regulation provides that 'programmatic' consultations allow the [consulting agency] to avoid the rigorous requirements of Section 7 consultation entirely." *Zeldin*, 171 F.4th at 367.

### e.    Section 10 Consultation

Section 10 establishes a different pathway for "private parties, states, and other nonfederal actors." *Id.* at 367–68 (first citing 16 U.S.C. § 1539(a); and then 50 C.F.R. § 402.14(i)(5)). "Under Section 10, a nonfederal actor may obtain a permit from the [FWS or the NMFS] that allows incidental takings to occur without subjecting the actor to liability under the ESA." *Id.* at 368 (citing 16 U.S.C. § 1539(a)(1)(B)). The permit process is significant. An applicant "must submit a conservation plan that describes the impacts of potential incidental takings, the steps the applicant will take to minimize and mitigate those impacts, alternatives to the planned activity,

9

why the applicant is not taking those alternatives, and any other measures that the [consulting agency] 'may require as being necessary or appropriate.'" *Id.* (citing 16 U.S.C. § 1539(a)(2)(A)). "The [consulting agency] must publish notice of the Section 10 permit application in the Federal Register and provide opportunity for public comment." *Id.* (citing 16 U.S.C. § 1539(c), (a)(2)(B)). "And the [consulting agency] must make certain findings before they can issue a permit that allows incidental takings, including that the takings 'will not appreciably reduce the likelihood of the survival and recovery of the species in the wild,' and that 'the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking.'" *Id.* (citing 16 U.S.C. § 1539(a)(2)(B)).

### 2.    The Surface Mining Control and Reclamation Act (SMCRA)

The Court provided a more detailed summary of the SMCRA in an earlier opinion in this case and assumes familiarity with that opinion. *See Ctr. for Biological Diversity v. U.S. OSMRE*, No. 23-cv-3343, 2025 WL 1503802, at *3–4 (D.D.C. May 27, 2025), ECF No. 33. In short, Congress enacted the SMCRA "to establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 105 F.3d 691, 693 (D.C. Cir. 1997) (quoting 30 U.S.C. § 1202(a)). The Department of Interior's Office of Surface Mining Reclamation and Enforcement (OSMRE) "administers and enforces" the SMCRA. *Id.* (citing 30 U.S.C. § 1211(c)).

"As part of its comprehensive regulatory scheme, the SMCRA provides for federal coordination with the states." *Coal River Mountain Watch v. U.S. Dep't of the Interior*, 146 F. Supp. 3d 17, 20 (D.D.C. 2015). "After an interim period of direct federal regulation, states are authorized by the [SMCRA] to assume a major regulatory role." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 701 (1988). "With the Secretary [of the Interior]'s approval, . . . state[s] [may]

10

assume[] primary responsibility for SMCRA enforcement and rulemaking." *Id.* at 701. States that have achieved this status are known as "primacy" states. *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 70 F.3d 1345, 1347 (D.C. Cir. 1995). But the OSMRE must still ensure that these state programs are properly administered and that violations of the SMCRA are corrected. *See* 30 U.S.C. §§ 1211(c), 1267, 1271 (describing the Secretary of the Interior's duties to oversee approved state programs).

### B.    Factual Background

#### 1.    The Effects of Coal Mining

The Plaintiffs are both non-profit 501(c)(3) corporations committed to overlapping environmental goals. *See* Am. Compl. ¶¶ 17–18, ECF No. 13. The Center for Biological Diversity "works to secure a future for all species, great or small, hovering on the brink of extinction." *Id.* ¶ 17. And Appalachian Voices is "committed to protecting the land, air, and water of the central and southern Appalachian region," with "a focus on reducing coal mining's impact on the region, including to species listed under the ESA." *Id.* ¶ 18. In this case, the Plaintiffs are particularly concerned about the ways that coal mining has negatively impacted threatened and endangered species in West Virginia, Kentucky, and Virginia. *See id.* ¶ 67.

The Plaintiffs allege that "coal mining activities have led to severe habitat degradation and dramatic population declines across the ranges of the Guyandotte River crayfish, Big Sandy crayfish, and candy darter." *Id.* ¶ 70. According to the Plaintiffs, coal mining has had a particularly negative impact on the Guyandotte River crayfish, which now survives in only two streams in West Virginia. *Id.* They point to hundreds of SMCRA-related actions as evidence that "the coal industry has a track record of chronic non-compliance with the requirements of [the] SMCRA across the ranges of both the Guyandotte River crayfish and Big Sandy crayfish." *Id.* ¶ 73. Both

11

species of crayfish, as well as the candy darter, are listed as endangered or threatened under the ESA. *See id.* ¶ 69; FWS_36633–34, ECF No. 52.

### 2.     The 2020 Biological Opinion

The OSMRE's implementation of its regulatory program for overseeing surface coal mining and reclamation operations has been subject to several ESA Section 7 consultations over the past thirty years, including in 1996 and 2016. FWS_36606–07. The consultation at issue here occurred in 2020, when the OSMRE requested that the FWS review its continued implementation of the SMCRA, including its "direct implementation and enforcement" of SMCRA regulations "in Federal program States and on Indian lands" and its "oversight of State regulatory programs with primacy." *Id*. With respect to the latter, the activities subject to consultation included the OSMRE's "oversight of State program compliance with requirements related to the protection and enhancement of proposed or listed species and proposed or designated critical habitats." FWS_36605. And importantly, that oversight included "implementation of two documents developed by [the] OSMRE in consultation with the [FWS]." *Id*. The first document detailed an "SMCRA/ESA Coordination Process." *Id*. And the second described a "Dispute Resolution Process Relevant to Regulatory Authorities Coordinating SMCRA Permitting with the USFWS." *Id*.

