**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, )<br><br>*Plaintiffs,* )<br><br>v. )<br><br>U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, *et al.*, )<br><br>*Defendants.* ) | Civil Action No.: 1:23-cv-03343-SLS |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARD......................................................................................................... 5

ARGUMENT ..................................................................................................................... 6

    I.     OSMRE Is Not Likely to Succeed on the Merits of its Appeal ........................................ 7

          A.     The Court's Decision Rests Firmly on the Plain Language of the ESA, the ESA Regulations, and Circuit Precedent............................................................................ 8

          B.     The Court Properly Weighed the Allied-Signal Factors to Determine that Partial Vacatur was Warranted................................................................................................ 12

    II.    OSMRE Has Failed to Demonstrate That It Will Suffer Irreparable Harm ..................... 14

          A.     The Services' Regulatory Rescission of the Definition of "Harm" Will Significantly Reduce, If Not Erase, the Processing Time and Resource-Based Burdens Defendants Allege......................................................................................... 15

          B.     In Any Case, Section 10 of the ESA Provides a Lawful, Available Route for Primacy States to Issue SMCRA Permits and Provide Take Coverage.................... 20

    III.   The Balance of Equities and Public Interest Weigh Against a Stay ................................. 23

          A.     A Stay Would Cause Plaintiffs Substantial Harm .................................................. 23

          B.     The Public Interest Lies in Governmental Adherence to Our Nation's Laws and Preservation of Endangered Species and their Critical Habitats for Generations to Come ....................................................................................................... 26

CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,
539 F. Supp. 3d 211 (D.D.C. 2021) ...................................................................... 5, 27

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) .............................................................................. 12

*Am. Hosp. Ass'n v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016) ................................................................................ 22

*Am. Hosp. Ass'n v. Price*,
867 F.3d 160 (D.C. Cir. 2017) ................................................................................ 22

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) ........................................................................ 26

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ................................................................................................. 24

*Archdiocese of Wash v. WMATA*,
897 F.3d 314 (D.C. Cir. 2018) .................................................................................. 6

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995) .............................................................................................. 3, 19

*BLOM Bank SAL v. Honickman*,
605 U.S. 204 (2025) ................................................................................................. 23

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................ 27

*\*Citizens for Resp. & Ethics in Wash. v. FEC*,
904 F.3d 1014 (D.C. Cir. 2018) ....................................................................... 5, 6, 8

*Conservation L. Found. v. Ross*,
422 F. Supp. 3d 12 (D.D.C. 2019) .......................................................................... 26

*Cooling Water Intake Structure Coal. v. EPA*,
905 F.3d 49 (2d Cir. 2018) ................................................................................... 9, 11

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ................................................................................ 22

*Ctr. for Biological Diversity v. Regan*,
734 F. Supp. 3d 1 (D.D.C. 2024) .................................................................. 11, 20, 21

*Ctr. for Biological Diversity v. Regan*,
No. CV 21-119 (RDM), 2024 WL 1740078 (D.D.C. Apr. 23, 2024) ..................... 14

*Ctr. for Biological Diversity v. Ross*,
480 F. Supp. 3d 236 (D.D.C. 2020) ........................................................................ 26

*Ctr. for Biological Diversity v. Zeldin,
  171 F.4th 356 (D.C. Cir. 2026) .......................................................... 4, 8, 9, 10, 11, 13, 20, 21

Ctr. for Biological Diversity, et al., v. Douglas Burgum, et al.,
  No. 26-02474 (W.D. Wash. July 14, 2026) ............................................................... 18

Cuomo v. U.S. Nuclear Regul. Comm'n,
  772 F.2d 972 (D.C. Cir. 1985) ................................................................................... 5

Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,
  36 F.4th 850 (9th Cir. 2022) ..................................................................................... 24

Fund for Animals v. Espy,
  814 F. Supp. 142 (D.D.C. 1993) ............................................................................... 27

Hilton v. Braunskill,
  481 U.S. 770 (1987) ..................................................................................................... 5

Holder v. Humanitarian L. Project,
  561 U.S. 1 (2010) ....................................................................................................... 28

Humane Soc'y of U.S. v. Kempthorne,
  481 F. Supp. 2d 53 (D.D.C. 2006), vacated sub nom. Humane Soc'y of U.S. v. Kempthorne,
  527 F.3d 181 (D.C. Cir. 2008) ................................................................................. 26

In re Aiken Cnty.,
  725 F.3d 255 (D.C. Cir. 2013) ................................................................................. 30

In re Ctr. for Biological Diversity,
  53 F.4th 665 (D.C. Cir. 2022) .................................................................................. 22

In re United Mine Workers of Am. Int'l Union,
  190 F.3d 545 (D.C. Cir. 1999) ................................................................................. 22

J.G.G. v. Trump,
  No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) .................................... 11

Kirwa v. U.S. Dep't of Def.,
  285 F. Supp. 3d 257 (D.D.C. 2018) .......................................................................... 29

LaShawn A. v. Barry,
  87 F.3d 1389 (D.C. Cir. 1996) ................................................................................. 25

Lincoln v. Vigil,
  508 U.S. 182 (1993) ................................................................................................... 30

Mexichem Specialty Resins, Inc. v. EPA,
  787 F.3d 544 (D.C. Cir. 2015) ................................................................................. 15

N. Slope Borough v. Andrus,
  642 F.2d 589 (D.C. Cir. 1980) ................................................................................. 11

Nat. Res. Def. Council v. EPA,
  489 F.3d 1250 (D.C. Cir. 2007) ............................................................................... 12

Nat'l Ass'n of Home Builders v. Defs. of Wildlife,
  551 U.S. 644 (2007) ................................................................................................... 30

*Nat'l Wildlife Fed'n v. Andrus*,
   440 F. Supp. 1245 (D.D.C. 1977) ......................................................................... 27

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) ................................................................................. 28

*Neb. Dep't of Health & Hum. Servs. v. HHS*,
   435 F.3d 326 (D.C. Cir. 2006) .............................................................................. 12

*\*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................... 5, 7, 8, 14, 23

*S. Fork Band Council of W. Shoshone v. U.S. Dep't of the Interior*,
   588 F.3d 718 (9th Cir. 2009) ................................................................................. 21

*Scripps-Howard Radio v. FCC*,
   316 U.S. 4 (1942) ................................................................................................... 15

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ................................................................................ 6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   205 F. Supp. 3d 4 (D.D.C. 2016) ............................................................................ 6

*State of Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) .............................................................................. 22

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ................................................................................... 24, 26, 27

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
   259 F.2d 921 (D.C. Cir. 1958) .............................................................................. 21

*Watson v. Republican Nat'l Comm.*,
   No. 24-1260, 2026 WL 1855462 (U.S. June 29, 2026) ........................................ 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................... 5, 28, 29

*\*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 14, 21

**Statutes**

16 U.S.C. § 1531(b) ..................................................................................................... 16

16 U.S.C. § 1532(20) ................................................................................................... 16

16 U.S.C. § 1532(3) ..................................................................................................... 27

16 U.S.C. § 1532(6) ..................................................................................................... 16

16 U.S.C. § 1533(d) ..................................................................................................... 16

16 U.S.C. § 1536(o)(2) ................................................................................................ 21

16 U.S.C. § 1538 .......................................................................................................... 21

