# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, APPALACHIAN VOICES, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:23-cv-03343 |
| U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, LANNY E. ERDOS, in his official capacity as Director of the Office of Surface Mining Reclamation and Enforcement, UNITED STATES FISH AND WILDLIFE SERVICE, DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, and BRIAN NESVICK, in his official capacity as Director of the U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR STAY PENDING APPEAL

### Introduction

In requesting a stay, Defendants ask only that the framework that has governed surface coal mining permitting in the primacy states for nearly five decades remain in place for the length of time it will take to decide on appeal whether this Court's summary judgment ruling was correct. Defendants are not asking this Court to grant them affirmative relief (and they therefore need not justify such relief), but rather to "simply suspend[] judicial alteration of the status quo" while the appellate courts consider the merits. *Nken v. Holder*, 556 U.S. 418, 429 (2009) (citation omitted); *see also* Fed. R. Civ. P. 62(d); Fed. R. App. P. 8(a)(1)(A).

Plaintiffs' opposition does not so much acknowledge Defendants' request as offer arguments that are internally incompatible and provide no basis for denying a stay. Its centerpiece is an argument that vacatur is harmless: because the Services have rescinded the regulatory definition of "harm," Plaintiffs say, habitat modification can no longer qualify as "take," coal mining may proceed unabated without incidental take coverage, and the complications Defendants describe "will almost certainly fail to materialize during the pendency of Defendants' appeal." ECF 59 at 3; *see also id.* at 2-4, 17-19. Defendants explain below why this argument is misguided. But even, for argument's sake, if Plaintiffs are right, they have argued themselves out of their opposition to Defendants' stay request. An instrument that changes nothing when vacated changes nothing when reinstated. Plaintiffs cannot suffer "substantial injury" from the reinstatement of an instrument they describe as a legal nullity— nor can they credibly maintain, in the same breath, that the instrument is a legal nullity and yet reinstating it would let Defendants "authorize the very issues that compelled Plaintiffs (in part) to bring this case." *Id.* at 4, 23. Both propositions cannot be true, and neither justifies denying the requested stay.

Plaintiffs proffer no evidence to support their opposition to a stay. Defendants' stay request, by contrast, is supported by declarations from officials in the Departments of Interior, Energy, and War who are charged with administering SMCRA and the ESA, and for ensuring the security of our nation's energy supply and defense. Those declarations establish that: (1) permitting actions in Virginia, West Virginia, and Kentucky are already stalled; (2) at least 117 permitting decisions and nearly seven million tons of annual production are at risk each year in those three states alone; (3) ESA Section 10 offers no realistic path to incidental take coverage within the life of this appeal because complex conservation plans commonly take at least five years or more; and (4) disruption of coal supply can impact the electric grid as well as domestic steelmaking and defense manufacturing. ECF 57-3 (Adams Decl. ¶¶ 27, 30, 36, 42-43); ECF 57-2 (Tirpak Decl. ¶¶ 13-14, 20-26); ECF 57-4

(Coccodrilli Decl. ¶¶ 5-14); ECF 57-5 (Thompson Decl. ¶¶ 5-15). Plaintiffs rebut none of this evidence. They offer only their unsupported and subjective opinions, which are entitled to no weight. Defendants' unrebutted evidence should decide the irreparable-injury and public-interest factors in their favor, which merge when the government is a party to a stay application. *Nken*, 556 U.S. at 435; *Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 211, 213 (D.D.C. 2021).

Indeed, this Court has granted summary judgment on a facial challenge to the 2020 BiOp and ITS. In so doing, the Court made no finding that any mine, permit, or technical assistance determination is unlawfully harming any listed species or designated critical habitat, nor did the Court identify any record evidence showing that vacating the 2020 BiOp and ITS will either prevent such harms or provide any tangible benefits to listed species or designated critical habitat. Plaintiffs' newfound claim of urgency does not square with their own conduct in this litigation: they obtained, and then fought to keep, an eight-month stay of the litigation when it was already two years old, throughout which the instruments they now call intolerable were in place in all 24 primacy states.

Defendants' likelihood of succeeding on the merits of their appeal completes the showing necessary for the requested stay. The D.C. Circuit will review the 2020 BiOp and ITS directly and *de novo*. It will decide for itself whether this Court was correct to find *CBD v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026), controlling. *Zeldin* was a highly fractured decision that produced no majority reasoning on the BiOp, drew a vigorous dissent, and remains open to a petition for rehearing *en banc*. Even if *Zeldin* was correct, it addresses the transfer of federal permitting authority to a state, not the continued oversight of a fifty-year-old cooperative federalism program in which the primacy states have held the permitting pen. Finally, regardless of the merits, the remedy swept far beyond the case Plaintiffs plead, which concerned just two crayfish species in three states. For these reasons, the Court should stay its May 29, 2026 order pending Defendants' appeal.

