**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, *et al.*,<br><br>*Defendants*. | Civil Action No. 23 - 3343 (SLS)<br>Judge Sparkle L. Sooknanan |

**<u>MEMORANDUM OPINION</u>**

On May 29, 2026, this Court vacated and set aside a 2020 Biological Opinion (BiOp) and Incidental Take Statement (ITS) issued by the U.S. Fish and Wildlife Service, finding that they failed to comply with the Endangered Species Act of 1973. *See Ctr. for Biological Diversity v. U.S. Off. of Surface Mining Reclamation & Enf't* (*OSMRE*), No. 23-cv-3343, 2026 WL 1506550, at *1 (D.D.C. May 29, 2026); Order, ECF No. 54. On July 15, 2025, the Defendants appealed the Court's decision, ECF No. 56, and they now move for a stay pending appeal, ECF No. 57. For the reasons below, the Court denies the Defendants' motion.

**LEGAL STANDARD**

"A stay pending appeal is an extraordinary remedy." *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). "It is 'an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). "It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the

circumstances of the particular case." *Nken*, 556 U.S. at 433 (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

Courts must consider four factors in connection with a stay motion: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). For the first factor, the D.C. Circuit has said that the chance of success on the merits must be "substantial." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Failure to satisfy this standard is "an arguably fatal flaw for a stay application." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam). For the second factor, "[w]here there is a low likelihood of success on the merits, a movant must show a proportionally greater irreparable injury[.]" *M.M.V.*, 459 F. Supp. 3d at 4 (citing *Cuomo*, 772 F.2d at 974). And the final two factors "merge when the Government is the opposing party." *Id.* (quoting *Nken*, 556 U.S. at 435).

## DISCUSSION

The Defendants do not satisfy the high burden needed for a stay pending appeal. The Court is not convinced that they are likely to succeed on the merits, that they will be irreparably injured absent a stay, or that the balance of equities favors a stay.

### A. Likelihood of Success on the Merits

For all the reasons explained in the Court's previous Memorandum Opinion, ECF No. 53, the Defendants cannot show a substantial likelihood of success on the merits. In urging the Court to grant a stay, the Defendants simply recycle arguments advanced in their prior briefing. *Compare*

Defs.' Mem. in support of Mot. to Stay (Mot.), ECF No. 57-1; Defs.' Reply in support of Mot. to Stay (Reply), ECF No. 60, *with* Defs.' Combined Opp'n to Pls.' Mot. Summ. J. and Defs.' Cross-Mot for Summ. J. (Summ. J. Cross-Mot.), ECF No. 45; Defs.' Reply in support of Defs.' Cross-Mot for Summ. J. (Summ. J. Reply), ECF No. 50.

In particular, the Defendants take issue with the Court's reliance on *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026). They argue that *Zeldin* does not control. But the Court already considered and rejected that argument. The Defendants also reiterate that two members of the *Zeldin* panel authored concurrences offering different rationales. But as the Court explained, it "f[ound] both concurrences persuasive and s[aw] no compelling reason to disregard them." *OSMRE*, 2026 WL 1506550, at *14, n.4. The Defendants argue that the Court should have instead adopted the rationale of the sole *Zeldin* dissenter. *See* Reply 5–6 ("[W]hile this Court found Judge Pan's and Judge Wilkins' separate concurrences persuasive, the D.C. Circuit may not be so persuaded due to the highly fractured nature of the panel's decision and Judge Henderson's strong dissent. . . . The D.C. Circuit could agree with Defendants and Judge Henderson that SMCRA's structural safeguards are sufficiently protective[.]"). But it would make no sense to adopt the reasoning of a dissenting opinion that could not support the Circuit's "bottomline result." *Ramos v. Louisiana*, 590 U.S. 83, 125 no.6 (2020) (Kavanaugh, J., concurring). The Court acknowledges that the degree of deference owed to a fractured panel decision is an "open question" in this Circuit. *J.G.G. v. Trump*, 2025 WL 3198891, at *3 (D.C. Cir. Nov. 14, 2025).[1] But whether or not the Court is bound by the *Zeldin* concurrences, it finds them persuasive.