### a.  Coordination Process

The Coordination Process, which was attached to the FWS's BiOp as Appendix A, prescribed four steps by which State regulatory authorities and the FWS would coordinate their efforts regarding State permit issuance. First, "State regulatory authorities [would] approach the Service as early as possible in the permit application development process to provide sufficient time for the coordination and permit review and revision process as it relates to threatened or

endangered species or designated or proposed critical habitat." FWS_36708. The State authority would notify the FWS whenever it received complete applications to receive, renew, or significantly revise a permit. *Id*. And upon request by the FWS, it would provide the Service with any "fish and wildlife resources information in the permit application, as well as the fish and wildlife protection and enhancement plan." *Id*.

Second, the State authority would, "based upon [its] discretion," provide the FWS with "fish and wildlife resource information" necessary to facilitate the FWS's "timely and efficient review" of each permit application. *Id*. "[I]n most instances," this information would include a description of the action under consideration that addressed: "the areas to be disturbed by mining activities"; "any listed or proposed species or designated critical habitat that may be affected by the action"; the actions the operator and applicant would take to "minimize disturbance and adverse impacts on fish and wildlife," including on "listed or proposed species and designated critical habitat"; and the actions proposed by the permit applicant "to enhance fish, wildlife and related environmental values, where practicable." FWS_36708–09.

Third, the FWS would review the materials provided, notify the State if any additional information was needed, and evaluate "the State regulatory authority's written findings that the exploration, mining, and reclamation activities [would] not jeopardize the continued existence of an endangered or threatened species." FWS_36709. "If, in close coordination with the regulatory authority, the Service and the State regulatory authority determine[d] there [was] a need for additional species-specific protective measures (SSPMs), including reporting and monitoring, the Service and the State regulatory authority [would] develop SSPM[s] to minimize anticipated incidental take." *Id*. "If no additional SSPMs [were] required, the Service [would] provide the State regulatory authority with written confirmation that the technical assistance process ha[d]

13

been successfully completed." *Id*. If, however, the FWS "unilaterally suggest[ed] additional SSPMs" that the State regulatory did not accept, the State would explain why it rejected those measures and the Service and the State would attempt to resolve the issue through the Dispute Resolution Process described below. FWS_36709–10.

Fourth, and finally, the State regulatory authority would "issue a written notification to the Service of its decision to approve or deny an application for a permit if the Service filed comments or objections to the permit application." FWS_36710. And "[b]efore approving any permit application that may affect proposed or ESA-listed species or designated critical habitat, the State regulatory authority [would] make a finding that '[t]he operation would not affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the [ESA].'" *Id*. (third and fourth alterations in original).

### b.      Dispute Resolution Process

The Dispute Resolution Process, which was attached to the FWS's BiOp as Appendix B, was designed to resolve disagreements that arose in step three of the Coordination Process about what measures might be necessary "to minimize disturbances and adverse impacts" on species or habitats caused by permitted activity. FWS_36711. The Dispute Resolution Process provided a four-level "elevation process" if the State regulatory authority and the FWS could not agree on measures that the FWS had recommended. In short, the dispute could be elevated: first, to an OSMRE Field Office Director; second, to OSMRE and FWS Regional Directors; third, to OSMRE and FWS Headquarters; and fourth, to the Secretary of the Interior. FWS_36712–13. At each stage in the elevation process, the FWS officials involved would propose a resolution to the dispute. And at each stage, the State would retain the authority to reject the proposed resolution. This was true even at level four, where the State could either "require implementation of the proposed resolution"

14

offered by the Secretary of the Interior or "reject the proposed resolution and approve the permit." FWS_36713. At that point, the Dispute Resolution Process specified that "[f]urther elevations [would] not be available." FWS_36713.

### c.      Jeopardy Determination

In reviewing the OSMRE's proposed action, the FWS ultimately concluded that the OSMRE's implementation of the SMCRA "through its existing regulations [was] not likely to jeopardize the continued existence of proposed or listed species and or destroy or adversely modify designated or proposed critical habitat." FWS_36682. In reaching that conclusion, the FWS relied on the additional protections that it believed would be provided by the Coordination and Dispute Resolution Processes. It noted that "[i]mplementation of the performance standards required by the SMCRA, on their own, [would] not necessarily eliminate adverse effects on ESA-proposed and listed species and designated and proposed critical habitat." FWS_36670. But the FWS found that the Coordination Process would enable it to provide State regulatory authorities with "additional site-specific and species-specific protective measures, monitoring, and reporting recommendations to further enhance the protection of listed or proposed species or designated or proposed critical habitat." *Id*. And it concluded that the "OSMRE's commitment to exercise its oversight authority to resolve any issues that arise between regulatory authorities and the Service further suggest[ed]" that adverse effects to ESA-protected species and habitats would be "adequately minimized." *Id*.

The FWS left it to subsequent technical assistance and coordination to address issues that might otherwise be addressed during a standard Section 7 consultation. It concluded, for example, that "it [was] not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis" in the BiOp. FWS_36662. This was because the SMCRA's program was

15

"essentially nationwide" and "detailed information on the specific size, scope, and operation of future mining activities" that might be permitted under the program was not available. *Id*. Instead, the FWS noted that "site-specific and species-specific information [would] be available and assessed through the technical assistance process." *Id*.; *see also* FWS_36680.