16 U.S.C. § 1538(a)(1)..........................................................................................................16

16 U.S.C. § 1539(a) ......................................................................................................20, 21

16 U.S.C. § 1539(a)(1)(B) ....................................................................................................2

**Regulations**

50 C.F.R. § 17.22 ...............................................................................................................20

50 C.F.R. § 17.3 (2026) .........................................................................................................2

50 C.F.R. § 402.14(g) .........................................................................................................11

50 C.F.R. § 402.14(i)(1)(i).....................................................................................................9

50 C.F.R. § 402.14(i)(5).......................................................................................................21

**Other Authorities**

91 Fed. Reg. 43300 (July 14, 2026)..........................................................................2, 3, 17, 19

Fed. R. Civ. P. 60(b) ......................................................................................................18, 23

**INTRODUCTION**

In its Opinion dated May 29, 2026, this Court held that Defendants Office of Surface Mining Reclamation and Enforcement and U.S. Fish and Wildlife Service (collectively, "OSMRE") violated the Endangered Species Act ("ESA") by issuing and relying on a 2020 biological opinion ("BiOp") that "lacks an effects analysis and relies on a technical assistance process that is less protective than Section 7 consultation," ECF 53 at 31,[1] and an incidental take statement ("ITS") that "openly violates applicable regulations regarding take amounts and the reinitiation of consultation," ECF 53 at 28 (citation omitted). The Court then narrowly vacated the portions of those instruments found to be in violation of the law. ECF 53 at 33-34; *see also* ECF 54 (Order).

In furtherance of the government's administrative and policy interests in expeditiously authorizing coal mines, Defendants now ask the Court to treat the ESA as a mere suggestion rather than a Congressional command. That request is not only legally unfounded but would lead to the type of irreversible harm to endangered species that the ESA was enacted to prevent.

Defendants' motion primarily focuses on the purported burden they, primacy states, and coal mine permit applicants will face due to the loss of the unlawful incidental take coverage previously provided through the 2020 BiOp and ITS. Defendants allege that "mining operators in those states have no alternative means of complying with ESA Section 9 readily available to them." ECF 57-1 at 5. That is fundamentally and legally not true. For all prospective actions, coal mine companies in primacy states can now simply utilize the well-established statutory route set out through Section 10 of the ESA if they wish to pursue activities that allow for the

---

[1] When citing to a filing on the docket in this action, Plaintiffs use the convention "ECF __" and the page number assigned by the District's Electronic Case Files system.

incidental take of protected wildlife during the pendency of OSMRE's appeal. As discussed in the Court's Opinion, ECF 53 at 9-10, Section 10 of the ESA enables a State or private party to seek a permit that allows "any taking otherwise prohibited by" the ESA and that, accordingly, provides protection from liability for incidental take. 16 U.S.C. § 1539(a)(1)(B).

Apart from the fact that Section 10 is a viable (and legally appropriate) option, Defendants motion neglected to advise the Court of a recent significant change to the regulatory definition of "harm" under the ESA. That change, along with the rationale for it, undercuts the purported injuries Defendants claim they will experience absent a stay of the Court's partial vacatur of the 2020 BiOp and ITS. On July 14, 2026 — the day before Defendants filed their stay motion here — Defendant U.S. Fish and Wildlife Service, along with the National Marine Fisheries Service (collectively, "the Services"), issued a final rule rescinding the definition of "harm" under the ESA. 91 Fed. Reg. 43300 (July 14, 2026). Through that action, the Services removed from the definition "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2026) (rescinded on July 14, 2026). At the same time, the Services declared that, in their view, the only "take" prohibited by the ESA occurs where an action is specifically directed at harming a listed species. 91 Fed. Reg. at 43301. This significant change in the Services' interpretation of the ESA means that the Services will no longer even consider, at a minimum, the effects of habitat modification or degradation on ESA-listed species to be a "take" under Section 9 of the ESA, and therefore Section 10. 91 Fed. Reg. at 43304 ("The word 'habitat' appears nowhere in section 10. Rather, section 10's incidental-take regime is symmetrical to what would otherwise be take prohibited as 'take' under section 9.").

2

As it relates to this case, the effect of that change is that, unless and until the Services'

rulemaking is found unlawful and vacated by a federal court or a new interpretation of "harm" is

promulgated, many — if not all — of the incidental take coverage-based complications set forth

by Defendants through their motion and supporting declarations will almost certainly fail to

materialize during the pendency of Defendants' appeal. This is because, as detailed in the 2020

BiOp as well as other record documents, almost all of the "harm" leading to take related to coal

mine permitting concerns effects on listed species from habitat destruction and modification. *See,

e.g.,* ECF 52-3 at 33 (OSMRE_0025725 at 28 (2020 BiOp)); *id*. at 58-60 (OSMRE_0025725 at

53-55). Defendants offer no evidence that the remaining effects on endangered and threatened

species to be assessed under Section 10 will be, pursuant to their new interpretation, the result of

an "'affirmative act[] . . . directed immediately and intentionally against a particular animal —

not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of

animals.'" 91 Fed. Reg. at 43305 (quoting *Babbitt v. Sweet Home Chapter of Cmtys. for a Great

Or.*, 515 U.S. 687, 719-20 (1995) (Scalia, J., dissenting)). Consequently, with that regulatory

change to the definition of "harm" and the accompanying legal justification, Defendants' alleged

injury absent a stay has dissipated, if not evaporated entirely.

All of Defendant other arguments in favor of a stay are similarly unavailing and fall far

short of satisfying Defendants' burden of showing that a stay pending appeal is appropriate.

First, in reaching its Opinion, the Court applied the plain language of the ESA, supporting

regulations, and directly on-point Circuit precedent to find the 2020 BiOp and ITS to "openly

violate[]" the ESA. ECF 53 at 28, 31. Next, far from "the Court abus[ing] its discretion in

vacating the 2020 BiOp and ITS," ECF 57-1 at 8, the Court very deliberately struck an equitable

remedial balance by: (1) setting aside only the unlawful portion of the BiOp and ITS "that

3

concern[s] the OSMRE's oversight of primacy states" and leaving in place the BiOp as it applies to the OSMRE's direct permitting authority, ECF 53 at 33, and then (2) "to further minimize any 'disruptive consequences' from this decision," ruling that the vacatur only applies prospectively in order to explicitly "'not call into question previously issued . . . permits,'" ECF 53 at 33-34 (quoting *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 383 (D.C. Cir. 2026)). Accordingly, the Court has not only appropriately exercised its discretion, it has done so with equanimity in applying well-established legal standards to strike a balance that provides regulatory predictability for OSMRE, primacy states, and coal mine permittees while also enforcing the law to see that Defendants do not continue to "ignore critical aspects of the ESA when administering" the Surface Mining Control and Reclamation Act ("SMCRA"). ECF 53 at 34.