**Argument**

I.    **Plaintiffs Do Not Rebut Defendants' Showing of Likely Success on the Merits of their Appeal**

A.  **Plaintiffs Ignore that Appellate Review of this Case is *De Novo***

Plaintiffs argue that Defendants are not likely to prevail on the merits of their appeal because this Court ruled against them. ECF 59 at 8. But the mere existence of an adverse ruling in the district court plainly does not foreclose a likelihood of success on appeal.[1] Indeed, the D.C. Circuit will review this case *de novo* and it will not be required to give any deference to this Court's findings. *See, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) ("In a case like the instant one, in which the District Court reviewed an agency action under the APA, we review the administrative action directly, according no particular deference to the judgment of the District Court").

More specifically, on appeal the D.C. Circuit will review the 2020 BiOp and ITS and the administrative record anew and apply the same standard that this Court did to make its own determination of whether the 2020 BiOp and ITS satisfy the APA's prohibition against agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014) (noting in an ESA BiOp challenge that "[d]e novo review of a district court judgment concerning a decision of an administrative agency means we view the case from the same position as the district court") (quoting *Sierra Club v. Babbitt*, 65 F.3d 1502, 1507 (9th Cir. 1995)).

Fundamentally, the D.C. Circuit will make its own determination of whether *Zeldin* controls this case. Plaintiffs cannot deny Judge Pan's statement in *Zeldin* that "structural safeguards in the form

---

[1] Plaintiffs assert that "[t]his Court applied the plain language of the ESA, its implementing regulations, and this Circuit's ESA precedents to rule in Plaintiffs' favor" (ECF 59 at 8), but they make no attempt to show how. Plaintiffs also complain that Defendants' arguments on the merits were "already presented before this Court" (*id.*), but that is the point of an appeal. Appellants are expected to press the arguments they presented below, and the court of appeals reviews the case *de novo*.

of deferred site-and species-specific assessments might be sufficient in some circumstances." 171 F.4th at 379. Defendants have argued that this is such a case because there are crucial factual differences between the two cases that make *Zeldin* inapposite here. ECF 50 at 3-16; ECF 57-1 at 5-6, 13-14. Defendants respectfully submit that this Court's analysis did not account for these differences and instead equated the agency action here with the agency action in *Zeldin*. In doing so, the Court treated the 2020 BiOp as though it was analyzing a transfer of federal permitting authority to the state, which it was not. That was the action in *Zeldin*, but not here. In applying *Zeldin*'s reasoning here, this Court faulted the 2020 BiOp for inadequately analyzing the effects of an action that it did not purport—and was not required—to analyze. Plaintiffs have no response to the fundamental factual differences between the two cases; they simply applaud the Court's application of *Zeldin*. The D.C. Circuit, however, could conclude that the two cases are distinguishable because OSM is not "displacing the ESA" here as was found in *Zeldin*.

Regardless, while this Court found Judge Pan's and Judge Wilkins' separate concurrences persuasive, the D.C. Circuit may not be so persuaded due to the highly fractured nature of the panel's decision and Judge Henderson's strong dissent. As Defendants have explained, *Zeldin* did not produce majority reasoning regarding the BiOp. When a panel divides in that fashion, its holding extends no further than the narrowest ground on which a majority agreed. *Marks v. United States,* 430 U.S. 188, 193 (1977). In *Zeldin*, Judge Pan believed the BiOp was deficient because the technical assistance process in that case would be less protective than the status quo of site-specific ESA Section 7(a)(2). Judge Wilkins concurred in Judge Pan's judgment for that section, but not in her analysis. He believed the BiOp was unlawful because its no-jeopardy finding depended on a deficient ITS. This Court adopted Judge Wilkins' rationale which, as Defendants have explained, is a misreading of the ESA. ECF 50 at 24, n.9; ECF 57-1 at 18-19. Plaintiffs have no response to this legal point. Judge Henderson disagreed with her colleagues regarding the BiOp. She believed it satisfied the ESA, and that FWS's

no-jeopardy determination was valid "in light of future structural safeguards." *Zeldin*, 171 F.4th at 403. The D.C. Circuit could agree with Defendants and Judge Henderson that SMCRA's structural safeguards are sufficiently protective and that this Court mischaracterized the mechanics of SMCRA's technical assistance process (ECF 57-1 at 14-17), another issue that Plaintiffs make no attempt to rebut.

Regardless, Defendants have until August 7, 2026, to seek *en banc* review of the panel's decision in *Zeldin*. In any *en banc* review, the full Court of Appeals would revisit the panel's decision and determine whether it was correct.