[1] Generally, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds" that "explain the result." *Marks v. United States*, 430 U.S. 188, 193 (1977) (cleaned up). Thus, "when one of the opinions in a splintered Supreme Court decision has adopted a legal standard that would produce results with which a majority of the Court in that case necessarily would agree, that opinion controls." *United*

The Defendants also argue that the Court "abused its discretion in vacating the 2020 BiOp and ITS in all 24 primacy states nationwide" instead of the states implicated in the Plaintiffs' Amended Complaint. Mot. 9. But as the D.C. Circuit has aptly explained:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court. On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up). Consistent with this principle, the D.C. Circuit has permitted partial vacatur of agency actions only when an underlying "regulatory text" is either plainly divisible or "invalid as applied to one state of facts and yet valid as applied to another." *NRDC v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)). Faithful to the Circuit's instructions, the Court carefully crafted a limited vacatur order in this case. *OSMRE*, 2026 WL 1506550, at *15–16. But it is not appropriate to further limit the "programmatic relief" guaranteed by the APA, *Nat'l Min. Ass'n*, 145 F.3d at 1409 (cleaned up), beyond those situations where "valid applications" of the 2020 BiOP and ITS "can be separated from invalid ones," *Wheeler*, 955 F.3d at 82 (cleaned up). Indeed, the Defendants did not request that relief at the merits stage. *See* Summ. J. Reply 15 ("[I]f the Court determines that vacatur is warranted, it

---

*States v. Duvall*, 740 F.3d 604, 610 (D.C. Cir. 2013) (Kavanaugh, J., concurring in denial of reh'g *en banc*). There is a dispute about whether this rule extends to decisions of the federal courts of appeals. *Contrast Binderup v. Att'y Gen.*, 836 F.3d 336, 356 (3d Cir. 2016) (*en banc*) (holding that the *Marks* rule extends to decisions of the U.S. Court of Appeals), *with United States v. Fischer*, 64 F.4th 329, 341 n.5 (D.C. Cir. 2023) (opinion of Pan, J.) (suggesting the *Marks* rule may not apply to decisions of federal circuit courts), *judgment vacated sub nom. Miller v. United States*, 144 S. Ct. 2706 (2024).

should be narrowly tailored to just those portions of the 2020 BiOp and ITS that concern OSM's oversight of states with primacy."). And they do not now explain why that relief would make them more likely to succeed on the merits.

Instead, the Defendants largely quarrel with the D.C. Circuit's binding jurisprudence on this subject—suggesting that APA remedies should be restrained by certain limitations governing "equitable relief." Mot. 9. But "there is good reason to think that Congress did not intend to incorporate" all "'background equitable principles' into the APA." *Make the Rd. New York v. Noem* (*Make the Rd.*), 2025 WL 3563313, at *35 (D.C. Cir. Nov. 22, 2025) (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring)). "The text of § 706(2) directs federal courts to vacate agency actions in the same way that appellate courts vacate the judgments of trial courts." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring). Thus, the APA "empower[s] the judiciary to act directly against the challenged agency action" and "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Make the Rd.*, 2025 WL 3563313, at *35, 37 (cleaned up). Accordingly, the Defendants do not establish that the Court erred on this basis.

For these reasons and those provided in the Court's Memorandum Opinion, ECF No. 53, the Defendants cannot show a substantial likelihood of success on the merits.

**B. Irreparable Injury and Remaining Factors**

Given the low likelihood of success on the merits, the Defendants "must show a proportionally greater irreparable injury" to justify a stay. *M.M.V.*, 459 F. Supp. 3d at 4 (citing *Cuomo*, 772 F.2d at 974). They plainly have not done so. In fact, as the Plaintiffs point out, other than in the legal standard section, the word "irreparable" does not even appear in the Defendants' motion. *See* Mot. The Defendants explain this oversight by claiming that the irreparable injury and

public interest factors merge when the Government is involved. Reply 9 ("To the extent that Plaintiffs claim Defendants have not addressed the irreparable harm prong, that is incorrect, because the irreparable harm and public interest prongs 'merge when the Government is' a party to the stay application." (citation omitted)). The Defendants are wrong.