### d.    Incidental Take Statement

The FWS took a similar approach in the ITS accompanying the BiOp. The Service noted that "the paucity of information regarding future mining projects . . . available at the time of [the] programmatic consultation [did] not allow the Service to identify the specific locations in which future mining projects [would] occur, the specific activities associated with a particular mining permit, and the number of individuals that might be affected by such activities in order for the Service to conduct species and site-specific analyses." FWS_36684. Accordingly, the ITS provided that "[f]or proposed mining activities" in primacy states where "incidental take of ESA-listed species [was] reasonably certain to occur, the amount and extent of incidental take anticipated from [those] proposed actions [would] be quantified by the Service and evaluated on a project-specific basis through the SMCRA Coordination Process." *Id*. Consistent with this approach, the ITS itself did not quantify or estimate a specific amount of incidental take that would be permitted. FWS_36684–85.

The ITS nonetheless provided that the "OSMRE, State regulatory authorities, and mine operators [would] be afforded an exemption from the prohibition against take resulting from surface mining activities subject to regulation under" the SMCRA, so long as the mining activities complied with the BiOp and the "Reasonable and Prudent Measures and associated Terms and Conditions" of the ITS. FWS_36685. The applicable Reasonable and Prudent Measures were that the OSMRE would "use its authorities to minimize impacts to listed species" by "evaluating and

16

assisting States and Tribes in the administration of SMCRA regulations, and the implementation,

enforcement, and maintenance" of their approved regulatory programs. *Id*. And the Terms and

Conditions required that, to be exempt from Section 9's take prohibitions, the OSMRE and State

regulatory authorities needed to engage with the FWS in accordance with the SMCRA

Coordination Process in their review and approval of permit applications. FWS_36685-86. If a

State regulatory authority disagreed about the necessity of an SSPM recommended by the FWS

and, after completing the dispute resolution process, "issu[ed] [a] permit without Service

concurrence," the permitted action would "not be exempted" from liability under the ITS.

FWS_36686. Finally, the OSMRE would provide an "annual evaluation report to the Service" on

"any known issues implementing the technical assistance or dispute resolution process." *Id*.

### e.    Reinitiation

The BiOp concluded by noting that, consistent with 50 C.F.R. § 402.16(a), reinitiation of

formal consultation would be required if:

1. The amount or extent of incidental take for [the BiOp was] exceeded;
2. New information reveal[ed] effects of the action that may affect listed species or critical habitat in a manner or to an extent not considered in [the BiOp];
3. The identified action [was] subsequently modified in a manner that cause[d] an effect to the listed species or critical habitat that was not considered in [the BiOp]; or
4. A new species [was] listed or critical habitat designated that may be affected by the action identified in [the BiOp].

FWS_36687. "Potential reinitiation scenarios" could also arise if certain assumptions in the BiOp

were "proven incorrect"—*e.g.*, about how State authorities and the OSMRE would adhere to

SMCRA regulations and would engage with the FWS through the Coordination and Dispute

Resolution Processes. *Id.*; *see also* FWS_36662–64.

17

### C.    Procedural Background

The Plaintiffs filed their Amended Complaint on March 4, 2024, raising three claims. *See* Am. Compl. ¶¶ 133–59. First, they allege that the OSMRE and the FWS violated the ESA and its implementing regulations by failing to reinitiate consultation, which constitutes agency action unlawfully withheld and unreasonably delayed in violation of the Administrative Procedure Act (APA). *Id.* ¶ 142 (first citing 50 C.F.R. § 402.16; and then 5 U.S.C. § 706(1)).  Second, they allege that the OSMRE violated Section 7(a)(2) of the ESA by not providing sufficient oversight for state implementation of the SMCRA programs as required by the 2020 BiOp, thereby failing to "insure that SMCRA-regulated mining operations will not jeopardize the continued existence of listed species or adversely modify their critical habitat." *Id.* ¶ 150 (citing 16 U.S.C. § 1536(a)(2)). And third, they allege that the 2020 BiOp opinion is facially invalid. *Id.* ¶¶ 151–59 (first citing 16 U.S.C. § 1536; and then 5 U.S.C. § 706(2)(A)).

The Defendants filed certified administrative record indices on July 10, 2024, ECF No. 20, and later provided the Court with complete certified copies of the administrative record, ECF No. 31. In May 2025, the Court denied a motion by the Plaintiffs to supplement the administrative record. *See Ctr. for Biological Diversity*, 2025 WL 1503802, at *1, ECF No. 33. And soon after, the Court granted an unopposed motion by the Plaintiffs to hold summary judgment briefing in abeyance pending a decision by the D.C. Circuit that the Plaintiffs expected would bear directly on this case. *See* Min. Order (June 13, 2025). In February—after the Defendants reversed their position and asked that the case proceed, *see* ECF No. 36—the Court lifted the stay, Min. Order (Feb. 11, 2026).

On March 4, 2026, the Plaintiffs moved for summary judgment. Pls.' Mot., ECF No. 42. On March 25, 2026, the Defendants opposed and cross-moved for summary judgment, Defs.'

Cross-Mot., ECF No. 45, while simultaneously moving to strike declarations and exhibits that the Plaintiffs had attached to their summary judgment motion, Mot. Strike, ECF No. 44. On March 27, 2026, the D.C. Circuit issued *Center for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026), and the Parties addressed the import of that decision in their final briefs. *See* Min. Order (Mar. 27, 2026). The Parties' motions are now ripe for decision. *See* Pls.' Reply & Opp'n Summ. J., ECF No. 48; Defs.' Reply Summ. J., ECF No. 50; Opp'n Mot. Strike, ECF No. 49; Reply Mot. Strike, ECF No. 51.

## LEGAL STANDARD

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The D.C. Circuit has held that ESA findings are reviewed under the APA "because the ESA does not specify a standard of review." *Zeldin*, 171 F.4th at 376 (citing *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 574 (D.C. Cir. 2016)).