Finally, Defendants also misrepresent the harms that Plaintiffs, their members, and their endangered species conservation missions will face if Defendants requested relief is granted. Defendants incorrectly argue that the public interest lies not with ecosystem resilience, endangered species persistence, and compliance with our nation's laws, but rather on "regulatory certainty" around the continued mining of coal without first fulfilling the requirements of the ESA. *See* ECF 57-1 at 23. OSMRE may be dissatisfied with a disruption of its preferred status quo in favor of lawful observance of the ESA, but that dissatisfaction is not grounds for granting a stay. Rather, because OSMRE fails to demonstrate likelihood of success on the merits of its appeal, the lack of harm (let alone irreparable harm) that Defendants are likely to face during that time, the substantial injury to Plaintiffs if a stay is granted, and that maintaining the Court's Order in partially vacating the 2020 BiOp and ITS is where the public interest lies, Plaintiffs respectfully request that the Court deny Defendants' motion.

## LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy." *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). The party seeking a stay bears the burden of establishing that relief is warranted. *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1016 (D.C. Cir. 2018). A decision to grant or deny a stay is "an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009).

In deciding whether to grant a stay, the Court must consider four factors: (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits;" (2) "whether the applicant will be irreparably injured absent a stay;" (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding;" and (4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Of those four factors, "[t]he first two . . . are the most critical," and they require, respectively, "'[m]ore than a mere 'possibility' of relief'" and more than "some 'possibility of irreparable injury.'" *Nken*, 556 U.S. at 434 (internal citations omitted). As the Supreme Court has observed, "[t]here is substantial overlap between these [factors] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).[2]

---

[2] Defendants also submit that the "sliding scale" approach applies here. ECF 57-1 at 7, 8. Under that approach, "'a movant may make up for a lower likelihood of success on the merits with a strong showing as to the other three factors, provided that the issue on appeal presents a serious legal question on the merits.'" *Id.* (quoting *Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 211, 213 (D.D.C. 2021) (internal quotation marks omitted)). Whether the sliding-scale approach survives the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), has not yet been resolved by the D.C. Circuit. The D.C. Circuit has, however, "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring [movants] to

# ARGUMENT

Defendants' motion must be denied because it has failed to satisfy the criteria for a stay pending appeal. To the contrary, Defendants merely rehash arguments that this Court and the D.C. Circuit have directly and decisively rejected. Defendants' arguments ignore the plain language and intent of the ESA in search of a pathway to maintaining the status quo for coal mining that the government prefers. In support of its request, Defendants claim internal staffing and resource burdens as their primary reasons for not utilizing the clear, statutorily-defined option available to them, permittees, and primacy states following the Court's partial vacatur of the 2020 BiOp and ITS: seeking an incidental take permit ("ITP") under Section 10 of the ESA. Then, disregarding that SMCRA permitting and ESA compliance can be achieved concurrently, Defendants rely on a purported energy emergency to claim that the public interest favors coal mining in lieu of protecting endangered wildlife (and the rule of law) against years of additional risk posed by reliance on a technical assistance process that the Court found to be "less protective than Section 7 consultation." ECF 53 at 31. Unquestionably, Defendants have not satisfied "the stringent requirements for a stay pending appeal." *Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1016.

As it relates to Defendants likelihood of success on the merits and any irreparable harm it may face, OSMRE's confusing arguments that the Court abused its discretion in partially vacating the 2020 BiOp and ITS ignores: (1) the Court's proper, extensive findings about the

---

independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011)); *see also Archdiocese of Wash v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (suggesting that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"). For present purposes, however, because OSMRE has failed to carry its burden with respect to any of the four factors, the Court need not resolve this open legal question.

unlawful nature of the 2020 BiOp and ITS as it relates to all primacy states; (2) the deliberate equitable balance the Court struck in OSMRE's favor in allowing for significant portions of the 2020 BiOp and ITS to remain untouched and not calling into question permits previously issued under OSMRE's unlawful scheme, (3) the Services recent regulatory recission of the definition of "harm" as applied under Sections 9 and 10 of the ESA, and (4) that Section 10 of the ESA provides a readily available option for states to continue issuing SMCRA permits that will result in the take of endangered and threatened species.

As it relates to the balance of equities and the public interest, while OSMRE's brief shows no meaningful, let alone "irreparable," harm to Defendants, it does illustrate substantial harm to Plaintiffs, Plaintiffs' members, and Plaintiffs' missions to protect and conserve endangered species and see compliance with the ESA. Defendants' brief, along with the facts of this case and record before the Court, also illustrate that providing Defendants the relief they seek here will significantly harm the public interest in sustained natural biodiversity — especially in the biologically rich areas of the Appalachian Mountains where much of this country's coal mining occurs — and a government operating in compliance with the laws of this Nation.

For these reasons, Plaintiffs, therefore, respectfully request that the Court deny Defendants' motion.

## I.    OSMRE Is Not Likely to Succeed on the Merits of its Appeal

Defendants have failed to demonstrate likelihood of success on the merits of their appeal. To receive a stay, OSMRE must make a "strong showing that [it] is likely to succeed on the merits." *Nken*, 556 U.S. at 426. "[M]ore than a mere 'possibility' of relief is required." *Id.* at 434. Indeed, likelihood of success is "one of the two most 'critical prongs' of the test for a stay."

7

*Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1017 (quoting *Nken*, 556 U.S. at 434). Defendants fail to clear this bar.

Defendants' motion rests on two theories: (1) that the Court erred in concluding that the Circuit Court's decision in *Center for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026), controls this case (and, therefore, that an Appellate review could find the mirror-image "technical assistance process" here to comply with the requirements of the ESA) and (2) that the Court exceeded its discretion in granting partial vacatur in this instance. But OSMRE's motion merely disagrees with the Court's application of established law to the facts of this case. OSMRE has not identified, let alone proven, any legal questions that the Court failed to take into consideration, any issues with the Court's Opinion that implicate a conflict with intra-Circuit or Supreme Court precedent, nor shown that the Court misapplied the facts of this case to controlling law. Defendants have failed to demonstrate a "substantial" likelihood of success on appeal. *Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1018.

### A. The Court's Decision Rests Firmly on the Plain Language of the ESA, the ESA Regulations, and Circuit Precedent

Relying substantially on the dissent in *Zeldin*, OSMRE presses the same worn arguments that it has already presented before this Court and which this Court (and previously the D.C. Circuit in *Zeldin*) solidly rejected. But the Court's decision in this case is soundly rooted in the Circuit Court's decision in *Zeldin* and other Circuit precedents, as well as the plain language and requirements of the ESA and the Supreme Court's interpretation thereof. OSMRE's motion, therefore, establishes no basis to find likelihood of success on appeal.

This Court applied the plain language of the ESA, its implementing regulations, and this Circuit's ESA precedents to rule in Plaintiffs' favor, finding that the 2020 BiOp and ITS failed to comply with the ESA by, among other errors, punting all analysis to a non-statutory and

8

inadequate technical assistance process at the permit level. ECF 53 at 20-35. Issuing a methodical opinion, the Court — agreeing that "[t]he Parties' arguments substantially revolve around the import of the D.C. Circuit's recent decision in *Zeldin,*" ECF 53 at 20, a proper conclusion that continues to be reflected through Defendants' motion — summarized and then analyzed the *Zeldin* decision (which itself relied on the plain language of the ESA, its implementing regulations, and controlling law) as it relates to the facts of this case. Upon reviewing the key holdings in *Zeldin*, the Court concluded that, "*Zeldin* controls and resolves this case in the Plaintiffs' favor." ECF 53 at 26.