### B.  Vacating the 2020 BiOp and ITS Was Unnecessary and Overbroad

Plaintiffs fail to show it was necessary to vacate the 2020 BiOp and ITS as an initial matter, much less to vacate these instruments nationwide, in all 24 primacy states. They claim that, before vacating the 2020 BiOp and ITS, the Court "analyzed the seriousness of Defendants' legal violations and the significance of the harm from those violations" (ECF 59 at 12), but Plaintiffs cannot point to any actual analysis of harm or what the practical consequences would have been of remanding the 2020 BiOp and ITS without vacatur. Plaintiffs do not address these omissions, and they never engage the authority Defendants cited for remand without vacatur in this posture. *See* ECF 50 at 24; ECF 57-1 at 4-5 (citing, *inter alia*, *Nat. Res. Def. Council v. Kempthorne*, No. 05-CV-1207 GSA, 2007 WL 4462391, *1 (E.D. Cal. Dec. 14, 2007) (remanding a BiOp and ITS without vacatur "[t]o avoid the potentially draconian consequences of operating the [projects] without incidental take authority")).

As Defendants have shown, this Court did not vacate based on any factual finding of harm. Rather, the Court made it clear that it was vacating the 2020 BiOp and ITS because the D.C. Circuit vacated the BiOp and ITS in *Zeldin*. ECF 57-1 at 5 (citing ECF 53 at 32). Plaintiffs' attempt to invent an alternative basis for the vacatur defies reality. Vacating the 2020 BiOp and ITS based on the remedy imposed in *Zeldin* cannot be justified. Indeed, as Defendants have repeatedly explained, vacating the

6

2020 BiOp and ITS in this case has fundamentally different consequences than vacating the BiOp and ITS in *Zeldin*. ECF 57-1 at 5-9; ECF 50 at 24. Vacatur here creates a dilemma that was not present in *Zeldin* whereby primacy states have permitting authority but no readily available site-specific Section 7 consultation from a Federal agency to fall back on for Section 9 coverage like Section 404 applicants are left with in *Zeldin*. Again, these differences were met with silence in Plaintiffs' opposition. Plaintiffs' unsupported contentions in a legal brief—that Section 10 permits can readily be obtained—are contradicted by the only evidence in the record. *See* Tirpak Decl. ¶¶ 13-14, 17-18, 20-26.

As noted above, the Court made no factual findings that the shortcomings it found in the 2020 BiOp and ITS were harming any species or designated critical habitats. Indeed, the Court ruled only on Plaintiffs' facial challenge to those instruments. Plaintiffs argue that, because the Court ruled on a facial challenge, it was appropriate to vacate the 2020 BiOp and ITS in all primacy states nationwide, even though Plaintiffs made no specific claims relating to 21 of those states. ECF 59 at 13. That is not the standard. The scope of the violation a court finds does not set the scope of the remedy it may award; Article III and traditional equitable principles do. As Defendants have explained, when granting equitable relief, courts must ensure the remedies are not overly broad and no more burdensome to the defendant than necessary to provide complete relief to the plaintiff. ECF 57-1 at 9-10.

Here, Plaintiffs do not, and cannot, show that the 2020 BiOp and ITS had to be vacated in states that they never even mentioned in their complaint to grant them complete relief. Plaintiffs' opposition does not identify a single member with an interest in any of the other 21 primacy states, or the vast majority of the listed species and critical habitat addressed in the 2020 BiOp and ITS that were swept in by the Court's order. A plaintiff's remedy must be "limited to the inadequacy that produced [its] injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citation omitted); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Plaintiffs' response that the remedy is "objectively symmetrical" to the

Court's legal rulings (ECF 59 at 13) disregards this law, as it improperly ties the remedy to the Court's legal opinion rather than to Plaintiffs' asserted injuries.

Plaintiffs argue that the Court "went no further" than to "surgically remed[y] the claims at issue" because the vacatur applies only prospectively (*id.*), but this ignores Defendants' central arguments: (1) there were permitting actions in mid-stream when the order was issued that are now stalled; and (2) every existing permit in primacy states will need to be renewed at least within the next five years and also may require revision. ECF 57-1 at 9-10. Thus, applying the vacatur prospectively does not eliminate its disruptive effect.