Although the balance of the equities and public interest "merge when the Government is [an] opposing party," *Nken*, 556 U.S. at 435, the Court finds no support for the proposition that the Government need not show irreparable harm when it seeks a stay. Indeed, "irreparable injury is the *sine qua non*" and "most critical" factor in the stay inquiry. *Ctr. for Biological Diversity v. Regan*, No. 21-cv-119, 2024 WL 1740078, at *4 (D.D.C. Apr. 23, 2024); *Nken*, 556 U.S. at 434. The Government, like any other party, has the "burden of showing that it will face irreparable injury" when seeking a stay. *Make the Rd.*, 2025 WL 3563313, at *31. In this inquiry:

> The key word . . . is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Here, the Defendants claim that the Court's vacatur has caused harm to the public interest. They say that the Court's Order "prospectively will have a substantial impact" on ongoing permit applications and renewals under the Surface Mining Control and Reclamation Act "starting within six months and expanding over the next two to five years." Coccodrilli Decl. ¶ 4, ECF No. 57-4. And they claim that the Court's Order "has the potential to disrupt and delay any new permits, or mandatory renewals, or and revisions that require ESA coverage, which causes significant cost and operational impacts to access new coal seams." *Id.*; *see also* Adams Decl. ¶¶ 19, 21, ECF No. 57-3. But the Defendants do not take the next step of explaining why these harms are

irreparable. Even if later "corrective relief" for these purported administrative burdens "expanding over the next two to five years" would be unavailable by the time the D.C. Circuit resolves the appeal in this case—a dubious proposition, at best—harms to "money, time and energy" of regulated parties do not themselves justify a stay. *Wis. Gas*, 758 F.2d at 674 (citation omitted); Coccodrilli Decl. ¶ 4.

The Defendants resist this characterization of their claimed injuries, arguing instead that the "administrative burdens and [the agency's] staffing limitations are *causes* of harm," namely "the disruption of energy security, economic security, and national defense that would result from a reduction in coal production." *Id.* at 14–15 (emphasis in original). They claim that "[a]ny delay in permitting decisions correspondingly delays the availability of an otherwise reliable domestic supply of energy resources that is necessary to meet the nation's expanding energy needs, as well as for time-sensitive national security applications." Mot. 21. The Court is skeptical that the Defendants can circumvent well-established jurisprudence recognizing that "administrative burdens and staffing limitations" fail to constitute irreparable harms in this manner. Reply 14; *see Wis. Gas*, 758 F.2d at 674. But their arguments do not carry the day in any event.

The Defendants stress that since the American economy is dependent on the electrical grid and natural resources, impacts to the coal permitting process may harm jobs and prices for various goods and services. Mot 20. And they emphasize that various domestic military installations, including "Naval Station Norfolk, Fort Meade, Marine Corps Base Quantico, and Wright-Patterson Air Force Base," rely on the "the commercial electric distribution system," and a "failure of the commercial grid serving these sites directly threatens [the] ability to command forces globally, execute cyber defense operations, and process national-level intelligence." *Id.* at 21.

Merely throwing around phrases like "national security" or "energy emergency" will not get the Defendants the stay that they desire.

Of course, the Court does not doubt that a complete eradication of the Nation's coal supply or the "failure of the commercial [electrical] grid" would pose grave harms to national security (and indeed, much more). *Id.* But the Defendants have no basis to assert that such a catastrophic result is imminent. Indeed, it has been over two months since the Court entered its Order, and our energy supply, mineral wealth, and national security apparatus all seem to be functioning. After all, as the Defendants concede, our existing coal "stockpile buffer insulates power supply against physical shortfalls." Coccodrilli Decl. ¶ 18. At bottom, the Defendants only claim irreparable harm by suggesting that the Government "cannot afford to chance whether [they] might be able to recover in the future" from any potential "reduction in coal production." Reply 9. Such speculation does not amount to irreparable harm. "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wisc. Gas*, 758 F.2d at 674 (emphasis in original).