The APA requires that the Court "set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The same is true of agency action undertaken "without observance of procedure required by law." *Id.* § 706(2)(D). "The question of whether agency action is arbitrary and capricious is a legal one generally made on the administrative record and resolved on summary judgment." *Zeldin*, 171 F.4th at 376 (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1277, 1282 (D.C. Cir. 2005)).

"It is well settled that an agency must adhere to its own regulations, and an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Id.* at 376 (cleaned up). "Moreover, an agency action that 'violates [a statute] is 'not in accordance

19

with law' within the meaning of [the APA]." *Id.* (alterations in original) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979)).

## DISCUSSION

The Plaintiffs contend that they are entitled to summary judgment for two reasons: (1) the 2020 BiOp violates the requirements of the ESA and is thus facially invalid (Claim 3); and (2) even if the 2020 BiOp were not deficient, the Defendants have failed to comply with its express requirements (Claims 1 and 2). The Court agrees that the 2020 BiOp is unlawful and should be vacated and set aside. It thus declines to consider the Plaintiffs' alternative theories.

### A.    *Center for Biological Diversity v. Zeldin*

The Parties' arguments substantially revolve around the import of the D.C. Circuit's recent decision in *Zeldin*. So, the Court begins by summarizing that decision. In *Zeldin*, the state of Florida applied to the U.S. Environmental Protection Agency (EPA) for authority to issue certain permits under Section 404 of "the Clean Water Act that would allow permittees associated with building and mining projects to discharge dredged or fill material into U.S. waters." 171 F.4th at 368. The intended permit recipients "normally would have to obtain an additional permit from the FWS or NMFS under Section 10 of the ESA if they wished to avoid liability for incidental takings resulting from the planned discharges." *Id.* But "Florida considered that extra step 'burdensome,' 'time consuming[,] and resource-intensive.'" *Id.* (alteration in original). It thus "proposed to 'streamline' the ESA's permitting process and to obtain broad, up-front ESA liability protection for all its future CWA permittees" by having the EPA "engage in a 'programmatic' Section 7 consultation with the FWS" aimed at approving Florida's application to assume Section 404 permitting authority. *Id.*

The EPA agreed to consider Florida's proposal and "submitted a request for a formal consultation with the FWS under Section 7 concerning [its] consideration of Florida's Section 404

20

application." *Id.* at 370. After completing its consultation, the FWS published a programmatic BiOp determining "that the EPA's approval of Florida's Section 404 permitting application would not jeopardize protected species or harm critical habitats." *Id.* In reaching this conclusion, "the FWS stated that it was 'not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis in [the] BiOp.'" *Id.* (alterations in original). Instead, it found that site-specific and species-specific effects would be sufficiently assessed and addressed through a "technical assistance" and coordination process in which Florida would have primary responsibility for reviewing and approving Section 404 permit applications and the FWS "would play a largely advisory role." *Id.* at 370-71.

Under the technical assistance process, Florida would receive and review material provided by Section 404 permit applicants that included "a description of the proposed activity, the 'specific areas' affected by the activity, a description of protected species and habitats in the area and ways in which they might be affected, analysis of any cumulative effects, and other 'relevant information,' including, '[w]hen needed, proposed project designs and . . . conservation measures that would avoid and minimize the expected impacts to listed species and their habitats.'" *Id.* at 371 (alterations in original). Based on that information, Florida "would decide whether protected species or habitats would be adversely affected if the permit were granted." *Id.* The FWS, meanwhile, would receive and review all the Section 404 permit applications (which would be sent to the FWS by Florida) and "could . . . participate in the approval process if it chose to do so." *Id.* If, for example, the FWS "found that an application 'may cause an adverse effect to [a] species,'" it could require that the project "include additional protective measures or Florida [would] reject the permit." *Id.* (alteration in original). The FWS could also, "if it wished, provide

21

Florida with technical information and recommend measures that would avoid or minimize effects." *Id.* (cleaned up).

In formulating its BiOp, "[t]he FWS reasoned that the 'assum[ed]' coordination between the FWS and Florida in the technical assistance program was 'as protective as the section 7 interagency consultation process.'" *Id.* (second alteration in original). And based on that supposed efficacy, the Service concluded "that Florida's program was 'sufficiently structured' to avoid jeopardy to ESA-listed species." *Id.* In formulating the BiOp's accompanying ITS, the FWS found that "some incidental take was 'reasonably certain'" to occur from Florida's permitting program. *Id.* But much like the effects analysis, the FWS determined that it could not estimate the incidental take amount "because it was 'not possible for [the] FWS to know what permits would issue and where throughout the life of the program, let alone specific amounts of take resulting from those permits.'" *Id.* at 372. "Instead, the FWS stated that Florida would estimate incidental-take amounts on a permit-by-permit basis and that the FWS would track anticipated take amounts of listed species on a permit-by-permit basis." *Id.* The ITS further provided "that Florida (not the EPA) would reinitiate consultation with the FWS if Florida found that its own permit-level incidental-take estimates were exceeded." *Id.* And it conferred "ESA liability protection for incidental takings of protected species" on all permittees so long as Florida complied with the ITS and the technical assistance program. *Id.*

A coalition of environmental groups filed suit alleging that the EPA's approval of Florida's Section 404 permitting application was unlawful. *Id.* The district court granted summary judgment in the plaintiffs' favor, holding, among other things, "that the FWS's BiOp and ITS must be set aside" because they "failed to comply with applicable standards under the ESA." *Id.* at 372-73. On appeal, the D.C. Circuit affirmed, similarly concluding that both the BiOp and the ITS violated

22

critical ESA requirements. *Id.* at 382–83. While all three judges on the panel wrote separately to explain their reasoning (and Judge Henderson dissented from some of the majority's conclusions), a majority of the *Zeldin* panel agreed on three points pertinent here.