The Court went on to thoroughly consider and reject Defendants' argument in the alternative that an outlier out-of-Circuit case, *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), should control instead of *Zeldin.* Summarizing that "Defendants effectively ask the Court to disregard *Zeldin*," the Court declined to do so, finding that "*Cooling Water* is neither binding in this Circuit nor persuasive." ECF 53 at 27 (citing *Zeldin*, 171 F.4th at 378 ("*Cooling Water* does not bind us . . . and its reasoning is at odds with applicable regulations and our own precedents.")); *Zeldin*, 171 F.4th at 386–87 (Wilkins, J., concurring)). Defendants, wisely, do not attempt to press this argument again through their present motion.

From there, the Court systematically applied the controlling law of *Zeldin*, the plain language of the ESA, and ESA regulations such as 50 C.F.R. § 402.14(i)(1)(i) ("In those cases where the Service concludes that an action . . . and the resultant incidental take of listed species will not violate section 7(a)(2) . . . the Service will provide with the biological opinion a statement concerning incidental take that . . . [s]pecifies the impact of incidental taking as the amount or extent of such taking . . . .") to find first that the 2020 ITS is unlawful because it "'openly violates applicable regulations regarding take amounts and the reinitiation of

9

consultation.'" ECF 53 at 28 (quoting *Zeldin*, 171 F. 4th at 381). And then to hold that the 2020 BiOp is additionally unlawful "because it lacks an effects analysis and relies on a technical assistance process that is less protective than Section 7 consultation," ECF 53 at 31.

In responding to these sound legal conclusions, OSMRE's motion fails to point to any new or unaddressed arguments or changes in the law or Circuit precedent to establish a likelihood of success on appeal. Instead, Defendants merely rehash the arguments already proffered through their motion for summary judgment and to which the Court has properly and thoroughly responded. For example, Defendants revisit, again, their argument that the Court should not follow the majority ruling in *Zeldin* because, despite reaching the same conclusion of vacatur of the offensive BiOp and ITS, Judges Pan and Wilkins reasoning slightly differs. ECF 57-1 at 17. However, the Court here ultimately reached its conclusion by adopting the portion of Judge Pan's ITS analysis that both Judge Pan and Wilkins concurred in, and by adopting *both* Judge Pan's and Judge Wilkin's reasoning in reaching its judgment on the 2020 BiOp, as Defendants acknowledge. ECF 57-1 at 22–23 ("The Court wrote in a footnote that it agreed with Judge Wilkins' reasoning in *Zeldin* that 'the validity of the BiOp was so inextricably linked to the validity of its accompanying ITS that the deficient ITS rendered the BiOp deficient,' and it concluded that this 'provides an independent basis for finding that the 2020 BiOp is deficient.'" (citing ECF 53 at 31 n.5)). And, even further, as the Court and precedent cited by Defendants in their motion for summary judgement make clear, "two concurrences in a fragmented circuit panel decision may [only] have no 'precedential effect' if they 'have no meaningful points of agreement,'" and here "the Court does not read Judge Wilkins and Judge Pan as 'hav[ing] no meaningful points of agreement,'" but that "[e]ither way, the Court finds both concurrences

10

persuasive and sees no compelling reason to disregard them." ECF 53 at 28 n.4 (quoting *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *3 (D.C. Cir. Nov. 14, 2025)).

Ultimately, Defendants' motion fails to show that the Court was incorrect in adopting and applying *Zeldin* to the facts of this case and then compounds that failure by neglecting to point the Court to any other binding precedent that supports their preferred outcome on appeal. The sole in-Circuit case to which they point, *North Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980), does not support their argument. *See* ECF 57-1 at 22. As established in *Zeldin*, *Andrus* stands for the principle that "undertaking a programmatic consultation does not excuse the Services from performing an effects analysis that is consistent with Section 7's requirements," *i.e.,* that the Services may address species-specific effects in phases as a *federal project* moves from planning to implementation. *Zeldin*, 171 F.4th at 378 (citing *Andrus*, 642 F.2d at 608–09). And further, as the Court in *Zeldin* makes clear (following another reference to *Andrus*), and as this Court's Opinion reflects, "[a] technical assistance process that sets standards less protective than those prescribed by the ESA cannot displace the ESA itself." *Id*. at 379.

As summarized by Judge Moss and affirmed by the Circuit Court in *Zeldin*, "[w]hat matters is that adequate consultation occur at some point; the ESA does not permit an agency to bypass the Section 7 consultative process altogether by postponing the required, 'detailed discussion of the effects of the action on listed species,' to a later phase, only to conclude . . . that the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7." *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 48 (D.D.C. 2024) (first quoting 50 C.F.R. § 402.14(g); then citing *Cooling Water*, 905 F.3d at 73 n.15), *aff'd sub nom., Zeldin*, 171 F.4th 356). "Congress did not codify a third option" outside of Section 7 or Section 10 for exempting incidental take from liability. *Regan*, 734 F. Supp. 3d at 45. Since Defendants offer

nothing to support their claims of likely success on appeal as a matter of law or fact, Defendants have failed to prove this factor.

### B. The Court Properly Weighed the Allied-Signal Factors to Determine that Partial Vacatur was Warranted

After ruling in Plaintiffs' favor on Claim 3, the Court thoughtfully weighed the *Allied-Signal* factors and narrowly vacated the portion of the 2020 BiOp and ITS found to be unlawful under its ruling. ECF 53 at 31-34. Defendants focus the majority of their brief on the question of remedy, alleging that the Court's partial vacatur "constitutes reversible error." ECF 57-1 at 14. But as with the merits, Defendants fail to support their claim with any substantive showing of error by this Court as a matter of law or fact. While OSMRE may disagree with the Court's conclusion, it does not identify any legal error or any matter that the Court failed to consider in exercising its discretion in fashioning a remedy. Defendants, therefore, fail also to show that they are likely to succeed on appeal regarding the Court's issuance of a partial vacatur in this case.

Contrary to Defendants' claim, the Court granted the proper, "normal" remedy of vacatur in this instance with due tailoring based on Defendants' equitable relief arguments. ECF 53 at 32 (citation omitted); *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (vacatur is the "normal remedy" for unsustainable agency action); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007) (vacating rule because of "wholesale revision" required on remand as well as harm to petitioners). Specifically, after recognizing that "[t]he Court must . . . ensure that any 'injunction' it issues is 'narrowly tailored to remedy the specific harm shown,'" ECF 53 at 32 (quoting *Neb. Dep't of Health & Hum. Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006)), the Court analyzed the seriousness of Defendants' legal violations and the significance of the harm from those violations to find that "it warrants vacating and setting aside the 2020 BiOp and ITS as they apply to the OSMRE's oversight of primacy states,"

12

a similar approach to the one taken in *Zeldin*. ECF 53 at 34-35, 32. But from there, the Court "deviate[d] from *Zeldin*'s approach on vacatur," *id.* at 32, by only vacating the 2020 BiOp and ITS as it relates to OSMRE's oversight of primacy state and leaving in place the portion of the BiOp and ITS that relate to "OSMRE's regulation of mining activities in non-primacy states." *Id.* at 33. Further, "to . . . minimize any 'disruptive consequences' from this decision, the Court's vacatur of the BiOp and ITS '[was] prospective and [did] not call into question previously issued . . . permits.'" *Id*. at 33-34 (quoting *Zeldin*, 171 F.4th at 383). That exercise of reasoned judgment by the Court, which surgically remedied the claims at issue (and resolved by the Court) but went no further, is far from an abuse of discretion — a conclusion only intensified by the fact that, as explained below, the "significant regulatory confusion and uncertainty" claimed by Defendants, ECF 57-1 at 8, is not only significantly exaggerated, it is readily and lawfully surmountable.