The unrebutted evidence before the Court shows that mining operations are currently being disrupted and that the disruptive effect of the order will grow over time as more operations come up for renewal or require a revision. Judging conservatively based only on existing permits with incidental take coverage in the three states referenced in the complaint (Virginia, West Virginia, and Kentucky), vacatur of the 2020 ITS can be expected to disrupt *at least* 117 permitting decisions and nearly 7 million tons of coal production *each year* the vacatur is in effect due to the lack of readily available Section 9 coverage. Adams Decl. ¶ 27. The state regulatory authorities ("SRAs") that are responsible for permitting and overseeing those operations will be forced to choose between denying or delaying new permit applications (as well as renewals and revisions of existing permits) that require ESA take coverage or allowing the operations to proceed without ESA coverage at the risk of liability for any unlawful take. *Id.* ¶ 25. The mining operators that bear responsibility for carrying out their operations in a lawful manner will be forced to make a similar choice between ceasing operations until they can secure any necessary Section 9 coverage and proceeding without ESA coverage at the risk of liability for any unlawful take. These disruptive consequences are significant and widespread.

**II.    The Balance of Harms and Public Interest Favor a Stay Pending Appeal**

Plaintiffs' lead response on these prongs is that the word "irreparable" does not appear in Defendants' motion. ECF 59 at 14-15. Plaintiffs quibble with vocabulary rather than quarrel with substance. To the extent that Plaintiffs claim Defendants have not addressed the irreparable harm prong, that is incorrect, because the irreparable harm and public interest prongs "merge when the Government is" a party to the stay application. *Nken*, 556 U.S. at 435; *Ala. Ass'n of Realtors*, 539 F. Supp. 3d at 213. To the extent that Plaintiffs claim a stay should be denied because the harms Defendants have shown to the public interest are not "irreparable," that, too, is incorrect.[2] When a sovereign is prevented "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Here, Defendants assert damage to the cooperative federalism program Congress designed to govern surface coal mining, and the attendant concrete harm to the primacy states, permit applicants, the electric grid, and national defense manufacturing. Furthermore, Defendants' four unrebutted declarations are more than sufficient to show an injury that is "certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up) (citation omitted). Defendants' declarations show that harm is more than just imminent, it is currently ongoing. Our nation cannot afford to chance whether it might be able to recover in the future from the harms inflicted on its economy, emergency security, and national defense from a reduction in coal production due to the vacatur of the 2020 BiOp and ITS.

---

[2] Plaintiffs' authorities do not help them. ECF 59 at 21-22. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), addressed out-of-pocket expenses by regulated parties. Defendants assert no interest here in the agencies' own money.

### A.  Plaintiffs' Reliance on the Withdrawal of the "Harm" Rule is Misplaced

Curiously, Plaintiffs have made a contention that coal mining operations will not be required to "cease due to the inability to obtain take authorization" their main basis for opposing reinstatement of the 2020 BiOp and ITS while Defendants pursue their appeal. ECF 59 at 17; *see also id.* at 3 (asserting that "many — if not all — of the incidental take coverage-based complications set forth by Defendants through their motion and supporting declarations will almost certainly fail to materialize during the pendency of Defendants' appeal"). This, Plaintiffs claim, is because the rule defining "harm" in the statutory definition of "take" is being withdrawn. 91 Fed. Reg. 43300 (July 14, 2026). The rule being withdrawn defines "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.* Due to the rule's withdrawal, Plaintiffs claim that "the primary means of take addressed in the ITS at issue in this case (habitat destruction or degradation) is no longer considered to be unlawful take by FWS." ECF 59 at 18. Plaintiffs contend that FWS "will not be bringing (or even threatening) any related enforcement actions for violations of Section 9," and that "there is little, if any, potential take liability under the ESA for the kinds of activities at issue here." *Id.* at 15, 18. Plaintiffs go so far as to editorialize that "the government has . . . told states and coal companies in no uncertain terms that they are off the hook" for ESA take liability. *Id.* at 19.

Plaintiffs' assertions are misplaced for several reasons. Initially, Defendants did not discuss the new rule change in their motion because it: (1) was published the day before, (2) does not take effect until September 14, 2026, and thus has no bearing on harms that are currently ongoing; (3) expressly does not disturb previously issued permits or incidental take statements; and (4) has no bearing on the question to be presented on appeal—whether the 2020 BiOp and ITS complied with the ESA when FWS issued them in 2020. Indeed, it is not appropriate to draw any blanket conclusions about how the rule change will affect the Title V program in primacy states, as the analysis of whether "take" is

reasonably certain to occur is evaluated on a case-by-case basis for each permit. *See e.g.*, 91 Fed. Reg. at 43308 ("Going forward, the Services intend to review each specific situation and species' response to a proposed action to determine whether it may or may not constitute 'harm' to a species pursuant to section 3 of the ESA"). In short, the rule change is not before this Court, and to the extent that Plaintiffs invite this Court to opine on its merit, the Court must decline; this is neither the time nor the forum. Indeed, as Plaintiffs note, the rule change is the subject of separate ongoing litigation. ECF 59 at 18 n.5. As such, Plaintiffs urge this Court to deny Defendants a stay pending appeal based on the rule change at the same time they acknowledge that "circumstances may change" if, for example, their challenge to the rule change is successful. ECF 59 at 18.