Stepping back, the Plaintiffs provide another reason why the Defendants' speculation about coal supply does not warrant a stay. On July 14, 2026, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service "issued a final rule rescinding the definition of 'harm' under the ESA" and "remov[ing] from the definition" of take "'significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.'" Pl.'s Opp'n 2, ECF. No. 59 (citing Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43300 (July 14, 2026) (to be codified at 50 C.F.R. pts. 17, 222)). Per the interpretation endorsed by the regulation, "for any action to be considered a prohibited 'take' it must be the result of an

'affirmative act . . . directed immediately and intentionally against a particular animal.'" *Id.* at 19 (citation omitted). The Plaintiffs explain the upshot of this:

> [T]he effect of that change is that, unless and until the . . . rulemaking is found unlawful and vacated by a federal court or a new interpretation of "harm" is promulgated, many—if not all—of the incidental take coverage-based complications set forth by Defendants through their motion and supporting declarations will almost certainly fail to materialize during the pendency of Defendants' appeal. This is because, as detailed in the 2020 BiOp as well as other record documents, almost all of the "harm" leading to take related to coal mine permitting concerns effects on listed species from habitat destruction and modification.

*Id.* at 3.

The Defendants urge the Court to disregard this change—which will go into effect next month—without explaining how existing coal mining would constitute a "take" under the rule and thus be impacted by the Court's decision at all during the appeal. *See* Reply 10–12. Rather, they predominantly ask the Court to ignore "the rule change" because it "is the subject of separate ongoing litigation" that might prevail. Reply 11. But courts do not regularly presume that federal regulations will be found unlawful, as the Defendants seem to suggest. And it is the Defendants' burden to show that there is a "clear and present need for equitable relief to prevent irreparable harm" now, not at some later date. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (cleaned up). So they may not rely on a potential court ruling in another case to meet that burden. *See Nken*, 556 U.S. at 434.

Curiously, the Defendants attempt to use the new rule affirmatively, arguing that "even if Plaintiffs were correct that the 2020 ITS will become legally unnecessary once the rule change takes effect," then "that would defeat their opposition to a stay pending appeal." Reply 11. Their argument goes like this: "If, as Plaintiffs contend, *vacating* the 2020 ITS has no effect on coal mining, by that same token *reinstating* it has no effect either. Plaintiffs' attempt to simultaneously maintain that vacating the 2020 ITS has no effect but that reinstating it would cause Plaintiffs

'substantial injury' cannot be reconciled." *Id.* at 11–12. This is a fair point about the balance of the equities. But the fact remains that "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433–34 (cleaned up). So even assuming that the Court's Order harms neither the Plaintiffs nor the Defendants, it does not mean that a stay is warranted. If the moving party fails to show irreparable harm, the burden does not shift to the opposing party to show some countermanding harm. Rather, "[a] stay is an intrusion into the ordinary processes of administration and judicial review" that requires an affirmative showing by the movant. *Id.* at 427 (cleaned up).

Ultimately, the Defendants have failed to show irreparable harm. And even if their purported, speculative harms could be sufficient, the upcoming rule change suggests a strong "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (cleaned up).

As to the remaining factors, the balance of equities and the public interest commonly "merge" when the Government is a party. *See Nken*, 556 U.S. at 435. And "the 'perpetuation of unlawful agency action'" by retaining the unlawful portions of the 2020 BiOp and ITS "does not serve the 'public interest.'" *League of Women Voters v. DHS*, No. 25-cv-3501, 2026 WL 1972055, at *7 (D.D.C. July 8, 2026) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Thus, none of the remaining factors support a stay.

* * *

In sum, all the factors weigh against granting a stay. The Court thus declines to stay its May 29, 2026, Order. ECF No. 54.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion for Stay Pending Appeal, ECF No. 57.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: August 19, 2026