*First*, the panel unanimously concluded that the programmatic ITS issued by the FWS violated several Section 7 regulations. *See id.* at 377, 379–81. Most notably, the ITS did "not quantify 'the amount or extent' of incidental take of ESA-listed species, due to an asserted 'inability to anticipate the locations of future State 404 permit applications,' which 'did not allow the [FWS] to conduct site-and species-specifi[c] analyses to estimate the number of individuals that might be affected by the permitted activities.'" *Id.* at 380 (first alteration in original). Instead, the ITS left the amount of incidental take to be quantified through the "technical assistance process" conducted between the FWS and Florida. *Id.*

The Circuit viewed this as a critical error. It rejected the FWS's explanations for why it could not estimate an incidental-take amount, noting that the ESA requires the FWS to "use the 'best available information'" and that the "FWS had 'reams' of information about protected Florida species at its disposal" that it could have used. *Id.* at 380–81. The Circuit further noted that providing an "initial estimate of 'the amount or extent' of incidental take is an important feature of any ITS because that take amount triggers immediate reinitiation of consultation between the [consulting agency] and the action agency under Section 7." *Id.* at 380 (citing *Am. Rivers v. FERC*, 895 F.3d 32, 48-49 (D.C. Cir. 2018)). As Judge Wilkins noted in his concurrence, the "ESA regulations mandate that the parties must monitor the impact of [an] action on protected species, and if the amount of take exceeds the limit set forth in the ITS, 'the Federal agency must reinitiate consultation immediately.'" *Id.* at 385 (Wilkins, J., concurring) (quoting 50 C.F.R. §§ 402.14(i)(4)–(5)). Complying with that requirement is impossible if the ITS does not even

23

estimate a take limit that can potentially be exceeded. *Id.* (noting that an ITS that lacks "a clear and enforceable incidental take limit . . . violates the ESA"). The *Zeldin* court thus concluded that the FWS's failure to include such a limit in its programmatic ITS governing Florida's permitting program was "arbitrary and capricious" because it "openly violate[d] applicable regulations regarding take amounts and the reinitiation of consultation." *Id.* at 381.[1]

*Second*, both Judge Pan and Judge Wilkins agreed that the BiOp approving Florida's permitting program was unlawful and must be set aside. *See id.* at 377. Judge Pan, in a portion of her opinion not joined by the other judges, identified several reasons why the BiOp was deficient. Chief among them was that the BiOp failed to include "a meaningful site-specific and species-specific effects analysis," as required by 50 C.F.R. § 402.14(g). It instead opted to have site-specific and species-specific information "assessed through the technical assistance process." *Id.* And it left compliance with various other ESA requirements to this "technical assistance program," which Judge Pan found was "not 'as protective' as the Section 7 consultation process." *Id.* Unlike a Section 7 consultation, the technical assistance process required only that Florida "share permit applications with the FWS" and give FWS "the *option* of weighing in to overturn *Florida's* effects determinations." *Id.* at 377-78. The FWS then could, but was not required to, provide Florida with technical information and "recommend[] measures that would avoid or minimize effects." *Id.* at 378. The technical assistance process also did not require that either Florida or the FWS evaluate each Section 404 permit using "the best scientific and commercial data available," as the

---

[1] In explaining how the ITS fell short, Judge Pan (writing for the unanimous court) further noted that the ITS failed to "identify *specific* 'reasonable and prudent measures' to minimize the impact of incidental take," as required by 50 C.F.R. § 402.14(i)(1)(ii). *Zeldin*, 171 F.4th at 380. Rather, it "(1) generally instruct[ed] the EPA, Florida, and other agencies to minimize impacts on protected species, and (2) '*assume[d]* that through technical assistance with the State,'" the FWS would help develop appropriate measures to ensure each permit minimized adverse effects and avoided placing ESA-listed species in jeopardy. *Id.* (emphasis in original).

24

FWS "would be required to do in carrying out a proper Section 7 consultation." *Id.* (first citing 16 U.S.C. § 1536(a)(2); and then 50 C.F.R. § 402.14(g)(8)).

Considering these differences, Judge Pan concluded that the technical assistance program was "far less demanding than what is required under Section 7." *Id* And the FWS's reliance on that "less protective" process to ensure ESA compliance was fundamentally different from the Service permissibly finding that the effects of later programmatic actions could be addressed by subsequent Section 7 consultations. *Id.* at. 378–79. Programmatic consultations, Judge Pan noted, "may delay but may not avoid the requirements of Section 7." *Id.* at 378. After all, "[n]either the ESA nor its implementing regulations permit the FWS to dilute the requirements of Section 7" and replace them with a "watered-down" technical assistance procedure that "does not comport with agency regulations or programmatic approvals." *Id.* at 379.

Judge Wilkins did not join Judge Pan's reasoning regarding the BiOp's deficiencies but instead emphasized simply that a BiOp cannot be compliant unless it includes an ITS that specifies the impact of incidental taking and the amount or extent of such taking. *Id.* at 385 (Wilkins, J., concurring) (first citing 16 U.S.C. § 1536(b)(4)(i); and then 50 C.F.R. § 402.14(i)(1)(i)). In other words, Judge Wilkins reasoned that because a BiOp requires a compliant ITS and the ITS at issue was plainly deficient, the BiOp was also deficient and no further analyses of its deficiencies was necessary. *See id.* at 384 ("[V]acatur of the Incidental Take Statement as deficient, . . . results in vacatur of the Biological Opinion because its no jeopardy finding is dependent upon the deficient ITS."). Thus, the most significant way in which Judge Wilkins' view appears to differ from Judge Pan's is that he found her additional analysis unnecessary to reach their shared conclusion that the BiOp was deficient.