Defendants attempt to argue past the Court's exercise of reasoned judgment by claiming that the scope of the Court's Order was excessive. ECF 57-1 at 13 ("Even if any vacatur was appropriate . . . the Court also abused its discretion in vacating the 2020 BiOp and ITS in all 24 primacy states nationwide."). However, given Court's Opinion, which found the 2020 BiOp and ITS to be unlawful under the ESA as they apply to "the OSMRE's oversight of primacy states" (not just as they apply to Kentucky, Virginia, and West Virginia), ECF 53 at 34-35, 32, the remedy ordered, which similarly vacated the 2020 BiOp and ITS as they apply to the OSMRE's oversight of primacy states, is objectively symmetrical.[3]

---

[3] As Defendants declarations additionally make clear, "[s]urface coal mining is not evenly distributed among [the 24 states that have primacy authority]; permitting activity is concentrated in a smaller number of coal-producing States, with Kentucky, Virginia, and West Virginia accounting for a substantial share of the Nation's active surface coal mining permitting." ECF 57-2 at 9 (Tirpak Decl. ¶ 19).

At bottom, the Court did not fail to "meaningfully address" Defendants' remedy requests, ECF 57-1 at 9, or "to meaningfully minimize the disruptive consequences of vacatur," *id*. at 13, but instead faithfully applied the *Allied-Signal* factors to conclude partial vacatur to be the proper remedy in this instance. ECF 53 at 33. The Court exercised reasoned judgment to balance the importance of correcting Defendants clear legal errors under the ESA, as well as satisfying the objectives of the ESA, against their equitable interests. *See id.* at 34 (summarizing that through the ESA "Congress knowingly imposed . . . burdens based on its recognition of what was at stake for our nation's wildlife. And it is not this Court's place to question or ignore that policy choice"). The outcome of that reasoned conclusion by no means evidences a court that "abused its discretion." ECF 57-1 at 13. Thus, here too, there is no basis to conclude that Defendants are likely to prevail on appeal.

## II.   OSMRE Has Failed to Demonstrate That It Will Suffer Irreparable Harm

Irreparable harm is not merely one factor among equals; it is a threshold requirement. Establishing irreparable harm to the moving party is one of "the most critical" factors when determining whether to issue a stay pending appeal. *Nken*, 556 U.S. at 434; *see also Ctr. for Biological Diversity v. Regan,* No. CV 21-119 (RDM), 2024 WL 1740078, at *4 (D.D.C. Apr. 23, 2024) ("[I]rreparable injury is the *sine qua non* for injunctive relief and for a stay pending appeal." (citation omitted)). To satisfy this factor, Defendants must show more than just some "possibility of irreparable injury." *See Nken*, 556 U.S at 433–34. Indeed, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis in original). The "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555

14

(D.C. Cir. 2015) (emphasis in original) (internal quotations and citations omitted). Even if irreparable injury to Defendants were identified, which is not the case here, granting a stay is not a matter of right but rather "an exercise of 'judicial discretion'" where "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 10–11 (1942).

Defendants fail to show any irreparable injury to them will result in the absence of a stay. Indeed, outside of their restatement of the legal standard for a stay pending appeal, the word "irreparable" fails to even appear in Defendants' brief. And, as explained below, Defendants do not mention, let along grapple with, the significant regulatory change that occurred the day before their brief was filed and that reflects the government's formal position that there is little, if any, potential take liability under the ESA for the kinds of activities at issue here. Accordingly, Defendants' protestation that coal production will somehow be stymied due to industry fears about take liability is disconnected from the legal and practical reality that the government itself has established. And, in any case, as the Court identified, Section 10 provides the proper — and readily available — statutory alternative for coal companies to acquire take coverage under the ESA. The only other harms Defendants claim (potential permitting delays, changed agency resources, and staff-time needs) also disregard the present regulatory and enforcement climate and, in any event, are not irreparable.

### A. The Services' Regulatory Rescission of the Definition of "Harm" Will Significantly Reduce, If Not Erase, the Processing Time and Resource-Based Burdens Defendants Allege

Defendants, through their motion and supporting declarations, claim that "[w]ithin five years, the order will — at a minimum — disrupt every single existing operation that has received incidental take coverage under the 2020 BiOp and ITS as well as new mining operations that require incidental take coverage." ECF 57-1 at 6. For example, "judging conservatively based on

15

existing permits with incidental take coverage in Virginia, West Virginia, and Kentucky alone, the order is expected to disrupt *at least* 117 permitting decisions." *Id.* at 5 (emphasis in original).[4] They further claim, "more broadly based on overlap of mining operations with ESA resources, the order has the potential to disrupt at least 432 mines across 13 states." *Id.* at 5-6; *see also id*. at 8-9. And, outside of the ESA-listed Big Sandy and Guyandotte River crayfish, OSMRE's brief identifies that "the Court vacated the 2020 BiOp and ITS . . . with respect to 192 ESA-listed and proposed species (and 64 other proposed or designated critical habitats)" in 21 other primacy states outside of Virginia, West Virginia, and Kentucky. *Id.* at 13 (citing OSM_0025726-48).

If prospectively accurate and taken at face value, Defendants' admissions here speak directly to the volume of harm that is or could be faced by endangered and threatened species and their designated critical habitats if the unlawful BiOp and ITS are allowed to remain in place, as further discussed below in relation to harm to Plaintiffs and the public interest. *See* 16 U.S.C. § 1531(b) (Congress enacted the ESA to promote "the conservation of . . . endangered species and threatened species," and the "ecosystems upon which [those] species depend"); *id.* § 1532(6) (an endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range"); *id.* § 1532(20) (a threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range"). Endangered species and threatened species receive important protections under the ESA. *See id.* §§ 1538(a)(1) (listing prohibited acts for endangered species), 1533(d) (authorizing protective regulations for threatened species). And this Court has found

---

[4] Comparatively, based on the "historical permitting data" Defendants rely on, the "Total Active Permits" in 2025 for these three states was 2,113. ECF 57-3 at 8 (Adams Decl. ¶ 27 (Table)).

those protections, as provided through the substantive and procedural provisions of Section 7, are not being fulfilled to the detriment of ESA-listed species. ECF 53 at 26.

But the entire premise underlying Defendants argument — that coal mining operations will cease due to the inability to obtain take authorization — has been undercut by the government's own change in policy. As noted, on July 14, 2026, the Services (including Defendant U.S. Fish and Wildlife Service (FWS)) finalized a rulemaking that has enormous bearing on this motion. Through that rulemaking, the Services rescinded the definition of "harm" under the ESA and, in so doing, published their formal position that "incidental take" for the purpose of Section 9, and therefore Section 10, no longer includes habitat destruction or degradation. 91 Fed. Reg. at 43304 ("The word 'habitat' appears nowhere in section 10. Rather, section 10's incidental-take regime is symmetrical to what would otherwise be take prohibited as 'take' under section 9.").