This request to deny a stay based on the alleged effects of a rule change that Plaintiffs are currently asking another federal court to declare unlawful and vacate is untenable. If Plaintiffs prevail in their parallel challenge and no stay is granted here, then the take liability they say here has "evaporated" (ECF 59 at 3) remains, leaving no incidental take statement in place here to address that liability. Given this, Plaintiffs cannot treat the rule change as settled law for purposes of Defendants' stay request while simultaneously claiming it is unlawful agency action for purposes of their own lawsuits. *Cf. New Hampshire v. Maine,* 532 U.S. 742, 749-50 (2001) (judicial estoppel generally prevents parties from taking conflicting positions across cases—a doctrine intended to "protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment," thereby playing "fast and loose with the courts") (citations omitted).

Moreover, even if Plaintiffs were correct that the 2020 ITS will become legally unnecessary once the rule change takes effect (a theory that neither Plaintiffs nor Defendants could verify during the pendency of Defendants' stay request), that would defeat their opposition to a stay pending appeal. If, as Plaintiffs contend, *vacating* the 2020 ITS has no effect on coal mining, by that same token *reinstating* it has no effect either. Plaintiffs' attempt to simultaneously maintain that vacating the 2020

ITS has no effect but that reinstating it would cause Plaintiffs "substantial injury" cannot be reconciled, as further explained below. Confusingly, at the same time Plaintiffs argue that coal mining operations can continue unabated while the 2020 BiOp and ITS remain vacated due to withdrawal of the harm rule (ECF 59 at 17), they argue that "the effect of granting the requested stay [of vacatur] would be to allow Defendants to continue to rely on" SMCRA's technical assistance process and "authorize the very issues that compelled Plaintiffs (in part) to bring this case to continue." *Id.* at 24. Those things cannot both be true.

Indeed, Plaintiffs' latter argument mischaracterizes the legal framework at play and the existing state of affairs in several ways. First, neither OSM nor FWS "authorize" surface mining in primacy states as Plaintiffs incorrectly assume. Second, Plaintiffs conflate technical assistance with incidental take authorization in every instance. SMCRA's technical assistance process is not unique to ESA resources—it must be completed for *all* state permitting decisions, even those that do not implicate ESA listed species or designated critical habitat and, hence, do not require incidental take coverage. ECF 45 at 5-7; ECF 57-1 at 24-26. Plaintiffs persist in misstating that SMCRA's technical assistance process is "established and implemented through the 2020 BiOp and ITS." *Id.* at 23. From this flawed premise, Plaintiffs assume that vacating the 2020 BiOp and ITS vacates SMCRA's technical assistance process. Not so. As Defendants have made abundantly clear, SMCRA's technical assistance process exists in SMCRA's regulations independent of the 2020 BiOp. The Secretary of the Interior established SMCRA's technical assistance process in the Code of Federal Regulations in 1979. ECF 45 at 18-20; ECF 57-1 at 10-17. This Court stated expressly in its summary judgment ruling as follows: "To be clear, the Court's decision today says nothing about the validity of the relevant SMCRA regulations." ECF 53 at 34.[3] Thus, while this Court has vacated the 2020 BiOp and ITS, it has not vacated SMCRA's

---

[3] As Defendants have noted, SMCRA's regulations require regulatory programs to "provide for the coordination of review and issuance of permits for surface coal mining and reclamation operations with applicable requirements of the Endangered Species Act of 1973." 30 C.F.R. § 773.5. To that end,

technical assistance process. Here, FWS will continue to provide technical assistance to the states; however, as long as the 2020 ITS remains vacated, the ITS cannot provide incidental take coverage for state permitting actions.

Indeed, Plaintiffs do not appear to contend that the 24 primacy states are precluded from taking any new permitting actions whatsoever, even where ESA species are not implicated or incidental take is not reasonably certain to occur. That would be an entirely different—and exponentially more disruptive—situation than the one Defendants described in their stay motion. In their motion, Defendants focused on the disruption of those state permits that currently have Section 9 incidental take coverage under the 2020 ITS and those that are most likely to require incidental take coverage in the future. This focus on the states' potential Section 9 liability is consistent with the fact that it is the states—not OSM or FWS—who make permitting decisions in primacy states, and the fact that state actions are subject to Section 9's take prohibition but are not subject to the requirements of ESA Section 7(a)(2).[4]