25

*Third*, and finally, Judge Pan and Judge Wilkins agreed that the unlawful agency actions at issue needed to be set aside. *Id.* at 382–83. While the *Zeldin* majority identified four agency actions that violated the ESA and the APA—"the BiOp, the ITS, the EPA's failure to consult with the NMFS, and the EPA's approval of Florida's permitting program"[2]—they noted that "[e]ach of those unlawful agency actions require[d] the normal remedy of vacatur." *Id.* The Circuit noted that "the deficiencies of each action [were] serious" and could not be "sufficiently explain[ed] on remand." *Id.* at 383. The FWS's BiOp and "no-jeopardy determination," for example, was based on "a flawed effects analysis and inaccurate assumptions about the efficacy of the technical assistance process." *Id.* The Circuit also found that vacatur was unlikely to cause undue "disruptive consequences" as it was prospective and would "not call into question previously issued Section 404 permits." *Id.*

## B.      The Current Challenge

Turning to this case, the Court finds that *Zeldin* controls and resolves this case in the Plaintiffs' favor. First, the ITS that accompanies the 2020 BiOp violates the ESA because it does not set a clear and enforceable incidental take limit. Second, the 2020 BiOp is itself invalid because it does not include a robust effects analysis and relies on a technical assistance coordination process that is not as protective as Section 7 consultation under the ESA. Third, those deficiencies warrant the normal remedy of vacatur, although in a more limited fashion than was appropriate in *Zeldin*.[3]

---

[2] The latter two actions are not relevant here, so the Court need not address them.

[3] The Parties more broadly disagree about whether non-federal entities may ever receive incidental take coverage based on a Section 7 consultation obtained by a federal agency that is not the permitting authority or if they must instead proceed under Section 10 themselves. *See* Pls.' Mot. 15–21; Defs.' Cross-Mot. 21–22. The Court declines to reach that question given its finding that the 2020 BiOp and ITS at issue are invalid.

26

In arguing otherwise, the Defendants effectively ask the Court to disregard *Zeldin*. And, curiously, even post-*Zeldin*, they "maintain" that the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), "was correctly decided and is persuasive under the facts of this case." Defs.' Reply 3 n.1. But the Defendants do not bother to explain how that position can be reconciled with *Zeldin*, which concluded that *Cooling Water* is neither binding in this Circuit nor persuasive. 171 F.4th at 378 ("*Cooling Water* does not bind us and its reasoning is at odds with applicable regulations and our own precedents." (citation omitted)); *see also id.* at 386–87 (Wilkins, J., concurring). The Circuit's dim view of *Cooling Water* was consistent with that of the district court in *Zeldin*, which found that the Second Circuit's decision "stands alone" and "is at odds with the statute, regulations, and caselaw." *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 48. This Court agrees.

### 1.    The 2020 ITS

The ITS attached to the 2020 BiOp suffers from the same critical deficiencies as the ITS in *Zeldin*. The ITS does not quantify or even estimate the amount or extent of incidental take of ESA-listed species that is permitted, as the ESA requires. *See* 50 C.F.R. § 402.14(i)(1)(i); *Zeldin*, 171 F.4th at 380. It instead claims an inability to provide such an estimate because of insufficient information about where specific permitted activities might occur in the future and "the number of specific individuals that might be affected by such activities." FWS_36684; *see also Zeldin*, 171 F.4th at 380. And it therefore leaves the amount of incidental take to be quantified later through a technical assistance process conducted by the FWS and a State regulatory authority. FWS_36684–85; *Zeldin*, 171 F.4th at 380.

The *Zeldin* court rejected such an approach as inconsistent with the ESA. Like the ITS in *Zeldin*, the 2020 ITS lacks a clear take limit that, if exceeded, can effectively trigger "immediate

27

reinitiation of consultation" as required by 50 C.F.R. § 402.14(i)(5). *Zeldin*, 171 F.4th at 380–81 (citing *Am. Rivers*, 895 F.3d at 48–49); *see also id.* at 385 (Wilkins, J., concurring) (noting that an ITS "without a clear and enforceable incidental take limit . . . violates the ESA"). In addition to this critical shortcoming, the ITS also fails to "identify *specific* 'reasonable and prudent measures' to minimize the impact of incidental take." *Id.* at 380 (emphasis added) (quoting 50 C.F.R. § 402.14(i)(1)(ii)). It instead generally instructs the OSMRE to use its oversight "authorities to minimize impacts to listed species." FWS_36685. Just as in *Zeldin*, "[b]ecause the ITS openly violates applicable regulations regarding take amounts and the reinitiation of consultation, it is arbitrary and capricious" in violation of the APA. *Zeldin*, 171 F. 4th at 381.

### 2.    The 2020 BiOp

The 2020 BiOp is also unlawful. As discussed earlier, Judge Pan found the BiOp in *Zeldin* legally deficient because, among other reasons, it did not include a robust effects analysis as required by 50 C.F.R. § 402.14(g), and it left that analysis and compliance with other ESA requirements to a "technical assistance program" that was "not 'as protective' as the Section 7 consultation process." *Zeldin*, 171 F.4th at 377. Both of those things are true here as well.[4]

*First*, as to the effects analysis, the FWS concluded in the 2020 BiOp that "it [was] not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis" in the BiOp. FWS_36662. Instead, the FWS noted "that site-specific and species-specific