The Services then go on to further explain that "Commenters are correct that private parties seeking ITPs . . . pursuant to section 10(a) of the ESA will no longer need to articulate the 'impact' to species' habitat, explain how they will 'minimize and mitigate' habitat modification or degradation, or consider alternatives in service of mitigating habitat modification or degradation in their conservation plans in order to obtain an incidental take permit," and that "in issuing an [ITP], the Secretary of the Interior will no longer consider the effects of a proposed action on the species' habitat, nor will the permit contain terms and conditions requiring permittees to take into account habitat modification and degradation when executing the permitted take." *Id.*

Thus, the very foundation of Defendants' motion — that due to the Court's vacatur of the 2020 BiOp and ITS, coal mining companies will face increased and unresolvable liability under

17

Section 9 of the ESA and/or will be required in droves to obtain coverage under Section 10 — is belied by FWS's own rulemaking, which makes clear that the primary means of take addressed in the ITS at issue in this case (habitat destruction or degradation) is no longer considered to be unlawful take by FWS. FWS, therefore, will not be bringing (or even threatening) any related enforcement actions for violations of Section 9, and as reflected in the above-quoted language, will no longer process ITPs covering the habitat degradation largely at issue in this case. Accordingly, it stands to reason that, at a minimum, the significant "disruption" and resource burden alleged by Defendants at this juncture will fail to materialize during the pendency of Defendants' appeal. So, while Plaintiffs' position is that Defendants would be unable to show irreparable injury even prior to the rule adopted on July 14, 2026 — because the Section 10 process remains available to anyone seeking take authorization, as discussed further below — they certainly cannot show irreparable injury from the loss of incidental take coverage at this point.

Certainly, if the Services' rulemaking is ultimately found by a federal court to be unlawful and is vacated on that basis,[5] circumstances may change. But there is little likelihood that such litigation will be resolved before the conclusion of Defendants' appeal in this case. Even if it is, or circumstances do otherwise materially change, nothing would prevent Defendants from seeking any appropriate relief at that juncture. *See, e.g.,* Fed. R. Civ. P. 60(b). That only further undermines any notion that there is irreparable harm sufficient to support a stay at this juncture.

---

[5] The Center has filed a lawsuit seeking such relief. *See Ctr. for Biological Diversity, et al., v. Douglas Burgum, et al.*, No. 26-02474 (W.D. Wash. July 14, 2026).

The baselessness of Defendants' protestation of imminent injury is even further reinforced by the legal justification proffered by the Services for the rule change. In the preamble to the rule, the Services adopt Justice Scalia's dissenting opinion in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995). In that case, the Supreme Court upheld the validity of the same regulation that the Services have now discarded. According to Justice Scalia's dissenting view (now formal FWS policy) "the term 'harm,' like the other nine verbs in the definition of 'take,' should be construed to require an 'affirmative act[] . . . directed immediately and intentionally against a particular animal—not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of animals.'" 91 Fed. Reg. at 43301 (quoting *Sweet Home*, 515 U.S. at 719–720 (Scalia, J., dissenting)).

In explicitly stating in this new rulemaking that "[w]e adopt Justice Scalia's rationale as articulated in *Sweet Home*," 91 Fed. Reg. at 43301, FWS now appears to have adopted the position that for *any* action to be considered a prohibited "take" it must be the result of an "affirmative act . . . directed immediately and intentionally against a particular animal." *Sweet Home*, 515 U.S. at 719–720 (Scalia, J., dissenting) (cleaned up). Indeed, that inference is reflected throughout the Services' rulemaking. *See, e.g.,* 91 Fed. Reg. at 43305 (confirming that ITPs will only be required for "affirmative conduct intentionally directed against a particular animal or animals"); *id*. at 43302 ("Nor do the Services choose to add a new regulatory definition for 'harm.' Given that 'take' is defined in the statute, and that the role and meaning of the term 'harm' within the larger definition of 'take' was expertly explicated by Justice Scalia in his *Sweet Home* dissent — an interpretation which we have herein adopted — we find that maintaining a freestanding definition of 'harm' is unnecessary."). This dramatic shift in the Services' position on the scope of the take prohibition severely undercuts any irreparable injury

19

argument offered by Defendants. Simply put, while arguing to this Court that coal production will be significantly hampered due to the potential for ESA take liability (an absurd position in any case), the government has, at the very same time, told states and coal companies in no uncertain terms that they are off the hook for such liability.

### B. In Any Case, Section 10 of the ESA Provides a Lawful, Available Route for Primacy States to Issue SMCRA Permits and Provide Take Coverage

Even outside of FWS's significant change in its policy and approach to ESA administration, Defendants' irreparable injury arguments would be groundless. Defendants argue that "pursuing alternative means . . . [for ESA] compliance for primacy states under SMCRA would be unprecedented and likely take years to develop and implement" if the Court's partial vacatur of the 2020 BiOp and ITS is allowed to stand. ECF 57-1 at 5. But far from unprecedented, as Defendants thereafter readily admit, "[i]n the absence of the programmatic incidental coverage under the 2020 BiOp and ITS, an ITP under ESA Section 10 is likely the principal mechanism available to a primacy-state operator to directly obtain coverage for incidental take of listed species under the ESA." ECF 57-1 at 10 (citing Tirpak Decl. ¶ 20); *see also* 16 U.S.C. § 1539(a) (Section 10 of the ESA); 50 C.F.R. § 17.22.

As the Court has already identified, this is exactly how the ESA was designed to work. "'Recognizing that some take can occur as a result of otherwise lawful activities, Congress created two paths to ensure that 'incidental take' does not jeopardize protected species or adversely modify or destroy critical habitat: The first path, under Section 7, applies to federal agency actions, and the second, under Section 10, applies to non-federal actions.'" ECF 53 at 3 (quoting *Regan*, 734 F. Supp. 3d at 15, *aff'd sub nom.*, *Zeldin*, 171 F.4th 356). A similar restatement (and acknowledgment by Defendants of controlling law) is found in the 2020 BiOp:

> [I]f a proposed action is anticipated to result in incidental take of a species, the State regulatory authority and/or the applicant/mining operator may indicate that incidental take coverage has already been provided . . . via an ESA section 10 permit (i.e., via a previously completed Habitat Conservation Plan [HCP] or Candidate Conservation Agreement with Assurances [CCAA]). If that is the case, then . . . the State regulatory authority and mining operator would not need to rely on incidental take coverage afforded by the ITS contained in this programmatic Opinion.

ECF 52-3 at 24 (OSMRE_0025716 at 19). Thus, because "[b]oth Section 7 and Section 10 'offer the promise of liability protection for incidental take' if certain requirements are met," Defendants' claim that they will be irreparably harmed by the loss of the 2020 BiOp and ITS for future SMCRA permitting activities lacks any basis. ECF 53 at 3 (citing *Regan*, 734 F. Supp. 3d at 15, *aff'd sub nom.*, *Zeldin*, 171 F.4th 356); *see also* 16 U.S.C. §§ 1536(o)(2), 1538, 1539(a); 50 C.F.R. § 402.14(i)(5)).