In sum, this Court should disregard Plaintiffs' arguments regarding the coming withdrawal of the harm rule, as they are misplaced. If anything, Plaintiffs' unfounded assertions about the effects of the withdrawal logically undermine their opposition to granting a stay of the vacatur of the 2020 BiOp

---

the SMCRA regulations incorporate the touchstone requirement of ESA Section 7(a)(2), prohibiting surface mining activity that is "likely to jeopardize the continued existence of endangered or threatened species listed by the Secretary or which is likely to result in the destruction or adverse modification of designated critical habitats of such species in violation of" the ESA. *Id.* § 816.97(b); *compare with* 16 U.S.C. § 1536(a)(2). Therefore, before an SRA can approve any surface mining permit application, it must find, in writing, based on information in the application, that the "operation would not affect the continued existence of endangered or threatened species or result in destruction or adverse modification of their critical habitats, as determined under the [ESA]." 30 C.F.R. § 773.15(j).

[4] To be sure, FWS provides technical assistance in a variety of contexts pursuant to its authorities to implement and administer the ESA—including under SMCRA regulations—and courts have held that merely providing technical assistance does not "authorize, fund, or carry out" any activity under ESA Section 7, 16 U.S.C. § 1536(a)(2). *See, e.g., Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1074–75 (9th Cir. 1996).

and ITS pending appeal. Plaintiffs cannot suffer "substantial injury" by reinstating an ITS that is a legal nullity. Under no circumstances does withdrawal of the harm rule support *denying* a stay.

### B. Plaintiffs Do Not Rebut Defendants' Showing of Harm to the Public Interest

Plaintiffs proffer no evidence to rebut Defendants' evidence of ongoing and increasing harm to the public interest from vacatur of the 2020 BiOp and ITS. Nor do they dispute the existence of a declared National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 20, 2025), or that coal not only fuels the power grids that our nation depends on to meet its growing energy needs, but it is also an invaluable feedstock for the coke, iron, steel, and metals industries that supply our military. Coccodrilli Decl. ¶¶ 6, 8-11; Thompson Decl. ¶¶ 5-15. Because Defendants' evidence stands unrebutted, it should be dispositive of the public interest prong.

Plaintiffs attempt to avoid Defendants' strong evidence of harm to the public interest by attacking a straw man. Plaintiffs assert that "Defendants' motion primarily focuses on the purported burden they, primacy states, and coal mine permit applicants will face due to the loss of the unlawful incidental take coverage previously provided through the 2020 BiOp and ITS." ECF 59 at 1; *see also id.* at 21 (claiming Defendants assert harm to the public interest "in terms of money, time and energy necessarily expended in the absence of a stay"). These are mischaracterizations. As is evident from Defendants' motion and supporting declarations, administrative burdens and staffing limitations are *causes* of harm to the public interest, they are not the asserted harms themselves.[5] The harm to the

---

[5] Plaintiffs also miss the point in arguing that "federal agencies cannot use staffing shortages, budgetary limitations, or competing operational priorities as a legal justification for failing to comply with statutory mandates, court orders, or other legal obligations." ECF 59 at 22. Defendants are not asking to be excused from complying with any statutory mandate, court order, or other legal obligation. Rather, they are requesting a stay of the vacatur pending appeal to avoid harm to the public interest during that time period. Plaintiffs' further suggestion that FWS's capacity constraints are self-inflicted (ECF 59 at 22 n.6) rests on no record evidence and, in event, does not disprove the existence of harm to the public interest. The Tirpak Declaration attributes those constraints to the breadth of FWS's statutory responsibilities and the limited number of HCP specialists. Tirpak Decl. ¶¶ 16-18.

public interest is in the disruption of energy security, economic security, and national defense that would result from a reduction in coal production. ECF 57-1 at 19-23.

As Defendants have established through their unrebutted evidence, the vacatur of the 2020 ITS disrupts coal production because states and operators cannot "simply utilize" Section 10 of the ESA as Plaintiffs assert. ECF 59 at 1-2. Plaintiffs provide no factual support for their claims that Section 10 is a "viable" and "readily available" alternative to the 2020 ITS in the real world (ECF 59 at 1-2, 7, 15, 20-21), which contradict the only evidence before this Court. ECF 57-1 at 19-23. It is beyond dispute that no SRA has ever used Section 10 before in the context of surface mining,[6] and the evidence before this Court shows that suddenly requiring all state permitting actions that require incidental take coverage to undergo this process would create a logjam of unmanageable proportions that would take years to clear. ECF 57-1 at 6-8. In the meantime, coal production would undeniably be disrupted, thereby harming the public interest.