---

[4] Though Judge Pan wrote alone on this point in *Zeldin*, the Court finds her analysis highly persuasive. The Defendants note that the Court may not be bound by either concurring opinion in *Zeldin*, citing *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *3 (D.C. Cir. Nov. 14, 2025). Defs.' Reply 2. But *J.G.G.* noted only that two concurrences in a fragmented circuit panel decision may have no "precedential effect" if they "have no meaningful points of agreement." 2025 WL 3198891, at *3 (Pillard, Wilkins & Garcia, JJ., respecting the denial of rehearing en banc). And the Court does not read Judge Wilkins and Judge Pan as "hav[ing] no meaningful points of agreement." *Id*. Either way, the Court finds both concurrences persuasive and sees no compelling reason to disregard them.

information [would] be available and assessed through the technical assistance process." *Id*. This is functionally identical to the approach that Judge Pan rejected in *Zeldin*. *See* 171 F.4th at 377 ("[T]he FWS did not evaluate how the approval of Florida's permitting program would affect listed species or critical habitat" and instead "stated in the BiOp that it was 'not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis in [the] BiOp.'" (second alteration in original)). That approach is equally problematic here.

*Second*, the technical assistance process outlined in the Coordination and Dispute Resolution Processes is less protective than Section 7 consultation under the ESA. As discussed at length above, the Section 7 formal consultation process is rigorous. *See id.* at 365. It requires that the federal agency initiating consultation provide the consulting agency with a substantial amount of information regarding all aspects of the proposed action. *See* 50 C.F.R. § 402.14(c)–(d). The consulting agency is then required to conduct a detailed review of that information; to conduct, if necessary, an on-site inspection; to evaluate the current status and environmental baseline for any listed species or critical habitat that may be affected by the proposed action; and to assess what effects the action might have on those species and habitats. *Id.* § 402.14(g). These tasks require the consulting agency to play a direct and proactive role in reviewing each proposed action and to thereby formulate a well-supported opinion "as to whether the action is likely to jeopardize" the species or habitat in question. *See id*. § 402.14(g)–(h).

Here, the technical assistance process takes key responsibilities assigned to the consulting agency under Section 7 (like conducting effects analyses and making a jeopardy determination) and delegates them to state regulatory authorities to conduct in the first instance. FWS_36708–09. It also leaves the scope of information to be provided to the FWS for each permit to "the discretion of the State regulatory authority." FWS_36708. Thus, the technical assistance process is less

29

protective than Section 7 and the Court agrees with Judge Pan that "[a] technical assistance process that sets standards less protective than those prescribed by the ESA cannot displace the ESA itself." *Zeldin*, 171 F. 4th at 379.

Indeed, although the technical assistance process at issue does not suffer from all the same deficiencies as the process in *Zeldin*, *compare, e.g.*, *id.* at 371 (noting the FWS's participation in permit approval process was optional) *with* FWS_36709 (spelling out actions the FWS "will" take as part of approval process), it is even less protective than the process in *Zeldin* in at least one key respect. In *Zeldin*, the technical assistance process gave the FWS the option to overturn effects determinations that Florida made with respect to specific permit applications. 171 F.4th at 377–78. It also empowered the FWS to insist that a project "include additional protective measures" and, if it did not, "Florida [would] reject the permit." *Id.* at 371. Here, the Coordination and Dispute Resolution Processes do not give the FWS such dispositive authority. Rather, even after the Secretary of Interior has proposed that a State regulatory authority require protective measures for a certain mining project, the State may still "reject the proposed resolution and approve the permit." FWS_36713.

In attempting to rebut arguments about the deficiency of the technical assistance process, the Defendants make much of the fact that the SMCRA regulatory program at issue is not a new program like Florida's proposal in *Zeldin.* They emphasize that "states with primacy have been appropriately following a technical assistance process mandated by the federal regulations implementing [the] SMCRA" for "nearly five decades." Defs.' Reply 3–4. The 2020 BiOp expressly acknowledges, however, that the requirements of the SMCRA, "*on their own*, will not necessarily eliminate adverse effects on ESA-proposed and listed species and designated proposed critical habitat." FWS_36670 (emphasis added); *see also* FWS_36673 ("Implementation of the

30

monitoring practices associated with SMCRA, on their own, will not necessarily adequately monitor effects on ESA-proposed and -listed species or designated and proposed critical habitat in all cases."). That is why the BiOp emphasizes the importance of the Coordination and Dispute Resolution Processes—both of which were developed as part of the 2020 consultation, FWS_36607—to ensure that the FWS can help reduce "the impacts of surface mining operations on ESA-proposed and -listed species" and "critical habitat," FWS_36670. And as described above, that technical assistance process is lacking.

For all the above reasons, the Court concludes that the 2020 BiOp is arbitrary and capricious because it lacks an effects analysis and relies on a technical assistance process that is less protective than Section 7 consultation.[5]

## C.      Remedies

Turning to the appropriate remedy, "[w]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *Zeldin*, 171 F.4th at 378 (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). That is because Congress has directed courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). Under certain limited circumstances, a court may remand an agency's action or decision to the agency. *Am. Great*

---

[5] As noted above, Judge Wilkins agreed with Judge Pan that the BiOp in *Zeldin* needed to be set aside, but he reached that conclusion for a different reason. Judge Wilkins reasoned that the validity of the BiOp was so inextricably linked to the validity of its accompanying ITS that the deficient ITS rendered the BiOp deficient. *See Zeldin*, 171 F.4th at 384–86 (Wilkins, J. concurring) ("[V]acatur of the Incidental Take Statement as deficient, . . . results in vacatur of the Biological Opinion because its no jeopardy finding is dependent upon the deficient ITS."). As he explained, "a clear and enforceable take limit" is necessary to enable effective monitoring of the impact of an approved federal action, and thus a consulting Service cannot conclude its consultation (and issue a BiOp) without first setting a clear take limit. *Id.* at 385–86 ("Neither the statute nor the regulations allow the action agency to state that take limits will be determined at a later time, and then deem Section 7 consultations finished."). The Court agrees with Judge Wilkins' reasoning, which provides an independent basis for finding that the 2020 BiOp is deficient.