In an effort to manufacture a claim of irreparable harm, Defendants argue not that the statutory mechanism of seeking Section 10 ITP coverage is unavailable, but rather that "[p]rocessing individual Section 10 applications for each, or even a substantial portion, of the known SMCRA permits that currently have incidental take coverage would impose an unmanageable volume of applications for" FWS. ECF 57-1 at 10; *see also* ECF 57-1 at 11 (describing the checks and balances of lawful compliance with Section 10, which includes coordination between the applicant and FWS and "draws on a multidisciplinary team — including biologists"). But such staff and government resourcing concerns, including compliance with the legal requirements of issuing ITPs, are not grounds for finding irreparable harm. *See Wis. Gas Co.*, 758 F.2d at 674 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958))); *S. Fork Band Council of W. Shoshone v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009)

21

(temporary economic harms did not outweigh environmental harms). They are also not grounds for continuing to give chronic, long-term violators (even the federal government) a pass from coming into compliance with the law. *Watson v. Republican Nat'l Comm.*, No. 24-1260, 2026 WL 1855462, at *7 (U.S. June 29, 2026) (policy preferences "cannot override the words Congress chose").

And further, as the D.C. Circuit and courts within it have consistently held, federal agencies cannot use staffing shortages, budgetary limitations, or competing operational priorities as a legal justification for failing to comply with statutory mandates, court orders, or other legal obligations. An agency cannot "shirk[ ] its duties by reason of mere difficulty or inconvenience." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 168 (D.C. Cir. 2017); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188 n.10 (D.C. Cir. 2017) ("[A]n agency may not duck its [ESA] consultation requirement, whether based on limited resources, agency priorities or otherwise."). "However many priorities the agency may have, and however modest its personnel and budgetary resources may be, there is a limit to how long it may use these justifications to excuse inaction in the face of the congressional command to act." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 554 (D.C. Cir. 1999); *see also In re Ctr. for Biological Diversity*, 53 F.4th 665, 672-73 (D.C. Cir. 2022) (finding "finite [agency] resources" not to be a valid equitable reasons to excuse the agency from delaying completion of an "effects determination" under the ESA); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016); *State of Wisconsin v. EPA*, 938 F.3d 303, 319 (D.C. Cir. 2019) ("When an agency faces a statutory mandate, a decision to disregard it cannot be grounded in mere infeasibility.").[6]

---

[6] Insofar as Defendants' asserted resource and personnel constraints result from Defendants' own actions — *e.g.,* the significant federal agency staff cutbacks orchestrated by the so-called Department of Government Efficiency ("DOGE") — a party's self-inflicted injury cannot afford

While the Court's decision will inevitably produce some changes to OSMRE's administration and oversight of SMACRA permitting, those changes are directed by the ESA and found by the Court to be necessary. Because Section 10 readily provides a clear, lawful path forward for Defendants, primacy states, and coal companies to avoid Section 9 liability and maintain compliance with the ESA, Defendants can evidence no irreparable injury even, again, when considered in the light most favorable to Defendants' motion that may have existed prior to FWS's "harm" recission, but certainly not post-July 14, 2026. Defendants' remaining "staff-time burden" claims, ECF 57-1 at 11, are not sufficient to establish irreparable harm. And especially for Defendant FWS, the administrative "burden" of complying with the mandates of the ESA should be nothing new or exceptional.

### III.    The Balance of Equities and Public Interest Weigh Against a Stay

Defendants are unable to satisfy their burden for showing a stay is warranted because they are unable to show likelihood of success on appeal or interim irreparable harm without a stay — the two most critical factors to the Court's inquiry. *Nken*, 556 U.S. at 434 (internal citations omitted). That is more than sufficient to deny Defendants' motion. Nevertheless, the Court should also deny the stay request because any of the negligible harms Defendants assert are outweighed by the harms Plaintiffs and the public would face if a stay were granted.

### A.  A Stay Would Cause Plaintiffs Substantial Harm

Through this litigation, Plaintiffs have identified significant concerns about ongoing harms to threatened and endangered species as a result of Defendants' reliance on the technical assistance process established and implemented through the 2020 BiOp and ITS. *See* ECF 42-1

---

the basis for equitable relief. *Cf. BLOM Bank SAL v. Honickman*, 605 U.S. 204, 212 (2025) (holding that a party's "deliberate choices" cannot afford a basis for equitable relief under Fed. R. Civ. P. 60(b)).

23

at 36-49; ECF 47 at 32-43. The Court reasonably declined to reach Plaintiffs' Claims 1 and 2, which argued the significance of these violations and harms to ESA-listed wildlife. *See* ECF 53 at 34-35. However, the effect of granting the requested stay would be to allow Defendants to continue to rely on the same faulty technical assistance process to which Plaintiffs express concern and, therefore, to authorize the very issues that compelled Plaintiffs (in part) to bring this case to continue, as evidenced by the record. Such an outcome would cause Plaintiffs, and their interest in lawful compliance with the ESA and protection of endangered species and their habitats, *see* ECF 53 at 11, substantial harm.

Where, as here, a stay would cause environmental injury, the balance of equities favors denying the stay request because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). That is especially the case in ESA-related actions where the continued loss of the "*unknown* uses that endangered species might have and . . . the *unforeseeable* place such creatures may have in the chain of life on this planet." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 178-79 (1978) (also citing to a Congressional Committee report as explaining that "the value of this genetic heritage is quite literally, incalculable") (emphasis in original). As Courts have long held, failing to follow the procedure that environmental laws require denies the laws' "fundamental safeguards" given the risk that "environmental consequences might be overlooked." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 870 (9th Cir. 2022) (citation modified).

Such a conclusion is especially true for species like the federally-endangered Guyandotte River crayfish, which now only survives in two streams in two counties in West Virginia (both of which are heavily impacted by coal mining activities) and to which FWS has stated is "already

24

pretty close to spiraling down the extinction vortex." *See* ECF 42-1 at 12 (quoting ECF 42-6 at 7 (Curry Decl.)). But that harm is not exclusive to the Guyandotte River crayfish, as Plaintiffs make clear in their briefing. *See, e.g.,* ECF 42-1 at 17 n.6 ("Numerous listed and proposed species have been pushed to the brink of extinction by SMCRA-permitted mining activities in Appalachia [alone], including not only the Guyandotte River crayfish and the Big Sandy crayfish, but also the candy darter, the diamond darter, and the purple bean mussel, among others." (citations omitted)). Because the record shows ongoing harm to threatened and endangered species will occur if Defendants are permitted to continue to rely on the unlawful status quo established through the 2020 BiOp and ITS, granting Defendants requested relief would cause Plaintiffs, their members, and their endangered species missions significant harm.

Defendants counter-protests are unavailing. Defendants repeatedly attempt to impugn Plaintiffs for supposedly "stay[ing] this case indeterminately pending a decision in *Zeldin,"* ECF 57-1 at 6; *id*. at 30-31 (same). But Defendants' argument is belied by the procedural posture and outcome of this case, where the D.C. Circuit's controlling decision in *Zeldin* allowed the parties and the Court to properly narrow the key issue in this case — the facial validity of the 2020 BiOp and ITS — and issue an opinion without additional briefing or argument, efficiency measures that allowed this case to be resolved more quickly than may have otherwise been possible and in furtherance of D.C. Circuit's consistency objectives. See *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("Inconsistency is the antithesis of the rule of law. For judges, the most basic principle of jurisprudence is that 'we must act alike in all cases of like nature'. . . . [T]he law-of-the-circuit doctrine [establishes that] the *same issue* presented in a *later case* in the *same court* should lead to the *same result."* (citation omitted) (emphasis in original)). That OSMRE now chooses to appeal this Court's straightforward decision and delay its own

25

efforts to bring its SMCRA program into compliance with the ESA cannot now be re-framed as a delay by Plaintiffs or as a delay that does not cause Plaintiffs harm.