Plaintiffs' reliance on the Court's observation that Sections 7 and 10 are two statutory "paths" to incidental take coverage (ECF 59 at 20) conflates legal availability with practical availability. The stay inquiry asks what will happen during the appeal. On that question, the record evidence is one-sided. A large, complex, or controversial conservation plan under Section 10 commonly takes at least five years or more to develop and finalize. Tirpak Decl. ¶ 14. Statewide programmatic conservation plans for the 24 primacy states are therefore "likely infeasible" given current staffing, and FWS "cannot guarantee final action on a permit application within any timeframe that an applicant may request." *Id.* ¶ 24.

Plaintiffs claim Defendants do not "point to any actual curbing of coal production that has happened as a result of the Court's Order" (ECF 59 at 28-29), but Defendants have established that

---

[6] Plaintiffs' assertion, unbacked by any evidence, that using Section 10 would be "far from unprecedented" in this context is plainly incorrect. ECF 59 at 20.

mining operations are *currently* being disrupted in Virginia, West Virginia, and Kentucky due to regulatory uncertainty caused by the vacatur of the 2020 BiOp and ITS. ECF 57-1 at 8. OSM attests that, in Virginia, there are two new permit applications, one application for additional acreage clearance, and four renewal permit applications for which the regulatory authority had documented the need for incidental take coverage under the 2020 BiOp and ITS but for which coverage had not been issued when the Court issued its order. Adams Decl. ¶ 43. These permits are now indefinitely delayed because of the vacatur of the 2020 BiOp and ITS. West Virginia has notified OSM that at least seven urgent permitting actions currently require incidental take coverage before a permit can be issued. *Id.* ¶ 30. Kentucky informs OSM that it has at least five urgent permitting actions that currently require incidental take coverage for compliance with SMCRA and the ESA. *Id.* ¶ 36.

Plaintiffs assert, again without evidentiary support, that Defendants' claims of significant regulatory confusion and uncertainty are "significantly exaggerated" and "readily and lawfully surmountable." ECF 59 at 13. Plaintiffs go so far as to claim that the vacatur of the 2020 BiOp and ITS "provides regulatory predictability for OSMRE, primacy states, and coal mine permittees." ECF 59 at 4. Attorney argument is not evidence. Plaintiffs offer no declaration from any SRA or mining operator to set against the sworn statements of the federal and state officials who administer the programs impacted by vacatur of the 2020 BiOp and ITS. Insofar as Plaintiffs contend that the withdrawal of the harm rule eliminates regulatory uncertainty, that is misplaced, as explained above. Even once the harm rule is withdrawn, SRAs and mining operators will still be forced to choose between denying, delaying, or foregoing new permit applications (as well as renewals and revisions of existing permits) that require ESA incidental take coverage or proceeding without coverage at the risk of suit and potential liability should any incidental take be deemed unlawful. Adams Decl. ¶ 25.

Plaintiffs also assert that the balance of equities and public interest factors are generally considered to tip in favor of listed species (ECF 59 at 26), but as noted above and further explained

16

below, Plaintiffs prevailed on a facial challenge to the 2020 BiOp and ITS. As such, there was no factual determination here that the 2020 BiOp's no-jeopardy determination is invalid as applied to any specific project, species, or designated critical habitat. It follows, therefore, that no listed species or designated critical habitats are likely to be irreparably harmed if the 2020 BiOp and ITS are left in place while Defendants pursue their appeal. Indeed, this Court has retained the 2020 BiOp's no jeopardy determination as it applies to federal permitting decisions and existing state permitting decisions. Because the Court's summary judgment ruling rested on facial flaws, not any finding that surface mining under the 2020 BiOp is jeopardizing identified species, Plaintiffs err in arguing that the public interest lies with vacatur pending appeal. As Defendants have explained, under the status quo, SMCRA's regulations include a comprehensive suite of structural checks and safeguards that protect ESA species. ECF 45 at 3-5; ECF 57-1 at 16-17. Vacating the 2020 BiOp and ITS creates uncertainty that is not justified by any finding of jeopardy to any specific species from any specific project. Plaintiffs' cited authorities are unavailing. The Supreme Court has held repeatedly that environmental statutes neither displace traditional equitable principles nor create a presumption of irreparable injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010). And *Tennessee Valley Authority v. Hill* addressed a federal project that would have extinguished a species outright, which is a far cry from this case. 437 U.S. 153, 171-72 (1978).

Plaintiffs also argue that the Court should deny Defendants a stay pending appeal because "[t]he public interest lies in compliance with and enforcement of the congressional mandates in the ESA" (ECF 59 at 26), but this assumes that Plaintiffs are right on the merits of their claims. Defendants maintain that the 2020 BiOp and ITS fully meet the requirements of the ESA. The public interest prong cannot automatically weigh against granting the government a stay pending appeal any time a court has ruled against it, as Plaintiffs would have it. Plaintiffs cannot rebut Defendants' evidence of the harm to the public interest by contesting their likelihood of success on the merits.