31

*Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). But "remand without vacatur remains an exceptional remedy." *Id.* at 519. To determine whether remand without vacatur is appropriate, the Court must consider: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). The Court must also ensure that any "injunction" it issues is "narrowly tailored to remedy the specific harm shown." *Neb. Dep't of Health & Hum. Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006).

In *Zeldin*, the Circuit held that the BiOp and the ITS were "each . . . unlawful agency actions" that "require[d] the normal remedy of vacatur." 171 F.4th at 382–83. In applying the *Allied-Signal* factors, the Circuit held: first, that "the deficiencies of each action [were] serious and the EPA [could] not sufficiently explain its actions on remand," and second, that "vacatur would not likely cause undue 'disruptive consequences' from 'an interim change that may itself be changed.'" *Id.* Given that the Court has identified much the same deficiencies with the BiOp and ITS here, it sees no reason to deviate from *Zeldin*'s general finding that vacatur rather than remand is appropriate for the unlawful agency actions at issue.

Even so, the Court deviates from *Zeldin*'s approach on vacatur in one notable way. As discussed, the 2020 BiOp and ITS cover not just the OSMRE's oversight of state regulatory programs with primacy, but also the OSMRE's "direct implementation and enforcement" of the SMCRA "in Federal program States and on Indian lands." FWS_36605. And the BiOp provides different guidance for the OSMRE's implementation of the SMCRA in states where it "retains permitting authority" as compared to its role in overseeing the regulatory programs of primacy States. FWS_36609. Of particular note, the BiOp's assessment of the OSMRE's direct permitting

of projects in states where it is the primary regulatory authority does not hinge on the technical assistance process that undergirds its oversight of primacy states. Rather, the BiOp concluded that the OSMRE's direct permitting of mining projects was "not likely to jeopardize" ESA-protected species or habitats because each of those projects would be covered by site-specific "step-down" Section 7 consultations that would assess the effects of the proposed projects. FWS_36682; *see also* FWS_36667 ("For OSMRE-issued permits that may affect ESA-listed species or designated critical habitat, section 7(a)(2) consultation is required and will be performed separately."); FWS_36621; FWS_36629; FWS_36664; FWS_36670; FWS_36678; FWS_36680. Those "project-specific, step-down" Section 7 consultations would also analyze and quantify "any incidental take anticipated to occur" from "mining activities in which [the] OSMRE is the authority issuing permits." FWS_36684–85.

The Plaintiffs do not challenge the 2020 BiOp as it applies to the OSMRE's direct permitting authority. Indeed, the Plaintiffs' facial challenge to the BiOp focuses on how the BiOp "does not 'insure' that SMCRA-permitted mining activities *in states with primacy* are not likely to jeopardize" ESA-protected species and habitats. Am. Compl. ¶ 157 (emphasis added). And the specific harms that the Plaintiffs identify are in primacy states: Kentucky, Virginia, and West Virginia. *Id.* ¶ 67; *see also* FWS_36609–10. Further, the Plaintiffs' summary judgment motion asks that the Court "vacate the 2020 BiOp *as it applies* to State-delegated SMCRA programs." Pls.' Mot. 29 (emphasis added). Accordingly, the Court sees no basis for disturbing the 2020 BiOp or its accompanying ITS as they apply to the OSMRE's regulation of mining activities in non-primacy states. It thus vacates and sets aside only those portions of the 2020 BiOp and the ITS that concern the OSMRE's oversight of primacy states. Finally, to further minimize any "disruptive

33

consequences" from this decision, the Court's vacatur of the BiOp and ITS "is prospective and [does] not call into question previously issued . . . permits." *Zeldin*, 171 F.4th at 383.

*    *    *

The Court recognizes that the burdens imposed by the ESA can often be substantial. But that is by design. As the Supreme Court has noted, "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184. That "is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Id.* The D.C. Circuit's recent decision in *Zeldin* affirms the importance of enforcing all aspects of the ESA—even though that makes it more difficult for federal and state actors to authorize activities, like coal mining, that may adversely affect the endangered and threatened species that the ESA protects. Congress knowingly imposed these burdens based on its recognition of what was at stake for our nation's wildlife. And it is not this Court's place to question or ignore that policy choice.

In issuing this decision, the Court is also cognizant of the federalism concerns that underlie the SMCRA's regulatory scheme for coal mining. But in enacting the SMCRA, Congress did not displace the ESA. Indeed, the Circuit faced similar concerns regarding the Clean Water Act in *Zeldin* and still vacated the agency action at issue. To be clear, the Court's decision today says nothing about the validity of the relevant SMCRA regulations. It says only that the Defendants may not ignore critical aspects of the ESA when administering the SMCRA.

**CONCLUSION**

For all these reasons, the Court grants the Plaintiffs' Motion for Summary Judgment as to Claim 3, ECF No. 42, and denies the Defendants' Cross-Motion for Summary Judgment, ECF No. 45, on that same claim. In light of this ruling, and the Court's conclusion that it warrants vacating and setting aside the 2020 BiOp and ITS as they apply to the OSMRE's oversight of

34

primacy states, the Court declines to reach the merits of Claims 1 or 2 as they essentially present alternative theories for obtaining the same relief. Moreover, because the Court's conclusion regarding Claim 3 is not dependent on any extra-record materials, the Court denies as moot the Defendants' Motion to Strike the Plaintiffs' Extra Record Declaration and Exhibits. ECF No. 44.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 29, 2026

35