### B.  The Public Interest Lies in Governmental Adherence to Our Nation's Laws and Preservation of Endangered Species and their Critical Habitats for Generations to Come

As Courts have reiterated time and again in the context of the ESA, the balance of equities and public interest factors are generally considered to tip in favor of the species. *See, e.g., Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230 (D.D.C. 2003) ("Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species.") (citation omitted); *Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 31 (D.D.C. 2019) ("And when an injunction is being considered as a remedy for a violation of Section 7 of the ESA, the third and fourth factors are generally considered to tip in favor of the species.") (citation omitted); *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 250 (D.D.C. 2020) (same). *Accord Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 71 (D.D.C. 2006), *vacated on other grounds sub nom. Humane Soc'y of U.S. v. Kempthorne*, 527 F.3d 181 (D.C. Cir. 2008) ("Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the 'public interest' lies in the protection of the endangered [species]…."). This is because, as the Supreme Court summarized in *Tennessee Valley Authority v. Hill*, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" 437 U.S. at 194.

The public interest lies in compliance with and enforcement of the congressional mandates in the ESA. The ESA was passed to "halt" the tipping of native wildlife towards

26

extinction, including through a thousand small cuts, in pursuit of not only stopping but "revers[ing] the trend towards species extinction . . . ." *Id*. at 184. The public interest also lies in government compliance with the laws it is intended to promote, here the ESA. *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977) ("The public unquestionably has a substantial stake in enforcement of [federal environmental laws] and in preservation of the natural environment."); *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) (There is a "strong public interest in meticulous compliance with the law by public officials"); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 26 (D.D.C. 2009) (same); *see also* 16 U.S.C. § 1532(3) (defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"). Defendants' motion ignores both of these principles.

Defendants counter that "'the government's interest *is* the public interest.'" ECF 57-1 at 23 (citing *Ala. Ass'n of Realtors*, 539 F. Supp. 3d at 213). That may be true when the government is complying with the law. But nowhere in their brief do Defendants meaningfully grapple with the effect their motion's requested relief will have on the public's interest in a government bound by and acting in furtherance of the ESA or the public interest, as embodied in that statute, in ecological integrity and ecosystem resilience, sustained natural biodiversity, including in the biologically rich areas of the Appalachian Mountains where much of this country's coal mining occurs, and the persistence of the endangered wildlife through ESA compliance. Rather, Defendants argument relies on the concepts of "regulatory certainty," "energy supply," and "national defense." ECF 57-1 at 23.

27

Taking each in turn, as it relates to "regulatory certainty," Defendants fail to show that having to instead look to Section 10 for take coverage, especially following FWS's change in its interpretation of "harm" will lead to regulatory uncertainty, as discussed previously. Defendants' position also fails to provide due consideration to the public interest in seeing that "[t]he ESA accomplish[] its purpose . . . which include[s] protecting the remaining members of a species." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018).

Next, as it relates to the "energy supply," Defendants have not shown that the relief granted in this case will actually cause a reduction in coal mining. Indeed, tellingly, despite spilling tens of pages of words across four declarations and through their brief, Defendants are unable to point to any actual curbing of coal production that has happened as a result of the Court's Order. Rather, Defendants rely on hypotheticals, contingent chains of uncertain future events, and speculation, none of which shows any harm to the public interest or interference with OSMRE's asserted energy priorities.

Finally, as it relates to the "national defense," Defendants rely on the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), but nowhere do they show any actual infringement on or threat to the national defense as a result of this Court's Order. ECF 57-1 at 23-24. *Winter* does not stand for the principle that Courts must exercise unfettered "deference to professional military judgments." *Id.* at 24. Instead, as the Court made clear, "military interests do not always trump other considerations, and we have not held that they do." *Winter*, 555 U.S. at 26; *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role."). The Court reached its conclusion in *Winter* after engaging in a highly fact-specific inquiry and finding that the consequence of

28

leaving an injunction in place in that instance would be to *preclude* the Navy from using active sonar — described by the Court as "the *only* reliable technology for detecting and tracking enemy diesel-electric submarines," *id*. (emphasis added) — to conduct training exercises under realistic conditions. *See also id.* at 27-28 ("The preliminary injunction requires the Navy to shut down its MFA sonar if a marine mammal is detected within 2,200 yards of a sonar-emitting vessel."). That would have resulted in "forcing the Navy to deploy an inadequately trained antisubmarine force[, which] jeopardizes the safety of the fleet," *id*. at 26, and "ultimately leaving strike groups more vulnerable to enemy submarines." *Id*. at 31. That is far from the situation here. *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018) ("APA review may be limited, but it involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'") (citation omitted). Not only have Defendants presented zero evidence that the Court's ruling has had any impact on the mining of coal in the affected states,[7] but to the extent incidental take coverage is needed in primacy states, Section 10 of the ESA provides that coverage and the protections it entails.

"[I]n enacting the SMCRA, Congress did not displace the ESA." ECF 53 at 34. Congress passed both laws knowing well that the two could, and would, work in conjunction, and providing Defendants with the tools, through Section 7 and Section 10 of the ESA, to achieve the objectives of each in unity. While the Supreme Court has recognized certain, limited situations where the ESA should give way to another statute when an agency lacks discretion, none of

---

[7] Indeed, according to the declaration filed by Defendants on behalf of the Department of War, the main electrical grid reliability concerns alleged are not because of any identified coal shortages as a result of this Order, but because coal burning power plants are "retiring at a rate that outpaces the construction of replacement resources." ECF 57-5 at 3-4 (Thompson Decl. ¶ 11).

29

those situations are present or alleged here. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007). As Federal judges have reiterated time and again, including Supreme Court Justice Kavanaugh when he was a Circuit Judge on the D.C. Circuit, "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cnty*., 725 F.3d 255, 260 (D.C. Cir. 2013) (*citing Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . .")); *id.* at 258, 267 (granting mandamus where Nuclear Regulatory Commission "shut down its review and consideration of the Department of Energy's license application" in direct violation of federal statute and noting that "[i]t is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law in the manner asserted in this case by the Nuclear Regulatory Commission"). The Court's Order reflects these principles by ensuring that both laws are equally administered as Congress intended.

## CONCLUSION

For the reasons stated above, Defendants have failed to carry their burden to demonstrate a stay is required. The Court should, therefore, deny the stay request.

July 29, 2026.                               Respectfully Submitted,

                                        /s/ Hannah Connor
                                        Hannah Connor (DC Bar #1014143)
                                        Center for Biological Diversity
                                        1411 K Street NW, Suite 1300
                                        Washington, DC 20005
                                        Tel: (202) 641-6176
                                        Email: hconnor@biologicaldiversity.org
                                        *Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of July 2026, I electronically filed the foregoing document

using the CM/ECF system. Service was accomplished by the CM/ECF system.


Respectfully Submitted,

/s/ Hannah Connor
Hannah Connor (DC Bar #1014143)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 641-6176
Email: hconnor@biologicaldiversity.org

31