Contrary to Plaintiffs' accusation, Defendants do not deny the existence of any public interest in "ecosystem resilience, endangered species persistence, and compliance with our nation's laws." ECF 59 at 4. Defendants' position is that reinstating the 2020 BiOp and ITS pending appeal does not impair those interests because the 2020 BiOp and ITS are lawfully based on "the best scientific and commercial data available" as ESA Section 7(a)(2) requires and that they represent reasoned decision making as required by the APA's highly deferential "arbitrary and capricious" standard of review. Plaintiffs assume—but cannot show—that retaining the 2020 BiOp and ITS while Defendants pursue their appeal will imperil endangered species persistence.

### C. Plaintiffs' Claim of "Substantial Injury" is Unfounded

Plaintiffs' claim that they will be "substantially injure[d]" if the 2020 BiOp and ITS are reinstated for the length of time it will take Defendants to pursue their appeal is neither supported by factual evidence nor persuasive. ECF 59 at 4; *contra Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 12 (2008) (court of appeals "was wrong" to uphold a preliminary injunction imposing restrictions on the Navy's sonar training where "'the record contain[ed] no evidence that marine mammals have been harmed' by the Navy's exercises" (citation omitted); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. CV 16-1534 (JEB), 2021 WL 2036662 (D.D.C. May 21, 2021) (plaintiffs failed to make a successful showing of irreparable harm based on the threat of an oil spill where "[n]ot only d[id] they fail to engage with [the defendant-intervenor's] evidence that a large, damaging, irremediable spill is unlikely, they never actually point[ed] to evidence suggesting that such an incident is likely").

As Defendants have noted, Plaintiffs themselves previously stayed this case indeterminately, allowing the 2020 BiOp and ITS to remain in place for years after their complaint was filed. *Id.* at 24. Plaintiffs attempt to reconcile their delaying of the case with their newfound urgency by arguing that their stay of the litigation proved beneficial to them—this Court ultimately held that *Zeldin* controlled this case and compelled a ruling in their favor. ECF 59 at 25. That misses the point. The point is that

18

Plaintiffs' lack of urgency and past openness to a lengthy stay of the case under the status quo belies their newfound claims that retaining the status quo while Defendants pursue their appeal would now lead to "irreversible harm to endangered species" and cause Plaintiffs "substantial injury." ECF 59 at 1, 4. Plaintiffs presumably would not say that they inflicted "irreversible harm to endangered species" by obtaining an eight-month stay while the 2020 BiOp and ITS remained in effect. The Court should discount Plaintiffs' rhetoric, given that their own litigation conduct belies their position. C*f. Fund for Animals v. Frizzell,* 530 F.2d 982, 987 (D.C. Cir. 1975).

No facts have changed since Plaintiffs themselves stayed the case, other than the vacatur of the 2020 BiOp and ITS. Plaintiffs have no response to the fact that there is no evidence before this Court showing that any permit recipient has exceeded the amount of incidental take quantified during SMCRA's codified technical assistance process in the near half-century the process has been in place. Nor do Plaintiffs dispute that this Court made no factual findings and identified no record evidence showing that vacating the 2020 BiOp and ITS, effective immediately, would be within the public interest by avoiding a likelihood of jeopardy to any particular listed species or designated critical habitat from any particular surface mining operation. ECF 57-1 at 23. Defendants emphasize that this Court granted Plaintiffs summary judgment on a facial challenge to the 2020 BiOp and ITS, not based on any factual finding of "harm to endangered species" in any specific instance. *Compare* ECF 59 at 1 *with id.* at 25 ("the key issue in this case [is] the facial validity of the 2020 BiOp and ITS") *and* ECF 13 (Am. Compl. ¶¶ 11-12, Count 3 alleging that "[t]he 2020 BiOp is facially invalid" and seeking "declaratory relief that the 2020 BiOp is facially invalid").

## Conclusion

For all the reasons set forth above and in Defendants' motion for a stay pending appeal, the Court should stay its May 29, 2026 Memorandum Opinion and Order vacating the 2020 BiOp and ITS (ECF Nos. 53 & 54) pending resolution of all appellate proceedings.

Dated: August 5, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/ *Robert P. Williams*
ROBERT P. WILLIAMS
Sr. Trial Attorney (SBN 474730 (DC))
U.S. Department of Justice
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 532-3101
Email: robert.p.williams@usdoj.gov

**Attorneys for Defendants**